```
             IN THE UNITED STATES DISTRICT COURT FOR THE
                    EASTERN DISTRICT OF VIRGINIA
                        Alexandria Division

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )
                                   )
        v.                         )    CRIMINAL ACTION
                                   )
HENRY OBILO,                       )    1:09-cr-47
                                   )
                    Defendant.     )
_____)


                        REPORTER'S TRANSCRIPT

                            JURY TRIAL

                            VOLUME 1

                    Tuesday, April 7, 2009


                              ---


BEFORE:        THE HONORABLE T.S. ELLIS, III
               Presiding

APPEARANCES:   UNITED STATES ATTORNEY'S OFFICE
               BY:  JOHN EISINGER, AUSA
                    TYLER NEWBY, AUSA

                  For the Government

               JOHN IWEANOGE, ESQ.

                  For the Defendant


                              ---


               MICHAEL A. RODRIQUEZ, RPR/CM/RMR
                    Official Court Reporter
               USDC, Eastern District of Virginia
                       Alexandria Division
```

<u>INDEX</u>

PRELIMINARY MATTERS                                          3

JURY VOIR DIRE/JURY SELECTION                               15

PRELIMINARY JURY INSTRUCTIONS                               91

OPENING STATEMENT BY THE GOVERNMENT                        100

OPENING STATEMENT BY THE DEFENDANT                         104

| WITNESS (Government) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Paula Gipson | 111 | 130 | 161 | --- |
| George Frazier | 162 | 170 | --- | --- |
| Louis A. Fraser | 173 | --- | --- | --- |
| Ezenwa Onyedebelu | 179 | 193 | --- | --- |

(Court recessed)

---

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

PROCEEDINGS

1

2

3        (Court called to order at 10:17 a.m. in USA v.

4  Obilo.)

5        THE COURT:  All right.  Good morning.

6        You may call the trial.

7        THE CLERK:  Case Number 09 Criminal 47, United

8  States of America versus Henry Obilo.

9        Will counsel please state your appearance for

10  the record.

11        ATTORNEY EISINGER:  Good morning, your Honor.

12        John Eisinger and Tyler Newby representing the

13  United States.

14        THE COURT:  All right.  Good morning to both of

15  you.

16        Mr. Iweanoge, you're here for Mr. Obilo.

17        ATTORNEY IWEANOGE:  Yes.  Good morning.

18        Mr. Obilo is present and standing up to my

19  left, Judge.

20        THE COURT:  Good morning, Mr. Obilo.

21        THE DEFENDANT:  Good morning.

22        THE COURT:  You may be seated.

23                PRELIMINARY MATTERS

24        THE COURT:  All right.  This matter is before

25  the Court for trial.  I take it both parties are prepared to

1    proceed to trial.

2                The Court will conduct all of the voir dire.  I

3    think Mr. Iweanoge is familiar with the Court's practice in

4    this regard because we just went through it in a trial not

5    long ago.

6                But you had the opportunity to participate in

7    three ways:  First, by submitting any suggested voir dire

8    that you wish; and secondly, by suggesting additional

9    questions for the Court to ask once a prospective juror who

10   has been questioned at the bench has returned to his or her

11   seat in the courtroom; then the final way in which you may

12   participate is at the conclusion of all the voir dire, the

13   Court will ask counsel whether they have any additional voir

14   dire.

15               Then you will -- we're going to select -- how

16   long -- we're going to select, I think, 13 jurors and one

17   alternate.

18               Let me ask, once again, Mr. Eisinger, how many

19   witnesses do you have?

20               ATTORNEY EISINGER:  We have ten witnesses, your

21   Honor.

22               THE COURT:  And how long do you think your

23   case-in-chief will take?

24               ATTORNEY EISINGER:  Approximately a day, maybe

25   a little bit more than one day.

1          THE COURT:  These are short witnesses?

2          ATTORNEY EISINGER:  Most of them are very

3     short, your Honor.

4          THE COURT:  Do you have a different view about

5     how long this matter might last, Mr. Iweanoge?

6          ATTORNEY IWEANOGE:  No, Judge.  At the most, I

7     believe we should be done in two days.

8          THE COURT:  All right.  That's what I will tell

9     the panel when I convene them.

10          So we'll pick 13 jurors and one alternate.

11     Maybe out of an abundance of caution I'll pick

12     two alternates, and you'll each have an additional

13     strike.

14          Mr. Iweanoge, that means you'll have 11

15     strikes.

16          Mr. Eisinger, you'll have seven.

17          When I reconvene now, I take it the parties

18     wish the rule to be invoked; is that right?

19          ATTORNEY IWEANOGE:  Yes, Judge.

20          THE COURT:  So if there are any witnesses

21     present in the courtroom, when we reconvene, they should be

22     outside the courtroom.

23          Anything else to be addressed before we have

24     the jury brought in?

25          ATTORNEY EISINGER:  We have two preliminary

1    matters, your Honor.

2                    THE COURT:  All right.

3                    ATTORNEY EISINGER:  The first is that we intend

4    to it play a number of calls through SpoofCard.com.  We

5    would ask that we be able to play those prior to them being

6    formally admitted by our case agent at the end.

7                    THE COURT:  Have you heard these, Mr. Iweanoge?

8                    ATTORNEY IWEANOGE:  Yes, Judge.  I've heard it.

9    And Mr. Eisinger discussed it with me yesterday, and I told

10   him that I don't have any objections to it, Judge.

11                   THE COURT:  All right.  Then you may do so

12   without objection.

13                   Anything else?

14                   ATTORNEY EISINGER:  The second is that we have

15   a summary chart, and we would like to be able to have that

16   on an easel for the jury when it comes time for the case

17   agent to testify.  It's just a summary of the phone calls

18   that we'll hear through SpoofCard.

19                   THE COURT:  This is a summary under 1001?  Is

20   that with you're suggesting?

21                   ATTORNEY EISINGER:  A second, your Honor.

22                   Yes, that's correct, on 1001.

23                   THE COURT:  And do you intend to offer it, or

24   do you just intend to have it for demonstrative purposes?

25                   ATTORNEY EISINGER:  We intend to offer it.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    However, if necessary, we'll just use it for demonstrative

2    purposes.

3              THE COURT:  And you've shown this to

4    Mr. Iweanoge.

5              When you want to display it, Mr. Eisinger?

6              ATTORNEY EISINGER:  This would be during the

7    testimony of the case agent, which will probably be the last

8    witness.

9              THE COURT:  Well, you may certainly use

10   something like that for a summary to summarize his

11   testimony.  Whether or not it comes in under 1011 (sic),

12   I'll await Mr. Iweanoge's review of it.

13             But, of course, he can use a chart or anything.

14   He could write in those things, if he wishes to.

15             But if you have a chart prepared and it meets

16   the standards of 1011 (sic), I'll consider it.  Mr. Iweanoge

17   should have access to it so that he can address any problems

18   he might have with it or he'd indicated that he has no

19   objection.  But I'll give him an opportunity to do that.

20             Anything else to be done in this matter before

21   I have the jury brought in?

22             ATTORNEY EISINGER:  No, your Honor.

23             ATTORNEY IWEANOGE:  No, Judge.

24             THE COURT:  All right.  The Court stands in

25   recess.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1        How long will it take you, Mr. Wood?

2        About ten minutes?

3        THE MARSHAL:  Yes, sir.

4        THE COURT:  Ten minutes.

5        (Court recessed at 10:25 a.m.)

6        (Court called to order at 10:38 a.m.)

7        (Jury panel present.)

8        THE COURT:  Good morning, ladies and gentlemen.

9        My name is Tim Ellis.  I will be the judge

10   presiding over the trial today, which is styled United

11   States against Henry Obilo.

12        I want to take this opportunity at the outset

13   to thank each of you for your service as jurors.  Nothing

14   you do as an American citizen is any more important than

15   jury service.  Together with voting, it's one of the

16   two cardinal duties each of us has as an American, and it is

17   vitally important that you fulfill that duty, that

18   obligation.

19        I've had the occasion to live and observe the

20   criminal justice and civil justice systems in other

21   countries, in Europe and in Latin America.  And there they

22   do not use juries as we do here.  That experience has

23   convinced me, confirmed with me the strong conviction that

24   juries play a vital role in the preservation of our rights

25   and liberties as Americans.

1          Now, this matter, as I told you, is United

2     States against Obilo.  It is in the nature of a criminal

3     matter.  And at the outset, I want to hasten to instruct you

4     that the charge against this defendant -- what that is, but

5     to tell you that he has pled not guilty to that charge and,

6     therefore, must be presumed by you to be innocent of that

7     charge unless and until the jury find otherwise.

8          Before I begin to do that, though, we're going

9     to call the roll and have an oath administered because I'm

10    going to ask you a series of questions after we take the

11    roll.

12         So the deputy clerk may call the roll.

13         THE CLERK:  Ladies and gentlemen, as I call

14    your name, please stand, answer "Present," and remain

15    standing until the next name is called.

16         Juror No. 1, Utay Ang?

17         (No response.)

18         THE CLERK:  Juror No. 1, Utay Ang?

19         THE COURT.  All right.  Show cause.

20         THE CLERK:  Juror No. 2, James Berman?

21         PROSPECTIVE JUROR NO. 2:  Present.

22         THE CLERK:  Juror No. 3, Michael Bitzer?

23         PROSPECTIVE JUROR NO. 3:  Present.

24         THE COURT:  You may be seated after the next

25    name is called.  Thank you.

1           The reason I'm doing that is twofold.

2           First, to ensure that of you are here who are

3    supposed to be here.  And you'll hear me say "Show cause"

4    occasionally, which means that those who are not here, if

5    they have not received a prior excuse, will have to appear

6    before this Court and show cause why they shouldn't be held

7    in contempt of court for not appearing.

8           The second reason that I would like for you to

9    stand when we your name is called is, to give counsel an

10   opportunity to match a name with a face on their list.

11          All right.  Mr. Bitzer, thank you, sir.  You

12   may be seated.

13          Next?

14          THE CLERK:  Juror No. 4, Michael Black?

15          PROSPECTIVE JUROR NO. 4:  Present.

16          THE CLERK:  Juror No. 5, William Brakefield?

17          PROSPECTIVE JUROR NO. 5:  Present.

18          THE CLERK:  Juror No. 6, Michael Brawner?

19          PROSPECTIVE JUROR NO. 6:  Present.

20          THE CLERK:  Juror No. 7, Theresa Breitenhaller?

21          PROSPECTIVE JUROR NO. 7:  Present.

22          THE CLERK:  Juror No. 8, James Brooks?

23          PROSPECTIVE JUROR NO. 8:  Present.

24          THE CLERK:  Juror No. 9, Catherine Brunson?

25          (No response.)

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1        THE CLERK:  Juror No. 9, Catherine Brunson?

2        THE COURT:  Show cause.

3        THE CLERK:  Juror No. 10, Charles Burton?

4        (No response.)

5        THE CLERK:  Juror No. 10, Charles Burton?

6        THE COURT:  Show cause.

7        THE CLERK:  Juror No. 11, Gonzalo Cebas?

8        PROSPECTIVE JUROR NO. 11:  Yes.

9        THE CLERK:  Juror No. 12, John Childs?

10        PROSPECTIVE JUROR NO. 12:  Present.

11        THE CLERK:  Juror No. 13, Kathy Davis (sic)?

12        PROSPECTIVE JUROR NO. 13:  Kati Davie?

13        THE COURT:  Davie, yes.  Thank you, Ms. Davie.

14        THE CLERK:  Juror No. 14, Susan Dove?

15        PROSPECTIVE JUROR NO. 14:  Present.

16        THE CLERK:  Juror No. 15, Michael Foushay?

17        PROSPECTIVE JUROR NO. 15:  Here.

18        THE CLERK:  Juror No. 16, Patricia Fox?

19        PROSPECTIVE JUROR NO. 16:  Present.

20        THE CLERK:  Juror No. 17, Victor Gordeuk?

21        PROSPECTIVE JUROR NO. 17:  Present.

22        THE CLERK:  Juror No. 18, Michael Goretsas?

23        PROSPECTIVE JUROR NO. 18:  Present.

24        THE CLERK:  Juror No. 19, Mark Gunderman?

25        PROSPECTIVE JUROR NO. 19:  Present.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1           THE CLERK:  Juror No. 20, George Guthridge?

2           (No response.)

3           THE CLERK:  Juror No. 20, George Guthridge?

4           THE COURT:  Show cause.

5           THE CLERK:  Juror No. 21, Martin Hester?

6           PROSPECTIVE JUROR NO. 21:  Present.

7           THE CLERK:  Juror No. 22, Peter Joudry?

8           (No response.)

9           THE CLERK:  Juror No. 22, Peter Joudry?

10          THE COURT:  Joudry, J-o-u-d-r-y.

11          Show cause.

12          THE CLERK:  Juror No. 23, Donnerell Dudson?

13          PROSPECTIVE JUROR NO. 23:  Present.

14          THE CLERK:  Juror No. 24, Michael Kalich?

15          PROSPECTIVE JUROR NO. 24:  Present.

16          THE COURT:  Did we pronounce that correctly?

17          PROSPECTIVE JUROR NO. 24:  Kalich

18     (pronouncing).

19          THE COURT:  Kalich.  Thank you, sir.

20          THE CLERK:  Juror No. 25, James Kelly?

21          PROSPECTIVE JUROR NO. 25:  Present.

22          THE CLERK:  Juror No. 26, Olga Lorincz-Reck?

23          PROSPECTIVE JUROR NO. 26:  Present.

24          THE COURT:  Did we pronounce that correctly?

25          PROSPECTIVE JUROR NO. 26:  Lorincz-Reck

```
1    (pronouncing).

2              THE COURT:  Thank you.

3              THE CLERK:  Juror No. 27, George Mashood.

4              PROSPECTIVE JUROR NO. 27:  Present.

5              THE CLERK:  Juror No. 28, Tram McCarthy?

6              PROSPECTIVE JUROR NO. 28:  Present.

7              THE CLERK:  Juror No. 29, Steve McGough?

8              PROSPECTIVE JUROR NO. 29:  Present.

9              THE CLERK:  Juror No. 30, Richard Milland?

10             PROSPECTIVE JUROR NO. 30:  Present.

11             THE CLERK:  Juror No. 31, Sung-Hee Miller?

12             PROSPECTIVE JUROR NO. 31:  Present.

13             THE CLERK:  Juror No. 32, Meshback Muffee?

14             PROSPECTIVE JUROR NO. 32:  Present.

15             THE CLERK:  Juror No. 33, Robin Mumpower?

16             PROSPECTIVE JUROR NO. 33:  Present.

17             THE CLERK:  Juror No. 34, Celina Monroe?

18             PROSPECTIVE JUROR NO. 34:  Present.

19             THE CLERK:  Juror No. 35, Brenton Nickens?

20             (No response.)

21             THE CLERK:  Juror No. 35, Brendon Nickens?

22             THE COURT:  Show cause.

23             THE CLERK:  Juror No. 36, Thomas Sadowski?

24             PROSPECTIVE JUROR NO. 36:  Present.

25             THE CLERK:  Juror No. 37, Kelly Schully?
```

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

```
1                    PROSPECTIVE JUROR NO. 37:  Present.

2              THE CLERK:  Juror No. 38, Evelyn Sobarra?

3              PROSPECTIVE JUROR NO. 38:  Present.

4              THE CLERK:  Juror No. 39, Salma Sufey?

5              PROSPECTIVE JUROR NO. 39:  Present.

6              THE CLERK:  Juror No. 40, Michelle Telleria?

7              PROSPECTIVE JUROR NO. 40:  Present.

8              THE CLERK:  Juror No. 41, Blaise Terry?

9              PROSPECTIVE JUROR NO. 41:  Present.

10             Blaise (pronouncing) Terry.

11             THE COURT:  Blaise Terry?  Thank you, sir.

12             THE CLERK:  Juror No. 42, Maria Tisson?

13             PROSPECTIVE JUROR NO. 42:  Present.

14             THE CLERK:  Juror No. 43, Rachel Toth?

15             PROSPECTIVE JUROR NO. 43:  Present.

16             THE COURT:  Is it Toth or Toth (pronouncing)?

17             PROSPECTIVE JUROR NO. 43:  Toth.

18             THE COURT:  Thank you, Ms. Toth.

19             THE CLERK:  Juror No. 44, Ranjet Varma?

20             PROSPECTIVE JUROR NO. 44:  Present.

21             THE CLERK:  Juror No. 45, Frederick Willard?

22             PROSPECTIVE JUROR NO. 45:  Present.

23             THE CLERK:  Juror No. 46, Mary Zurawski?

24             PROSPECTIVE JUROR NO. 46:  Present.

25             THE CLERK:  Are there any jurors whose name I
```

1  have not called?

2       (No response.)

3       THE COURT:  All right.  You may administer the

4  oath to the panel.

5       THE CLERK:  If the jurors could please stand

6  and raise your right hand.  And after the oath is

7  administered, respond with "I shall."

8       (Prospective jury panel sworn.)

9       JURY VOIR DIRE / JURY SELECTION

10       THE COURT:  All right.  Ladies and gentlemen,

11  I'm now going to give you a thumbnail sketch of what the

12  case is about by reading to you from the indictment.

13       But before I do so, I want to hasten to

14  instruct you once again that the defendant has pled not

15  guilty to the charge and, therefore, must be presume by you

16  to ne innocent of that charge unless and until the jury find

17  otherwise.

18       And the indictment from which I will read to

19  you a portion of it, that's not proof or evidence of guilt

20  of any kind whatsoever.  It's merely a formal means of

21  accusing a defendant of a crime.  That's all.  It is not

22  proof or evidence of guilt of any kind whatsoever.

23       The charge against the defendant is the

24  following:  Beginning no later than May 2007 and continuing

25  through at least in or about August 1, 2008 in the Eastern

1    District of Virginia and elsewhere, Defendant Henry Obilo

2    and others unlawfully, willfully, and knowingly combined,

3    conspired, confederated, and agreed with each other and with

4    others to execute and attempt to execute a scheme and

5    artifice to defraud a financial institution and to obtain

6    monies, funds, and credit owned by and under the custody and

7    control of a financial institution by means of materially

8    false and fraudulent pretenses and representations, in

9    violation of Title 18, Section 1349.

10               In essence, then, the defendant is charged with

11   engaging in a conspiracy to commit bank fraud.

12               You'll learn more about the case once -- if

13   you're selected, but that should give you enough.  And as I

14   told you, the indictment from which I read the charge is

15   merely a formal means of accusing a person of a crime.  It's

16   not proof or evidence of any guilt at all.

17               And also, the defendant has pled not guilty to

18   the charge and, therefore, must be presumed by you to be

19   innocent of that charge unless and until the government --

20   or the jury find otherwise.

21               Now, ladies and gentlemen, I'm going to ask you

22   a series of questions designed to enable the Court to

23   ascertain whether any of you may be disabled by any Rule of

24   Law from serving as a juror in this case.  These are

25   easy-to-answer questions.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1        For the most part, when I ask a question, if

2   you have an affirmative answer, you'll raise your hand.  And

3   when you're recognized, please give your name and the answer

4   to the question.

5        Now, for a number of questions that I will ask,

6   I'll have you come forward one at a time to give your

7   answers in the relative privacy of bench and counsel.  And I

8   do that for the purpose of preserving your privacy as to

9   what information, any information, that you may have to

10  provide and also to avoid having any knowledge that may

11  disable you from serving as a juror from also disabling

12  others.

13        All right.  Now, to begin with, Mr. Eisinger,

14  would you stand, introduce yourself, your co-counsel, and

15  your case agent to the panel, please.

16        ATTORNEY EISINGER:  Good morning.

17        My name is John Eisinger.  I'm an assistant

18  United States attorney for the Eastern District of Virginia.

19  With me is Tyler Newby, who is also an assistant with the

20  United States attorney in our office; as well as Charles

21  Pak, who is a detective with the Alexandria Police

22  Department; and we have Lisa Porter, one of our paralegals.

23        THE COURT:  All right.  Ladies and gentlemen,

24  do you or any member of your family, so far as you know,

25  know any of these individuals or have you had any business

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    or social dealing of any kind whatsoever with any of them?

2                (No response.)

3                THE COURT:  Mr. Eisinger and Mr. Newby are

4    members of the United States Attorney's Office for the

5    Eastern District of Virginia.

6                Do you or any member of your family, so far as

7    you know, know any of the attorneys or employees of that

8    office or have you had any business or social dealings of

9    any kind whatsoever with any of them?

10               (No response.)

11               THE COURT:  All right.  And let me go now --

12   your case agent was from what department, Mr. Eisinger?

13               ATTORNEY EISINGER:  The Alexandria Police

14   Department.

15               THE COURT:  Do you or any member of your

16   family, so far as you know, know any of the employees or

17   officers of the Alexandria Police Department or have you had

18   any business or social dealings of any kind whatsoever with

19   them?

20               We have one hand here.  Would you stand,

21   please, and give us your name.

22               PROSPECTIVE JUROR NO. 13:  Katie Davie.

23               THE COURT:  Ms. Davie, whom do you know in the

24   Alexandria Police Department?

25               PROSPECTIVE JUROR NO. 13:  I know my husband is

1    a deputy sheriff with the Alexandria City deputy department.

2    He may know this gentleman.

3              THE COURT:  You don't know whether he does or

4    doesn't?

5              PROSPECTIVE JUROR NO. 13:  I do not know.  He's

6    been there for 13 years, sir.

7              THE COURT:  Do you feel that having a husband

8    so employed would prevent or hinder you in any way in

9    rendering a fair and an impartial verdict in this case?

10             PROSPECTIVE JUROR NO. 12:  No, sir.

11             THE COURT:  You may be seated.  Thank you,

12   Ms. Davie.

13             Next?  There was one hand in the back.

14             Yes, ma'am.  Your name, please.

15             PROSPECTIVE JUROR NO. 46:  Mary Zurawski.

16             THE COURT:  Yes, Ms. Zurawski.

17             PROSPECTIVE JUROR NO. 46:  I'm not sure if he's

18   in Arlington or Alexandria.

19             THE COURT:  Alexandria.

20             PROSPECTIVE JUROR NO. 46:  Okay.  I'm not sure

21   which department he's with, but his son and my son play

22   baseball together.

23             THE COURT:  Your son and the son of somebody

24   with his last name?  Is that what you're saying?

25             PROSPECTIVE JUROR NO. 46:  The police officer

1    that I know, I'm not sure if he's with Arlington or

2    Alexandria.

3              THE COURT:  Oh, I see.

4              My question to you was do you or any member of

5    your family, so far as you know, know this individual?  And

6    I take it you don't know --

7              PROSPECTIVE JUROR NO. 46:  I don't know.

8              THE COURT:  Thank you.  You may be seated.

9              Anyone else?

10             I'll come to a question which will call for

11   that answer in a few minutes.

12             Let me move on now.

13             Mr. Iweanoge, would you stand and introduce

14   yourself and your client to the panel, please.

15             ATTORNEY IWEANOGE:  Thank you, Judge.

16             Good morning, ladies and gentlemen of the jury.

17             My name is John O. Iweanoge, II.  And I

18   practice out of Washington, D.C.  The name of my law firm is

19   the Iweanoge Firm, where I practice with two of my brothers:

20   Charles Iweanoge, who's also a lawyer; and Joe Iweanoge,

21   who's also a lawyer.

22             We represent Mr. Henry Obilo, who is the

23   defendant in this case, standing to my left.

24             THE COURT:  All right.  You may be seated.

25             Ladies and gentlemen, do you or any member of

```
 1    your family, so far as you know, know any of these
 2    individuals or have you had any business or social dealings
 3    with either of them?
 4              All right.  Let me also ask whether you or any
 5    member of your family, so far as you know, have had any --
 6    know or have had any business or social dealings with
 7    Mr. Iweanoge's brothers or any other attorneys or employees
 8    of his law firm.
 9              Next, ladies and gentlemen, I'm going to read
10    to you a list of names.  I want you to listen carefully
11    because at the end of that list, I will ask you once again
12    whether you know or -- you or any member of your family know
13    or have had any business or social dealings with any of
14    these persons.
15              Paula Gipson, G-i-p-s-o-n.
16              George Frazier, F-r-a-z-i-e-r.
17              Louis Fraser, F-r-a-s-e-r.
18              Eznewa (sic) Onyedebelu.
19              Abel Nnabue.
20              John Hayes.
21              James Witt.
22              Larry Plassmeyer.
23              And Robert Short.
24              Do you or any member of your family, so far as
25    you know, know any of those individuals or have you had any
```

1    business or social dealings of any kind whatsoever with any

2    of them?

3                 (No response.)

4                 THE COURT:  All right.  Next, ladies and

5    gentlemen, I want to know whether any of you have served in

6    the past on any juries, on any trial juries or grand juries

7    in either Federal, State, or local courts.  Would you raise

8    your hands, please.

9                 We have a few veterans.

10                We're going to begin with the front row moving

11   left to right.  Would the first person who raised his or her

12   hand please stand, this gentleman on the end.

13                Your name, sir?

14                PROSPECTIVE JUROR NO. 4:  Michael Black.

15                THE COURT:  I'm sorry.  Your name again?

16                PROSPECTIVE JUROR NO. 4:  Excuse me.  Michael

17   Black.

18                THE COURT:  Yes, Mr. Black.

19                What juries have you served on in the past?

20                PROSPECTIVE JUROR NO. 4:  It was Fairfax County

21   jury.  It was an assault case.

22                THE COURT:  How long ago?

23                PROSPECTIVE JUROR NO. 4:  Probably nine years

24   ago.

25                THE COURT:  And was -- without telling me the

1    result, was the jury on which you served able to reach a

2    unanimous verdict?

3              PROSPECTIVE JUROR NO. 4:  Yes.

4              THE COURT:  Any other jury service, Mr. Black?

5              PROSPECTIVE JUROR NO. 4:  No.

6              THE COURT:  Thank you, sir.  You may be seated.

7              Let's go to the second row, left to right.

8              Yes, sir, your name?

9              PROSPECTIVE JUROR NO. 29:  No. 28 (sic), Steve

10   McGough.

11             THE COURT:  Yes, Mr. McGough.

12             PROSPECTIVE JUROR NO. 29:  It was also in

13   Fairfax County.  It was a civil case.  And we were not able

14   to reach a verdict.  There was a mistrial.

15             THE COURT:  All right.  What was the nature of

16   the case, Mr. McGough?

17             PROSPECTIVE JUROR NO. 29:  It was a traffic

18   case in which there was an injury claim.

19             THE COURT:  And the jury was not able to reach

20   a unanimous decision?

21             PROSPECTIVE JUROR NO. 29:  Yeah.  Apparently,

22   someone said something in the courtroom they weren't

23   supposed to.

24             THE COURT:  So you never had an opportunity to

25   0 deliberate?

1                PROSPECTIVE JUROR NO. 29:  No, sir.

2                THE COURT:  I fall prey to my own criticism of

3 lawyers.

4                Do you ever have an opportunity to deliberate?

5                PROSPECTIVE JUROR NO. 29:  No.

6                THE COURT:  Thank you, Mr. McGough.

7                The reason I criticize lawyers often for asking

8 questions in that leading way is because it's ambiguous what

9 the answer means.  It's much easier to ask it directly.

10                All right.  Let's go to the third row, left to

11 right.

12                Yes, sir, your name?

13                PROSPECTIVE JUROR NO. 18:  Michael Goretsas.

14                THE COURT:  Yes, Mr. Goretsas.

15                What juries have you served on in the past?

16                PROSPECTIVE JUROR NO. 18:  It was a Richmond

17 County jury.

18                THE COURT:  And Richmond where?

19                PROSPECTIVE JUROR NO. 18:  Richmond County in

20 Warsaw, Virginia.

21                THE COURT:  All right.  What was the nature of

22 the case you heard there?

23                PROSPECTIVE JUROR NO. 18:  It was a criminal

24 case.

25                THE COURT:  What kind of crime involved?

1          PROSPECTIVE JUROR NO. 18:  Alleged rape.

2          THE COURT:  And was the jury on which you

3    served, Mr. Goretsas, able to reach a unanimous decision?

4          PROSPECTIVE JUROR NO. 18:  Yes.

5          THE COURT:  Have you had any other jury

6    service?

7          PROSPECTIVE JUROR NO. 18:  No.

8          THE COURT:  Thank you, sir.  You may be seated.

9          Next in that row?

10          PROSPECTIVE JUROR NO. 24:  24, Michael Kalich.

11          THE COURT:  Mr. Kalich, what juries have you

12    served on?

13          PROSPECTIVE JUROR NO. 24:  Dade County in

14    Pennsylvania.

15          THE COURT:  What was the nature of the case?

16          PROSPECTIVE JUROR NO. 24:  Assault and rape.

17          THE COURT:  Was the jury on which you served

18    able to reach a unanimous verdict?

19          PROSPECTIVE JUROR NO. 24:  Yes.

20          THE COURT:  Any other jury service, Mr. Kalich?

21          PROSPECTIVE JUROR NO. 24:  No.

22          THE COURT:  Thank you, sir.  You may be seated.

23          Next?  Yes, sir.

24          PROSPECTIVE JUROR NO. 2:  Juror 2, James

25    Berman.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  All right.  Mr. Berman, what juries

2     have you served on?

3          PROSPECTIVE JUROR NO. 2:  I served on a jury in

4     this courthouse.  It was a real estate -- it was a criminal

5     case.  It was a real estate bidding conspiracy to rig

6     auction bidding for homes.

7          THE COURT:  And how long ago was that trial?

8          PROSPECTIVE JUROR NO. 2:  I honestly can't

9     remember, but I think it was in the past five to

10    seven years.

11         THE COURT:  And was the jury on which you

12    served able to reach a unanimous decision?

13         PROSPECTIVE JUROR NO. 2:  Yes, they were.

14         THE COURT:  And the courthouse has been here

15    now about 14 or 15 years, and I've been here more than 20.

16    Let's be clear.

17         Was I the presiding judge?

18         PROSPECTIVE JUROR NO. 2:  I honestly can't

19    remember.

20         THE COURT:  Thank you.

21         Next?

22         PROSPECTIVE JUROR NO. 14:  No. 14, Susan Dove.

23         THE COURT:  Yes.

24         PROSPECTIVE JUROR NO. 14:  I was on a jury at

25    the Leesburg courthouse.  I think that might be

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    Loudoun County.

2              THE COURT:  And what was the nature of the

3    case?

4              PROSPECTIVE JUROR NO. 14:  It was a family that

5    was suing a doctor for malpractice.

6              THE COURT:  And how long ago was this case?

7              PROSPECTIVE JUROR NO. 14:  I don't remember

8    exactly, your Honor, but I would say close to three to

9    five years.  Probably closer to three years.

10             THE COURT:  Was the jury on which you served in

11   that case able to reach a unanimous verdict?

12             PROSPECTIVE JUROR NO. 14:  Yes.

13             THE COURT:  Thank you, Ms. Dove.  You may be

14   seated.

15             Next?  Anyone else have jury service?

16             Yes, in the next row.

17             PROSPECTIVE JUROR NO. 36:  Juror 36, Thomas

18   Sadowski.

19             THE COURT:  Mr. Sadowski, what juries have you

20   served on in the past?

21             PROSPECTIVE JUROR NO. 36:  In Fairfax

22   approximately 12 years ago.

23             THE COURT:  What was the nature of the case?

24             PROSPECTIVE JUROR NO. 36:  A robbery.

25             THE COURT:  Was the jury on which you served

1    able to reach a unanimous verdict?

2              PROSPECTIVE JUROR NO. 36:  Yes.

3              THE COURT:  Any other jury service,

4    Mr. Sadowski.

5              PROSPECTIVE JUROR NO. 36:  No.

6              THE COURT:  Thank you, sir.  You may be seated.

7              Anyone else?  Yes.

8              PROSPECTIVE JUROR NO. 26:  Olga Lorincz-Reck.

9              THE COURT:  Ms. Lorincz-Reck, what juries have

10   you served on in the past?

11             PROSPECTIVE JUROR NO. 26:  Wayne County,

12   Michigan.

13             THE COURT:  And how long ago?

14             PROSPECTIVE JUROR NO. 26:  Approximately

15   14 years ago.

16             THE COURT:  And what was the nature of the

17   case?

18             PROSPECTIVE JUROR NO. 26:  Assault.

19             THE COURT:  Was the jury on which you served

20   able to reach a unanimous verdict?

21             PROSPECTIVE JUROR NO. 26:  Yes.

22             THE COURT:  Any other jury service,

23   Ms. Lorincz-Reck?

24             PROSPECTIVE JUROR NO. 26:  No.  That's all.

25             THE COURT:  Thank you.  You may be seated.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    Anyone else?  Do any of those reminiscences

2  trigger any memories of jury service?

3    All right.  Now, next -- I'm now going to ask

4  you a series of three questions and have you come forward

5  here to the bench, over here to my left and to your right,

6  to give your answers in the relative privacy of bench and

7  counsel.

8    As I told you before, this is to preserve your

9  privacy as to information you may have to provide and also

10  to avoid having information that you have that disables you

11  from also disabling others.

12    And I ask them in a series of three, the

13  questions in a series of three, so that it will not be

14  evident to you which question you have an affirmative answer

15  to.

16    If your answer is "No" to all three questions,

17  you do not need to come forward.  Only if your answer to one

18  or more of the three questions is "Yes" do you need to come

19  forward.

20    And Mr. Wood, the court security officer, will

21  have you line up here at the gate and have you come forward

22  one at a time.

23    The questions are the following:  First, you've

24  told me about your jury service.  I now want to know whether

25  any of you have had any experience in court other than jury

1   service; that is, have you ever appeared in court as a

2   plaintiff?  As a defendant?  As a witness?  As an expert?

3   As an attorney?  Indeed, in any capacity at all, I want you

4   to come forward.

5            The only exceptions to that are traffic court

6   and divorce court.  You need not come forward if your only

7   appearance in court was traffic or divorce court.

8            So, again, the question to you is I want to

9   know whether any of you have had any experience in court of

10  any kind other than jury service.

11           The second question is would any of you tend to

12  believe of the testimony of a law enforcement officer merely

13  because that person is a law enforcement officer?  Or would

14  any of you tend to disbelieve?  In other words, would any of

15  you tend to either believe or to disbelieve the testimony of

16  a law enforcement officer merely because that person is a

17  law enforcement officer.

18           And finally, I want to know whether any of you

19  have heard or read or seen anything at all about this case

20  in any context at all.  And I ask that not because it's

21  probable or likely that you have, but merely out of an

22  abundance of caution to ensure that if any of you know

23  anything about this case, you bring that promptly to the

24  Court's attention.

25           All right.  I'll have counsel at the bench.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

 1                    Now, I have a device --

 2                    Actually, I have one other thing.

 3                    How many of you -- let me ask one further

 4      question before I do this.  I want to know -- see the hands

 5      of those of you or people in your immediate family who are

 6      employed by any law enforcement agency.  If you would raise

 7      your hands.

 8                    All right.  We have a few.

 9                    Mr. Wood, let's do these before we have people

10      come to the bench.  And I'll repeat the three questions.

11                    Who is the first -- yes, sir.  Your name?  You

12      don't need to come forward.  Your name?

13                    PROSPECTIVE JUROR NO. 44:  Ranjet Varma.

14                    THE COURT:  Yes.

15                    What number is that?

16                    THE MARSHAL:  44.

17                    PROSPECTIVE JUROR NO. 44:  44.

18                    THE MARSHAL:  44.

19                    THE COURT:  All right.  Mr. Varma, who in your

20      family is a law enforcement officer?

21                    PROSPECTIVE JUROR NO. 44:  Can I approach the

22      bench?

23                    THE COURT:  I can't hear you.

24                    PROSPECTIVE JUROR NO. 44:  Can I approach the

25      bench?

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  All right.  I'll let you do that

2     later.  You may be seated.

3          Next?  Yes, ma'am.  Ms. Terry?

4          PROSPECTIVE JUROR NO. 13:  Davie.

5          THE COURT:  Davie.  I'm sorry.

6          PROSPECTIVE JUROR NO. 13:  13.  My husband's a

7     deputy sheriff with Alexandria City.

8          THE COURT:  Yes, and I already asked you.  Let

9     me ask you once again.

10          PROSPECTIVE JUROR NO. 13:  Sure.

11          THE COURT:  Is the fact that your husband's a

12     deputy sheriff -- would that prevent or hinder you in any

13     way from rendering a fair and an impartial verdict in this

14     case based only on the evidence and the Court's

15     instructions?

16          PROSPECTIVE JUROR NO. 13:  No, sir.

17          THE COURT:  Thank you.  You may be seated.

18          Next?  Yes, sir.

19          PROSPECTIVE JUROR NO. 18:  No. 18, Michael

20     Goretsas.

21          THE COURT:  Yes, sir.

22          PROSPECTIVE JUROR NO. 18:  I work for ATF.

23          THE COURT:  What do you do for the Alcohol,

24     Tobacco and Firearms agency?

25          PROSPECTIVE JUROR NO. 18:  I'm the telecom

1   manager.

2          THE COURT:  So do you have any law enforcement

3   responsibilities?

4          PROSPECTIVE JUROR NO. 18:  No, not direct law

5   enforcement.  Indirect support of law enforcement.

6          THE COURT:  Do you feel that your employment

7   with ATF would prevent or hinder you in any way from

8   rendering a fair and an impartial verdict in this case based

9   only on the evidence and the Court's instructions?

10          PROSPECTIVE JUROR NO. 18:  No.

11          THE COURT:  Thank you, sir.  You may be seated.

12          Next?

13          PROSPECTIVE JUROR NO. 30:  No. 30, Richard

14   Milland.  I have an uncle that works for the United States

15   postal inspector for the United States Postal Service in

16   New Jersey.

17          THE COURT:  All right, Mr. Milland.  Do you

18   feel that having an uncle so employed would prevent or

19   hinder you in any way from rendering a fair and an impartial

20   verdict in this case?

21          PROSPECTIVE JUROR NO. 30:  No, sir.

22          THE COURT:  Thank you.  You may be seated.

23          Next?

24          PROSPECTIVE JUROR NO. 39:  39, Salma Sufey.  My

25   husband is with financial crime investigation with the

1    Department of Treasury.

2             THE COURT:  Would you repeat that, Ms. Sufey.

3             PROSPECTIVE JUROR NO. 39:  Financial crime

4    investigation department with the United States Department

5    of Treasury.

6             THE COURT:  And how long has he been so

7    employed?

8             PROSPECTIVE JUROR NO. 39:  He's been employed

9    over two years.

10            THE COURT:  Do you feel that having a husband

11   so employed would prevent or hinder you in any way from

12   rendering a fair and an impartial verdict in this case based

13   only on the evidence and the Court's instructions?

14            PROSPECTIVE JUROR NO. 39:  No.

15            THE COURT:  Thank you.  You may be seated.

16            Next?

17            PROSPECTIVE JUROR NO. 41:  My daughter, she --

18            THE MARSHAL:  Your number?

19            PROSPECTIVE JUROR NO. 41:  Juror No. 41, Blaise

20   Terry.

21            THE COURT:  Yes, Mr. Terry.

22            PROSPECTIVE JUROR NO. 41:  My daughter, she is

23   employed by the ATF.

24            THE COURT:  What does your daughter with ATF?

25            PROSPECTIVE JUROR NO. 41:  She can't -- she's

1    in a high security position, sir.  She can't tell me.  But

2    she deals with a lot of the general counsel there, and she's

3    affiliated.

4                THE COURT:  All right.  Is your daughter an ATF

5    agent or an attorney?

6                PROSPECTIVE JUROR NO. 41:  She is an agent,

7    sir.  She can't explain to me what she does.

8                THE COURT:  All right.  Do you feel that having

9    a daughter so employed with ATF would prevent or hinder you

10   in any way from rendering a fair and an impartial verdict in

11   this case, Mr. Terry?

12               PROSPECTIVE JUROR NO. 41:  No.

13               THE COURT:  Thank you, sir.  You may be seated.

14               That is not an uncommon situation, Mr. Terry,

15   for people whose family members are employed in one or

16   another law enforcement endeavor.

17               Anyone else?

18               All right.  Now, let me repeat the

19   three questions and have Mr. Wood have you line up at the

20   gate here one at a time.

21               The first is you've told me about your jury

22   service; that is, service on trial juries or grand juries.

23   I now want to know whether any of you have ever participated

24   in any legal proceeding in any capacity at all either as an

25   attorney, as a witness, as a party, indeed in any capacity.

1    I want you to come forward.  The only exceptions to that are

2    traffic court and divorce court.

3            Second, I want to know whether any of you would

4    tend to believe or disbelieve the testimony of a law

5    enforcement officer merely because that person is a law

6    enforcement officer.

7            And finally, I want to know whether any of you

8    have seen or read or heard or know anything about this case

9    from any source whatever.  I ask that not because it's

10   likely or probable that you have, but merely out of an

11   abundance of caution to ensure that if any of you know

12   anything about this case, that you bring that promptly to

13   the Court's attention.

14           Now, I have a device here at the bench that

15   masks the conversations at the bench.  Some 23 years ago

16   when it was first installed when I came to try cases in the

17   old courthouse, the young engineer who installed it told me

18   that it would be very pleasant-sounding, that it would sound

19   like waves breaking gently on some distant tropical romantic

20   beach and that it would mask the conversation here at the

21   bench.  In a few you moments, I'll ask you whether it

22   succeeds in either respect.

23           All right.  Counsel may come to the bench.

24           (Sidebar conference held as follows:)

25           THE COURT:  Mr. Iweanoge, your client may come

1    if he wishes.

2                    Have you talked to him?

3                    ATTORNEY IWEANOGE:  I can do it, Judge.

4                    THE COURT:  All right.  He waives his right to

5    be here?

6                    ATTORNEY IWEANOGE:  Yes, Judge.

7                    THE COURT:  Thank you.

8                    If you'll come right here.  I will have the

9    person come right here.

10                   THE MARSHAL:  Juror No. 40.

11                   THE COURT:  Come forward here.  Right here.

12                   Is it Ms. Telleria?

13                   PROSPECTIVE JUROR NO. 40:  Uh-huh.

14                   THE COURT:  Which question do you have an

15   answer to?

16                   PROSPECTIVE JUROR NO. 40:  I was a defendant in

17   a case.

18                   THE COURT:  What was the nature of the case?

19                   PROSPECTIVE JUROR NO. 40:  Criminal.

20                   THE COURT:  And what was the outcome?

21                   PROSPECTIVE JUROR NO. 40:  I had to go to

22   rehab.

23                   THE COURT:  With was the nature of the case?

24                   PROSPECTIVE JUROR NO. 40:  Controlled dangerous

25   substance.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  What was the nature of the
2    substance?
3          PROSPECTIVE JUROR NO. 40:  PCP.
4          THE COURT:  How long ago was this?
5          PROSPECTIVE JUROR NO. 40:  20 years.
6          THE COURT:  And have you had any difficulty
7    with any substances since then?
8          PROSPECTIVE JUROR NO. 40:  No.
9          THE COURT:  Now, that was not a felony, I take
10   it?
11         PROSPECTIVE JUROR NO. 40:  No.
12         THE COURT:  Now, you understand this case has
13   nothing whatever to do with that case?
14         PROSPECTIVE JUROR NO. 40:  Uhm-hmm.
15         THE COURT:  Do you feel that you can put that
16   experience to one side and judge this case fairly and
17   impartially based only on the evidence presented in court
18   and the Court's instructions?
19         PROSPECTIVE JUROR NO. 40:  Yes.
20         THE COURT:  So you think you can be fair to
21   both the government and the defendant in this case?
22         PROSPECTIVE JUROR NO. 40:  Yes.
23         THE COURT:  Do you have any answers to any of
24   the other questions?
25         PROSPECTIVE JUROR NO. 40:  No.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  Thank you, Ms. Telleria.

2          THE MARSHAL:  Juror No. 5.

3          THE COURT:  Good morning Mr. Brakefield.

4          PROSPECTIVE JUROR NO. 5:  Good morning.

5          THE COURT:  Which question do you have an

6      answer to, sir?

7          PROSPECTIVE JUROR NO. 5:  Experience with the

8      courts.

9          THE COURT:  Yes, sir.

10         PROSPECTIVE JUROR NO. 5:  Arrested for

11     possession of marijuana.  Let's see.  Arrested three times

12     for driving under the influence and driving in traffic.

13     Associate member of the Virginia Bar.

14         THE COURT:  I take it you have taken the bar

15     and passed it?

16         PROSPECTIVE JUROR NO. 5:  Yes.

17         THE COURT:  Where did you attend law school?

18         PROSPECTIVE JUROR NO. 5:  George Mason.

19         THE COURT:  When did you graduate?

20         PROSPECTIVE JUROR NO. 5:  1990.

21         THE COURT:  Did you ever practice law?

22         PROSPECTIVE JUROR NO. 5:  No.

23         THE COURT:  And how long ago was the arrest for

24     marijuana?

25         PROSPECTIVE JUROR NO. 5:  High school.

1          THE COURT:  All right.  That would be how long

2     ago?

3          PROSPECTIVE JUROR NO. 5:  Early '80s.

4          THE COURT:  I take it you've had no contact

5     with controlled substances since then?

6          PROSPECTIVE JUROR NO. 5:  Correct.

7          THE COURT:  Now, you understand that that

8     incident where you were arrested for marijuana has nothing

9     whatever to do with this case?

10          PROSPECTIVE JUROR NO. 5:  Sure.

11          THE COURT:  Do you feel the legal system

12     treated you fairly in that context?

13          PROSPECTIVE JUROR NO. 5:  Yes.

14          THE COURT:  You understand this has nothing to

15     do with that case.

16          Do you feel you can put that experience to one

17     side and judge this case fairly and impartially based on the

18     evidence and the Court's instructions?

19          PROSPECTIVE JUROR NO. 5:  Yes.

20          THE COURT:  Have you had any training in the

21     law apart from what you received in law school?

22          PROSPECTIVE JUROR NO. 5:  Only through

23     business.  So...

24          THE COURT:  Have you had any training in

25     criminal law?

```
 1                    PROSPECTIVE JUROR NO. 5:  No.

 2                    THE COURT:  Have you ever practiced criminal

 3      law in any way?

 4                    PROSPECTIVE JUROR NO. 5:  No.

 5                    THE COURT:  Do you feel there's anything in

 6      your background that would hinder you in any way from

 7      rendering a fair and impartial verdict in our case?

 8                    PROSPECTIVE JUROR NO. 5:  No.

 9                    THE COURT:  It indicates that you're an

10      investor.

11                    Is that -- would that be the same as a venture

12      capitalist?

13                    PROSPECTIVE JUROR NO. 5:  Not quite.  Similar.

14      I assist my family in managing at this point.

15                    THE COURT:  Thank you, Mr. Brakefield.  You may

16      return to your seat.

17                    THE MARSHAL:  Juror No. 15.

18                    THE COURT:  Mr. Foushay.

19                    PROSPECTIVE JUROR NO. 15:  Yes, sir.  Good

20      morning.

21                    THE COURT:  Which question do you have an

22      answer to?

23                    PROSPECTIVE JUROR NO. 15:  I was a defendant in

24      a civil suit.

25                    THE COURT:  What was the nature of the suit?
```

1    PROSPECTIVE JUROR NO. 15:  The allegations were

2    failure to fulfill contract, misappropriation of funds,

3    fraud, and a couple of other various and sundry.

4    THE COURT:  Would this be in the construction

5    business?

6    PROSPECTIVE JUROR NO. 15:  I'm an independent

7    contractor.

8    THE COURT:  What was the result of that

9    lawsuit?

10    PROSPECTIVE JUROR NO. 15:  The result was the

11    only charge I was found guilty to, I attempted to plead

12    guilty to.

13    THE COURT:  Breach of contract?

14    PROSPECTIVE JUROR NO. 15:  Failure to have a

15    meeting of the minds, fairly.  The customer asked me to

16    leave, then asked me to come back.  And I would not come

17    back and, thereby, was in breach of contract because I

18    failed to fulfill the contract.

19    THE COURT:  You feel the legal system operated

20    fairly in that case.

21    PROSPECTIVE JUROR NO. 15:  I gave my lawyer the

22    check with a smile.

23    THE COURT:  Well put.

24    You understand that case has nothing whatever

25    to do with this case?

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          PROSPECTIVE JUROR NO. 15:  Absolutely.

2          THE COURT:  You feel you can put your

3   experience to one side, sir, in that case --

4          PROSPECTIVE JUROR NO. 15:  It would have no

5   bearing.

6          THE COURT:  -- fairly and impartially --

7          Let met finish.

8          PROSPECTIVE JUROR NO. 15:  I'm sorry.

9          THE COURT:  Do you feel you can put your

10  feelings to one side and judge this case fairly and

11  impartially based on the Court's instructions?

12         PROSPECTIVE JUROR NO. 15:  Certainly.

13         THE COURT:  Do you have an answer to the other

14  questions?

15         PROSPECTIVE JUROR NO. 15:  I'm sorry.  What was

16  Question No. 2?

17         THE COURT:  Do you intend to believe or

18  disbelieve the testimony of a law enforcement officer merely

19  because that person is a law enforcement officer?

20         PROSPECTIVE JUROR NO. 15:  No.

21         THE COURT:  The third one?

22         PROSPECTIVE JUROR NO. 15:  No.

23         THE COURT:  Thank you, sir.  You may return to

24  your seat.

25         THE MARSHAL:  Juror No. 8.

1           THE COURT:  Mr. Brooks, good morning, sir.

2           PROSPECTIVE JUROR NO. 8:  Good morning.

3           THE COURT:  Which question do you have an

4    answer to?

5           PROSPECTIVE JUROR NO. 8:  I have appeared in

6    court as a witness.

7           THE COURT:  In what type of case?

8           PROSPECTIVE JUROR NO. 8:  It was grand jury

9    testimony.

10          THE COURT:  How long ago was this?

11          PROSPECTIVE JUROR NO. 8:  It was four or

12   five years ago.

13          THE COURT:  Did you testify for the prosecution

14   or the defense?

15          PROSPECTIVE JUROR NO. 8:  I did.  I testified.

16          THE COURT:  You identified.

17          PROSPECTIVE JUROR NO. 8:  He did a plea even

18   before it was finished.  So...

19          THE COURT:  You understand that case has

20   nothing whatever to do with this case?

21          PROSPECTIVE JUROR NO. 8:  Correct.

22          THE COURT:  Do you feel you can put your

23   experience in that case to one side and judge this case

24   fairly and impartially based only on the evidence and the

25   Court's instructions on the law?

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

```
1                   PROSPECTIVE JUROR NO. 8:  Absolutely.

2                   THE COURT:  Any other answers to the questions

3    I put, Mr. Brooks?

4                   PROSPECTIVE JUROR NO. 8:  No.

5                   THE COURT:  Thank you.  You may return to your

6    seat.

7                   THE MARSHAL:  No. 27.

8                   THE COURT:  Good morning, Mr. Mashood.

9                   PROSPECTIVE JUROR NO. 27:  Good morning.

10                  THE COURT:  Come forward, if you would.

11                  Which question do you have an answer to?

12                  PROSPECTIVE JUROR NO. 27:  The middle one, a

13   reason to believe or disbelieve an officer at this point.

14                  THE COURT:  Yes.

15                  PROSPECTIVE JUROR NO. 27:  That one, I have

16   highly confidence in officer due to a few incidents I have

17   witnessed on TV led me to disbelieve.

18                  THE COURT:  You would tend to disbelieve?  Is

19   that what you're saying?

20                  PROSPECTIVE JUROR NO. 27:  Not everything.  To

21   some extent.

22                  THE COURT:  To some extent?

23                  PROSPECTIVE JUROR NO. 27:  To some extent.

24                  THE COURT:  Do you feel you can put that

25   feeling to one side and judge the testimony of a law
```

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1  enforcement officer as you would judge the testimony of any

2  witness?

3          PROSPECTIVE JUROR NO. 27:  Yes.

4          THE COURT:  Do you have answers to any of the

5  other questions put to you.

6          PROSPECTIVE JUROR NO. 27:  No, sir.

7          THE COURT:  You said you had seen things on TV

8  which led you to mistrust police officers?

9          PROSPECTIVE JUROR NO. 27:  Not entirely.

10          THE COURT:  What have you seen on TV?

11          PROSPECTIVE JUROR NO. 27:  Like police

12  misconduct, like beating culprits that were powerless.

13          THE COURT:  You understand those matters have

14  nothing to do with this case?

15          PROSPECTIVE JUROR NO. 27:  Yes, I do.

16          THE COURT:  I'll ask you again, can you put

17  those feelings to one side and judge this case fairly and

18  impartially based on the evidence and the Court's

19  instructions?

20          PROSPECTIVE JUROR NO. 27:  Absolutely.

21  Absolutely.

22          THE COURT:  And judge the testimony and the

23  credibility of the law enforcement officers just as you

24  would judge the credibility of any other witness?

25          PROSPECTIVE JUROR NO. 27:  Absolutely, yes.

1          THE COURT:  You may return to your seat.

2          THE MARSHAL:  No. 37.

3          THE COURT:  Ms. Schully.

4          PROSPECTIVE JUROR NO. 37:  Yes.

5          THE COURT:  Which question do you have an

6     answer to?

7          PROSPECTIVE JUROR NO. 37:  The first and the

8     third.

9          THE COURT:  Yes, ma'am.

10         PROSPECTIVE JUROR NO. 37:  The first.  I was in

11    a court deposition.  I was working for Northern Virginia

12    Electric.  There was an explosion in a house.  My name was

13    on one of the utilities that caused the explosion.  My name,

14    it was on the ticket that -- of a misutility.  That was it.

15    Just the beginning part.

16         And then his face looks familiar.

17         THE COURT:  The face of the defendant?

18         PROSPECTIVE JUROR NO. 37:  Yes.  I may have

19    seen him in the area, I think in Centerville.  I'm not sure.

20         THE COURT:  Do you know for what?

21         PROSPECTIVE JUROR NO. 37:  I mean, there was --

22    the front page of Centerville, there is usually something,

23    crime-related or whatever.  I have a very good face -- good

24    familiarity for faces.  So it could have been something

25    else.  I am thinking that's it.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  Let's take these one at a time.

2          PROSPECTIVE JUROR NO. 37:  Sure.

3          THE COURT:  First, the proceeding you said you

4    were involved in, do you understand that matter has nothing

5    whatever to do with this case?

6          PROSPECTIVE JUROR NO. 37:  Okay.

7          THE COURT:  Do you feel the legal proceeding in

8    that case operates fairly, the legal process?

9          PROSPECTIVE JUROR NO. 37:  I think so.

10          THE COURT:  Can you put your feelings in that

11    experience to one side and judge this case fairly and

12    impartially based only on the evidence and the Court's

13    instructions?

14          PROSPECTIVE JUROR NO. 37:  Yes.

15          THE COURT:  Now, let's go to the second matter.

16          The second matter you said you saw -- excuse

17    me -- may have seen this defendant's picture in the

18    newspaper, you said, in Centerville?

19          PROSPECTIVE JUROR NO. 37:  Yes, Centerville.

20    We have a local paper that's called Centerville that goes

21    out to everyone.  They come every Thursday.  I just think,

22    but I don't know.

23          THE COURT:  You think you saw it on a page?

24          PROSPECTIVE JUROR NO. 37:  If I see someone on

25    the subway, I think I remember this face.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  You do remember this defendant's

2     face?

3          PROSPECTIVE JUROR NO. 37:  I do remember his

4     face.

5          THE COURT:  Do you remember what was said in

6     the newspaper?

7          PROSPECTIVE JUROR NO. 37:  I have a very good

8     memory of that otherwise.  The most I can remember was they

9     said something about complicated name.  I think I remember

10    seeing a complicated name.

11         THE COURT:  All right.  Do you feel you can put

12    that to one side and judge this case fairly and impartially

13    based only on the evidence and the Court's instructions?

14         PROSPECTIVE JUROR NO. 37:  Yes, I can.

15         Is that it?

16         THE COURT:  Do you have answers to any of the

17    other questions I put to you?

18         PROSPECTIVE JUROR NO. 37:  No.

19         THE COURT:  Thank you.  You may return to your

20    seat.

21         Mr. Iweanoge?

22         ATTORNEY IWEANOGE:  Yes, Judge.

23         THE COURT:  Is there any reason why your client

24    would be in that newspaper?

25         ATTORNEY IWEANOGE:  No, Judge.  But I didn't

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    research.   I will do an Internet search later on to see.

2                THE COURT:   What was this juror's number?

3                ATTORNEY IWEANOGE:   No. 37.

4                ATTORNEY EISINGER:   37.

5                ATTORNEY IWEANOGE:   I move to strike.

6                THE COURT:   I think under the circumstances, I

7    will grant that.

8                ATTORNEY EISINGER:   I'm certainly not aware of

9    any press that would be related to him, but there is no

10   reason to risk anything.

11               THE COURT:   I will grant the motion because she

12   said she remembers the face.   She is very firm about that.

13   She also remembers she saw it in the context of a criminal

14   report.   So that being the case, I will grant that motion.

15   No. 37 is stricken.

16               THE MARSHAL:   44.

17               THE COURT:   Good morning, Mr. Berman.

18               Now you can tell me what your daughter does.

19               PROSPECTIVE JUROR NO. 44:   My daughter works

20   for a law firm in Georgetown, and she joined law school

21   in --

22               THE COURT:   She's a law professor?

23               PROSPECTIVE JUROR NO. 44:   Law student.   We do

24   discuss a lot of things, because I come from a family of

25   lawyers.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

```
 1                    THE COURT:  All right.
 2                    PROSPECTIVE JUROR NO. 44:  My wife works for
 3      the -- she's a court interpreter.  She comes here and comes
 4      to all of the courts.
 5                    THE COURT:  To serve as an interpreter?
 6                    ATTORNEY IWEANOGE:  She might have served with
 7      your Honor.
 8                    THE COURT:  Do you feel having a wife employed
 9      or a daughter who is a law student would prevent or hinder
10      you from rendering an impartial verdict in this case?
11                    PROSPECTIVE JUROR NO. 44:  My wife does not
12      tell me much.  I don't discuss cases with her much.
13                    THE COURT:  Do you feel it would prevent you
14      from being fair and impartial?
15                    PROSPECTIVE JUROR NO. 44:  I don't think so.
16      Discussing, you know, it might come back in my mind.  I
17      don't know.
18                    THE COURT:  Do you have answers to any of the
19      other questions that I put to you?
20                    PROSPECTIVE JUROR NO. 44:  No, not the other
21      two.  Only that my family is involved in this, I want to
22      say.
23                    THE COURT:  Thank you, Mr. Berman.  You may
24      return to your seat.
25                    PROSPECTIVE JUROR NO. 44:  Anything regarding
```

1    health that you need?

2          THE COURT:  I will ask later, but you can tell

3    me now if you wish.

4          PROSPECTIVE JUROR NO. 44:  I have a problem

5    with, you know, angina.  I had sent a letter to -- this one.

6    And I have a very serious backbone problem and things.  I

7    might not be able to sit for more than an hour or so.  I

8    have to fidget a lot or stretch my muscles and have to eat

9    or drink a lot.

10          THE COURT:  You may not be selected.  But if

11    you are, we will accommodate that need.

12          PROSPECTIVE JUROR NO. 44:  Thank you.

13          THE COURT:  The medical record he showed me

14    indicated, as you saw, that he has to eat and drink once an

15    hour and he can't sit for more than an hour.  He has to get

16    up and walk around.  I didn't see the exact diagnosis.

17    There wasn't any, that I could see.

18          Do you have any objection to striking him?

19          ATTORNEY IWEANOGE:  No objection, Judge.

20          ATTORNEY EISINGER:  No objection.

21          THE COURT:  All right.  He's stricken.

22          THE MARSHAL:  No. 11.

23          THE COURT:  Mr. Cebas, yes.

24          Which question do you have an answer for?

25          PROSPECTIVE JUROR NO. 11:  I appeared in

1    Bankruptcy Court in Alexandria, 2000.

2              THE COURT:  With what court?

3              PROSPECTIVE JUROR NO. 11:  Bankruptcy Court.

4              THE COURT:  What was the nature?

5              PROSPECTIVE JUROR NO. 11:  We filed bankruptcy.

6              THE COURT:  Your business or you personally?

7              PROSPECTIVE JUROR NO. 11:  Personal.

8              THE COURT:  Is that matter over now?

9              PROSPECTIVE JUROR NO. 11:  Oh, yes.  I was

10   separated.

11             THE COURT:  Do you feel the Court treated you

12   fairly in that case?

13             PROSPECTIVE JUROR NO. 11:  Yes.

14             THE COURT:  You understand that case has

15   nothing to do with this case?

16             PROSPECTIVE JUROR NO. 11:  Yes.  I know that it

17   doesn't have.  I just had to say it just in case I had

18   anything.

19             THE COURT:  All right.  Do you feel you can put

20   your experience in the bankruptcy case to one side and judge

21   this case fairly and impartially based only on the evidence

22   and the Court's instructions?

23             PROSPECTIVE JUROR NO. 11:  Yes.

24             THE COURT:  All right, Mr. Cebas.

25             Do you have any other answers to the questions

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1      I asked you?

2                      PROSPECTIVE JUROR NO. 11:  No.

3                      THE COURT:  All right.  You may return to your

4      seat.

5                      PROSPECTIVE JUROR NO. 11:  Thank you.

6                      THE MARSHAL:  No. 29.

7                      THE COURT:  Mr. McGough.

8                      PROSPECTIVE JUROR NO. 29:  Yes, sir.

9                      THE COURT:  Good morning, sir.

10                     Which question do you have an answer to?

11                     PROSPECTIVE JUROR NO. 29:  No. 1.  I have been

12     involved in two court dealings.  Both were about 10,

13     15 years ago.

14                     One was I had stopped a check on some work that

15     had been done for me, and the guy who did it took me to

16     small claims court.  He didn't show up.  That was the end of

17     that one.

18                     The second one, I was summoned as a witness in

19     a domestic dispute -- well, I guess it was assault, because

20     two of my neighbors got in a fight.  I never got called.  I

21     was there.  I never got called.

22                     THE COURT:  Do you feel the legal system in

23     both of those instances operated fairly?

24                     PROSPECTIVE JUROR NO. 29:  As far as I know.

25                     THE COURT:  Do you know those matters have

1    nothing to do with this case?

2              PROSPECTIVE JUROR NO. 29:  Yes, sir.

3              THE COURT:  Do you feel you can put your

4    feelings to the side and judge this case based only on the

5    evidence and the Court's instructions?

6              PROSPECTIVE JUROR NO. 29:  Yes, sir.

7              THE COURT:  Do you have any answers to the

8    other questions?

9              PROSPECTIVE JUROR NO. 29:  No, sir.

10             THE COURT:  You may return to your seat.

11             THE MARSHAL:  No. 17.

12             THE COURT:  Mr. Gordeuk, which question do you

13   have an answer to, sir?

14             PROSPECTIVE JUROR NO. 17:  I think the first

15   one.  I have previous experience in court.  About 27 years

16   ago in South Africa, I was testifying as a physician on an

17   autopsy I performed.

18             THE COURT:  Are you a pathologist?

19             PROSPECTIVE JUROR NO. 17:  I'm a hematologist

20   there.  I did everything.

21             Also, I given deposition for trial between drug

22   companies and litigation requiring different presentations.

23   I have given opinions to lawyers on malpractice cases.

24             THE COURT:  Let's go back to the first matter

25   in South Africa.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1           Were you a party in this litigation?

2           PROSPECTIVE JUROR NO. 17:  No.  I was just

3    called to be a witness with regard to my findings.

4           THE COURT:  You have always been as an expert

5    witness, as a physician?

6           PROSPECTIVE JUROR NO. 17:  As an expert

7    witness.

8           THE COURT:  Do you feel that the legal system

9    operated fairly in those contexts?

10          PROSPECTIVE JUROR NO. 17:  Yes.

11          THE COURT:  You understand, of course, those

12   matters have nothing to do with this case?

13          PROSPECTIVE JUROR NO. 17:  Sure.

14          THE COURT:  Do you feel you can put your

15   experience in those matters to one side and judge this case

16   fairly and impartially based only on the evidence and the

17   Court's instructions on the law?

18          PROSPECTIVE JUROR NO. 17:  Yes.

19          THE COURT:  Do you have other answers to any of

20   the questions I asked?

21          PROSPECTIVE JUROR NO. 17:  No.

22          THE MARSHAL:  18.

23          THE COURT:  Mr. Gorestsas, good morning.

24          Which question do you have an answer to?

25          PROSPECTIVE JUROR NO. 18:  Question 1.

1      THE COURT:  Yes.

2      PROSPECTIVE JUROR NO. 18:  I was involved as a

3  plaintiff in a limited partnership in Alexandria District

4  Court.

5      THE COURT:  How did that come about?

6      PROSPECTIVE JUROR NO. 18:  It was a financial

7  matter which the primary partner was involved in taking

8  funds for other purposes in a limited partnership at the

9  Washington Airport.

10     THE COURT:  Was the outcome in that case

11  favorable to you?

12     PROSPECTIVE JUROR NO. 18:  It dragged on for

13  several years.  As far as the limited partnership, all our

14  monies involved in it we lost.  And the county ended up

15  stepping in.

16     THE COURT:  Do you feel the legal system

17  operated fairly?

18     PROSPECTIVE JUROR NO. 18:  From our

19  perspective, we all were left out in the cold.

20     THE COURT:  You understand, of course, that

21  case has nothing to do with this case?

22     PROSPECTIVE JUROR NO. 18:  Yes.

23     THE COURT:  Do you feel you can put your

24  experience to one side and judge this case fairly and

25  impartially based only on the evidence and the Court's

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    instructions on the law?

2              You have to answer so he can hear you.

3              PROSPECTIVE JUROR NO. 18:  Yes.

4              THE COURT:  I'll ask again.

5              Do you feel you can render a fair and impartial

6    verdict in this case?

7              PROSPECTIVE JUROR NO. 11:  Yes.

8              THE COURT:  Do you have answers to any of the

9    other questions put to you?

10             PROSPECTIVE JUROR NO. 11:  Yes.

11             THE COURT:  You may return to your seat.

12             He nodded.

13             THE MARSHAL:  No. 24.

14             THE COURT:  Good morning, Mr. Kalich.

15             PROSPECTIVE JUROR NO. 24:  I work for the

16   American Safety and Health Administration.  I serve as a

17   government witness, expert witness, in cases before

18   administrative law judges.

19             THE COURT:  Do you feel the legal system

20   operated fairly in that context?

21             PROSPECTIVE JUROR NO. 24:  Yes.

22             THE COURT:  Do you understand that none of

23   those cases have anything to do with this case?

24             PROSPECTIVE JUROR NO. 24:  Correct.

25             THE COURT:  Do you feel you can put your

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    experience in those cases to one side and judge this case

2    fairly and impartially based only on the evidence and the

3    Court's instructions on the law?

4                    PROSPECTIVE JUROR NO. 24:  Yes.

5                    THE COURT:  Do you have answers to any of the

6    other questions I put to you?

7                    PROSPECTIVE JUROR NO. 24:  None.

8                    THE MARSHAL:  14.

9                    THE COURT:  Good morning, Ms. Dove.

10                   PROSPECTIVE JUROR NO. 14:  Hello.

11                   THE COURT:  What does William Bergman do?

12                   PROSPECTIVE JUROR NO. 14:  We are a

13   multiple-service management company.  We manage nonprofit

14   associations and foundations that are small enough or do not

15   want to hire their own staff.  We provide full management

16   services to them.

17                   THE COURT:  Thank you.

18                   Which question do you have an answer to?

19                   PROSPECTIVE JUROR NO. 14:  The one that serving

20   or as a witness or --

21                   THE COURT:  Yes.

22                   PROSPECTIVE JUROR NO. 14:  I have.

23                   THE COURT:  In what cases?

24                   PROSPECTIVE JUROR NO. 14:  It was a long time

25   ago.  It was about 25 years ago.  It was a theft case.  I

1   was a witness.  It was in Washington, D.C.  I worked for an

2   association in a building that rented space, leased space,

3   in Washington, D.C.  The case was brought against the

4   management of the building for filtering money from parking

5   fees and other things, and it was managing that company.  So

6   I was called to witness what payments were made, in what

7   fashion, and so part.

8               THE COURT:  All right.  Do you feel that the

9   legal system in that case operated fairly?

10              PROSPECTIVE JUROR NO. 14:  Oh, yes.

11              THE COURT:  What was the outcome?

12              PROSPECTIVE JUROR NO. 14:  I think he was found

13  guilty.

14              THE COURT:  Do you understand this case has

15  nothing to do with that case?

16              PROSPECTIVE JUROR NO. 14:  Oh, yes.

17              THE COURT:  Do you feel you can put your

18  experience to one side and judge this case fairly and

19  impartially based solely on the evidence presented here and

20  the Court's instructions?

21              PROSPECTIVE JUROR NO. 14:  I do, sir.

22              I have a question.

23              Would you be asking -- I have a special set of

24  circumstances with regard to my profession, job --

25              THE COURT:  All right.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1              PROSPECTIVE JUROR NO. 14:  -- in the next few

2    days and so forth, because my boss is in and out of the

3    hospital.  I had sent this letter.

4              THE COURT:  Let me see that.

5              PROSPECTIVE JUROR NO. 14:  Okay.  I didn't know

6    whether this was the appropriate time to --

7              THE COURT:  I expect this case will last two,

8    perhaps at most three days starting today.

9              PROSPECTIVE JUROR NO. 14:  I'm under some

10   pretty big deadlines.  I'll tell you why.  Because the

11   program product for this meeting, it prints on Friday.  The

12   two books for the two board meetings are due on Monday.  I'm

13   under just a real terrible, terrible time crunch, your

14   Honor.  I don't mean to shirk --

15             THE COURT:  I know you don't, because you have

16   you served in the past.

17             PROSPECTIVE JUROR NO. 14:  I will be happy to.

18             THE COURT:  I will take that into account.

19             That is No. 14.

20             ATTORNEY IWEANOGE:  Yes, Judge.

21             THE COURT:  Any objection to striking No. 14?

22             ATTORNEY IWEANOGE:  No, Judge.

23             ATTORNEY EISINGER:  No.

24             THE COURT:  No. 14 is stricken.

25             THE MARSHAL:  No. 2.

1            THE COURT:  Mr. Berman, good morning, sir.

2            PROSPECTIVE JUROR NO. 2:  Good morning, sir.

3            THE COURT:  Which question do you have?

4            PROSPECTIVE JUROR NO. 2:  The bailiff told me I

5    should tell you this.  I was convicted of a Class 2

6    misdemeanor in Fairfax County court.

7            THE COURT:  How long ago?

8            PROSPECTIVE JUROR NO. 2:  Must have been five

9    or six years ago.

10            THE COURT:  What was the misdemeanor?

11            PROSPECTIVE JUROR NO. 2:  I called a meter maid

12    a bitch.  I was telling it like it was.

13            THE COURT:  And do you feel the legal system in

14    that case against you operated fairly?

15            PROSPECTIVE JUROR NO. 2:  No, I do not.

16            THE COURT:  Why is that?

17            PROSPECTIVE JUROR NO. 2:  I'm not -- this is

18    not representing the law enforcement office because many of

19    them, they lied on the stand in that particular case.

20            THE COURT:  And do you feel you can put that

21    experience to one side and judge this case fairly and

22    impartially based only on the evidence and the Court's

23    instructions?

24            PROSPECTIVE JUROR NO. 2:  Absolutely, yes.

25            THE COURT:  Anything other than that incident

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    with the meter maid?

2                    PROSPECTIVE JUROR NO. 2:  Small claims actions

3    that I took against Blue Cross/Blue Shield in a general

4    District Court action that I took in Fairfax County.

5                    THE COURT:  What about the first one, small

6    claims matter?

7                    PROSPECTIVE JUROR NO. 2:  I won.

8                    THE COURT:  Do you feel the legal system

9    operated fairly in that case?

10                   PROSPECTIVE JUROR NO. 2:  Absolutely.  At least

11   in my case.

12                   THE COURT:  Is there anything about that

13   experience that would prevent or hinder you in any way from

14   rendering a fair and impartial verdict in this case?

15                   PROSPECTIVE JUROR NO. 2:  No.

16                   THE COURT:  You said in the first incident, the

17   meter maid, I take it, had testified falsely.

18                   Is that who testified?

19                   PROSPECTIVE JUROR NO. 2:  Yes.  She -- it was a

20   minor white lie.  I admitted I called her a bitch.  I was

21   very upset.  But she basically said I called her a bitch

22   five to ten times, and then she called the Fairfax County

23   Police Department to make sure I couldn't get my car out,

24   and they corroborated her story.  And I had never said a

25   word to either of them.  Yes, that is how it worked out.

1            THE COURT:  Your feelings are understandable.

2  I want to be sure you can put that to one side and not have

3  that influence your consideration in this case.

4            PROSPECTIVE JUROR NO. 2:  I understand.

5            THE COURT:  Can you do that?

6            PROSPECTIVE JUROR NO. 2:  Absolutely.

7            THE COURT:  Can you be fair to the defendant

8  and to the government in this case?

9            PROSPECTIVE JUROR NO. 2:  Yes.

10            THE COURT:  You may return to your seat.

11            THE MARSHAL:  No. 30.

12            THE COURT:  Mr. Milland.

13            PROSPECTIVE JUROR NO. 30:  Yes.

14            THE COURT:  What question do you have an answer

15  to?

16            PROSPECTIVE JUROR NO. 30:  I believe it's the

17  one about appearing in court.

18            THE COURT:  Yes, sir.

19            PROSPECTIVE JUROR NO. 30:  About 15 years ago

20  in Fairfax County, I was involved in sort of like a domestic

21  dispute.  I followed my ex-girlfriend to the job.  She

22  showed up with this guy.  Basically, I tried to speed up and

23  had a collision with the car, then left the scene.  Then

24  there was an alleged -- she also filed an alleged assault

25  charge on me, which never occurred.  I went to court.  The

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    assault charge was dropped.  I ended up paying for the

2    damage to his car.

3              THE COURT:  Do you feel the legal system

4    operated fairly?

5              PROSPECTIVE JUROR NO. 30:  Yes.

6              THE COURT:  Do you feel you can put that

7    experience to one side and judge this case fairly and

8    impartially based only on the evidence and the Court's

9    instructions on the law?

10             PROSPECTIVE JUROR NO. 30:  Yes, I do.

11             THE COURT:  Anything else?

12             PROSPECTIVE JUROR NO. 30:  No.

13             THE COURT:  Thank you.

14             PROSPECTIVE JUROR NO. 30:  Thank you.

15             THE MARSHAL:  No. 38.

16             THE COURT:  Yes, Ms. Sobarra.

17             PROSPECTIVE JUROR NO. 38:  Yes.

18             THE COURT:  Which question do you have an

19   answer to?

20             PROSPECTIVE JUROR NO. 30:  I have been --

21   30 years ago, I was in a trial for a car accident.  It

22   was -- it actually -- I'm trying to think.  It was a

23   mistrial.  I was in a car accident, and the woman sued me --

24   was trying to sue me for injuries, and it ended up being a

25   mistrial.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  And was it ultimately settled?

2          PROSPECTIVE JUROR NO. 30:  No.

3          THE COURT:  That was the end of it?

4          PROSPECTIVE JUROR NO. 30:  That was basically

5     the end of it.

6          THE COURT:  Do you feel the legal system was --

7          PROSPECTIVE JUROR NO. 30:  I was very young.

8     It was 19 years ago.  I think it was, yes, I assume so.

9     Because it was basically her word against my word and no

10    witnesses, I don't think.

11         THE COURT:  Do you feel you can put that

12    experience to one side and judge this case fairly and

13    impartially based on the evidence and the Court's

14    instructions?

15         PROSPECTIVE JUROR NO. 30:  Yes.

16         THE COURT:  Thank you.  You may return to your

17    seat.

18         THE MARSHAL:  No. 21.

19         THE COURT:  Mr. Hester.

20         PROSPECTIVE JUROR NO. 21:  Yes, sir.

21         THE COURT:  Good morning.

22         I can't resist the temptation to ask.

23         What is that, geospatial intelligence?

24         PROSPECTIVE JUROR NO. 21:  We make maps for the

25    military and civilian organizations.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  Is it a part of the Department of

2    Defense?

3          PROSPECTIVE JUROR NO. 21:  It's within the

4    Department of Defense and intelligence community, yes.

5          THE COURT:  Which question do you have an

6    answer to?

7          PROSPECTIVE JUROR NO. 21:  The part about

8    tendency to believe a police officer because he is a police

9    officer.

10          THE COURT:  Or disbelieve.

11          PROSPECTIVE JUROR NO. 21:  I tend to believe a

12    police officer.  I tend to believe a police officer's

13    testimony.

14          THE COURT:  You understand, of course, police

15    officers, like all of us, are human beings?

16          PROSPECTIVE JUROR NO. 21:  Yes, I do.

17          THE COURT:  Sometimes they're truthful; and

18    sometimes they're not.

19          PROSPECTIVE JUROR NO. 21:  Yes, sir.

20          THE COURT:  Can you put that aside and judge

21    the testimony of a police officers just as you would judge

22    the testimony of any other witness?

23          PROSPECTIVE JUROR NO. 21:  Yes.  I was raised

24    by my father that police officers were to be respected and

25    believed and everything.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  But you understand in this context

2    you're going to be asked when to believe the law enforcement

3    officers' testimony, and you'll have to take into

4    consideration a number of factors to decide whether his or

5    her testimony is credible or not.  You should do that -- I

6    would instruct you to do that just as you would the

7    testimony of any other person.

8          PROSPECTIVE JUROR NO. 21:  Yes.

9          I was told downstairs about travel.

10         THE COURT:  Yes.

11         PROSPECTIVE JUROR NO. 21:  My wife and I were

12   planning a cruise, leaving on Saturday.  I did not put in

13   for deferral.

14         THE COURT:  This case is not going to last that

15   long.

16         PROSPECTIVE JUROR NO. 21:  We were leaving on

17   Saturday.

18         THE COURT:  This will not interfere.

19         MR. IWEANOGE:  I move to strike him for cause.

20         THE COURT:  I think you would probably join,

21   wouldn't you?

22         ATTORNEY EISINGER:  Yes.

23         THE COURT:  He is stricken.

24         What was his name?

25         ATTORNEY EISINGER:  21, Hester.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1              THE COURT:  21, he's stricken.

2              THE MARSHAL:  No. 6.

3              THE COURT:  Mr. Brawner.

4              PROSPECTIVE JUROR NO. 6:  How are you doing?

5              THE COURT:  The first question, whether you've

6      participated in any legal capacity at all.

7              PROSPECTIVE JUROR NO. 6:  No.

8              THE COURT:  The second question was whether you

9      would tend to believe or disbelieve the testimony of a law

10     enforcement officer merely because that person is a law

11     enforcement officer.

12             PROSPECTIVE JUROR NO. 6:  I would believe his

13     testimony.

14             THE COURT:  Well, you understand law

15     enforcement officers are human beings and --

16             PROSPECTIVE JUROR NO. 6:  They are sworn to

17     tell the truth and all that, take the oath and all that.

18             THE COURT:  So is every witness who takes the

19     stand.

20             PROSPECTIVE JUROR NO. 6:  Yes.  I tend to

21     believe law enforcement.

22             THE COURT:  Thank you.  You may return to your

23     seat.

24             ATTORNEY IWEANOGE:  I move to strike.

25             THE COURT:  Granted.

1              No objection?

2              ATTORNEY EISINGER:  No.

3              THE CLERK:  We're down to three.

4              THE COURT:  All right.  You may remain here.  I

5    have three more questions I'm going to ask.  I'm going to

6    ask them whether anything about the case suggests any reason

7    why they would not be able to sit as fair and impartial

8    jurors.

9              And I will also tell them the case will last

10   two, no more than three days.  And I'll ask them again does

11   that present any reason why they couldn't sit as fair and

12   impartial jurors.  And that's really all I'm going to ask.

13             Does the government have any additional voir

14   dire?

15             ATTORNEY EISINGER:  No, your Honor.

16             THE COURT:  Does the defense?

17             ATTORNEY IWEANOGE:  Just in case, to be on the

18   safe side, have any of them ever been a victim of identity

19   fraud.

20             THE COURT:  I will ask.

21             ATTORNEY IWEANOGE:  You said you would not be

22   sitting on Thursday and Friday?

23             THE COURT:  I will sit on Thursday if we have

24   to get it done by then.

25             ATTORNEY IWEANOGE:  Yes, Judge.

1           Other than that, if your Honor would let me in

2     the morning -- I'm taking my son for a procedure in the

3     morning.  It won't take more than an hour.

4               THE COURT:  I will allow that.  Remain here.

5               (In open court:)

6               THE COURT:  All right.  I have three final

7     questions for you.

8               First, I want to know whether any of you or any

9     member of your immediate family have ever been a victim of

10    identity theft or fraud.

11              Second, I've told you what the nature of the

12    case is about, and I expect that the case will last no more

13    than two days perhaps spilling over into a third.  And I

14    want to know whether there is any reason, either from the

15    nature of the case or from any of the questions that I've

16    asked, that suggests to you that you would not be able to be

17    a fair and impartial juror.  If you think that's the case, I

18    want you to come forward.

19              Also, I want to know whether any of you have

20    any reason -- and if you've already expressed this, you

21    don't need to come forward again -- but if you have any

22    disability that needs to be accommodated during the

23    two days -- two- to three-day trial that we will have, you

24    may come forward.

25              Mr. Wood will have you come forward one at a

1    time.

2             Let me preface this.  I know that jury service

3    is always an inconvenience and an imposition.  All of you

4    lead busy lives, both business and personal.  And if I were

5    to excuse all jurors with business and personal

6    inconveniences, we would not be able to proceed with jury

7    trials.

8             So I'll ask you to be understanding and come to

9    me with only exigent reasons.  Jury service always involves

10   sacrifices for all jurors.  This would be for only two or

11   three days.

12            (Sidebar conference continues as follows:)

13            THE MARSHAL:  15.

14            THE COURT:  All right.  Mr. Foushay.

15            PROSPECTIVE JUROR NO. 15:  I recognize jury

16   service probably is always not convenient, but at this time

17   it would be incredibly inconvenient.  I'm an independent

18   contractor, and I do have contract negotiations that need to

19   be met in a time limit.

20            THE COURT:  How large an organization do you

21   have?

22            PROSPECTIVE JUROR NO. 15:  I'm it.

23            THE COURT:  Do you feel you can make

24   arrangements if it were to last two days, and possibly a

25   third day?

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          PROSPECTIVE JUROR NO. 15:  Your Honor, my

2     finances are such that any day would be a bad day.

3          THE COURT:  You may not be selected.  I will

4     certainly take that into account.  You may be seated,

5     Mr. Foushay.

6          Let's wait and see with Mr. Foushay.

7          THE MARSHAL:  No. 5.

8          THE COURT:  Yes, Mr. Brakefield.

9          PROSPECTIVE JUROR NO. 5:  My parents were

10    victims of credit card fraud.

11         THE COURT:  How long ago was that?

12         PROSPECTIVE JUROR NO. 5:  Seven years.

13         THE COURT:  Did they suffer any loss?

14         PROSPECTIVE JUROR NO. 5:  No, they did not.

15         THE COURT:  Do you feel you can put -- that

16    would prevent or hinder you in any way from rendering a fair

17    and impartial verdict in this case?

18         PROSPECTIVE JUROR NO. 5:  No.

19         THE COURT:  Thank you, sir.

20         PROSPECTIVE JUROR NO. 5:  Can we ask about

21    vacation?  I'm scheduled to drive with my family Thursday

22    afternoon to Ohio for Easter.

23         THE COURT:  Well, I expect this case will be

24    over by then, but it may not be.  You may have to postpone

25    it one day.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          Do you feel you can do that?

2          PROSPECTIVE JUROR NO. 5:  If I have to.

3          THE COURT:  Thank you.  I appreciate it.

4          THE MARSHAL:  No. 39.

5          THE COURT:  Yes, Ms. Sufey.

6          PROSPECTIVE JUROR NO. 39:  I have vacation

7  taken for Thursday and Friday.  I have a family member

8  coming from New York.  I have already my cousin here from

9  England.  That is the two days that would be conflicting for

10  me.

11          THE COURT:  Which two days?

12          PROSPECTIVE JUROR NO. 39:  Thursday and Friday.

13          THE COURT:  Well, I expect the case will be

14  over by then, but it may not be.  It may last through

15  Thursday.

16          Can you make arrangements if it's necessary?  I

17  don't think -- we definitely won't go to Friday.  It may go

18  to Thursday.  Do you feel you can make some arrangements?

19          PROSPECTIVE JUROR NO. 39:  We planned to go out

20  of town, all of us together.  That's where I'm --

21          THE COURT:  All right.  I will take that into

22  account, Ms. Sufey.  Thank you for calling that to my

23  attention.

24          THE MARSHAL:  43.

25          THE COURT:  I will do that together with the

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    other one.

2                    Ms. Toth.

3                    PROSPECTIVE JUROR NO. 43:  They told me to tell

4    you I have a staph infection in my finger.  They just wanted

5    me to let you know.

6                    THE COURT:  Not a problem.  If you need a

7    recess, if you have to apply some medication or something to

8    it, just raise your hand and I'll accommodate it.

9                    PROSPECTIVE JUROR NO. 43:  Another thing.  I

10   don't know if this is important, but I'm a nanny.  If I miss

11   work, my employers have to miss work.  I don't know if

12   that's something to tell you about or not.

13                   THE COURT:  It's an inconvenience, but jury

14   service is a duty.  And interfering with jury service can be

15   a legal violation, a violation of the law.  So I'm sure they

16   will accommodate you in some way just as if they were to

17   have jury service.

18                   PROSPECTIVE JUROR NO. 43:  Well, I just thought

19   I would say that.

20                   THE COURT:  Thank you for calling that to my

21   attention.

22                   THE MARSHAL:  42.

23                   THE COURT:  Yes, Ms. Tisson.

24                   PROSPECTIVE JUROR NO. 42:  Yes.  I couldn't

25   understand what was going on with this case.  I come to find

1    out --

2              THE COURT:  Your native language is what?

3              PROSPECTIVE JUROR NO. 42:  Spanish.

4              THE COURT:  So is mine.

5              PROSPECTIVE JUROR No. 42:  I'm Argentinian.

6              THE COURT:  All right.  You think you would

7    have difficulty?

8              PROSPECTIVE JUROR NO. 42:  I was in the

9    emergency room yesterday for pain.  I'm taking some

10   medicine.  I don't feel good, either.  I come because I have

11   to come today.

12             THE COURT:  So you're saying you can understand

13   the testimony, but you don't feel well?

14             PROSPECTIVE JUROR NO. 42:  I couldn't

15   understand the testimony, either.

16             THE COURT:  Thank you for calling that to my

17   attention.

18             PROSPECTIVE JUROR NO. 42:  Thank you very much.

19             THE COURT:  I will strike Ms. Tisson on the

20   Court's own motion.  I think she clearly has difficulty

21   understanding.  In addition, she is obviously not well.

22             THE MARSHAL:  41.

23             THE COURT:  Mr. Terry?

24             PROSPECTIVE JUROR NO. 41:  Yes, sir.  It

25   catches me sometimes.

1          I have a deceased relative who was defrauded

2   with a diamond mine fraud out of Africa.  I don't know if

3   this gentleman is from that part of the world.  She was

4   defrauded and was -- it was one of those get-rich-quick

5   schemes.  She invested a couple thousand dollars, and she

6   never got a dime or anything from it.

7          THE COURT:  Well, I can assure you that matter

8   has nothing whatever to do with this case.

9          Do you feel you can put your experience to one

10  side and judge this case only on the basis of the evidence

11  you see and hear presented in the courtroom and the Court's

12  instructions on the law?

13          PROSPECTIVE JUROR NO. 41:  Well, as you

14  explained to me, Judge, just now about identity theft or

15  fraud, that's when this situation came to my mind, that I

16  remembered it.  She was a very elderly woman.  It just was

17  painful she lost this money.  I would want to say, yes, I

18  could put that aside and that wouldn't deter the outcome.

19          THE COURT:  This isn't a case about whether

20  identity theft is a good or bad thing.

21          PROSPECTIVE JUROR NO. 41:  Yes.

22          THE COURT:  Congress has proscribed laws that

23  prohibit it.

24          PROSPECTIVE JUROR NO. 41:  Yes, sir.

25          THE COURT:  The question is whether the

1   government could prove beyond a reasonable doubt each of the

2   elements of the offense charged.

3           PROSPECTIVE JUROR NO. 41:  Yes.

4           THE COURT:  The burden is entirely on the

5   government, not on the defendant.

6           And the question is can you be a fair and

7   impartial juror in deciding whether the government has

8   proved the elements of the offense beyond a reasonable

9   doubt?

10          PROSPECTIVE JUROR NO. 41:  I have to say no.  I

11  have to say I can't.  Until you mentioned this about -- I

12  mean, I was ready to say yes to everything.  But just now,

13  it's kind of -- that experience robbed us both.

14          THE COURT:  You may return to your seat.

15          ATTORNEY IWEANOGE:  I move to strike, Judge.

16          THE COURT:  All right.  Any objection to the

17  motion to strike?

18          ATTORNEY EISINGER:  No.

19          THE COURT:  Mr. Terry is stricken.

20          Now, we're getting down fairly low.  There were

21  two jurors that we held that we held in abeyance.  One was

22  Mr. Foushay, and I'm inclined to strike him.  He is a

23  single, one-person -- the contractor.

24          ATTORNEY EISINGER:  Contractor.

25          ATTORNEY IWEANOGE:  No objection.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  No. 15 is stricken.

2          Then the other person that we have held in

3    abeyance was Ms. Sufey.  She was leaving with her family --

4    or was having family arrive here on Thursday or Friday.  We

5    have four more people.

6          ATTORNEY EISINGER:  Five.

7          THE CLERK:  Five.

8          THE COURT:  Five more people.  We may have to

9    reduce the number of restrictions and the number of people

10   we select.

11         THE CLERK:  Judge, did you strike Ms. Sufey?

12         THE COURT:  Not yet.

13         THE MARSHAL:  No. 36.

14         PROSPECTIVE JUROR NO. 36:  Juror 36.  I have a

15   daughter with special needs, Down's Syndrome.  I work from

16   my home.  I don't have arrangements to care for her after

17   today.

18         THE COURT:  Can you make those arrangements?

19         PROSPECTIVE JUROR NO. 36:  Potentially.  I

20   don't know until I get home and get to a phone.

21         THE COURT:  Because you need to be able to

22   serve on a jury and make some arrangements unless it's

23   clearly impossible, in which case I will excuse you.  We

24   would like you to be a potential juror in our case.

25         PROSPECTIVE JUROR NO. 36:  And I would like to

1   be a juror.  I'm fine doing that.  I just don't know.  It's

2   a question for me until I can get to a phone and get home

3   and try and make those arrangements.

4           THE COURT:  All right.  I will take that into

5   account, Mr. Sadowski.

6           THE MARSHAL:  No. 34.

7           THE COURT:  Yes, Ms. Monroe.

8           PROSPECTIVE JUROR NO. 34:  Yes.  I'm attending

9   a party.  I'm part of a wedding.  I'm traveling up to

10  Philadelphia on Friday.

11          THE COURT:  You will be free for that.

12          Thank you for calling that to my attention.

13          THE MARSHAL:  No. 33.

14          THE COURT:  Yes, Ms. Mumpower.

15          PROSPECTIVE JUROR NO. 33:  I'm a teacher.  This

16  is my spring break, which means my own children are out of

17  school.  I have daycare issues because of that.

18          THE COURT:  I have sympathy for that.  My wife

19  is a teacher.  I will --

20          How old are your children?

21          PROSPECTIVE JUROR NO. 33:  12 and 14.

22          THE COURT:  You may not be selected as a juror.

23  If you are, I'll ask that you make arrangements because it's

24  very important that we -- it's an inconvenience, as you can

25  tell by the number of people that stood up.  If I excused

1    everybody, we simply could not proceed.  I will ask you to

2    bear with us.

3              Where do you teach?

4              PROSPECTIVE JUROR NO. 33:  Lovitt Elementary.

5              THE COURT:  You teach what grade?

6              PROSPECTIVE JUROR NO. 33:  Fourth.

7              THE COURT:  We don't appreciate our teachers

8    enough.

9              Thank you.

10             THE MARSHAL:  38.

11             THE COURT:  Ms. Sobarra.

12             PROSPECTIVE JUROR NO. 38:  I'm scheduled for a

13   family vacation Wednesday through Friday.  We are home as a

14   family.  I wanted to bring that to your attention.

15             THE COURT:  You may not be selected.  I think

16   the case will be over before Thursday, but no longer than

17   Thursday.

18             PROSPECTIVE JUROR NO. 38:  I just wanted to

19   bring that --

20             THE MARSHAL:  No. 12.

21             THE COURT:  Yes, Mr. Childs.

22             PROSPECTIVE JUROR NO. 12:  Yes, sir.

23   Approximately two and a half years ago, my sister had to go

24   to court in Bucks County.  Her former boyfriend and his

25   girlfriend at the time had stolen her identity, accessed her

1    cell phone information, changed her password, went to her

2    bank account.

3              The court ultimately -- my sister decided not

4    go to court.  The case was dropped.  I should say because

5    she had -- as a result of that activity had written some

6    aggressive letters and had been counter-charged with assault

7    in the case.  And they -- the two parties decided not to do

8    anything.  There had not been any economic damage to my

9    sister, just an exchanging of privileges.  But there was an

10   identity theft issue in that process.

11             THE COURT:  You understand that that event --

12   those matters have nothing whatever to do with this case?

13   You understand that?

14             PROSPECTIVE JUROR NO. 12:  Based on what I know

15   so far.

16             THE COURT:  Well, it has nothing whatever to do

17   with this case.

18             PROSPECTIVE JUROR NO. 12:  Okay.

19             THE COURT:  Do you feel you can put your

20   feelings about that matter to one side and judge this case

21   fairly and impartially based only on the evidence you see

22   and hear presented here and the Court's instructions?

23             PROSPECTIVE JUROR NO. 12:  Yes.

24             THE COURT:  Thank you, sir.

25             PROSPECTIVE JUROR NO. 12:  One other issue.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1              For the holiday, I will travel with the family

2    starting at 8:00 on Friday morning.  I don't know if that

3    presents any other challenges.

4                   THE COURT:  No.  We expect to be done by then.

5                   Thank you.

6                   THE MARSHAL:  No. 2.

7                   THE COURT:  Yes, Mr. Berman.

8                   PROSPECTIVE JUROR NO. 2:  Hi again.

9              First of all, ten years ago I was a victim of

10   identity theft.  I went to Vietnamese restaurant, used my

11   credit card.  I paid my bill -- he gave me my bill, and I

12   signed the receipt.  The credit card wasn't there.  By the

13   next morning, there was, like, $3,000 worth of Asian spices

14   laundered.

15                  THE COURT:  Was he ever apprehended?

16                  PROSPECTIVE JUROR NO. 2:  I haven't a clue.  I

17   turned it over to the credit card company.  They covered all

18   costs.  There was no money out of my pocket.

19                  THE COURT:  You understand that matter has

20   nothing whatever to do with this case?

21                  PROSPECTIVE JUROR NO. 2:  Absolutely.

22                  THE COURT:  Do you feel you can put your

23   feelings to one side?

24                  PROSPECTIVE JUROR NO. 2:  I got paid.  I have

25   no feelings whatsoever.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1      THE COURT:  Do you feel you can be fair and

2  impartial?

3      PROSPECTIVE JUROR NO. 2:  That leads me to

4  part two.

5      I would like to be excused because tomorrow is

6  the start of Passover, majoor Jewish holiday.  My wife

7  passed away.  I do all the cooking, and I spend it with

8  all -- with my daughter.  If I can't, I can't.  That is my

9  preference.

10      THE COURT:  You may not be selected.  I'm glad

11  you brought that to my attention.

12      Any objection to striking Mr. Berman?

13      ATTORNEY IWEANOGE:  No, Judge.

14      THE COURT:  All right.  Any objection?

15      ATTORNEY EISINGER:  No.

16      ATTORNEY NEWBY:  No.

17      THE COURT:  Mr. Berman.  Let's also strike --

18      How many does that leave us now?

19      All right.  You're back to six strikes, and

20  you're at 11.  But we're only going to pick 11.  So we'll

21  pick the first 10.  You will exercise your strikes against

22  the first 10.  You will have 11.  You will have 6.  And then

23  we'll pick an additional juror at the end who will be the

24  alternate.

25      THE CLERK:  Did you say 10?

1          THE COURT:  We will pick 12.

2          Does any counsel want me to ask her a question

3   about that, Mr. Iweanoge?

4          ATTORNEY EISINGER:  No, your Honor.

5          THE MARSHAL:  No. 6.

6          THE COURT:  Yes, Mr. Brawner.

7          PROSPECTIVE JUROR NO. 6:  Yes.

8          THE COURT:  Do you have something further that

9   you want to say?

10          PROSPECTIVE JUROR NO. 6:  I thought we had to

11   get in line to answer the question.

12          THE COURT:  The question was was there anything

13   in the nature of the case or anything -- or any question

14   that I asked that would suggest that you would not be a fair

15   and impartial juror?  And secondly, have you or any member

16   of your family been a victim of identity fraud?

17          PROSPECTIVE JUROR NO. 6:  No.

18          THE COURT:  Thank you.

19          The only persons that have been stricken,

20   No. 2, No. 6, No. 14, No. 15, No. 20 --

21          Or is that 21?

22          ATTORNEY EISINGER:  21.

23          ATTORNEY IWEANOGE:  21.

24          THE COURT:  -- No. 37.  And I'm going to strike

25   39 and 41.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          Any objection to striking --

2          ATTORNEY EISINGER:  39?

3          ATTORNEY IWEANOGE:  No, Judge.

4          ATTORNEY EISINGER:  No, your Honor.

5          THE COURT:  And then finally, No. 42 and

6    No. 44.

7          ATTORNEY EISINGER:  That's correct.

8          THE COURT:  All right.  We don't have enough.

9    So I'm not going to pick any alternate.  We'll pick 12.  You

10   will have 6.  You will have 10.  That will take us to 28.

11   That's all we have left.

12         ATTORNEY EISINGER:  Okay.

13         ATTORNEY IWEANOGE:  Yes.

14         THE COURT:  Call 12 jurors.  No alternate.  6

15   and 10.

16         THE CLERK:  Yes, sir.

17         THE COURT:  Let's do it as quickly as you can.

18         (End of sidebar conference, open court as

19   follows:)

20         THE COURT:  All right.  Ladies and gentlemen,

21   we will proceed with the jury selection process now.  The

22   deputy clerk will call a number or name by lot.  You will

23   come and sit in the jury box.  Counsel will have an

24   opportunity to exercise their peremptory challenges.  I

25   expect this will take no longer than 15 to 20 minutes.

1          All right.  You may proceed.

2          THE CLERK:  If the following jurors can come

3     forward and take a seat:

4          Juror No. 34, Selena Monroe.

5          Juror No. 7, Teresa Breitenthaller.

6          Juror No. 4, Michael Black.

7          Juror No. 17, Victor Gordeuk.

8          Juror No. 27, George Mashood.

9          Juror No. 8, James Brooks.

10         Juror No. 46, Mary Zurawski.

11         Juror No. 25, James Kelly.

12         Juror No. 26, Olga Lorincz-Reck.

13         Juror No. 33, Robin Mumpower.

14         Juror No. 3, Michael Bitzer.

15         And Juror No. 5, William Brakefield.

16         THE COURT:  Let's expedite, Counsel.

17         ATTORNEY IWEANOGE:  Yes.

18         THE CLERK:  The following jurors can return to

19    their seats in the courtroom:

20         Juror No. 7, Teresa Breitenhaller.

21         Juror No. 27, George Mashood.

22         Juror No. 33, Robin Mumpower.

23         Juror No. 8, James Brooks.

24         Juror No. 3, Michael Bitzer.

25         Juror No. 25, James Kelly.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1              Juror No. 46, Mary Zurawski.

2              Juror No. 4, Michael Black.

3              And if the following jurors can please come

4    forward and take a seat in the jury box as instructed by the

5    security officer:

6              Juror No. 11, Gonzalo Cebas.

7              Juror No. 13, Kati Davie.

8              Juror No. 24, Michael Kalich.

9              Juror No. 16, Patricia Fox.

10             Juror No. 23, Donerell Dudson.

11             Juror No. 36, Thomas Sadowski.

12             Juror No. 18, Michael Goretsas.

13             Juror No. 28, Tram McCarthy.

14             The following jurors can return to their seats

15   in the courtroom:

16             Juror No. 18, Michael Goretsas.

17             Juror No. 11, Gonzalo Cebas.

18             Juror No. 36, Thomas Sadowski.

19             Juror No. 24, Michael Kalich.

20             And if the following jurors can please come

21   forward and take a seat in the jury box, as instructed by

22   the security officer:

23             Juror No. 31, Sung-Hee Miller.

24             Juror No. 40, Michelle Telleria.

25             Juror No. 43, Rachel Toth.

1              Juror No. 19, Mark Gunderman.

2              The following jurors can return to their seats

3     in the courtroom:

4              Juror No. 43, Rachel Toth.

5              Juror No. 19, Mark Gunderman.

6              And if the following jurors can please come

7     forward and take a seat in the jury box:

8              Juror No. 12, John Childs.

9              Juror No. 30, Richard Milland.

10              The following juror can return to his seat in

11     the courtroom:

12              Juror No. 30, Richard Milland.

13              And if the following juror can please come

14     forward and take a seat in the jury box:

15              Juror No. 38, Evelyn Sobarra.

16              THE COURT:  All right.  You may swear the jury.

17              THE CLERK:  If the jury will stand, please, and

18     raise your right hand.  And after the oath is administered,

19     you will say, "I shall."

20              THE COURT:  The defendant needs to stand and

21     face the jury.

22              Proceed.

23              (Jury sworn.)

24              THE COURT:  All right.  Ladies and gentlemen,

25     I'm now able to excuse the remainder of you.  Again, I want

1   to thank you.  We could not have proceeded without your

2   participation today.  Your participation was vital, and we

3   appreciate that.

4              As I told you, I've had the occasion to serve

5   the civil and criminal justice systems in other parts of the

6   world.  And I think we have something quite unique and

7   precious here.  And we could not do that without the willing

8   service of many persons, including yourselves.  We thank you

9   for that.

10             I've had the occasion, also, to participate

11  with a group of my fellows many years ago now, seems more

12  than 30 years ago.  I joined -- nearly 40 years ago, I

13  joined with a group of my fellow attorneys at that time to

14  eliminate exemptions that had grown up in jury service over

15  the years.  Not surprisingly, a number of exemptions had

16  cropped up; exemptions for legislators, physicians,

17  dentists, and many others, including some exotic ones,

18  Tangier Island residents, Chesapeake Bay pilots, and many

19  others.

20             We thought that was wrong.  We thought everyone

21  should have the obligation, indeed the privilege, of serving

22  as a juror.  So we set about to persuade the General

23  Assembly of Virginia to eliminate those exemptions.

24             And I'm pleased to say that we succeeded in

25  large measure so that in the time that I have presided over

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    cases here and elsewhere, Richmond and the Tidewater, I've

2    had jurors from all walks of life participate; certainly

3    judges and lawyers, physicians, dentists, Chesapeake Bay

4    pilots, and Tangier Island residents.  So it's as it should

5    be.

6           We tried to eliminate the exemption for the

7    Governor of Virginia to serve in civil cases.  Of course,

8    the Governor of Virginia could not serve in criminal

9    matters, but in civil matters.  That effort wasn't

10   successful.  But I understand that it continues and may one

11   day succeed.  I think it should because everyone, including

12   the governor, should have the privilege of serving as a

13   juror.

14           Thank you.  You may now depart.  Return when

15   the Clerk's Office next directs.

16           (Remainder of prospective jurors excused at

17   12:37 p.m.)

18                PRELIMINARY JURY INSTRUCTIONS

19           THE COURT:  All right.  Members of the jury,

20   now that you've been sworn, I'm going to give you some

21   instructions to guide you in your participation in this

22   trial.  These will be brief, about five minutes to

23   ten minutes.

24           And then you will take the luncheon recess.

25   And when you return, you will have your own little books to

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    take notes in.  But these preliminary instructions you do

2    not need to take notes on these because you'll hear them

3    again.

4              It will be your duty in this case to find from

5    the evidence presented what the facts are.  You and you

6    alone will be the judges of facts of this case.  You and you

7    alone will be the judges of the credibility of the testimony

8    of all of the witnesses and the weight and effect of their

9    testimony.

10             You will then have to apply to the facts, as

11   you find them from the evidence in the case, the law that

12   the Court will give to you in the form of instructions.  And

13   you must follow that law whether you agree with it or not.

14             Nothing the Court may say or do in the course

15   of the trial is intended to indicate to you nor should it be

16   taken by you as indicating what your verdict should be.

17   What your verdict is is your sole and exclusive duty and

18   responsibility.

19             Now, the evidence from which you will find the

20   facts of the case will consist of the testimony of the

21   witnesses who will testify from the witness stand directly

22   across from you and any documents or other materials that

23   the Court admits into the record as exhibits and any facts

24   that the lawyers may agree or stipulate to or that the Court

25   may instruct you that you may find.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          There are, however, certain matters that are

2    not evidence.  And let me list those for you now.

3          First, the lawyers' arguments, the lawyers'

4    statements, the lawyers' questions by themselves are not

5    evidence.  Objections to questions are not evidence.

6    Lawyers have an obligation to make objections when they

7    believe evidence is being offered that's contrary to the

8    Rules of Evidence.

9          The essence of a fair trial is that it be

10   conducted pursuant to the Rules of Evidence and that your

11   decision be based solely on legally admissible evidence.  So

12   you should not be influenced by the objection or by the

13   Court's ruling on it.

14         If the objection is sustained, ignore the

15   question.  If the objection is overruled, then you may treat

16   the answer to that question just as you would treat the

17   answer to any other question.  And if I instruct you that

18   some item of evidence is admitted for a limited purpose, you

19   must follow that instruction.

20         Also, any testimony that the Court excludes or

21   tells you to disregard is not evidence and must not be

22   considered by you.  And, of course, anything you may have

23   seen or read or heard outside the courtroom is not evidence.

24   It must be disregarded.  You to decide the case solely on

25   the evidence presented here.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          Now, there are two kinds of evidence from which

2   you may find the facts:  There is direct evidence and

3   circumstantial evidence.

4          Now, direct evidence is direct proof of a fact,

5   such as the testimony of an eyewitness.

6          Circumstantial evidence is proof of facts from

7   which you may infer or conclude that other facts exist.

8          I'll give you further instructions on these as

9   well as other matters at end of the case.  But for now you

10  should have in mind that you may consider both kinds of

11  evidence, both direct and circumstantial.

12         And as I told you, it will be up to you to

13  decide which witnesses to believe, which witnesses not to

14  believe, and how much of each witness' testimony to accept

15  or reject because you're the sole judges of the witness'

16  credibility.  I'll give you some guidelines for determining

17  the credibility of witnesses at the end of the case.

18         As you know, this is a criminal case.  There

19  are three rules that you must keep in mind.

20         First, the defendant is presumed innocent until

21  proven guilty.  The indictment against the defendant brought

22  by the government is only an accusation, nothing more.

23  It's not proof of guilt or anything else, as I previously

24  instructed you.  So the defendant starts out with a clean

25  slate.

1        And second, the burden of proof is on the

2    government until the very end of the case.  The defendant

3    has no burden to prove his innocence or to present any

4    testimony or to testify.

5        Since the defendant has the right to remain

6    silent, the law prohibits you from considering that the

7    defendant may not have testified.  So in considering your

8    verdict, you may not discuss or take into account the fact

9    that the defendant may not have testified.

10       And third, the government must prove the

11   defendant's guilt beyond a reasonable doubt.  And I'll give

12   you further instructions on this point later.  But bear in

13   mind that in this respect, a criminal case is different from

14   a civil case.

15       Now, let me give you a few brief words about

16   your conduct as jurors.

17       First, I instruct you that during the trial,

18   you are not to discuss the case among yourselves or with

19   anyone.  Not until the end of the case when you retire to

20   deliberate on your verdict are you to discuss the case among

21   yourselves.

22       The moment of deliberation is a precise one,

23   and I'll tell you when that arrives.  Until then, don't

24   discuss the matter with anyone or among yourselves.  And if

25   anyone should try to speak to you about the case, stop them

1   and call that to the Court's attention promptly.  And, of

2   course, don't read or listen to anything on the case.

3            Also, do not undertake to do any research about

4   the case on your own.  You're decide the case solely on the

5   basis of the evidence presented here and the Court's

6   instructions.

7            And finally, do not form any opinion until all

8   the evidence is in.  Keep an open mind until you start your

9   deliberations at the end of the case.  I'm going to permit

10  you to take notes.  When you return from lunch, there will

11  be booklets with your name on them.  They're for your

12  convenience.  You may take as many or as few notes as you

13  wish.  It's entirely for your convenience.

14           No one will look at the books.  Mr. Wood, the

15  court security officer, will collect them and maintain them

16  secure from anyone's view during any recess.  At the end of

17  the case, you'll have them to take home with you, and then

18  you may do with them as you wish.

19           Now, the trial will begin after lunch.  First,

20  the government will have an opportunity to make an opening

21  statement.

22           Mr. Eisinger, how long do you think you need

23  for an opening statement?

24           ATTORNEY EISINGER:  Approximately 10 to

25  15 minutes, your Honor.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  Mr. Iweanoge, do you wish to make

2     an opening statement?

3          ATTORNEY IWEANOGE:  Yes, Judge.  About

4     10 minutes.

5          THE COURT:  All right.  So first the government

6     will make its opening statement, which is simply an outline

7     of the evidence the government expects to present.  And it's

8     offered to help you follow that evidence as it is presented.

9     Then the defendant may, if he wishes, make an opening

10    statement.  Remember that opening statements are neither

11    argument nor evidence.

12          Then the government will present its witnesses.

13    The defendant may cross-examine those.  And then the defense

14    may, if it wishes, present witnesses.  The government may

15    then cross-examine.

16          Then when all the evidence is in, the attorneys

17    will present their closing arguments to you in which they

18    will summarize and interpret the evidence as they recall it

19    for you.  Your memory, however, will govern.

20          In other words, the attorneys will tell you

21    what they recall the evidence as being.  But it is your

22    memory of that evidence that will control.  And they will

23    summarize and interpret the evidence for you.

24          Then the Court will give you final instructions

25    on the law and permit you to retire and deliberate on your

1  verdict.

2          We'll take two recesses, one mid-morning and

3  one in mid-afternoon.  However, I give to all of you the

4  privilege of asking for a recess simply by holding your hand

5  up or giving me the sports time signal, and I will call a

6  recess without inquiring of you the reason for the recess.

7          So I ask that you not avail yourselves of this

8  privilege unless it's truly an exigent reason.  Otherwise,

9  you can count on a morning recess and an afternoon recess.

10          We will reconvene at 1:45.  Mr. Wood will tell

11  you what's available for lunch in this area.  When we first

12  came to the courthouse -- the courthouse was built in '95 --

13  there was nothing but fields around here, no buildings at

14  all.  This was the first building here.

15          We were assured that restaurants would spring

16  up like dandelions in spring.  I've seen a lot of springs

17  and a lot of dandelions, but not that many restaurants.

18  Perhaps Mr. Wood can give you some direction, but he makes

19  no warranties.

20          Remember as many of you as wish to do so can

21  eat together, but don't discuss this case.  Thank you.

22  Remember to refrain from discussing the matter among

23  yourselves or with anyone or undertaking any investigation.

24          You may follow Mr. Wood out now.  When you

25  return, don't linger in the halls.  Come into the jury room.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    Mr. Wood will be there and he'll show you in.

2              All rise.

3              (Jury excused for lunch at 12:48 p.m.)

4              THE COURT:  You may be seated.

5              Anything further?

6              (No response.)

7              THE COURT:  We'll reconvene, then, at 1:45.

8    Court stands in recess.

9              (Court recessed at 12:48 p.m.)

10             (Court called to order at 1:51 p.m.)

11             (Jury not present.)

12             THE COURT:  We'll proceed at this time.

13             Let me confirm that there were no motions to

14   strike for cause.

15             I think you made them in the course of the

16   voir dire, but there weren't any others, were there,

17   Mr. Iweanoge?

18             ATTORNEY IWEANOGE:  No, Judge.

19             THE COURT:  How about the government as well?

20             ATTORNEY IWEANOGE:  No, your Honor.

21             THE COURT:  All right.  You may bring the jury

22   in, Mr. Wood.

23             (Jury impaneled at 1:52 p.m.)

24             THE COURT:  We'll continue with the trial in

25   this case.

1       Who's going to make the opening statement?

2       Let's have the podium moved.

3       Mr. Eisinger, are you going to make the opening

4    statement on behalf of the government?

5       ATTORNEY EISINGER:  Yes, your Honor.

6       THE COURT:  All right, sir.  You may proceed.

7       ATTORNEY EISINGER:  Thank you, your Honor.

8       OPENING STATEMENT BY THE GOVERNMENT

9       ATTORNEY EISINGER:  Over the course of the next

10   two days, the government will be presenting evidence to you

11   showing that defendant, Henry Obilo, along with others

12   conspired to commit bank fraud.

13       Now, although these members were physically

14   located generally in Miami and Dallas, by making calls to

15   credit unions here in Alexandria, they've come under

16   jurisdiction of this court.

17       To date six individuals have pled guilty to

18   their roles in this conspiracy.  You'll be hearing from

19   three of them, who will explain how they saw the defendant

20   in the presence of other conspirators going through credit

21   reports, making phone calls to financial institutions, as

22   well as having an agreement with Tobechi Onwuhara, also

23   known as Toby, who is the main conspirator in this case,

24   whereby Toby would provide victim identification information

25   on various people to the defendant in return for a portion

1     of the proceeds.

2              You will hear that the defendant specialized in

3     calls to Bank of America where he often represented himself

4     as a B of A employee and would say to the wire department

5     that, in fact, he had the victim on the phone or in his

6     office and had verified their identity and now wanted to

7     make a wire transfer on their behalf.

8              The scheme itself varied over time and from

9     attempt to attempt, although in general what would happen is

10    that the conspirators would go to pay for websites that

11    would provide real estate information, and they would get

12    lists of names of people that met a certain profile.  That

13    profile might have a certain marital status, a certain

14    amount of money in income per year, a certain amount of

15    money in their house.

16             Once they had a list of these people, they

17    would go through other websites and gather up personal

18    information like Social Security numbers, date of birth, and

19    other information they would use to run credit reports.

20    From the credit report, they would find out how much money

21    these people had in home equity line of credit accounts,

22    also known as HELOCs, as well as prior addresses,

23    reoccurring debit accounts, mortgage lenders, auto lenders,

24    and other information they might need to verify themselves

25    and their identity to financial institutions.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          Prior to calling the financial institution,

2     they would often go to the phone company of the victim and

3     have the person's home phone forwarded to their own prepaid

4     cell phone.  And that way if a bank were to call back a

5     victim with the number they had in their account

6     information, they would, in fact, go back to the

7     conspirators.

8          And they would use a program called SpoofCard.

9     SpoofCard is a service that allows you to call in to

10    SpoofCard, set a phone number that you want to show up in

11    the person's caller I.D. display, and therefore impersonate

12    someone else's phone number as your phone number.  They

13    would use this in order to get the banks to think they were

14    calling from the victim's home number when, in fact, they

15    were calling from a prepaid cell phone.

16         Once they would call financial institutions,

17    they would provide information like names, Social Security

18    numbers, date of birth, addresses in order to convince the

19    bank or credit unions that they are, in fact, the victim.

20         If, for whatever reason, they were asked

21    questions they could not answer, they would simply hang up

22    and call back again and get some other customer service rep

23    who hadn't spoken to them and use information they got from

24    the prior call to convince the customer service rep they

25    were, in fact, the victim.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1        Once they convinced the financial institution

2    that they were, in fact, the victim, they would have money

3    moved from home equity line of credit accounts into a

4    savings or checking account and then also would wire

5    transfer in the hundreds of thousands of dollars to overseas

6    or domestic banks controlled by the conspirators.

7        You will see that Tobechi Onwuhara and the

8    defendant used on at least one occasion the same prepaid

9    cell phone to call financial institutions.

10        In addition, the defendant used Tobechi

11    Onwuhara SpoofCard accounts that he had set up, and you will

12    hear the defendant's voice on calls made to financial

13    institutions, notably Bank of America and Visa Card

14    Services.  In addition, you'll hear his voice during an

15    interview at JFK International Airport in April of 2007.

16        So not only will you have the co-conspirators

17    who can identify the defendant's voice as well Charlie Pak

18    from the Alexandria Police Department, but you will be able

19    to hear with your own ears that it's the same person.

20        Likewise, you'll hear recordings of Tobechi

21    Onwuhara making calls to the financial institutions in this

22    district.  You'll hear an interview with him in April of

23    2007 -- sorry -- 2008 also at JFK International Airport.

24    You'll hear from Detective Pak, who will explain how law

25    enforcement agents were able to trace these calls back to

1    Tobechi Onwuhara.

2              Finally, you'll hear from the victims

3    themselves.  They'll explain that they don't know the

4    defendants.  They don't know Tobechi Onwuhara.  They never

5    authorized any of these transactions.  They never authorized

6    anyone to make these transactions on their behalf.

7              Once you've heard all the evidence, the

8    defendant's participation and role in this scheme will

9    become clear as will the only appropriate verdict in this

10   case, which is the defendant is guilty of conspiring to

11   commit bank fraud.

12             Thank you.

13             THE COURT:  All right.

14             Mr. Iweanoge, do you wish to make an opening

15   statement?

16             ATTORNEY IWEANOGE:  Yes, Judge.

17             THE COURT:  You may proceed.

18             ATTORNEY IWEANOGE:  Yes, sir.

19             May it please the Court, Counsel.

20             OPENING STATEMENT BY THE DEFENDANT

21             ATTORNEY IWEANOGE:  Ladies and gentlemen of the

22   jury, good afternoon to you.

23             On behalf of Mr. Henry Obilo, who is the

24   defendant in this case, the government, as well the Court

25   would like to thank you for taking out time from your other

1    obligations of the day, be that at work, caring for older

2    parents, or caring for your children, to take out time to

3    answer the jury summons to be here today to listen to this

4    case.

5              As the judge told you during the jury selection

6    process, it's a privilege to sit on a jury because as Thomas

7    Jefferson said so many years ago, that he considers trial by

8    jury the greatest anchor ever yet imagined by which a

9    government, in this case this table right here, is held

10   through to the principles of its Constitution.

11             Ladies and gentlemen of the jury, you have now

12   been chosen as jurors to decide this case solely on the

13   evidence alone, not about what you may presuppose, not about

14   what the government or myself says in the opening, but from

15   the evidence adduced in this courtroom.  In other words,

16   you're going to see some of it on the screen, you're going

17   to hear witnesses when they take the stand to testify.

18             At the end of that, we're going to have another

19   opportunity to talk to you again, which the judge will tell

20   you is called closing arguments.  The judge will give you

21   instructions.  Then and only will the judge instruct you

22   that you into the jury room to deliberate on the case.

23             Ladies and gentlemen of the jury, the

24   government has charged one count in this case called

25   conspiracy.  And the government's charge is conspiracy to

1    commit bank fraud.  This is not the time for argument.  So I

2    have an opportunity to come back to talk to you during the

3    closing argument phase after you've listened to the

4    witnesses and seen the evidence in this case.

5              But ladies and gentlemen of the jury, I'm going

6    to ask you, as the judge has instructed you, to withhold

7    opinions.  Do not be judgmental.  Listen to the evidence

8    before you go in to deliberate.  And then you're able to

9    reach and make an informed decision based on the evidence.

10             Why do I say that, ladies and gentlemen of the

11   jury?

12             This is not a case about conspiracy.

13             Why?

14             The evidence will show that the individuals in

15   this case went to school together, high school together, in

16   Nigeria before they all migrated to the United States.  They

17   eventually became United States citizens, and they continue

18   to associate.  Some of them have even been on Facebook.

19   They have even connected on Myspace.

20             At the end of the day, ladies and gentlemen of

21   the jury, the evidence will not show that Mr. Henry Obilo

22   conspired, confederated, assisted in any way, shape, or form

23   in the conspiracy as alleged in this case.

24             Let me tell you, ladies and gentlemen of the

25   jury, this case, you're going to see bank records.  You're

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1   going to see and hear numbers.  You're going to see

2   individuals who are going to come into the courtroom and

3   say, "I don't know this person.  I didn't know that person.

4   Somebody took my money."

5          But bear in mind, ladies and gentlemen of the

6   jury, that that is not the case.  I'm telling you right now.

7   You're going to hear from witnesses who will tell you that

8   money was taken from their account.  Money was moved from

9   their account.

10          But what the evidence will not show you is that

11   Mr. Henry Obilo took that money from anyone's account that

12   will take the stand to testify in this case.

13          Let me also remind you the evidence will show,

14   as I have told you previously, these individuals knew each

15   other.  What the evidence will show, that knowing each other

16   and being friends -- you're not going to hear any evidence

17   put on Mr. Obilo to any of the criminal activities charged

18   in this particular case.

19          The evidence will further show that there were

20   contacts made.  You're going to hear names.  At some point,

21   they will be lost in translation.  But let me try to break

22   it down so you may follow.

23          You're going to hear the name Tobechi Onwuhara,

24   AKA Toby.  I'm going to continue to refer to him as Toby

25   because there's another name of an individual called

1   Chikezie Onwumere, whose name, if you don't pay attention,

2   will be lost in translation with Onwuhara.

3          So Chikezie Onwumere, I'll refer to him as

4   Chikezie.  Toby Onwuhara, full name Tobechi Onwuhara, I will

5   refer to as Toby.

6          You're going to hear about another individual

7   Abel Nnabue.  He goes by the name of Q.  I'll refer to him

8   as Q so that you will follow and track what happens with

9   these individuals at every part and stage of this case.

10          You may, as the government told you, hear from

11   another individual who in this case has pled guilty by the

12   name of Ezenwa Onyedebelu.  I will call him Eze, E-z-e, so

13   that we don't get lost in translation because a lot of the

14   names seem to sound alike, so that you know and follow who

15   was doing what on what occasion.

16          You may hear, as the government told you, from

17   another person who pled guilty, Paula Gipson, G-i-p-s-o-n.

18          And there is another individual by the name of

19   Precious Matthews.

20          There's another individual -- those ones are

21   easy to follow.

22          At the end of the day, ladies and gentlemen of

23   the jury, one thing you're going to see in this case and the

24   evidence will show from all these names I've given you, from

25   T to Q to Eze to Precious to Matthews to Gipson to Chikezie,

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    one thing that you're going to see that is common with all

2    those individuals, that at some point they were receiving

3    monies from Toby through Ms. Matthews.

4              When the monies are wired overseas, it's then

5    sent back to the United States through Ms. Matthews's

6    account, who would then distribute the monies to individuals

7    at Toby's direction.

8              One thing the evidence will not show in this

9    case is that a dime, a cent has ever made its way to the

10   alleged co-conspirator, Mr. Obilo.

11             At the conclusion of this case, I'm going to

12   come back to talk to you again and then try to summarize

13   what I will submit to you the evidence has shown.  And at

14   that time, I'm going to ask you to find Mr. Obilo not guilty

15   because the government will not have proven each and every

16   element of the offense charged in this particular case.

17             The law, ladies and gentlemen of the jury, as a

18   great Supreme Court justice once said, is meant to protect

19   the trusting as well as the suspicious.  And at the

20   conclusion of this case, you're going to be left with one

21   impression:  He may have been suspicious, he may have been

22   trusting, but definitely not guilty.

23             Thank you, Judge.

24             THE COURT:  Mr. Eisinger, you may call your

25   first witness.

1          ATTORNEY NEWBY:  The United States calls Paula

2     Gipson.

3          THE COURT:  All right.  Mr. Newby.

4          ATTORNEY NEWBY:  Your Honor, before we start

5     with Ms. Gipson's testimony, the government and defendant

6     have reached a stipulation that we would like to enter into

7     the record.

8          THE COURT:  Give it to the court security

9     officer when he returns.  I'll review it and then I'll

10    present it.

11         Come forward, ma'am.

12         Mr. Wood, retrieve from Mr. Newby the

13    stipulation.

14         THE MARSHAL:  Yes, sir.

15         THE COURT:  You may administer the oath to the

16    witness.

17         (Witness sworn.)

18         THE COURT:  All right.  Before we begin,

19    Mr. Newby, hand the stipulation to Mr. Wood.

20         You may be seated, Ms. Gipson.

21         ATTORNEY NEWBY:  (Complied).

22         THE COURT:  All right.  We can wait on this for

23    a bit unless you're going to play it during this testimony.

24         ATTORNEY NEWBY:  We will be playing recordings

25    during this testimony.

1          THE COURT:  All right.  Ladies and gentlemen,

2     the parties may stipulate to facts; that is, they may agree

3     that certain facts exist.  That's called a stipulation.  And

4     you may accept that fact as having been proved.  You're not

5     required to, but you may do so.

6          In this instance, the defendant and the

7     government stipulate that the call recordings produced by

8     E&M Limited, doing business as SpoofCard.com, on or about

9     February 4th, 2008, and filed as Government's Exhibits 1 and

10     2, are accurate recordings of phone calls made through E&M

11     Limited Systems; and E&M Limited makes and keeps in the

12     ordinary course of business; and that the recordings marked

13     as Government Exhibits 1 and 2 are authentic and admissible

14     in evidence without any additional authentication.

15          In essence, ladies and gentlemen, Exhibits 1

16     and 2 are admitted into evidence, and the parties have

17     stipulated that these call recordings are accurate

18     recordings of the telephone calls.

19          Proceed, Mr. Newby.

20          PAULA GIPSON, having been duly sworn, was

21     examined and testified as follows:

22                    DIRECT EXAMINATION

23     BY ATTORNEY NEWBY:

24     Q.   Good afternoon, Ms. Gipson.

25          Please state your name and spell it for the

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    court reporter.

2    **A.**    Paula Gipson; P-a-u-l-a, G-i-p-s-o-n.

3    **Q.**    Ms. Gipson, where do you currently live?

4    **A.**    I live in Glenn Heights, Texas.

5    **Q.**    How long have you lived in Glenn Heights, Texas?

6    **A.**    I been there for about 14 months.

7    **Q.**    Where were you living prior to that?

8    **A.**    DeSoto, Texas.

9    **Q.**    Approximately where are Glenn Heights, Texas and

10   DeSoto, Texas?

11   **A.**    They're about five miles down the road from each

12   other.

13   **Q.**    Is that near a major metropolitan area?

14   **A.**    The south part of Dallas.

15   **Q.**    Ms. Gipson, have you recently been convicted of a

16   federal crime?

17   **A.**    Yes, I have.

18   **Q.**    And what was that federal crime of which you were

19   convicted?

20   **A.**    Conspiracy to commit bank fraud.

21   **Q.**    When were you convicted of that crime?

22   **A.**    February of 2009.

23   **Q.**    Was that pursuant to a plea agreement?

24   **A.**    Yes.

25   **Q.**    You pled guilty?

1    A.    Yes, sir.

2    Q.    Prior to that crime, have you been convicted of any

3    federal crimes in the past?

4    A.    Yes.  In the year of 2000.

5    Q.    What was that crime?

6    A.    Conspiracy to commit -- to counterfeit a securities

7    organization.

8    Q.    And generally speaking, what was your involvement in

9    that particular crime?

10   A.    Cashing counterfeit travelers checks.

11   Q.    You were cashing them?

12   A.    I gave them to people to cash.

13   Q.    Have you had any other convictions in the past?

14   A.    I had theft -- a theft in '93-'94, the year of

15   '93-'94.

16   Q.    So approximately 15 years ago?

17   A.    Yes.

18   Q.    Now, with respect to the conspiracy to commit bank

19   fraud crime of which you were convicted a couple of months

20   ago, please describe what your role in that conspiracy was.

21   A.    My role was to call banking institutions impersonating

22   the customer -- the account holder and ask for balances,

23   information about the person's account, and information to

24   send a wire transfer, and relay the information to Toby.

25   Q.    Who is Toby?

1    A.    Toby is Tobechi Onwuhara.

2    Q.    What was his role based on your observations in this

3    scheme to commit bank fraud?

4    A.    He basically managed the whole scheme.

5    Q.    Were there other persons besides yourself and Toby who

6    were involved in this scheme?

7    A.    Yes, there were.

8    Q.    And who were they?

9    A.    Some I know by names; some I know by nicknames.   One

10   is a gentleman named E, Brandy Anderson, Henry.

11              THE COURT:   Henry who?

12              THE WITNESS:   Henry Obilo.

13              THE COURT:   Next question.

14              Any others?

15              THE WITNESS:   Abel Nnabue, Chike, Precious

16   Matthews.   Those are a few that I know.

17   BY ATTORNEY NEWBY:

18   Q.    You mentioned the name Henry Obilo.

19              Do you see him in the courtroom today?

20   A.    Yes, I do.

21   Q.    Could you please identify him by an article of

22   clothing he's wearing and his general position in the

23   courtroom.

24   A.    He's to my left with the gray jacket on.

25              THE COURT:   The record will reflect that the

1    witness has identified the defendant.

2              Next question.

3    BY ATTORNEY NEWBY:

4    Q.    I believe you mentioned Q.

5              Do you know his full name?

6    A.    Abel Nnabue.

7    Q.    Did you go by any nicknames among these people?

8    A.    They called me Mookie before.

9    Q.    How did you get involved in this scheme?

10   A.    I met Chike, who is a cousin of Tobechi Onwuhara.   And

11   he introduced me to Toby, and Toby introduced me to the

12   scheme.

13   Q.    Approximately what was the time frame that you were

14   introduced to the scheme?

15   A.    In 2007.

16   Q.    And did you know any of these other individuals who

17   you've listed prior to being introduced to Toby?

18   A.    No, sir.

19   Q.    Had you met Q before?

20   A.    Yes.  Yes, sir.

21   Q.    How did you know Q?

22   A.    I met Q from the halfway house.

23   Q.    When did you know him from the halfway house?

24   A.    In 2003.

25   Q.    That was following your release from your prior

1    conviction?

2    A.    That is correct.

3    Q.    Now, you mentioned that Toby would give you names; is

4    that correct?

5    A.    That is correct, yes, sir.

6    Q.    And who were these names of?

7    A.    Account holders of banks or either credit unions.

8    Q.    How would this list of names be obtained?

9    A.    He would call a leads company and ask them for an

10   advertisement listing or a mailing list and basically would

11   tell them the criterias he would want the people to have,

12   either -- sometimes he wanted a certain state.  Sometimes he

13   wanted a certain age, married.  And also how much money --

14   income he would like for them to make over.

15   Q.    Were there any particular criteria that would be

16   searched for?

17   A.    Yes.  He would want people that made over a half a

18   million dollars in some cases, people that had homes that

19   were a million plus.

20   Q.    And do you recall the names of some of these leads

21   companies that would be searched?

22   A.    U.S. Data, Maryland Data are a couple of them.

23   Q.    List Source?  Does that name sound familiar?

24   A.    That does sound familiar.

25   Q.    Was that another leads company?

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    A.    Yes.

2    Q.    So once these leads were gathered, what would be done

3    with that information?

4    A.    Once he gets the leads, he would then use a site

5    called Tracers Info or Search America which are sites

6    that -- like skip tracing.  They're skip tracing sites.  He

7    would then obtain the customer -- from the customer's name

8    and address, he would then obtain their date of birth and

9    their Social.

10          The skip tracing site, you can also run a

11   report on it, which will give you relatives, neighbors,

12   employment history, previous addresses, general information

13   about the account holders.

14   Q.    Did you ever run these skip tracing reports for Toby?

15   A.    I have before, yes, sir.

16   Q.    And how did you have access to these databases?

17   A.    Toby would give me, like, his log-on or I've been

18   right there in the presence of him doing it.

19   Q.    Were those fee-based databases?

20   A.    Excuse me?

21   Q.    Were they fee-based databases, if you know?

22          Did you have to pay a fee to use them?

23   A.    Yes, sir.

24   Q.    So once you would get this additional personal

25   identifying information of account holders, what would you

1    do next?

2    **A.**    Once he obtained that type of information, then he

3    would run the person's credit.  He would use

4    annualcreditreport.com.  He would run the person's credit.

5    He would use the choice of Experian.  When you go to

6    annualcreditreport.com and you go to Experian, you would

7    come to a questionnaire.  It's series of four to

8    five questions:  Normally, who is your mortgage account

9    with?  How much is your mortgage payment?  And different

10   things like that.  It's multiple-choice type answers.

11            He would then -- when he'd get to the

12   questionnaire, he would back space his key, which would take

13   him back to the previous page.  Then he would forward space

14   his key again, which would take him back to the

15   questionnaire.

16            The questions would remain the same, but the

17   order of the answers would change.  He would use what you

18   call like a process of elimination to guess the answers.

19   Whichever answer appeared the most is the answer he would

20   use as the correct, and that's how he obtained it.

21   **Q.**    Did you ever follow this process to obtain credit

22   reports for other people?

23   **A.**    Yes, sir.

24   **Q.**    And who taught you how to do that?

25   **A.**    Toby.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1  Q.    Do you know if other people that were involved in this

2  scheme also did that?

3  A.    Yes, sir.

4  Q.    Did you observe them doing that?

5  A.    Yes, sir.

6  Q.    Who were some of those people that you observed

7  accessing credit reports of other individuals?

8  A.    I've observed Q, which is Abel Nnabue.  I've observed

9  Chike doing it.  I've observed Toby doing it.  And that's

10  it.

11  Q.    Once you or members of the scheme would have this

12  information from the credit reports, what would you then do

13  as part of the scheme?

14  A.    Then he would look for people that had second

15  mortgages, line of credit accounts.  Once he verified that

16  the line of credit account was on the credit report, he

17  would see if the account was open.  And then he would --

18  once he knew the account was open, he would then call the

19  back and verify balances, the high credit, and different

20  things like that, and then he'd request a wire transfer.

21  Q.    You said that "he" would call the banks.

22         Are you referring to Toby?

23  A.    Toby or whoever he'd chose to do that.

24  Q.    And you called the banks?

25  A.    I have, yes, sir.

1    Q.    And you were impersonating female account holders?

2    A.    That's correct, sir.

3    Q.    In the instance when you called the banks, what would

4    you do if you were posed with a question like "What's your

5    mother's maiden name?"

6    A.    Toby would always give me the information.  He knew

7    the process of the banks, so he knew the type of questions

8    they would ask.  He would already provide me with that type

9    of information.  And I asked him before how was he obtaining

10   the mother's maiden name.  He told me he used ancestry.com.

11   Q.    Ancestry.com?

12   A.    That is correct.

13   Q.    That's a website?

14   A.    Yes, sir.

15   Q.    Now, once you would call a bank -- well, let me back

16   up.

17              How would people involved in this scheme call

18   the bank?  What type of phone would they use?

19   A.    They would use a phone that's not associated with a

20   person, a phone that you can pick up at your Walgreens,

21   Walmart, a pay-as-you-go type phone that comes with minutes

22   or something like that.

23   Q.    Would the bank be called directly from that phone or

24   through some other service?

25   A.    No.  He would use a service called Spoof.  He would

1   set up a Spoof account.  Spoof was -- it's a -- it was -- it

2   was designed to play pranks on the phone because it allows

3   you to actually call a person and put whatever number of

4   your choice to come up on the caller I.D.

5         So once he knew how the SpoofCard worked, he

6   used that to call the bank.  And when the banker looks on

7   the caller I.D., he could actually make it look as if he's

8   calling from the customer's home.

9   Q.   Have you used SpoofCard?

10  A.   Yes, I have, sir.

11  Q.   Could you just walk the jury through the process of

12  how you would initiate a call through SpoofCard?

13  A.   You would call the -- it's, like, a 1-800 number.  You

14  would call the 1-800 number.  It will ask you for your

15  account number.  Then it would relate to you how many

16  minutes you have available.

17        Then it would say, "Enter the number you wish

18  to call."  You enter your number.

19        Then it will say, "Enter the number you wish to

20  come on the caller I.D."  you would enter that.

21        It would say, "Press 1 to record."  You can

22  choose that option.

23        Then it would say, "Connect your call."  And it

24  would tell you what key to press at that time.

25  Q.   Now, when calling a bank, how would a typical call to

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1   a financial institution go in terms of trying to get account

2   information?

3   A.   You would call -- typically, you would call as if you

4   were the person, impersonating the account holder, ask for

5   your account balance.  And they'll just ask you your date of

6   birth, your Social, probably to verify the home phone

7   number, things like that.  Then they would give you the

8   information that you're asking for.

9           He would -- Toby would want you to get the wire

10  information.  So you would probably ask them, "What is the

11  cutoff time for an international wire?"

12          "What is the procedure of getting a wire

13  transfer?"

14          He pretty much knew the procedure of getting

15  the wire transfer.  So he knew that they would actually fax

16  the form to you.

17          So he would already supply you with an e-fax

18  number to his e-fax, and he would tell you to have them

19  wire -- send the form to his e-fax.

20  Q.   What is e-fax?

21  A.   E-fax is a fax number that you can get that goes

22  directly to your e-mail.

23  Q.   I want to back up for one moment.

24          When you make a phone call through SpoofCard,

25  you said you would enter an account number?

1    A.    Yes, sir.

2    Q.    How would you get access to those account numbers?

3    A.    Toby had an account with that company.

4    Q.    Toby provided you with the account number?

5    A.    Yes.  Yes, sir.

6    Q.    Going back to making these phone calls to banks, were

7    any of the phone calls that you made to banks successful in

8    causing wire transfers to be made from other people's

9    accounts?

10   A.    Yes, sir.

11   Q.    Do you know approximately the dollar value of those

12   transfers?

13   A.    I know around the amount.  I believe one was, like,

14   89,000 something.  The other was, like, 97,000 something.

15   Q.    And what would happen -- how would you learn the wire

16   had gone through?

17   A.    Toby Would tell me.

18   Q.    Would you receive any kind of compensation for your

19   role in performing those calls?

20   A.    Yes, I was.  I did receive money for making the calls.

21   Q.    And how would you be paid?

22   A.    I was paid in cash.

23   Q.    By whom?

24   A.    Toby.

25   Q.    Based on your observations, were other people paid by

1    Toby for participating in this scheme?

2    A.    Yes, sir.

3    Q.    Do you know approximately how the funds were split

4    depending on who did the work in making the calls?

5    A.    No, I really don't know how the money was split.  He

6    would -- on a few occasions, he's given me, like, $4,000 for

7    making a call.  Then he's given me, like, $3,000 for making

8    a call.  But as far as how it was split up, no, sir.

9    Q.    Based on your observations of Tobechi Onwuhara, did it

10   appear that he made a fair amount of money through this

11   scheme?

12   A.    Yes, sir.

13   Q.    What led you to make that observation?

14   A.    His lifestyle, the cars he drove, his jewelry, the way

15   he lived, and how he lived.

16   Q.    What type of cars do you recall seeing him drive?

17   A.    I've seen him drive a Bentley.  I've seen him drive a

18   Maserati.  Those are the two most expensive cars.

19   Q.    Now, you mentioned that you had seen Henry Obilo

20   before; correct?

21   A.    Yes, sir.

22   Q.    Could you please describe the circumstances in which

23   you recall seeing the defendant Henry Obilo.

24   A.    I was meeting -- Toby had me to meet him over to a

25   guy's house by the name of E, which was an apartment

1    community by the name of Verona.  And when I came in the

2    door, Henry was sitting at the table, Toby was in the living

3    area, and there were a couple other people that were there.

4                And Toby -- me and Toby walked in the kitchen.

5    He told me to come in the kitchen.  And he was showing me

6    something on his laptop.  Henry was sitting at the kitchen

7    table.

8    Q.    What was Toby showing you on his laptop?

9    A.    He was showing me some credit reports that he was

10   looking at.

11   Q.    What did you observe about the defendant Henry Obilo?

12   A.    Well, while I was there, Donald -- they call him

13   D.O. -- came into the house -- came to the apartment, and he

14   was talking to Henry about something they had did with a

15   Washington Mutual account.  And I saw Henry also looking at

16   credit reports while I was there.

17   Q.    Did the defendant have any discussions with any of the

18   other people in the apartment regarding the scheme?

19   A.    Well, also while I was there, Q, which is Abel Nnabue,

20   came over to the apartment and confronted Henry about some

21   money that he owed him from some money that they supposedly

22   had drew out of someone's account.

23   Q.    And how did that conversation ensue?

24   A.    He -- he said, you know, "Hey, what happened to that

25   deal we did?"  You know, "What happened to the deal we did?"

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    or whatever.  And Henry states, you know, "We hadn't got

2    that money yet."  And Toby yelled from the kitchen "I told

3    you we hadn't got that money."

4    Q.    During the course of your involvement in the scheme,

5    did you witness persons involved making phone calls to

6    financial institutions?

7    A.    Yes, sir.

8    Q.    And did you become familiar with the voices of some of

9    those people?

10   A.    Yes, sir.

11          ATTORNEY NEWBY:  At this point, the government

12   would like to play what's been marked as Government

13   Exhibit 3, Clip 1.

14          THE COURT:  Is this part of the stipulation?

15          ATTORNEY NEWBY:  Yes, your Honor.  This will be

16   tied up through Detective Pak.  This was part of the

17   stipulation we discussed prior to this morning's

18   proceedings.

19          THE COURT:  All right.  You may proceed.

20          (Tape played to the jury.)

21   BY ATTORNEY NEWBY:

22   Q.    Do you recognize the male voice on that phone call?

23   A.    Yes, sir.

24   Q.    Who is that?

25   A.    That's Toby's voice.

1    Q.    Tobechi Onwuhara?

2    A.    Yes.

3    Q.    I would ask you to listen to what's been marked as

4    Government Exhibit 6, Clip 1.

5              THE COURT:  Well, he gave a name in that phone

6    call.

7              Was that his name?

8              THE WITNESS:  No, sir.

9              THE COURT:  Next question.

10             So I take it that was a call in which he was

11   impersonating a depositor?

12             THE WITNESS:  Yes, sir.

13             THE COURT:  Next question.

14             (Tape played to the jury.)

15   BY ATTORNEY NEWBY:

16   Q.    Do you recognize the male voice on that telephone

17   call?

18   A.    Yes, sir.

19   Q.    Whose voice is that?

20   A.    Tobechi Onwuhara.

21   Q.    Toby?

22   A.    Yes.

23   Q.    That was not Robert?

24   A.    No, that was not Robert.

25   Q.    Do you -- would there ever be a situation -- strike

1    that.

2            In advance of calling a financial institution,

3    would anything be done to anticipate a situation where a

4    bank might call back to confirm a wire?

5    A.    Yes.  Toby pretty much knew how the bank worked as far

6    as once they fax you the form, they will -- once they

7    receive the form back, they will call you.  They will call

8    the number that's on the account holder's account.

9            So what he would do is he would find out the

10   account holder's phone -- telephone company.  He would then

11   call the telephone company and have them to remotely forward

12   the phone.  He would say, "I had a flood in my house.  I

13   can't go back into my house.  Could you forward my phone

14   remotely?"  And they would.  He would send -- so the call

15   would actually come to him.

16           ATTORNEY NEWBY:  I would like to play what's

17   been marked as Government Exhibit 12, Clip 1, please.

18           (Tape played to the jury.)

19           THE COURT:  Can you all hear that?

20           (Jurors respond affirmatively.)

21   BY ATTORNEY NEWBY:

22   Q.    Do you recognize the male voice on that phone call?

23   A.    Yes, sir.

24   Q.    Whose voice is that?

25   A.    That's Tobechi Onwuhara.

1    Q.   Toby?

2    A.   Yes, sir.

3    Q.   That was not James Witt?

4    A.   No, sir.

5    Q.   Do you know a James Witt?

6    A.   No, sir.

7              ATTORNEY NEWBY:   Can we play Government's

8    Exhibit 16, Clip 1.

9              (Tape played to the jury.)

10   BY ATTORNEY NEWBY:

11   Q.   Do you recognize the male voice on that phone call?

12   A.   Yes, sir.

13   Q.   Whose voice was that?

14   A.   That is Tobechi Onwuhara.

15   Q.   Toby?

16   A.   Yes, sir.

17   Q.   That was not Joseph White?

18   A.   No, sir.

19             ATTORNEY NEWBY:   Play Government's Exhibit 17,

20   Clip 1.

21             (Tape played to the jury.)

22   BY ATTORNEY NEWBY:

23   Q.   Do you recognize the male voice on that phone call?

24   A.   Yes, sir.

25   Q.   Whose voice is that?

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    A.    Tobechi Onwuhara.

2    Q.    Toby?

3    A.    That is correct.

4    Q.    You referenced earlier seeing the defendant Henry

5    Obilo and Q and Toby and Donald Okoro at the Verona

6    apartments?

7    A.    Yes, sir.

8    Q.    What city are the Verona apartments in?

9    A.    They're in the City of Dallas.

10   Q.    Approximately what was the time frame -- time of year

11   when you recall seeing the defendant?

12   A.    It was in the month of April of '08.

13   Q.    And the name Donald Okoro, who was he?

14   A.    His nickname was D.O.  That was the name he was

15   called.

16   Q.    Did you recognize him as somebody who was involved in

17   the scheme?

18   A.    Yes, sir.

19              ATTORNEY NEWBY:  No further questions.

20              THE COURT:  Any cross-examination?

21              ATTORNEY IWEANOGE:  Yes, Judge.

22                    CROSS-EXAMINATION

23   BY ATTORNEY IWEANOGE:

24   Q.    Good afternoon, Ms. Gipson.

25   A.    Good afternoon.

1    Q.    You said back in -- back in 2000, you were convicted

2    of a crime involving lying, cheating, and stealing; correct?

3              ATTORNEY NEWBY:  Objection; misstates the

4    testimony.

5              THE COURT:  It does.  Let's not rehash.  It's

6    been asked and answered, but you may ask about it.

7              ATTORNEY IWEANOGE:  Okay.  May I proceed?

8              THE COURT:  Yes.

9    BY ATTORNEY IWEANOGE:

10   Q.    You were convicted for stealing back in 2000; correct?

11   A.    No.  No, sir.

12   Q.    What were you convicted of in 2000?

13   A.    Conspiracy to counterfeit a securities organization.

14   Q.    Were the monies cashed?

15   A.    Yes, sir.

16   Q.    Did you receive part of the money?

17   A.    Yes, sir.

18   Q.    So the money was stolen; correct?

19             THE COURT:  What was your question, the money

20   was what?

21             ATTORNEY IWEANOGE:  Stolen.

22   BY ATTORNEY IWEANOGE:

23   Q.    It wasn't your money, was it?

24   A.    No, sir.

25   Q.    So the money was stolen; correct?

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    A.    I guess so, yes.

2              THE COURT:  Well, let's be clear about this.

3              You were convicted of what crime?

4              THE WITNESS:  Conspiracy to counterfeit a

5    securities organization.

6              THE COURT:  To counterfeit?

7              THE WITNESS:  Yes, sir.

8              THE COURT:  What -- and you were -- you

9    received money for engaging in this conspiracy?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  Do you know where that money came

12   from?

13             THE WITNESS:  No, sir.

14             THE COURT:  So you don't know whether it was

15   stolen or not, do you?

16             THE WITNESS:  No, sir.

17             THE COURT:  Next question.

18   BY ATTORNEY IWEANOGE:

19   Q.    Do you recall on direct examination explaining to the

20   jury that you were cashing monies that you knew did not

21   belong to you?

22   A.    I'm sorry.  Could you repeat that.

23   Q.    Do you recall when Mr. Newby asked you to explain to

24   the jury on direct examination about the crime you were

25   convicted of this 2000?  Do you recall that question?

1  **A.**     Yes, sir.

2  **Q.**     Okay.

3            Specifically, could you tell us what you did in

4  that case?

5            What was the crime you committed and you went

6  for jail for?

7            THE COURT:  Your question is now compound.

8            ATTORNEY IWEANOGE:  I'll rephrase it.

9            THE COURT:  Let me ask this of the witness:

10 Did you pass counterfeit money?

11           THE WITNESS:  Yes, sir.

12           THE COURT:  And what did you do with the money

13 that you got back when you passed it or the merchandise?

14           THE WITNESS:  I gave it to the person who I was

15 actual getting the counterfeit travelers checks from.

16           THE COURT:  All right.  So they were

17 counterfeit travelers checks?

18           THE WITNESS:  Yes, sir.

19           THE COURT:  And you received money for those?

20           THE WITNESS:  Yes, sir.

21           THE COURT:  Were you paid?

22           THE WITNESS:  Yes, sir.

23           THE COURT:  And were you paid from the funds

24 that came out of cashing the counterfeit travelers checks?

25           THE WITNESS:  I was paid from the person who

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    was actually giving me the counterfeit travelers checks.

2                    THE COURT:  Next question.

3    BY ATTORNEY IWEANOGE:

4    Q.    You knew the checks were counterfeit; correct?

5    A.    Yes, sir.

6    Q.    You were cashing monies that were not yours or -- that

7    were not yours; correct?

8    A.    Yes, sir.

9    Q.    Okay.

10                   With respect to Toby Onwuhara, you met him

11   through his cousin Chikezie Onwumere?

12   A.    Could you please restate that.

13                   THE COURT:  He just wants to know who you met

14   Toby through.

15                   THE WITNESS:  I met Toby through Chike, which

16   is Toby's cousin.

17   BY ATTORNEY IWEANOGE:

18   Q.    The full name is Chikezie; right?

19   A.    That is his first name, yes.

20   Q.    He lives in New York; correct?

21   A.    Yes, sir.

22   Q.    In fact --

23                   THE COURT:  Avoid commenting on the evidence.

24                   ATTORNEY IWEANOGE:  I will rephrase, Judge.

25

1    BY ATTORNEY IWEANOGE:

2    Q.    Where does Chikezie live?

3    A.    He lives in New York, from my knowledge.

4    Q.    After Chikezie, who you told us is Toby's cousin,

5    introduced you to Toby, you initially did not start doing

6    anything illegal with Toby; correct?

7    A.    That is correct.

8    Q.    It took a while for him to trust you; correct?

9    A.    That is correct.

10   Q.    And then you started doing activities as -- criminal

11   activities; correct?

12   A.    That is correct.

13   Q.    You started making calls on behalf of Toby; correct?

14   A.    Yes, sir.

15   Q.    And Toby paid you for making those calls; correct?

16   A.    Yes, sir.

17   Q.    You knew the calls you were making were illegal

18   because you were trying to obtain money that belonged to

19   other people; correct?

20   A.    Yes, sir.

21   Q.    And you and Toby received funds from these accounts;

22   correct?

23   A.    Yes, sir.

24   Q.    The monies were wired overseas?

25   A.    Yes, sir.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1   Q.   And then subsequently sent back to the United States;

2   correct?

3   A.   Yes, sir.

4   Q.   And then you received your own proceeds by Western

5   Union transfer from Precious Matthews; correct?

6   A.   No, sir.

7   Q.   You got your money directly from Toby?

8   A.   Directly from Toby.

9   Q.   In fact, on one occasion you got $10,000; isn't that

10  correct?

11  A.   No, sir.

12  Q.   Isn't it true -- do you recall talking to Special

13  Agent Nail, N-a-i-l, in this particular case?

14  A.   Yes, sir.

15       ATTORNEY IWEANOGE:   The Court's indulgence.

16       (Pause.)

17  BY ATTORNEY IWEANOGE:

18  Q.   You spoke to Special Agent Nail back in August --

19  August the 15th of 2008; correct?

20  A.   No, sir.

21  Q.   When did you talk to him first?

22  A.   The first time I met Michael Nail was when me and my

23  attorney came here in Virginia.  And I believe that was,

24  like, in September -- the end of August or September.

25  Q.   End of September?

1    A.    That sounds about right.

2              THE COURT:  She said end of August or

3    September.

4              Next question.

5    BY ATTORNEY IWEANOGE:

6    Q.    So you did not talk to Special Agent Nail on the 14th

7    of August of 2008?

8    A.    That does not sound right.

9    Q.    Did you talk to --

10              ATTORNEY IWEANOGE:  Court's indulgence.

11              (Pause.)

12   BY ATTORNEY IWEANOGE:

13   Q.    Did you talk to Special Agent Lynd and Etienne -- I'll

14   spell it, E-t-i-e-n-n-e -- on the 5th of August of 2008?

15   A.    I believe -- yes, I believe so.

16              Is that Mr. Haley, last name Haley?

17   Q.    E-t- -- two agents.  First name, A-l-l-y-n; last name

18   is L-y-n-d.

19   A.    I did speak with a couple of agents around that time.

20   Q.    So the first time -- you now recall that the first

21   time you spoke to an agent was actually August the 5th of

22   2008?

23   A.    That sounds about right.

24   Q.    Isn't it true that back in August -- August the 5th of

25   2008 when you spoke to these agents, you were asked about

1    individuals that were members of this conspiracy?  Correct?

2    A.    Yes, sir.

3    Q.    Isn't it true that when you spoke to the agents,

4    Etienne and Lynd, back on the 5th of August 2008, you never

5    mentioned the name Henry Obilo; correct?

6    A.    That is correct.

7    Q.    In fact, you never even mentioned the name Henry;

8    correct?

9    A.    That is correct.

10   Q.    You mentioned the name of Toby; correct?

11   A.    Yes, sir.

12   Q.    You mentioned Q; correct?

13   A.    Yes, sir.

14   Q.    You mentioned Eze Onyedebelu; correct?

15   A.    No, I didn't mention him.

16   Q.    You mentioned Chikezie; correct?

17   A.    Yes, sir.

18   Q.    You mentioned Dennis Dorsey; correct?

19   A.    Yes, sir.

20   Q.    And subsequently, you had another meeting which you

21   don't recall back on the 14th of August, which was

22   approximately about nine or ten days later.  This time it

23   was one of the original special agent, last name -- I'll

24   spell it -- E-t-i-e-n-n-e, and then Special Agent Nail,

25   N-a-i-l

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

```
 1              Do you recall that meeting at the
 2   U.S. Attorney's Office with Detective Pak present and
 3   U.S. attorney Mr. Tyler present as well?
 4   A.    Yes, sir, I did have a meeting with them.
 5   Q.    And your lawyer, Mr. Todd, was present at the time;
 6   correct?
 7   A.    Yes, sir.
 8   Q.    At that time you were also asked about members of this
 9   conspiracy; isn't that correct?
10   A.    Yes, sir.
11   Q.    And when you came to see them on the 5th, you were not
12   in jail, were you, the first time you saw them on the 5th of
13   August?
14   A.    I believe I was still in jail, yes.
15   Q.    On the 15th when you came to see them, you were not in
16   jail; correct?
17   A.    That's correct.
18   Q.    You had actually gone home, and then you came with
19   your own two feet with your lawyer into the U.S. Attorney's
20   Office; correct?
21   A.    That's correct.
22   Q.    At the time you were asked about the people who were
23   involved in this conspiracy; correct?
24   A.    Yes, sir.
25   Q.    You again mentioned Toby Onwuhara that you knew as T
```

1    or you call Toby; correct?

2    A.    Yes, sir.

3    Q.    You again tell them about Dennis Dorsey; correct?

4    A.    Yes, sir.

5    Q.    You again tell them about Chikezie Onwumere; correct?

6    A.    Yes, sir.

7    Q.    And then, in fact, you specifically went into detail

8    as to what Toby did in this conspiracy; correct?

9    A.    Yes, sir.

10          MR. IWEANOGE:   Court's indulgence.

11          (Pause.)

12   BY ATTORNEY IWEANOGE:

13   Q.    And then you also told them about Donald Okoro that

14   you referred to today as D.O.; correct?

15   A.    Yes, sir.

16   Q.    And you told them specifically what D.O. did in the

17   conspiracy; correct?

18   A.    Yes, sir.

19   Q.    You talked also about Abel Nnabue; correct?

20   A.    Yes, sir.

21   Q.    That's Q?

22   A.    Yes, sir.

23   Q.    You told them what he did in the conspiracy; correct?

24   A.    Yes, sir.

25   Q.    Including the fact that allstateassociates@yahoo.com

1    website belongs to him; correct?

2    **A.**    That's an e-mail address.  Yes, sir.

3    **Q.**    You also told them about Precious Matthews; correct?

4    **A.**    Yes, sir.

5    **Q.**    You were even shown a photograph of Precious Matthews

6    and you identified Ms. Matthews; correct?

7    **A.**    That is correct, sir.

8    **Q.**    And then you also advised them that Ms. Matthews

9    conducted the Western Union transfers and was a

10   co-conspirator to Toby; correct?

11   **A.**    That she --

12   **Q.**    I'll repeat.

13            That Gipson -- that Matthews --

14            ATTORNEY IWEANOGE:  Court's indulgence.  I'm

15   sorry.

16            (Pause.)

17   BY ATTORNEY IWEANOGE:

18   **Q.**    Matthews conducted Western Union wire transfers to --

19            THE COURT:  Is this a question?

20            ATTORNEY IWEANOGE:  Yes, judge.

21            THE COURT:  Come to the bench.

22            (Sidebar conference held as follows:)

23            THE COURT:  Mr. Iweanoge, it appears to me

24   you're reading from a document.  You may not get a document

25   in evidence simply because you're reading it.  You may ask

1   her questions.

2                 Is that what you're doing?

3                 ATTORNEY IWEANOGE:  Judge, I didn't want to

4   misquote what she said to the agents.  That's why I just

5   read the exact line, not to confuse her.  I will not read

6   from the document.  I will just ask the questions.

7                 THE COURT:  If she can't recall, you may

8   certainly show her the document to see if that refreshes her

9   recollection.

10                 ATTORNEY IWEANOGE:  Yes, Judge.

11                 THE COURT:  It appears you're just reading from

12   a document, and you may not put a document into evidence

13   that doesn't belong in evidence simply by reading it.  But

14   you may continue to examine her about what she said to the

15   agents at the time.

16                 ATTORNEY IWEANOGE:  Yes, Judge.

17                 THE COURT:  All right.  Let's proceed.

18                 ATTORNEY IWEANOGE:  Yes, Judge.

19                 (End of sidebar conference, open court as

20   follows:)

21                 THE COURT:  You may proceed.

22                 ATTORNEY IWEANOGE:  Yes, your Honor.

23   BY ATTORNEY IWEANOGE:

24   Q.   And you told them at the time that Ms. Matthews was

25   the one who did the wire transfers by Western Union;

1   correct?

2   **A.**   I think I said that -- I believe I said that she sent

3   me a wire transfer one time.  But as far as how he

4   distributed the money through Western Union, I wasn't aware

5   of anything like that.

6   **Q.**   You told them also about Chikezie Onwumere, who

7   happened to be your boyfriend; correct?

8   **A.**   He was a friend of mine, yes, sir.

9   **Q.**   You had sexual relations with him, did you not?

10  **A.**   Yes, sir.

11  **Q.**   With respect to Chikezie, you also told them that

12  Chikezie played a role in this conspiracy?

13  **A.**   Yes, sir.

14  **Q.**   That Chikezie specifically made calls as well;

15  correct?

16  **A.**   I witnessed him doing that.

17  **Q.**   Okay.

18          Were you disappointed when you found out that

19  Chikezie's case was dropped?

20  **A.**   No.  I wasn't even aware of that.

21  **Q.**   Okay.

22          You told the government as well about Derek

23  Tresvant.  I'll spell the last name.  T-r-e-s-v-a-n-t.  You

24  told them about him?

25  **A.**   That is correct.

1   Q.    You also told them about Eze, also known as Ezenwa

2   Onyedebelu; correct?

3   A.    I really can't remember, but I don't think I mentioned

4   him because I didn't even remember him at the time.

5   Q.    So you don't recall telling Special Agent Nail back on

6   the 14th with your attorney present about Ezenwa Onyedebelu?

7   A.    I believe he may have shown me a picture of him and I

8   knew him as E, but I don't remember what all was said or

9   may, you know -- because I met Toby several times over at

10  his apartment, but --

11  Q.    Is there something that will refresh your

12  recollection?

13  A.    Yes, sir.

14          THE COURT:  She hasn't said she doesn't recall.

15  You asked her a specific question.

16          ATTORNEY IWEANOGE:  Okay.

17          THE COURT:  Not okay, Mr. Iweanoge.

18          ATTORNEY IWEANOGE:  Yes, Judge.  I apologize,

19  your Honor.

20  BY ATTORNEY IWEANOGE:

21  Q.    Specifically, with respect to Mr. Onyedebelu, you were

22  shown a photograph of Mr. Onyedebelu; correct?

23  A.    Mr. Who?

24          THE COURT:  Onyedebelu.

25

1    BY ATTORNEY IWEANOGE:

2    **Q.**    Onyedebelu, E.

3    **A.**    I believe I was shown a photo of E.

4             ATTORNEY IWEANOGE:  The Court's indulgence.

5             (Pause.)

6    BY ATTORNEY IWEANOGE:

7    **Q.**    You also told the agents about another individual by

8    the name of Obinna Nneji, N-n-e-j-i?

9    **A.**    Could you repeat that name, please.

10   **Q.**    Okay.

11            First name is O-b-i-n-n-a, Obinna.  Last name

12   is Nneji, N-n-e-j-i?

13   **A.**    I think I was shown a picture of him and I recognized

14   him.

15   **Q.**    Okay.

16            You identified him for the agents; correct?

17   **A.**    Yes, sir.

18            THE COURT:  Mr. Iweanoge, you have to cease

19   commenting on the testimony.

20            ATTORNEY IWEANOGE:  Yes, Judge.

21            THE COURT:  Do you know what I mean?

22            ATTORNEY IWEANOGE:  Yes, Judge.

23   BY ATTORNEY IWEANOGE:

24   **Q.**    After you were shown the photograph of Mr. Nneji, you

25   identified him; is that correct?

1   A.   Yes, sir.

2   Q.   And then did you tell them what he did in the

3   conspiracy as well?

4   A.   I told them how I knew him.

5   Q.   Okay.

6          With respect to another individual, T-y, you

7   also tell them about T-y; correct?

8   A.   Ty.  I told them about my experience with Ty.

9   Q.   Okay.

10          THE COURT:  Come to the bench.

11          ATTORNEY IWEANOGE:  Yes, Judge.

12          (Sidebar conference held as follows:)

13          THE COURT:  I'm not sure you do understand,

14   Mr. Iweanoge, about commenting on the evidence.  After a

15   witness answers a question -- and this is true for the

16   government as well -- don't say, "Okay."

17          That's a comment on the testimony.  It

18   indicates you agree with it or accept it because there are

19   times when you don't say, "Okay."  So when you ask a

20   question and the witness answers it, don't say anything.

21   Ask another question.

22          ATTORNEY IWEANOGE:  Yes.

23          THE COURT:  Is that clear?  That is what I

24   meant by commenting on the evidence.

25          ATTORNEY IWEANOGE:  Yes, Judge.

1          THE COURT:  It goes for the government as well.

2          Let's proceed.

3          (End of sidebar conference, open court as

4     follows:)

5          THE COURT:  All right.  You may proceed.

6     BY ATTORNEY IWEANOGE:

7     Q.    You told them about Ty; is that correct?

8     A.    Yes, sir.

9     Q.    And the fact that Ty even dealt drugs as well;

10    correct?

11    A.    I believe that came up.

12    Q.    And you also then talked about Brandy Anderson;

13    correct?

14    A.    I believe her name came up, but I've never experienced

15    her doing anything wrong.

16    Q.    Isn't it true that you told Special Agent Nail that

17    Precious Matthews and Brandy Anderson were good friends?

18    A.    I don't recall that, but -- I'm not sure.  But I knew

19    they were -- they would speak and everything, but I don't

20    know anything about then being good friends.

21    Q.    Isn't it true that you also told Special Agent Nail

22    that Brandy Anderson was well aware of the scheme?

23    A.    Yes.  Yes, sir.

24    Q.    And at the end of this conversation with Special Agent

25    Nail, you never mentioned Henry or Henry Obilo or Ujay as a

1   member of this conspiracy; correct?

2   A.    That is correct.

3   Q.    As a defendant in this case, before you pled guilty

4   before Judge T.S. Ellis, III, you received discovery in this

5   case; correct?

6   A.    Yes, sir.

7   Q.    You received statements -- or documents that contained

8   statements that other people may have said; correct?

9   A.    I didn't receive -- I don't remember receiving any

10  statements of what other people made.  Possibly just my part

11  in it, but I don't know who made the statements or anything

12  like that.

13  Q.    So you never saw any statements written by special

14  agents or the FBI that investigated this case?

15          ATTORNEY NEWBY:  Objection; relevance.

16          THE COURT:  I'll overrule it.  If she saw,

17  she can say so.

18          THE WITNESS:  I don't remember --

19          THE COURT:  Maybe her attorney is the only one

20  who saw it.

21          Next question.

22          THE WITNESS:  I don't remember.  I don't

23  remember that.

24  BY ATTORNEY IWEANOGE:

25  Q.    Did you review videotapes or audiotapes in this case?

1   A.    I've listened to audiotapes before, yes.

2          ATTORNEY IWEANOGE:   Court's indulgence.

3          (Pause.)

4   BY ATTORNEY IWEANOGE:

5   Q.    You also testified before of the grand jury in this

6   case; correct?

7   A.    Yes, sir.

8   Q.    And before you testified at the grand jury, you had an

9   opportunity to speak with Special Assistant U.S. Attorney

10  Tyler Newby; correct?

11  A.    Yes, sir.

12  Q.    And then appeared under oath before the grand jury;

13  correct?

14  A.    Yes, sir.

15  Q.    Before the grand jury -- you appeared before the grand

16  jury on August the 14th of 2008; is that correct?

17  A.    Yes, sir, that sounds right.

18  Q.    Isn't it true that when you appeared before the grand

19  jury under oath again you never mentioned Henry Obilo as a

20  member of this conspiracy?

21  A.    That is correct, yes, sir.

22          THE COURT:   Were you asked who the members of

23  the conspiracy were?

24          THE WITNESS:   There were people that I didn't

25  know.   There were people that I knew by nicknames.   There

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    were people that I only knew by first names or even by face.

2              THE COURT:  No.

3              My question was in the grand jury, were you

4    specifically asked to name all the members of the

5    conspiracy?

6              THE WITNESS:  No.  I was asked about specific

7    people.

8              THE COURT:  Next question.

9              ATTORNEY IWEANOGE:  Court's indulgence.

10             THE COURT:  All right.

11             (Pause.)

12   BY ATTORNEY IWEANOGE:

13   Q.    Were you ever shown a photograph of Henry Obilo?

14   A.    Yes, sir.

15   Q.    And that was before the grand jury; correct?

16   A.    No, sir.

17   Q.    At the U.S. Attorney's Office; correct?

18             ATTORNEY NEWBY:  Objection, your Honor.  The

19   question is confusing.  It's unclear when he's referring to.

20             THE COURT:  Yes.

21             Were you shown a picture of Henry Obilo?

22             THE WITNESS:  Yes, sir, I was.

23             THE COURT:  Where were you when you were shown

24   that picture?

25             THE WITNESS:  I really don't remember exactly

1    the specific place, but I remember seeing the picture.

2              THE COURT:  Next question.

3    BY ATTORNEY IWEANOGE:

4    Q.    Was a special agent of the FBI present?

5    A.    I'm really not sure.  I really don't remember.

6    Q.    Was an assistant United States attorney present?

7    A.    I really don't remember who all was present at that

8    time.

9    Q.    Why were you shown -- why were you being shown a

10   photograph of Mr. Obilo?

11   A.    You said why?

12   Q.    Yes.

13   A.    I was being shown pictures of a lot of people.

14   Q.    Who was showing you the photographs?

15   A.    I've been shown photographs from different people,

16   difference agents at different times.

17   Q.    So which one was showing you Henry Obilo's photograph?

18   A.    I believe it was Michael Nail.

19   Q.    And what did you tell him when he showed you the

20   photograph?

21   A.    He asked me did I know him, did I recognize him.  And

22   I know him yes.

23   Q.    When did this conversation take place?

24   A.    It took place -- I believe it was around January or

25   February of '09.

1    Q.   Of this year?

2    A.   First time, yes, sir.

3    Q.   Was he taking notes when you were talking to him?

4    A.   I don't believe he was.

5    Q.   Other than Special Agent Nail, who else was present?

6    A.   I believe Tyler Newby was present.  Yes, he was taking

7    notes.  They were all taking notes.

8    Q.   Okay.

9              And you identified Henry as what?

10   A.   As being part of the scheme.

11   Q.   Have you ever made any calls on his behalf?

12   A.   No, sir.

13   Q.   Has he ever given you any numbers to call?

14   A.   No, sir.

15   Q.   Has he ever given you his phone to use to make any

16   calls?

17   A.   No, sir.

18   Q.   The monies that you -- Toby gave you part of, did you

19   ever see Toby giving him any money?

20   A.   I never seen Toby giving him money.

21             ATTORNEY IWEANOGE:  Court's indulgence.

22             (Pause.)

23             THE COURT:  Anything further?

24             ATTORNEY IWEANOGE:  Just briefly, Judge.

25             Judge, may we approach?  Jencks issue.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  Have you made the Jencks

2     production, Mr. Newby?

3          ATTORNEY NEWBY:  We made Jencks productions of

4     statements.

5     BY ATTORNEY IWEANOGE:

6     Q.   Ma'am, would it surprise you to know that there's no

7     notes from the FBI of any conversation with them where you

8     identified Mr. Henry Obilo in any photograph?

9          ATTORNEY NEWBY:  Objection.

10         Can we approach?

11         THE COURT:  Sustained whether -- her surprise

12    or lack of surprise is irrelevant.

13         Anything further, Mr. Iweanoge?  You still need

14    to approach?

15         ATTORNEY IWEANOGE:  Yes, Judge.

16         THE COURT:  All right.  Do it quickly.

17         ATTORNEY IWEANOGE:  Yes, Judge.

18         Sidebar conference held as follows:)

19         ATTORNEY IWEANOGE:  Judge --

20         THE COURT:  Speak up.

21         ATTORNEY IWEANOGE:  Based on my questions, I

22    asked Mr. Newby, any of the Jencks -- he said everything

23    they had they turned over to me.  There is no such Jencks

24    that exists.

25         THE COURT:  Do you understand what Jencks

1    really applies to?

2                ATTORNEY IWEANOGE:  If she's going to be called

3    as a witness.

4                THE COURT:  Who's going to be called?

5                ATTORNEY IWEANOGE:  If a witness is going to be

6    called and a witness made a statement --

7                THE COURT:  Yes.

8                ATTORNEY IWEANOGE:  -- it should be turned over

9    to me.

10               THE COURT:  Only if it's her statement.

11               ATTORNEY IWEANOGE:  Yes.

12               THE COURT:  That she adopts, not necessarily

13   FBI interview notes or 302.

14               ATTORNEY EISINGER:  We never received any of

15   these.

16               ATTORNEY NEWBY:  If I can make the government

17   abundantly clearly on the issue.  We turned over formal 302

18   in an abundance of caution statements that were made by this

19   witness and all testifying witnesses.  We did not turn over

20   raw notes, as is our practice.  They were never adopted by

21   the defendant.  They were not statements.

22               ATTORNEY IWEANOGE:  Judge, I'm not talking

23   about raw notes.  I'm talking about the witness with an

24   interview with the FBI identifies a photograph and saying

25   this is so-and-so, and so I know him.  I have no -- no

1    documentation on that interview.  That surprises me.

2              THE COURT:  It doesn't surprise me.  They don't

3    have to write down everything that happens in a note.  It

4    isn't Jencks.

5              It isn't something she read and adopted; is

6    that correct?

7              ATTORNEY EISINGER:  That is correct.

8              ATTORNEY NEWBY:  That is absolutely correct.

9              THE COURT:  It isn't Jencks if your request is

10   failure to turn over Jencks.

11             Have you turned over all statements she has

12   made or adopted?

13             ATTORNEY NEWBY:  Yes.  We turned over the

14   written confession and went beyond that and turned over the

15   302 that she has not adopted.

16             THE COURT:  What is your objection or problem,

17   Mr. Iweanoge?

18             ATTORNEY IWEANOGE:  Judge, a problem I have,

19   if a witness is shown a photograph and the witness

20   supposedly -- allegedly identifies my client in the

21   photograph, first of all, the photograph that was used for

22   identification is supposed to be turned over to me.

23             THE COURT:  Why?  Under what case?

24             ATTORNEY IWEANOGE:  Judge, I believe, it's,

25   like, under identification cases whereby the witness -- when

1    it's suggestive in terms of the identification process.

2    Suggestivity, reliability of identification.

3          THE COURT:  She isn't identifying the defendant

4    today on the basis of a prior identification.  She is doing

5    it on the basis of what she says today.

6          ATTORNEY IWEANOGE:  Judge, I'm talking about

7    the one that happened at the meeting.

8          THE COURT:  Well, you elicited that testimony.

9    They didn't.

10          ATTORNEY IWEANOGE:  I did, Judge.

11          THE COURT:  So, they don't have to, the

12    identification that she made at some time in the past is not

13    the basis of her identification here in court.  And,

14    therefore, and you never moved to suppress.

15          In any event, I don't see any need -- any

16    requirement by the government to produce that photograph to

17    you.  If you can show me some authority to the contrary --

18    I'm fully aware of the cases to the contrary.

19          If there is a photo array shown or any

20    photograph, if unduly suggestive, it can be suppressed.

21    That identification is not being offered in court today.

22    The identification that is being offered in court today is

23    her identification of him today.

24          Now, you can inquire if you think there is some

25    doubt that she really knows who Henry Obilo is.  You can

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    certainly inquire.  But the fact that there isn't some 302

2    that specifically refers to an identification doesn't

3    surprise me.

4                    Is there such a 302?

5                    ATTORNEY NEWBY:  No, your Honor.

6                    THE COURT:  There you have it.

7                    ATTORNEY IWEANOGE:  Yes, Judge.

8                    THE COURT:  All right.

9                    ATTORNEY IWEANOGE:  Yes, Judge.

10                   THE COURT:  Do you have more examination?

11                   ATTORNEY IWEANOGE:  Yes, Judge.

12                   THE COURT:  All right.  Let's -- how much more?

13                   ATTORNEY IWEANOGE:  My client is writing some

14   notes for me.  I think about another 15 minutes.

15                   THE COURT:  All right.  Let's do it quickly

16   now.

17                   ATTORNEY IWEANOGE:  Yes, Judge.

18                   (End of sidebar conference, open court as

19   follows:)

20                   ATTORNEY IWEANOGE:  Court's indulgence.

21                   (Pause.)

22                   THE COURT:  Let's proceed.

23                   ATTORNEY IWEANOGE:  Yes, Judge.

24   BY ATTORNEY IWEANOGE:

25   Q.    With respect to your conversations with Special Agents

1    Lynd and Etienne, if I'm pronouncing it right, that happened

2    on the 5th of August of 2008, isn't it true you told them

3    that you were paid $10,000 -- T paid you $10,000 on one

4    occasion and $8,000 on another occasion?

5    **A.**    I don't remember if I told them that.

6    **Q.**    With respect to that conversation of 8/5/2008, you

7    also advised them that you've been to New York on many

8    occasions with Toby; correct?

9    **A.**    No, sir.

10    **Q.**    You've never been to New York with Toby?

11    **A.**    No.  I've been to New York one time, but it was with

12    my family.

13    **Q.**    So you have not been to New York on trips with a group

14    to meet other people involved in New York?

15    **A.**    No, sir.

16    **Q.**    Isn't it true, during your meeting with Agents Lynd

17    and Etienne on 8/5/2008, that you told them that you had

18    been to New York on trips with a group and met other people

19    involved --

20           ATTORNEY NEWBY:  Objection.  He appears to be

21    reading from a document.  It's been asked and answered.

22           ATTORNEY IWEANOGE:  I'm not reading from a

23    document.

24           THE COURT:  It's been asked and answered.  But

25    I'll permit it one more time, and that's it.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          Proceed.

2               ATTORNEY IWEANOGE:  Yes, your Honor.

3     BY ATTORNEY IWEANOGE:

4     Q.    And that you met people that were involved in the

5     conspiracy while in New York?

6     A.    I never told anyone that.

7     Q.    You never met Mr. Obilo in New York, did you?

8     A.    No, sir.

9     Q.    Where does Mr. Obilo live?

10    A.    I believe he lived in Florida.

11    Q.    Okay.

12               But you saw him in --

13    A.    Dallas.

14    Q.    Toby's sister and mom also participated in this

15    conspiracy; correct?

16    A.    I've never seen them.  I've never been in the company

17    of them doing that, no.  No, sir.

18    Q.    How much total did you receive from Toby for what you

19    did in this conspiracy?

20    A.    It was somewhere in between about $15- to $18,000.

21    Q.    And at no time did you receive a one-time payment of

22    $8,000?

23    A.    I may have.  But a total, you know, over a period of

24    time was about $15- to $18,000.

25               ATTORNEY IWEANOGE:  The Court's indulgence.

1          (Pause.)

2          THE COURT:  All right.  How much more do you

3     have?

4          ATTORNEY IWEANOGE:  I'm almost done, Judge.

5     I'm just going through my notes to make sure.

6     BY ATTORNEY IWEANOGE:

7     Q.   With respect to this SpoofCard or this Spoof, do you

8     buy it in a store or do you buy it online?

9     A.   I don't know because I got the information from Toby.

10    He gave me his account and his pin to use his SpoofCard.  So

11    I don't know how he purchased it.

12    Q.   So you don't know how the SpoofCard is purchased?

13    A.   No, sir.

14         THE COURT:  Asked and answered.

15         ATTORNEY IWEANOGE:  Judge, I believe I'm done.

16    Let me just talk to my client for just one minute.

17         THE COURT:  All right.  How much do you have by

18    way of redirect, Mr. Newby?

19         ATTORNEY NEWBY:  Very brief, your Honor.

20         THE COURT:  All right.

21         ATTORNEY IWEANOGE:  The Court's indulgence.

22         (Pause.)

23    BY ATTORNEY IWEANOGE:

24    Q.   Ms. Gipson, how did you know that Toby had an account

25    with Spoof?

1   A.   Because he gave me his account number and his pin.

2   Q.   Okay.

3            He gave you an account number and the pin, and

4   you assumed that's his account?

5   A.   No.  I don't know whose account it was.  He gave me

6   the information --

7   Q.   Okay.

8   A.   -- to use the SpoofCard.

9            THE COURT:  Redirect.

10                 REDIRECT EXAMINATION

11  BY ATTORNEY NEWBY:

12  Q.   Mr. Iweanoge asked you if you knew where the defendant

13  Henry Obilo lived.

14           Do you recall that question?

15  A.   Yes, sir.

16  Q.   And you believed that he lived in the Florida area?

17  A.   Yeah.  I've just heard them say that, but I don't know

18  exactly where he lived.

19  Q.   During 2007 and 2008, you lived in Dallas?

20  A.   That is correct.

21  Q.   Where you saw Henry Obilo was in Dallas?

22  A.   Yes, sir.

23  Q.   Tobechi Onwuhara, where did he live during this time

24  period?

25  A.   He lived -- his home was in Florida, but he had an

1    apartment also in Dallas, too.

2             ATTORNEY NEWBY:  No further questions.

3             THE COURT:  Thank you.  You may step down.

4             (Witness excused.)

5             THE COURT:  Call your next witness.

6             ATTORNEY EISINGER:  Government calls George

7    Frazier, your Honor.

8             And can we release the witness, your Honor?

9             THE COURT:  Any objection, Mr. Iweanoge, to the

10   witness be released?

11            ATTORNEY IWEANOGE:  No, Judge.

12            THE COURT:  She may be.

13            Come forward and take the oath, please.

14            (Witness sworn.)

15            THE COURT:  All right.  You may proceed.

16            GEORGE FRAZIER, having been duly sworn, was

17   examined and testified as follows:

18                     DIRECT EXAMINATION

19   BY ATTORNEY EISINGER:

20   Q.    Could you please state your name and spell your last

21   name for the record.

22   A.    George Frazier.  That's F-r-a-z-i-e-r.

23   Q.    How are you employed, Mr. Frazier?

24   A.    I'm currently out of a disability for chronic

25   disseminated lyme disease.  My background is in finance.

1    Q.    How long have you been out on disability?

2    A.    Since 1998.

3    Q.    In what city and state do you currently reside?

4    A.    Scottsdale, Arizona.

5    Q.    How long have you lived there?

6    A.    Since 1996.

7    Q.    In September and October of 2007, did you have a

8    checking account at Bank of America?

9    A.    Yes, I did.

10   Q.    Did you also have a home equity line of credit or

11   HELOC there?

12   A.    Yes, I did.

13   Q.    On September 26th, 2007, did you call up a Brian Kelly

14   at Bank of America to request a wire transfer in the amount

15   of $385,000 from your Bank of America account?

16   A.    No, I did not.

17   Q.    Did you authorize anyone to move $385,000 from your

18   home equity line of credit to your checking account?

19              THE COURT REPORTER:  Excuse me, your Honor.

20              THE COURT:  Yes.

21              Mr. Eisinger, a little slower.

22              THE COURT REPORTER:  No, no, no, no, no.

23              THE COURT:  Oh, the papers?

24              THE COURT REPORTER:  No.  The defense is

25   speaking too loudly in his mike, and I'm not hearing the

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1   questions.

2              THE COURT:  Thank you, Mr. Rodriquez.

3              Mr. Iweanoge, you'll have to be quiet.

4              Proceed, Mr. Eisinger.

5   BY ATTORNEY EISINGER:

6   Q.    Did you authorize anyone to move $385,000 from your

7   HELOC to your checking account?

8   A.    No, I did not.

9   Q.    Did you authorize anyone to wire transfer $385,000

10  from your checking account to Johnny Construction Company?

11  A.    No, I did not.

12             ATTORNEY EISINGER:  I'm going to play what's

13  been admitted -- or marked as Government's Exhibit No. 20,

14  Clip 1.

15             THE COURT:  Is this another telephone?

16             ATTORNEY EISINGER:  Yes, it is.

17             THE COURT:  All right.  And you're going to tie

18  it up later?

19             ATTORNEY EISINGER:  Yes, your Honor.

20             THE COURT:  And there's no objection in doing

21  that, is there?

22             ATTORNEY IWEANOGE:  No objection, Judge.

23             THE COURT:  All right.  Proceed.

24             (Tape played to the jury.)

25

1    BY ATTORNEY EISINGER:

2    Q.    Did you recognize the caller who claims he's Brian

3    Kelly, a premiere account manager at Bank of America?

4    A.    No, I did not.

5    Q.    Do you recognize the defendant?

6    A.    No, I do not.

7    Q.    Prior to this year, did you ever hear the name Henry

8    Obilo or Ejay?

9    A.    No, never.

10   Q.    Did you authorize anyone else to make those transfers

11   for you?

12   A.    No, I did not.

13   Q.    Can you tell the jury what happened to your Bank of

14   America account in and about September of 2007?

15   A.    Yes.  Basically, I was actually -- I live in

16   Scottsdale, Arizona, as I said.  I was visiting my brother

17   during that time frame in Fort Myers, Florida.  I was coming

18   back into Phoenix on September 28th.  The date I remember

19   because it was my mother's birthday.  And actually, I was in

20   Florida to be with my brother on the anniversary of my

21   mother's death.

22            And I got a call from my wife, who was coming

23   to pick me up at the airport on the 28th, about Bank of

24   America calling several times to try to determine the

25   validity of a $385,000 draw-down of our home equity credit

1    line and whether I had anything to do with it or any

2    authorization to a wire transfer to a Johnny Construction

3    Company.  Of course, I knew nothing of it.

4              And she immediately put me through on my cell

5    phone to a representative from Bank of America, and they

6    asked several questions.  And, of course, I basically told

7    them what I just reiterated; that I did not authorize a

8    draw-down, that I was not trying to wire money to Johnny

9    Construction.

10             Basically, this home equity credit line was for

11   emergency purposes.  I would had one in place on my primary

12   residence in Scottsdale for approximately 11 years at that

13   point, had never used it, had never had the reason to use it

14   or a cause to use it.  It was strictly for emergency

15   purposes.  And that I was not authorizing anybody to do that

16   whatsoever.  They froze the account.

17             I immediately went through customer service

18   with Bank of America on the phone to change all of my

19   online -- or my passcodes and all of my privacy information.

20   We -- on the way home from the airport before even getting

21   home, we stopped at our local Bank of America branch to

22   close out that home equity credit line, which already had

23   fraud alerts placed on it by Bank of America; to close out

24   the corresponding checking account, which was a bit of a

25   hardship because that account was placed -- the reason I had

1    that checking account was to deal with some medical issues

2    that my mother was having while she was ill in Florida.  It

3    was the only account that I still had my mother's name on if

4    we had any medical issues or anything resolved to have --

5    make deposits or do anything with anything related to her

6    name.

7              But we immediately closed that account out as

8    well, changed all of our online access codes and everything

9    else, put fraud alerts on all the accounts, and did whatever

10   we could to try to stop whoever was coming after us in

11   trying to get this money from us and took whatever steps we

12   deemed appropriate at the time.

13   Q.   Did the $385,000 actually -- did you actually lose

14   that money?

15   A.   Well, what happened was it was successfully drawn down

16   out of the home equity credit line and placed into the

17   checking account that I had set up with my brother and my

18   mother in Florida, but they were not able to wire it out of

19   that account.

20             Bank of America was insisting on calling me.

21   And when they couldn't get through to me, they didn't

22   transfer those funds to this Johnny Construction.

23             So the money never technically left Bank of

24   America, never left my checking account.  It did show up on

25   my credit report.  Both the phone number that was being used

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    to perpetrate this fraud, which I determined was out of the

2    State of Georgia, as well as an address in Georgia tied to

3    that phone number as well as the $385,000, you know, on my

4    credit report basically --

5              THE COURT:  The answer has now become a

6    narrative and not responsive to the question.

7              Next question.

8    BY ATTORNEY EISINGER:

9    Q.   With the help of Mr. Wood, I would like to show you

10   what's been marked as Government Exhibit No. 24.

11             ATTORNEY EISINGER:  And, your Honor, we have a

12   stipulation as to the authenticity of these records.

13             THE COURT:  All right.  You may hand that to

14   the court security officer.

15             All right.  The witness has Exhibit 24.

16             Ladies and gentlemen, the parties stipulate

17   that records produced by the Bank of America on or about

18   March 30, 2009 and in Government's Exhibit 24 are business

19   records that the Bank of America makes and keeps in the

20   ordinary course of business.  And the parties agree that

21   Exhibit 24 is admissible without any further authentication.

22             And I take it the parties agree it's admissible

23   as a business record?

24             ATTORNEY EISINGER:  Correct, your Honor.

25             THE COURT:  All right.  So I will admit

1    Exhibit 24 by virtue of the parties' stipulation.

2                All right.  What's your question on Exhibit 24,

3    Mr. Eisinger?

4    BY ATTORNEY EISINGER:

5    Q.   Do you recognize this exhibit?

6    A.   Yes, I do.

7    Q.   Can you tell the jury what's on -- what's shown on

8    Page 3 of this exhibit.

9    A.   What I have in front of me is a signature page for

10   both --

11               THE COURT:  Look to your left, ladies and

12   gentlemen, and you'll see --

13               You'll have to make that a lot larger, the

14   print, if you want the jurors to see what you're referring

15   to.

16               Do you see that, ladies and gentlemen.

17               (Jurors respond affirmatively.)

18               THE COURT:  Go ahead, Mr. Eisinger.

19   BY ATTORNEY EISINGER:

20   Q.   Can you explain what's shown on that page?

21   A.   Yes, I can.  I see it now.

22               It's basically the checking account that I had

23   set up with my brother and mother in Florida.  It shows the

24   beginning balance that we had in the account at the time for

25   her medical expenses, and then it shows the $385,000

1    draw-down of my home equity credit line being added to the

2    checking account balance on September 26th.  It shows it as

3    part of the balance in the account.

4    Q.   And did you suffer any losses or incur any costs as a

5    result of this?

6    A.   Because Bank of America caught this and didn't allow

7    the transfer out of the checking account without talking to

8    me, the only out-of-pocket expenses I incurred were trying

9    to figure out what the -- I did an Internet search on the

10   phone number to try to figure out an address tied to it, and

11   I think that was less than $10.

12              I spent, I think, a nominal amount, about $5,

13   with an organization called Chex Systems to provide an added

14   level of security on any checks that would be issued out of

15   any of my accounts.

16              ATTORNEY EISINGER:  No further questions, your

17   Honor.

18              THE COURT:  All right.  Cross-examination.

19                   CROSS-EXAMINATION

20   BY ATTORNEY IWEANOGE:

21   Q.   Good afternoon, Mr. Frazier.

22   A.   Good afternoon.

23   Q.   Your account -- you didn't have an account here in

24   Virginia; correct?

25   A.   Not in Virginia.

1   **Q.**   Okay.

2             The account was in Florida?

3   **A.**   This account was in Florida.

4   **Q.**   And then your research indicated that the number that

5   was calling was from the State of Georgia; correct?

6   **A.**   The information I was given on the phone number was

7   that the phone call originated with a Georgia area code.

8             THE COURT:  That could have been a cell phone;

9   is that right?

10             THE WITNESS:  It could have been any phone

11   whatsoever.  I mean, it was just a phone number I was given

12   by Bank of America security.  They believed this was the

13   phone number that was making the phone calls for the people

14   that were trying to perpetrate this fraud.

15             THE COURT:  Next question.

16   BY ATTORNEY IWEANOGE:

17   **Q.**   And you live in Scottsdale, Arizona?

18             THE COURT:  Asked and answered.

19             Next question.

20             ATTORNEY IWEANOGE:  Court's indulgence.

21             (Pause.)

22             ATTORNEY IWEANOGE:  No further questions,

23   Judge.

24             THE COURT:  Any redirect?

25             ATTORNEY EISINGER:  No, your Honor.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

```
 1                    THE COURT:  Call your next witness.

 2                    ATTORNEY EISINGER:  May we release Mr. Frazier?

 3                    THE COURT:  Any objection?

 4                    ATTORNEY IWEANOGE:  No, Judge.

 5                    THE COURT:  All right.  He may be released.

 6                    (Witness excused.)

 7                    THE COURT:  Next witness.

 8                    ATTORNEY EISINGER:  The government calls Louis

 9      Fraser.

10                    THE COURT:  Different Fraser; is that right?

11                    ATTORNEY EISINGER:  That's correct, your Honor.

12                    THE COURT:  After this witness, ladies and

13      gentlemen, we'll take the afternoon recess.

14                    How long do you anticipate this witness will be

15      on direct, Mr. Eisinger?

16                    ATTORNEY EISINGER:  We have two clips.  And one

17      of them, I think, is a little bit longer.  So probably about

18      15 minutes, your Honor.

19                    THE COURT:  All right.

20                    Come forward, sir, and take the oath, please.

21                    (Witness sworn.)

22                    THE COURT:  All right.  You may proceed.

23

24

25
```

1          LOUIS A. FRASER, having been duly sworn, was

2     examined and testified as follows:

3                    DIRECT EXAMINATION

4     BY ATTORNEY EISINGER:

5     Q.    Can you please state your name and spell your last

6     name for the record.

7     A.    Louis A. Fraser.  I spell it -s-e-r at the end.

8     Q.    And how are you employed?

9     A.    I'm sorry?

10    Q.    How are you employed?

11              THE COURT:  Are you employed?

12              THE WITNESS:  No.  I'm retired.

13              THE COURT:  Next question.

14    BY ATTORNEY EISINGER:

15    Q.    And in what city and state do you reside?

16    A.    Palmetto Bay, Florida.

17    Q.    And how long have you lived there?

18    A.    Thirty-five years.

19    Q.    In September and October of 2007, did you have a

20    personal account and a business account at Bank of America?

21    A.    Yes, I did.

22    Q.    And on September 26th, 2007, did you call Bank of

23    America and request a wire transfer for $38,200 from your

24    Bank of America account?

25    A.    No, I did not.

1   Q.    Did you authorize anyone to wire transfer $38,200 from

2   your personal account?

3   A.    No, I did not.

4   Q.    Do you know anyone by name of Daniel Aiken?

5   A.    No, I don't.

6   Q.    I'm going to play a clip for you of what's been marked

7   as Government Exhibit No. 21?

8              THE COURT:  Turn it up a bit, please.

9              (Tape played to the jury.)

10  BY ATTORNEY EISINGER:

11  Q.    Was the caller who claimed to be you on the call

12  actually you?

13  A.    No.

14  Q.    I'm going to play for you what's been marked as

15  Government's Exhibit No. 27.

16             THE COURT:  Well, the person who was claiming

17  to be Fraser gave some numbers.

18             Did you hear the numbers?

19             THE WITNESS:  Sir?

20             THE COURT:  The person who claimed to be you on

21  the telephone call provided some numbers.

22             Did you recognize those numbers?

23             THE WITNESS:  No, I did not, sir.

24             THE COURT:  Next question.

25

1    BY ATTORNEY EISINGER:

2    Q.    I will play for you what has been marked as

3    Government's Exhibit 27.

4              (Tape played to the jury.)

5    BY ATTORNEY EISINGER:

6    Q.    Do you recognize the voice of the person who's

7    claiming to be Bank of America employee Leonard Copley?

8    A.    No.

9    Q.    Was the caller who claimed to be you actually you or

10   anyone you know?

11   A.    I'm sorry.  Can you repeat?

12   Q.    Was the caller who claimed to you actually you or

13   anyone that you know?

14   A.    No.

15   Q.    Do you recall if your Bank of America account number

16   ended in 2931?

17   A.    I don't recall that.

18   Q.    Do you recognize the defendant?

19   A.    No, I don't.

20   Q.    Prior to this year, did you know anyone by the name of

21   Henry Obilo or Ubay?

22   A.    No, I don't.

23   Q.    And can you briefly describe what happened to your

24   account at Bank of America in September of 2007?

25   A.    I received a call from our account manager -- my

1    account manager.  His name is Mark Smith.  He asked me if I

2    had called the bank to make a transfer.

3              And I told him no.

4              And he told me that he thought somebody was

5    trying to impersonate me.  The amount of transfer was, I

6    think, 38,200.

7              And I told him absolutely not.

8    Q.    And was that money ever actually transferred out of

9    your account?

10   A.    No.

11   Q.    Did you incur any actual losses or expenses as a

12   result of this?

13   A.    Well, shortly after this happened, in September I had

14   a bunch of identity thefts on opening up new accounts in

15   different stores.  And consequently, I was forced to employ

16   LifeLock to protect my credit.  But the identity theft that

17   began shortly after this call, there were 14 of them.  And I

18   did pay LifeLock for the service one year, and I rehired

19   them again this year.

20             I've spent at least 30 hours, if not more,

21   going to police stations, dealing with individual merchants

22   and credit agencies trying to clear my credit, which I've

23   successfully done.  It took me, like one year to do it.  My

24   credit was finally cleared 100 percent from these series of

25   events in September 2008.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          ATTORNEY EISINGER:  I have no further

2     questions, your Honor.

3               THE COURT:  Any cross-examination?

4               ATTORNEY IWEANOGE:  No, Judge.

5               THE COURT:  Thank you.  You may step down.

6               (Witness excused.)

7               THE COURT:  All right.  Ladies and gentlemen,

8     you may pass your books to the right.  Mr. Wood will collect

9     them and maintain their security during the recess.

10              ATTORNEY EISINGER:  Can we excuse this witness,

11     your Honor?

12              THE COURT:  Yes, he may be excused.

13              ATTORNEY IWEANOGE:  No objection, Judge.

14              THE COURT:  Now, it's about ten minutes to

15     4:00.  Mr. Wood, if we could let the folks downstairs know

16     not to close up early so they can go down there.

17              Remember during the recess to refrain from

18     discussing the matter among yourselves or with anyone or

19     undertaking any investigation on your own.  You may follow

20     Mr. Wood out.  We will reconvene at quarter after 4:00, at

21     which time we'll proceed till 5:30 or so.

22              If some of you have childcare responsibilities

23     that require you to be released promptly at 5:00, I will

24     accommodate you.  But I would like to get more done today,

25     if we can.  You tell Mr. Wood how later you're willing to

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    go.

2              You may follow Mr. Wood out.  All rise.

3              (Jury excused at 3:51 p.m.)

4              THE COURT:  All right.  You may be seated.

5              Anything at this time?

6              Mr. Eisinger, how many more -- is this an

7    accurate list of your witnesses, or have you dispensed with

8    some of them because of stipulations?

9              ATTORNEY EISINGER:  No.  That's without

10   stipulations, your Honor.

11             THE COURT:  I beg your pardon?

12             ATTORNEY EISINGER:  That's without the

13   stipulations, your Honor.

14             THE COURT:  This is without them.

15             So have you eliminated some witnesses as a

16   result of the stipulations?

17             ATTORNEY EISINGER:  I'm sorry.  That's the list

18   after the stipulations.

19             THE COURT:  All right.

20             ATTORNEY EISINGER:  So that's our final list.

21             THE COURT:  Court stands in recess until 4:15.

22   Let's see if we can get much more done today.

23             (Court recessed at 3:50 p.m.)

24             (Court called to order at 4:24 p.m.)

25             (Jury impaneled at 4:24 p.m.)

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  All right.  You may be seated.

2          We'll proceed now.

3          Call your next witness, Mr. Newby.

4          ATTORNEY NEWBY:  The government calls

5    Mr. Ezenwa Onyedebelu.

6          THE COURT:  I understand one of you has

7    childcare responsibilities, so I'll release you promptly at

8    5:00.

9          Come forward and take the oath, please, sir.

10          (Witness sworn.)

11          THE COURT:  All right.  You may proceed.

12          EZENWA ONYEDEBELU, having been duly sworn, was

13    examined and testified as follows:

14                    DIRECT EXAMINATION

15    BY ATTORNEY NEWBY:

16    Q.    Good afternoon.

17          Could you please state your name and spell your

18    full name for the record.

19    A.    Ezenwa Onyedebelu; E-z-e-n-w-a, last name

20    O-n-y-e-d-e-b-e-l-u.

21    Q.    Mr. Onyedebelu, where do you currently reside?

22    A.    Flower Mound, Texas.

23    Q.    And how long have you lived in Flower Mound?

24    A.    For about a year.

25    Q.    How old are you?

1    A.    Twenty.

2    Q.    And with whom do you currently live?

3    A.    Both of my parents.

4    Q.    Are you currently employed?

5    A.    No, I'm not.

6    Q.    What do you do to pass your time?

7    A.    I attend Brookhaven College.

8    Q.    How long have you been a student at Brookhaven?

9    A.    For about six months now.

10   Q.    And approximately how far along are you in your

11   collegiate studies?

12   A.    Second year.

13   Q.    Before you were living with your parents in Flower

14   Mound, where did you live?

15   A.    I stayed at the Veronas directly behind the Galleria

16   in Dallas, Texas on Noel Road.

17   Q.    The Veronas?

18   A.    Correct.

19   Q.    Is that an apartment complex?

20   A.    Yes, that is.

21   Q.    Approximately what were the years that you resided at

22   the Veronas apartments?

23   A.    Late 2007, early 2008.

24   Q.    Have you recently been convicted of a federal crime?

25   A.    Yes, I have.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1   Q.   What was that crime?

2   A.   Conspiracy to commit bank fraud.

3   Q.   When were you convicted?

4   A.   November 20th.

5   Q.   Was that through a guilty plea?

6   A.   Yes, that's correct.

7   Q.   Have you been sentenced yet?

8   A.   Yes, I have.

9   Q.   Who was your sentencing judge?

10   A.   Judge Ellis.

11   Q.   Can you describe briefly, give an overview, of what

12   conduct you were involved in that led to your conviction for

13   conspiracy for commit bank fraud.

14   A.   It involved obtaining victims' information from

15   fee-based databases online and then running annual credit

16   reports of these -- using these victims' information.  And

17   then once able to gain access and find out what was

18   available on the account, attempting to fraudulently move

19   the funds.

20   Q.   And were others involved in this scheme?

21   A.   Yes, they were.

22   Q.   Was Toby or Tobechi Onwuhara one of the people

23   involved in this scheme?

24   A.   Yes, he was.

25   Q.   What was his role?

1    A.    He supplied most of the information to everybody else

2    in the scheme.  He obtained most of the Social Security

3    numbers and transferred that to everybody else involved in

4    the scheme.  He did wire transfers from various institutions

5    and so on and so forth.

6    Q.    What was your role in the scheme?

7    A.    I also did along the same lines of running annual

8    credit reports, pulling up bank information, calling into

9    banks and attempting to transfer funds from various

10   institutions.

11   Q.    Did you witness other members of the scheme calling

12   financial institutions and impersonating account holders?

13   A.    Yes, I did.

14   Q.    Approximately how many times did you witness these

15   fraudulent calls?

16   A.    More than probably about 500 occasions.

17   Q.    How many fraudulent calls did you personally make?

18   A.    Somewhere in the ballpark of a hundred.

19   Q.    Do you recognize the name Henry Obilo?

20   A.    Yes, I do.

21   Q.    Do you see Henry Obilo in the courtroom today?

22   A.    Yes, I do.

23   Q.    Can you please identify him by his location and an

24   article of clothing he's wearing.

25   A.    To your left-hand side in a grey suit.

1   Q.   Would that be to my right?

2   A.   Your right-hand side.  I'm sorry.  My left.

3              ATTORNEY NEWBY:  Let the record reflect that

4   the witness has identified the defendant Henry Obilo.

5              THE COURT:  So ordered.

6   BY ATTORNEY NEWBY:

7   Q.   What role, if any, did the defendant Henry Obilo have

8   in this scheme?

9   A.   He mainly was involved in calling Bank of America and

10   impersonating account holders there at Bank of America.

11   Also, he was involved in using the security information of

12   the bank employees at Bank of America, which is the CIA and

13   MBK number, which is basically used by employees at the bank

14   to call in to the corporate office and place orders for

15   things such as checks, debit cards, and other things on the

16   account.

17              And basically it worked by him calling in as

18   the account holder first so it looked like he was placing an

19   order himself inside the bank.  And then by using the bank

20   employee's information, the CIA and MBK number, he was able

21   to speed up the process of ordering the checks or the debit

22   cards.

23   Q.   Did you personally observe the defendant, Henry Obilo,

24   making fraudulent calls to financial institutions?

25   A.   Yes, I did.

1   Q.    Did you observe him disguising -- strike that -- using

2   someone else's name?

3   A.    Yes, I did.

4   Q.    Did you ever observe Mr. Obilo receiving money from

5   any other members of the conspiracy as part of this scheme?

6   A.    Yes, I did.

7   Q.    How did you observe that?

8   A.    Most times face to face.  Sometimes done at my

9   apartment, the Veronas, in Dallas, Texas.  Other times by

10  Western Union, either money given to me by Henry Obilo

11  himself or Tobechi Onwuhara.  And I would transfer the funds

12  to whoever I was instructing.

13  Q.    You personally provided money from Toby to Henry

14  Obilo?

15  A.    Yes, I have.

16  Q.    Approximately what was the time period that you

17  witnessed Henry Obilo participating in this scheme?

18  A.    Mainly closely between the period of April 2007 --

19  2008 -- I'm sorry -- to July 2008.

20  Q.    And where did that take place?

21  A.    At various places.  A lot of times at the Veronas in

22  Dallas, Texas, my apartment; hotels like the Hotel

23  Intercontinental in Addison, Texas; the Pavilion directly

24  next to the Veronas in Dallas, Texas; and other local

25  hotels.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1   Q.   You referenced reviewing credit reports of potential

2   victim account holders.

3   A.   Yes, I did.

4   Q.   How would you access these credit reports of other

5   people?

6   A.   First you would need the name of the victim, the date

7   of birth, Social Security number, previous addresses.  And

8   by having all of this information, you would now enter it on

9   the Annual Credit Report site.

10        It would now transfer you over to another page,

11   which is either asking you which site you wanted to use to

12   run the credit report, which varies from Experian, Equifax,

13   and TransUnion.

14        And from there you would be able to select one,

15   and there was various ways and topics that you would be able

16   to use to access the credit report and answer all the

17   questions successfully.

18   Q.   When you were accessing the credit reports, were you

19   doing that over the Internet?

20   A.   Yes, I was.

21   Q.   How would you connect to the Internet to access these

22   credit reports?

23   A.   By using prepaid wireless cards, mainly Verizon and

24   Sprint wireless cards, obtaining them inside the store.  And

25   by either loading X dollar amount, maybe $500, onto the

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    account and it would last for a while or either paying for

2    these wireless cards by using Green Dot, which is a prepaid

3    debit card, also, which is also obtained using the victim's

4    information.

5    Q.   When you say these Green Dot cards were purchased

6    using a victim's information, what do you mean by that?

7    A.   The card is first purchased.  But to actually gain

8    access and use the funds that were actually put onto the

9    card, you have to enter either a name, date of birth, Social

10   Security, and all of that information.  And usually that

11   information was fraudulent.

12   Q.   I would ask the court security officer to show you

13   what has been marked as Government Exhibit 11-1.

14            ATTORNEY NEWBY:  Your Honor, we have a

15   stipulation regarding this particular exhibit.

16            THE COURT:  All right.  Hand it to Mr. Wood.

17            ATTORNEY NEWBY:  (Complied).

18            THE COURT:  All right.  Ladies and gentlemen,

19   the government and the defendant have stipulated that the

20   video recordings produced by Cellco Partnerships on or about

21   January 2nd, 2008 and filed as Government's Exhibit 11 are

22   accurate recordings of the Verizon Wireless store at Polo

23   Towne Crossing, 2208 Dallas Parkway, Suite 310, Plano,

24   Texas, on or about January 2nd and that Verizon Wireless

25   makes and keeps in the ordinary course of business and that

1     the recordings marked as Government Exhibit 11 are authentic

2     and admissible without any additional authentication.

3              Now, these are voice recordings?

4              ATTORNEY NEWBY:  This is a security video

5     camera recording.

6              THE COURT:  These are -- this is a video?

7              ATTORNEY NEWBY:  This is a video.  And what we

8     will be introducing is a still shot from that video.

9              THE COURT:  You'll have all these stipulations

10    in the jury room with you, and you'll have the exhibits that

11    I admit.

12             Exhibits 11 and 11-1 are admitted, I take it,

13    without objection, Mr. Iweanoge?

14             ATTORNEY IWEANOGE:  Yes, Judge.

15             THE COURT:  All right.  Proceed.

16             ATTORNEY NEWBY:  Your Honor, may we publish

17    11-1.

18             THE COURT:  Yes, you may.  You'll see to your

19    left, ladies and gentlemen, Exhibit 11-1.

20             Ys, enlarge it.

21             All right.  Next question.

22    BY ATTORNEY NEWBY:

23    Q.   Do you recognize the individuals in what's been

24    admitted as Exhibit 11-1?

25    A.   Yes, I do.

1    Q.    What's taking place in this photograph?

2    A.    In this photograph, there is a payment being made on a

3    Verizon prepaid wireless card.

4    Q.    And if you could identify by the position in the

5    photograph the individuals in this photograph.

6    A.    The individual directly in front of the kiosk machine

7    is Abel Nnabue, who is making a payment on the Verizon card;

8    directly behind him in the jacket with the glittery on it is

9    Tobechi Onwuhara; and in the white shirt is me myself as

10   Ezenwa Onyedebelu.

11   Q.    You recall being present to make the payment on this

12   card?

13   A.    Yes, I do.

14   Q.    And this was the type of wireless card that would be

15   used to connect to the Internet and access credit reports

16   for --

17            ATTORNEY IWEANOGE:  Objection as to leading.

18            THE COURT:  It is leading.

19            Next question.

20            I'll sustain it.

21   BY ATTORNEY NEWBY:

22   Q.    What were these data cards used for?

23   A.    The data cards were used on the laptops to access the

24   Internet online, which we also used to access these fee

25   databases online and the credit report sites.

1  Q.   Were any of the attempts to wire funds out of victims'

2  accounts successful?

3  A.   Yes, they were.

4  Q.   And what would happen with that money in terms of

5  being distributed?

6  A.   Depending on the type of -- depending on what was done

7  and whether it was either a check clearing that was written

8  on an account or by using the debit card to access the funds

9  in the account or a wire transfer, it would vary from

10  Tobechi collecting one-third usually because he was

11  supplying the information, and then 40 or 30 percent going

12  to the one who supplied the account, and then the rest

13  coming back to whoever worked the job throughout.

14  Q.   During the course of your involvement in this scheme,

15  did you become familiar with many of the voices of other

16  members of the scheme?

17  A.   Yes, I did.

18        ATTORNEY NEWBY:   At this point, I would like to

19  play what's been marked as Government Exhibit GX3, Clip 1.

20        (Tape played to the jury.)

21  BY ATTORNEY NEWBY:

22  Q.   Do you recognize the male voice on Government

23  Exhibit 3?

24  A.   Yes, I do.

25  Q.   Whose voice is the male voice?

1  A.    Tobechi Onwuhara.

2  Q.    That's also known as Toby or T?

3  A.    Yes, that's correct.

4  Q.    That was not an individual that you know as Robert

5  Short?

6  A.    No, that was not.

7          ATTORNEY NEWBY:  The government would play

8  Government's Exhibit 12, Clip 1.

9          (Tape played to the jury.)

10 BY ATTORNEY NEWBY:

11 Q.    Do you recognize the male voice on Government's

12 Exhibit 12?

13 A.    Yes, I do.

14 Q.    Whose voice is that?

15 A.    Tobechi Onwuhara.

16 Q.    That is not an individual that you know as James Witt?

17 A.    No, that is not.

18          ATTORNEY NEWBY:  At this point, we would play

19 Government's Exhibit 20, Clip 1.

20          (Tape played to the jury.)

21 BY ATTORNEY NEWBY:

22 Q.    Do you recognize the male voice on that phone call?

23 A.    Yes, I do.

24 Q.    And whose voice was that?

25 A.    Henry Obilo.

1    Q.    The defendant Henry Obilo?

2    A.    Yes, that is correct.

3    Q.    That was not the voice of an individual you know as

4    Brian Kelly?

5    A.    No.

6              ATTORNEY NEWBY:  The government would now play

7    Government Exhibit 21, Clip 1.

8              (Tape played to the jury.)

9    BY ATTORNEY NEWBY:

10   Q.    Do you recognize the male voice on that phone call?

11   A.    Yes, I do.

12   Q.    And whose voice do you recognize that as?

13   A.    Henry Obilo.

14   Q.    So that's not the voice of an individual you know as

15   Louis Fraser?

16   A.    No, it is not.

17             ATTORNEY NEWBY:  At this point, the government

18   would play Government's Exhibit 22, Clip 1.

19             (Tape played to the jury.)

20   BY ATTORNEY NEWBY:

21   Q.    Do you recognize the voice of the individual on that

22   call who identified himself as Paul C. Rozelle?

23   A.    Yes, I do.

24   Q.    Whose voice do you recognize that as?

25   A.    Henry Obilo.

1    Q.    Mr. Onyedebelu, have you had any conversations with

2    the defendant Henry Obilo within the last month?

3    A.    Yes, I have.

4    Q.    When did that phone call -- when did that conversation

5    take place?

6    A.    Roughly about four weeks ago.  I was out at a

7    nightclub, and I ran into Chikezie Onwumere.  And he

8    informed me that Henry Obilo said that I would be

9    testifying --

10              ATTORNEY IWEANOGE:  Objection; hearsay.

11              THE COURT:  Why isn't it hearsay, Mr. Newby?

12              ATTORNEY NEWBY:  I can ask a question.

13              THE COURT:  I'll sustain the objection.

14              Proceed.

15   BY ATTORNEY NEWBY:

16   Q.    Did you speak with Henry Obilo that night while you

17   were at the nightclub?

18   A.    Yes.

19   Q.    How did you speak with him?

20   A.    Through Chikezie Onwumere's cell phone.

21   Q.    Where were you -- in what city were you located?

22   A.    In Dallas, Texas.

23   Q.    And please describe to the jury the substance of that

24   conversation you had with the defendant Henry Obilo.

25   A.    He first proceeded to ask me what did he do to me.

1        And I told him he did nothing to me.  And I

2    asked him why he asked me that.

3        He said that I was supposed to be testifying

4    against him in court.

5        And I told him, no, I was not.

6        And he said, well, then, who is supposed to be

7    testifying against him.

8        And I said, "I really don't know, but maybe Q."

9        He said, "Well, if that's the case, they have

10   no case."

11   Q.   Why did you tell Mr. Obilo that you were not going to

12   testify against him?

13   A.   Because at the time I had not been informed that I was

14   going to be testifying.

15   Q.   You had not received a subpoena at that point?

16   A.   Yes, that's correct.

17        ATTORNEY EISINGER:  No further questions.

18        THE COURT:  Cross-examination.

19        ATTORNEY IWEANOGE:  Thank you, Judge.

20                  CROSS-EXAMINATION

21   BY ATTORNEY IWEANOGE:

22   Q.   Good afternoon, sir.

23   A.   Good afternoon.

24   Q.   In reference to -- prior to you pleading guilty in

25   November, you had meetings with the FBI and the

1    United States Attorney's Office; correct?

2    A.    Yes, I did.

3    Q.    And during those meetings, Special Agent Nail was

4    present; correct?

5    A.    Yes, that's correct.

6    Q.    And during those meetings, you did not tell them the

7    whole truth about your conversations or about you talking to

8    Toby since he's been on the run; correct?

9    A.    Yes, that's correct.

10   Q.    But then later you fessed up about it; correct?

11   A.    Yes, that's correct.

12   Q.    You pled guilty before Judge T.S. Ellis, III?

13   A.    Yes, that's correct.

14   Q.    And you have been sentenced; correct?

15   A.    That's correct.

16   Q.    How much time did you get?

17   A.    37 months.

18   Q.    37 months.

19          You're presently not in jail; correct?

20   A.    Yes, that's correct.

21   Q.    You're allowed to do what they call self-surrender?

22   A.    Yes, that's correct.

23   Q.    You're waiting to get the date that you'll be

24   reporting to jail?

25   A.    Yes, that's correct.

1    Q.   Before you pled guilty, you and your lawyer had an

2    opportunity to review discovery in this case; correct?

3    A.   I'm sorry.  I really don't understand the question.

4    Q.   Okay.

5              Before you pled guilty, there were some

6    documents and videos and audios that you listened to before

7    you pled guilty?

8    A.   Yes, there was audio of myself.

9    Q.   Okay.

10              I didn't hear you?

11   A.   Of myself, yes.

12   Q.   Okay.

13              And the documents you looked at included

14   statements that --

15              THE COURT:  He didn't say he looked at

16   documents.  You see, your question was compound.  All he

17   said was that he listened to audios of himself.

18              Is that right, Mr. Onyedebelu?

19              THE WITNESS:  Yes, that's correct, Judge.

20              THE COURT:  Next question.

21   BY ATTORNEY IWEANOGE:

22   Q.   Did you review documents as well?

23   A.   Only -- I didn't review any documents.  I listened to

24   audio recordings of myself.

25   Q.   As part of your -- and then as part of your plea

1   agreement, you agreed to cooperate with the United States;

2   correct?

3   A.   Yes, that's correct.

4   Q.   And part of the cooperation is for you to come to

5   court to testify when called upon to do so; correct?

6   A.   Yes, that is correct.

7   Q.   And in addition to doing that -- in return for doing

8   that, the government, if you provide assistance

9   substantially to them, could recommend to the judge that

10  your sentence be reduced; correct?

11  A.   I have -- I was not informed that I was going to get

12  any type of reduction.  But I believe that may be correct,

13  yes.

14  Q.   You did review the plea agreement before you signed it

15  and appeared before the judge; correct?

16  A.   Yes.

17  Q.   Judge Ellis went through a series of questions

18  including that part about you cooperating with the

19  government; correct?

20  A.   Yes, he did.

21  Q.   It is your expectation that by testifying against

22  Mr. Obilo, that you expect the government to ask the judge

23  for your 37 months to be reduced; correct?

24  A.   Actually, it was -- it was in the plea agreement that

25  I would truthfully cooperate with the U.S. Government.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    There was no -- I didn't know of any agreement of a

2    reduction or anything like that for my testimony, no.

3              ATTORNEY IWEANOGE:  The Court's indulgence.

4              (Pause.)

5    BY ATTORNEY IWEANOGE:

6    Q.    Isn't it true that in your plea agreement on Page 8,

7    Paragraph 15, it talks about the government reserving the

8    right to file for a downward departure on your sentencing?

9    A.    Yes, that's correct.

10   Q.    And downward departure, as you understand it, is for

11   them to ask the judge for your sentence to be reduced based

12   on your cooperation; correct?

13   A.    Yes.

14   Q.    And they, the Unites States Attorney's Office, have

15   the sole discretion to do that; correct?

16   A.    Yes, that's correct.

17             THE COURT:  They can ask -- what's your

18   understanding of how that would work, Mr. Onyedebelu?

19             THE WITNESS:  What my lawyer explained to me,

20   that if the government saw fit, that they would be able to

21   ask for a reduction, but it's not a promise that it would

22   happen or it will not happen.

23             THE COURT:  What's your understanding of who

24   has the final authority?

25             THE WITNESS:  Judge Ellis.

```
1              THE COURT:  Next question.
2              ATTORNEY IWEANOGE:  Yes, Judge.
3    BY ATTORNEY IWEANOGE:
4    Q.    Prior to this guilty plea that you did in November
5    before Judge Ellis, you had previously been convicted of a
6    crime involving cheating and lying in 2002; correct?
7    A.    No, that is not correct.
8    Q.    I apologize.
9              THE COURT:  Next question.
10   BY ATTORNEY IWEANOGE:
11   Q.    Initially back on the 18th of August of 2008 when you
12   met with Special Agent Nail, you denied knowing anywhere --
13   you denied knowing where the money came from, correct, the
14   wire transfers?
15   A.    I don't believe that was in August -- on August 18th.
16   But, yes, I did deny knowing where the money came from.
17   Q.    And you also denied your role as well; correct?
18   A.    Yes.
19   Q.    And at the time back on either the 18th or the 16th of
20   August of 2008, you were asked about individuals who were
21   involved in this conspiracy; correct?
22   A.    Yes, that's correct.
23   Q.    You did mention an individual by the name of Obinna
24   Nneji; correct?
25   A.    Yes.
```

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    Q.    You mentioned Donald Okoro, O-k-o-r-o; correct?

2    A.    Yes.

3    Q.    You mentioned Tobechi Onwuhara; correct?

4    A.    Yes.

5    Q.    You mentioned Precious Matthews; correct?

6    A.    Yes.

7    Q.    But you did not mention Mr. Obilo; correct?

8    A.    Actually, it was photos shown to me asking me

9    whether -- who I knew and whether I understood who was --

10   whether I knew who it was in the picture.  All I was

11   supposed to do was identify them and tell them who they were

12   and how I knew them.

13   Q.    So when you were asked -- when you told them about

14   Donald Okoro, you were shown a photograph of Donald Okoro?

15   A.    Yes, I was.

16   Q.    Are you very sure of that?

17   A.    I'm almost most definitely, yes.

18   Q.    There's no doubt in your mind?

19   A.    Yes.

20   Q.    You received about -- how much did you receive in

21   terms of wire transfers?  How much did you receive from

22   Western Union?

23   A.    From Western Unions alone?

24   Q.    Yes.

25   A.    I think -- I can't really give an actual estimate, but

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    I'll say somewhere in the range of 5- to 6,000 maybe.

2              THE COURT:  How much more do you have,

3    Mr. Iweanoge?

4              ATTORNEY IWEANOGE:  Judge, about five,

5    seven minutes.

6              THE COURT:  All right.  Let's move it along.

7              ATTORNEY IWEANOGE:  Yes, Judge.

8    BY ATTORNEY IWEANOGE:

9    Q.    With respect to monies that were gotten from the wire

10   transfers, Precious Matthews deposited monies into Brandy

11   Anderson's account on your behalf; correct?

12   A.    No, that is not correct.

13   Q.    Monies were deposited directly into your account?

14   A.    Money was deposited into my account, yes.

15   Q.    As a matter of fact, on one occasion you received

16   $70,000; correct?

17   A.    Yes.

18   Q.    For one of the successful wire transfers that you did;

19   correct?

20   A.    Yes, but not directly all into my account.

21   Q.    It was actually wired to -- it was wired outside of

22   the United States and then made its way back into your

23   account; correct?

24   A.    Yes.

25   Q.    How much money have you paid into Mr. Obilo's account?

1    **A.**    Most times I didn't pay directly into Obilo's account.

2    I paid probably 3- to 4,000 into Henry Obilo's account.

3    Most times money was given to him cash or in money orders.

4    **Q.**    Where was the bank?

5    **A.**    Washington Mutual.

6    **Q.**    Did you provide that information in terms of his bank

7    and bank account number to the United States or the agents

8    in this case during your debriefing?

9    **A.**    At that time, the information wasn't still with me.

10   So no.

11   **Q.**    So you never told them that Mr. Obilo had an account?

12   **A.**    No.

13          THE COURT:  Did they ever ask you where he had

14   an account?

15          THE WITNESS:  No, they didn't.

16          THE COURT:  Next question.

17          ATTORNEY IWEANOGE:  Court's indulgence.

18          (Pause.)

19   BY ATTORNEY IWEANOGE:

20   **Q.**    Isn't it true that when there's a successful wire

21   transfer, that the split was either 60-40 or 50-50?

22   **A.**    Most times, but it's not definite because it depends

23   on what the negotiation was before the wire transfer was

24   done.

25   **Q.**    Isn't it true that during your meeting with Special

1   Agent Michael Nail back on the 18th of August of 2008 that

2   you specifically said that the split was either 60-40 or

3   50-50?

4   A.    That's pertaining to something that I was involved in,

5   not for everybody else.

6   Q.    You know Paula Gipson; correct?

7   A.    Yes, I do.

8            ATTORNEY IWEANOGE:   The Court's indulgence.

9            (Pause.)

10  BY ATTORNEY IWEANOGE:

11  Q.    You know Precious Matthews as well; correct?

12  A.    Yes, I do.

13  Q.    You know Brandy Anderson; correct?

14  A.    Yes, I do.

15  Q.    You know Chikezie Onwumere; correct?

16  A.    Yes, I do.

17  Q.    What was Chikezie Onwumere's role in this case?

18  A.    Chikezie Onwumere's role, on various occasions I

19  witnessed him with victims' information and calling in --

20  making calls to Bank of America, supplying account

21  information and stuff like that.

22  Q.    Did you provide that information to the United States?

23  A.    Yes, I did.

24  Q.    You said about a month ago you saw Chikezie Onwumere

25  in Dallas; correct?

1    A.    That's correct.

2    Q.    And you found out that his case was dismissed;

3    correct?

4    A.    I didn't know that he had a case, but no.

5    Q.    When you saw Chikezie in Dallas, you said it was about

6    a month ago at a nightclub?

7    A.    That's correct.

8    Q.    Who called whom?  In other words, did --

9              THE COURT:  The question is about to be

10   compound.

11   BY ATTORNEY IWEANOGE:

12   Q.    Did Chikezie -- who called Mr. Obilo?

13   A.    Chikezie did.

14   Q.    Okay.

15             How long did Chikezie speak to Mr. Obilo?

16   A.    Before giving me the phone, probably about 25 to

17   30 seconds.

18   Q.    Okay.

19             And then subsequently he gave you the phone?

20   A.    Yes.

21   Q.    How long did you talk to Mr. Obilo?

22   A.    About two to five minutes.

23   Q.    Okay.

24             What's the telephone number that this

25   conversation happened on?

1   **A.**    I was not given a telephone number.  He placed the

2   call by himself.

3   **Q.**    Okay.

4             So it was done on Chikezie's phone?

5   **A.**    Yes, that's correct.

6   **Q.**    Isn't it true that during your conversations with

7   Special Agent Nail back on August the 18th --

8             ATTORNEY IWEANOGE:  Court's indulgence.

9             (Pause.)

10  BY ATTORNEY IWEANOGE:

11  **Q.**    Back on -- let me get it right.

12            Back on the 15th of September of 2008, that you

13  specifically told him that Henry Obilo had his own partner

14  and a deal with Bank of America?

15  **A.**    I don't understand what you're trying to say.  I'm

16  sorry.

17  **Q.**    All right.  Let me rephrase it.

18            Isn't it true -- do you recall talking to

19  Special Agent Nail back on the 15th of September 2008?

20  **A.**    I mean, it's likely.  I don't recall the exact dates.

21  **Q.**    Okay.

22            Do you recall telling him that Henry Obilo's

23  specialty was Bank of America?

24  **A.**    Yes, I do.

25  **Q.**    Do you recall telling him that he had a business

1  partner in New York, Mr. Obassi, Charles Obassi?

2  A.    Yes, that's correct.

3  Q.    You said that?

4  A.    Yes.

5  Q.    And that he lived in Miami?

6  A.    Yes, that's correct.

7  Q.    And they had their own separate deal going?

8  A.    I don't know about saying their own separate deal

9  going.  I'm sorry about that part.

10          ATTORNEY IWEANOGE:  The Court's indulgence.

11          (Pause.)

12          ATTORNEY IWEANOGE:  I believe I'm done, Judge.

13  Let me just look through my notes.

14          The Court's indulgence.

15          (Pause.)

16          THE COURT:  Anything further?

17          ATTORNEY IWEANOGE:  No, Judge.

18          THE COURT:  All right.  Any redirect?

19          ATTORNEY NEWBY:  No redirect, your Honor.

20          THE COURT:  All right.  Thank you.  You may

21  step down.

22          May this witness be excused?

23          ATTORNEY NEWBY:  Yes, the witness may be

24  excused.

25          ATTORNEY IWEANOGE:  Yes, Judge.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1       (Witness excused.)

2           THE COURT:  All right.  Ladies and gentlemen,

3   pass your books to the right.

4           Now, this evening when you arrive home, you'll

5   being accosted by your family, your spouses, your children.

6   They will be intensely curious about what you've been doing

7   today.  And they will ask you questions, and you will be

8   tempted to answer those questions.

9           Resist the temptation.  Don't answer the

10  questions.  Tell them the Court -- the judge has told you

11  that you may not discuss the matter until it's over.  When

12  it's over -- I'll give you other instructions after it's all

13  over.

14          For now you may not discuss the matter with

15  anyone.  You'll be faced with temptations tonight to do

16  precisely that.  So resist the temptation.  Don't do it.

17          Don't look up -- I used to say many years

18  ago -- I used to tell juries don't look up anything in

19  books.  But that's fairly dated now.  Don't do anything on

20  the computer.  Don't Wikipedia or Google anything or

21  whatever it is people do.  I'm not a computer person, so I

22  don't really know.

23          But don't do any research of any kind because

24  you're to decide the matter solely on the basis of the

25  evidence you see and hear presented in this case.  Put the

1    matter out of your mind.  I'll see you tomorrow morning.

2            Now, I'll accommodate you tomorrow.

3            How many witnesses do we have left?

4            ATTORNEY NEWBY:  Five or six depending on the

5    availability of one of the witnesses, although most of them

6    should be relatively short, your Honor.

7            THE COURT:  Perhaps we should begin at 9:00 or

8    9:30.

9            Which would you prefer?

10           (Jurors indicating.)

11           THE COURT:  9:00 o'clock.  Let's begin at 9:00.

12   Tomorrow morning at 9:00.

13           That you for your careful and close attention

14   to the evidence today.  You may follow Mr. Wood out.

15           (Jury excused at 5:00 p.m.)

16           THE COURT:  All right.  You may be seated.

17           Anything further this evening on behalf of the

18   government, Mr. Newby?

19           ATTORNEY NEWBY:  Your Honor, there is a Touhy

20   issue that has come up.

21           THE COURT:  A what?

22           ATTORNEY NEWBY:  A Touhy issue that has come up

23   that I would like to put on the record.

24           Mr. Iweanoge has informed the government that

25   he intends to call Special Agent Nail and potentially

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    Special Agent Etienne to testify in the defense's

2    case-in-chief.  And before that takes place, we need to

3    relay it to them so that their agency can make the proper

4    determination of whether they're going to object.  But

5    before --

6              THE COURT:  Well, he wants to impeach on other

7    statements, but I may not allow that under 613.  So first

8    thing to do is to address that issue.  The Touhy issue is

9    something you'll have to do internally --

10             ATTORNEY NEWBY:  Yes, your Honor.

11             THE COURT:  -- because he's late.

12             ATTORNEY NEWBY:  Yes, your Honor.

13             THE COURT:  And the other point that you might

14   want to consider, Mr. Iweanoge, is that you asked all these

15   questions for the purpose of creating -- or maybe not for

16   the purpose, but at least it created what you think is an

17   inconsistency between 302 and what a witness said here.

18   That isn't something the government asked.  They didn't

19   object on scope.  But it's something that is vulnerable in

20   that regard, too.

21             So there are really two problems:  One is under

22   613, whether or not the Court should allow it for the

23   reasons I stated.  You can address that tomorrow.  And

24   number two is your Touhy issue.  That's for you all to

25   resolve.

1           There's no subpoena pending, is there?

2           ATTORNEY NEWBY:  There is not.

3           THE COURT:  It would be too late anyway.

4           But I take it they can be -- they are within

5    hailing?

6           ATTORNEY NEWBY:  Yes, your Honor.

7           THE COURT:  So the real issue is not the Touhy

8    issue.  You can deal with that as you see fit.  His agency

9    would have to come in here and complain about it or you all

10   would and tell me why Touhy would need to be satisfied here.

11          But more importantly, the context in which

12   these things -- what is -- Mr. Iweanoge, what I want you --

13   you want to ask about certain statements; is that right?

14          ATTORNEY IWEANOGE:  Yes, Judge, three --

15   specifically, three.  And I've told the government what they

16   are.

17          THE COURT:  All right.  I'll -- I need to know

18   tomorrow what they are and consider whether or not it's a

19   collateral matter that just goes to your view of

20   credibility.  Because you asked these questions.  It wasn't

21   something brought up on direct.  And so I need to consider

22   it.

23          Mr. Newby, you need to look up the law on 613

24   and the other rules on whether -- is it 613?  Let me look to

25   be sure.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          Yes, you can start with 613.  There may be

2    other pertinent rules as well.  Typically what this

3    contemplates is a statement made by a witness on the stand

4    which is then subject to a prior inconsistent statement made

5    to another person.

6          But these three statements that Mr. Iweanoge

7    wants to cross-examine -- or wants to examine the agent on

8    are statements he elicited, not statements that the

9    government elicited on direct.  And that may present you

10   with a problem.

11         So you should look at the law on this,

12   Mr. Iweanoge.

13         And you as well, Mr. Newby.

14         ATTORNEY NEWBY:  Yes, your Honor.  We will be

15   prepared to argue on it in the morning.

16         ATTORNEY IWEANOGE:  I will, but the government

17   specifically asked the witness to -- if she's ever seen or

18   known Mr. Obilo.

19         And the witness said, "Yes," which is

20   inconsistent with what she told the detec- -- I mean the

21   agents.  But I will -- I will review it and then address it.

22         THE COURT:  All right.  You can -- you may be

23   right.  You show me the three statements.  You have the law

24   ready on whether -- you see, what I have in mind,

25   Mr. Iweanoge, is that it wasn't a part of the direct.  Yes,

1       they did ask whether they could identify Mr. Obilo.  They

2       said, "Yes."  But that isn't anything that was

3       contradictory.

4               You then went on to ask them, well, on August

5       so-and-so, did you tell them about this deal or that deal?

6       That wasn't part of the direct testimony.  And I'm not sure

7       you can ask that question and then when you get a no answer

8       have the opportunity to call extrinsic testimony.

9               ATTORNEY IWEANOGE:  Judge, I believe -- I was

10      going to raise another issue with the Court.  I have the

11      government looking right now.

12              But in the grand jury transcripts that I

13      received as part of Jencks yesterday for Ms. Gipson, Page

14      22 -- while reviewing it with my client about 11:00 last

15      night, we realized that on Page 22, there was a specific

16      question "Do you recognize the individual in Grand Jury

17      Exhibit No. 3."

18              And she says, "Yes, I do."

19              "Do you know his name?"

20              "I don't know his name."

21              "Ma'am, have you seen this individual?"

22              "I've seen him with Toby?"

23              "Did he make calls?"

24              "Well, I've never physically -- I've never

25      heard him making calls."

1        I've asked the government to try to locate

2   Grand Jury Exhibit No. 3 that Ms. Gipson was shown.  They

3   have looked and they have not found it.  They're continuing

4   to look.

5        The reason I raise it, Judge, is, as my client

6   believes, that's why I asked specifically about the

7   photograph, if she was shown a photograph.  If the Exhibit

8   No. 3 is the one that I suspect it is of Mr. Obilo and she

9   failed to identify before the grand jury, I will be asking

10   to recall Ms. Gipson because --

11        THE COURT:  Did you ask her that?

12        ATTORNEY IWEANOGE:  Judge, I specifically

13   asked -- I asked.

14        THE COURT:  You asked what?

15        ATTORNEY IWEANOGE:  I asked her whether she

16   was -- whether she identified -- whether she was shown a

17   photograph of Mr. Obilo.

18        And she said, "Yes."

19        That when your Honor called us to the bench.

20   But then I don't have Grand Jury Exhibit No. 3, so I don't

21   know what photograph she was shown where she said that she'd

22   never seen the person making calls.  But then today we have

23   her saying, "I have seen him making calls."

24        So that's why I went down that road about

25   photographs and about making calls.  So the government is

1   saying they have not found it, but they're going to continue

2   to search.  I don't know how the issue will develop in the

3   morning.

4               THE COURT:  Did either of you present the case

5   to the grand jury?

6               ATTORNEY EISINGER:  Yes, your Honor.  First

7   off, she did not on the stand testify that she saw Mr. Obilo

8   making phone calls.

9               And second, we didn't -- at that time, we had

10   no pictures of just Mr. Obilo.  We had a couple pictures of

11   the back of his head with other individuals in it.

12               Therefore, it couldn't have been a single

13   picture that says, "Do you recognize this individual,"

14   because there are two people in all the pictures we had of

15   Mr. Obilo at that time.  We didn't start asking Ms. Gipson

16   or others about  Mr. Obilo until about October, right about

17   the time we arrested him.

18               THE COURT:  All right.  But you're looking for

19   Exhibit 3?

20               ATTORNEY EISINGER:  Yeah, I'm trying to

21   locate -- we had -- there was, I think, four exhibits.  They

22   were in one of the pink grand jury folders, and I can't find

23   it.

24               THE COURT:  What was the date of this grand

25   jury hearing?

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    ATTORNEY EISINGER:  I think that was

2  August 14th of 2008.

3    THE COURT:  And Mr. Iweanoge, you say that she

4  testified that she saw this person making telephone calls?

5    ATTORNEY IWEANOGE:  Yes, during her testimony.

6    THE COURT:  Saw Mr. Obilo making calls?

7    ATTORNEY IWEANOGE:  Yes.  Yes.  Whatever the

8  transcript says, Judge, let me not -- my recollection -- the

9  Court --

10   THE COURT:  If she didn't say that, then

11  there's no point in all of this.

12   ATTORNEY NEWBY:  I think -- we can check the

13  transcript, but I'm quite positive that she did not testify

14  on the stand that she saw Henry Obilo making calls.  When I

15  asked her --

16   THE COURT:  Because you would have elicited

17  that.

18   ATTORNEY NEWBY:  Absolutely.  What I did ask

19  her was when she had seen Mr. Obilo.  And she recounted an

20  instance when he was in the Verona apartment in an argument

21  and he was holding credit reports.

22   THE COURT:  All right.  Mr. Rodriquez, can

23  you -- how long is the direct testimony of Ms. Gipson?  Can

24  you search it for that particular question and answer?

25   THE COURT REPORTER:  Yes, Judge.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  Do so and let counsel see that.

2          But it seems to me, Mr. Iweanoge, that if she

3    didn't say she saw him, Mr. Obilo, making telephone calls,

4    then I'm not sure what the fuss is about Exhibit 3.

5          Do you see what I mean?

6          ATTORNEY IWEANOGE:  Yes, Judge, only that my

7    client -- I see what the Court is saying, but my client is

8    requesting -- my client and I --

9          THE COURT:  You're the lawyer.  You don't do

10   what he says.  You do what your judgment tells you to do

11   after conferring with him.

12         ATTORNEY IWEANOGE:  Yes, Judge.  My judgment

13   tells me that there may be -- it may be pretty --

14         THE COURT:  I will have Mr. Rodriquez see what

15   the record is.  That Government's going to continue to look

16   for Exhibit 3.  The government says it couldn't have been

17   Mr. Obilo because they didn't have a picture of him at that

18   time.

19         Is that right?  Is that what you said?

20         ATTORNEY EISINGER:  That is correct.  We only

21   had pictures of him with another individual.  In that

22   picture, you couldn't even really tell that it was him.  It

23   was a picture of his back.

24         THE COURT:  All right.  Let's see if we can

25   find Exhibit 3.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1           Remember, however, Mr. Iweanoge, that it's not

2    your task just to be a mouthpiece.  You have to factor

3    through your judgment and your legal skill what your client

4    is telling you.

5           I think if you're right that the witness said,

6    "Yes, I saw him making telephone calls," and if this is a

7    picture of Henry Obilo and she denied in the grand jury that

8    he was making telephone calls, then absolutely I'll permit

9    you to elicit that.

10           ATTORNEY IWEANOGE:  Yes, Judge.

11           THE COURT:  But not if it's not really

12    relevant.

13           All right.  Now -- and there should be no

14    question about whether she testified that she saw him making

15    telephone calls.  That we can easily verify through

16    Mr. Rodriquez.

17           Court stands in recess until 9:00 tomorrow

18    morning.

19           (Court recessed at 5:13 p.m.)

20                          ---

21

22

23

24

25

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

```
 1
 2                    CERTIFICATE OF REPORTER
 3
 4          I, MICHAEL A. RODRIQUEZ, an Official Court
 5   Reporter for the United States District Court, in the
 6   Eastern District of Virginia, Alexandria Division, do hereby
 7   certify that I reported by machine shorthand, in my official
 8   capacity, the proceedings had and evidence adduced upon the
 9   jury trial in the case of UNITED STATES OF AMERICA v. HENRY
10   OBILO.
11
12          I further certify that I was authorized and did
13   report by stenotype the proceedings and evidence in said
14   jury trial, and that the foregoing pages, numbered 1 to 217,
15   inclusive, constitute the official transcript of said
16   proceedings, Volume 1, as taken from my machine shorthand
17   notes.
18
19          IN WITNESS WHEREOF, I have hereto subscribed my
20   name this _____ day of _____, 2010.
21
22
23                         _____
                           Michael A. Rodriquez, RPR/CM/RMR
24                               Official Court Reporter
25
```

MICHAEL A. RODRIQUEZ, RPR/CM/RMR