IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,          )
                                   )
                 Plaintiff,        )
                                   )
      v.                           )    CRIMINAL ACTION
                                   )
HENRY OBILO,                       )    1:09-cr-47
                                   )
                 Defendant.        )
_____    )

REPORTER'S TRANSCRIPT

JURY TRIAL

VOLUME 2

Wednesday, April 8, 2009

---

BEFORE:        THE HONORABLE T.S. ELLIS, III
               Presiding

APPEARANCES:   UNITED STATES ATTORNEY'S OFFICE
               BY:  JOHN EISINGER, AUSA
                    TYLER NEWBY, AUSA

               For the Government

               JOHN IWEANOGE, ESQ.

               For the Defendant

---

MICHAEL A. RODRIQUEZ, RPR/CM/RMR
Official Court Reporter
USDC, Eastern District of Virginia
Alexandria Division

INDEX

| WITNESS (Government) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Abel Nnabue | 5 | 13 | 25 | --- |
| John Hayes | 27 | 37 | --- | --- |
| James W. Witt | 39 | --- | --- | --- |
| Lawrence Plassmeyer | 46 | --- | --- | --- |
| Abel Nnabue | 76 | --- | --- | --- |
| Charlie Pak | 78 | 112 | --- | --- |

| | |
|---|---|
| INSTRUCTIONS CONFERENCE | 137 |
| RULE 29 MOTION BY THE DEFENDANT | 147 |
| CLOSING ARGUMENT BY THE GOVERNMENT | 152 |
| CLOSING ARGUMENT BY THE DEFENDANT | 168 |
| REBUTTAL ARGUMENT BY THE GOVERNMENT | 186 |
| JURY INSTRUCTIONS BY THE COURT | 193 |

(Jury excused to deliberate)

(Court recessed)

---

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

<u>PROCEEDINGS</u>

1

2

3          (Court called to order at 9:02 a.m. in USA

4     v.Obilo.)

5          (Jury not present.)

6          THE COURT:  All right.  Good morning.

7          This is United States against Obilo.  It is

8     09-47.  And the record will reflect that counsel and the

9     defendant are present.

10          I take it we're prepared to proceed, the

11     government's prepared to proceed?

12          ATTORNEY EISINGER:  We are, yes.

13          THE COURT:  You are as well, Mr. Iweanoge?

14          ATTORNEY IWEANOGE:  Yes, Judge.  I just want --

15     I have one minor issue that I want to see if the Court will

16     assist me.  I have a 10:00 pretrial conference with

17     Magistrate Judge Davis.

18          THE COURT:  Today?

19          ATTORNEY IWEANOGE:  Today, Judge.

20          THE COURT:  He'll have to accommodate you.

21     We're in trial.

22          ATTORNEY IWEANOGE:  I haven't called his

23     chambers.

24          THE COURT:  We'll take care of that.

25          ATTORNEY IWEANOGE:  Thank you, Judge.

1          THE COURT:  All right.  Bring the jury in.

2     I'll ask the deputy clerk to call Judge Davis's chambers.

3          (Jury impaneled at 9:05 a.m.)

4          THE COURT:  All right.  You may be seated.

5          Ladies and gentlemen, good morning.

6          I can see that all of you are here.  But before

7     we proceed, for purposes of the record, I will have the

8     deputy clerk call the roll.  Let's do it by number.

9          Do you all remember your numbers?

10         That's all right.  Let's do it the names, then.

11         (Roll call, all jurors present.)

12         THE COURT:  All right.  Ladies and gentlemen,

13    let me confirm that none of you had any difficulty in

14    adhering to the Court's instructions to refrain from

15    discussing the matter with anyone.

16         (Jurors indicating.)

17         THE COURT:  Good.  Hearing that none of you had

18    any difficulty, we'll proceed.

19         Who proceeds?

20         Mr. Newby, is it your witness?

21         ATTORNEY NEWBY:  Yes, your Honor.

22         THE COURT:  You may call your next witness.

23         ATTORNEY NEWBY:  The government calls Abel

24    Nnabue.

25         THE COURT:  Come forward and take the oath,

1    please, sir.

2                    (Witness sworn.)

3                    THE COURT:  All right.  Mr. Newby, you may

4    proceed.

5                    ABEL NNABUE, having been duly sworn, was

6    examined and testified as follows:

7                         DIRECT EXAMINATION

8    BY ATTORNEY NEWBY:

9    Q.    Good morning, sir.

10                   Please state and spell your full name for the

11   court reporter.

12   A.    First name is A-b-e-l, Abel.  My last name is

13   N-n-a-b-u-e, Nnabue.

14   Q.    Mr. Nnabue, are you currently incarcerated?

15   A.    Yes, I am.

16   Q.    Since when have you been incarcerated?

17   A.    Since August of 2008.

18   Q.    What crime were you convicted of that led to your

19   incarceration?

20   A.    Conspiracy to commit bank fraud.

21   Q.    When were you convicted?

22   A.    I was convicted -- I believe it was 2009 -- 2008

23   around October somewhere.

24   Q.    Was that pursuant to a guilty plea?

25   A.    Yes.

1    **Q.**    Could you please describe what conduct you were

2    involved in that led to your conviction for conspiracy to

3    commit bank fraud.

4    **A.**    Well, I participated in a group of guys that pulled

5    some type of scam with the Internet and with various -- with

6    various tools that we had over the Internet and searching

7    for names and people that had equity line of credits and

8    et cetera and find them and would do -- cause to do wire

9    transfers overseas.

10    **Q.**    Approximately what time period were you involved in

11    this scheme?

12    **A.**    2007.  Around December 2007.

13    **Q.**    Where were you living at that time?

14    **A.**    Dallas, Texas.

15    **Q.**    Who were some of the other people that were involved

16    in the scheme, that you can recall?

17    **A.**    Ezenwa was involved and Tobechi was involved and Henry

18    was involved, and those are the people that were involved

19    that I can remember right now.

20    **Q.**    Tobechi, what was his last name?

21    **A.**    Onwuhara.

22    **Q.**    Ezenwa, what was his last name?

23    **A.**    I don't know his last name.

24    **Q.**    Henry, what was his last name?

25    **A.**    Obilo.

1   Q.   Prior to your involvement in this scheme, did you have
2   any previous convictions, federal convictions?
3   A.   Yes.
4   Q.   What was that conviction?
5   A.   That was -- that conviction was access device fraud.
6   Q.   When was that?
7   A.   2003.
8   Q.   Where did that take place?
9   A.   That happened in Seattle, Washington.
10  Q.   Who were some of the people that were involved in that
11  scheme with you?
12  A.   It was just me and Tobechi Onwuhara.
13  Q.   The same Tobechi that was involved in --
14  A.   Just me and him, yeah.
15  Q.   What was your particular role in this most recent
16  scheme that led to your current conviction?
17  A.   Well, I participated in calling banks, finding out who
18  had what and what amounts of money that they had by doing
19  various homeworks over the Internet and finding out
20  passwords and things like that and caused to do a wire
21  transfer from there.
22  Q.   Did you ever share any of the information that you
23  gathered over the Internet with other members of the scheme?
24  A.   Well, I shared my information personally with Tobechi.
25  Q.   How would you do that?

1    A.    Over the Internet.

2    Q.    Would you e-mail it?

3    A.    Yes.

4    Q.    What were some of the e-mail addresses that you recall

5    using?

6    A.    I personally used Allstate Associates.  That's the one

7    I used.

8    Q.    Allstate Associates?

9    A.    Uhm-hmm, @yahoo.com.

10   Q.    You mentioned Henry.

11               Who is the Henry you're referring to?

12   A.    Who is he?

13   Q.    Yes.

14               What was his last name?

15   A.    Obilo.

16   Q.    Do you recognize Henry Obilo in the courtroom today?

17   A.    Yes.

18   Q.    Could you please identify him by an article of

19   clothing he's wearing and his location in the courtroom.

20   A.    He's right there, blue shirt -- purple shirt.

21               THE COURT:  The record will reflect that the

22   witness has identified the defendant.

23               Next question.

24   BY ATTORNEY NEWBY:

25   Q.    After you would make a phone call to the bank, how

1   would the wire transfer process take place?

2   **A.**   It would take place with obtaining a wire transfer

3   form from the bank.  And then we would fill it out -- I

4   would fill it out and then send it back via Internet --

5   e-fax Internet, send it back to the bank.  And then they

6   would go ahead and proceed with the wire transfer from

7   there.

8   **Q.**   Would you affix a signature to these wire transfer

9   forms?

10  **A.**   Yes.

11  **Q.**   How would you put the signature of another person on

12  those forms?

13  **A.**   We would do -- I would do a copy and paste -- copy and

14  paste from the Internet from a program on the computer,

15  Photoshop, and then do a copy and paste from the signature

16  there to the wire transfer form.

17  **Q.**   How would you get the original signature of the

18  account holder to copy from?

19  **A.**   From -- I think it was a Web-based site called

20  Document Edge, and they do -- they sell mortgage loans and

21  things like that.  That's where you would obtain the

22  signature from, from loan documents.

23  **Q.**   Now, at some point did you travel to --

24  **A.**   Yes, I did.

25  **Q.**   -- Nigeria?

| | |
|---|---|
| 1 | Just so that the court reporter can hear us |
| 2 | both, please let me finish before -- |
| 3 | A.    Okay. |
| 4 | Q.    -- you answer. |
| 5 | Did you travel to Nigeria with the defendant |
| 6 | Henry Obilo? |
| 7 | A.    Yes. |
| 8 | Q.    Were any other people on that trip with you? |
| 9 | A.    Yes. |
| 10 | Q.    Who were they? |
| 11 | A.    It was me myself and Tobechi, Henry, and Tobechi's |
| 12 | fiancee Precious. |
| 13 | Q.    When did that trip take place? |
| 14 | A.    February 2008. |
| 15 | Q.    When did you return to the United States? |
| 16 | A.    April 2008. |
| 17 | Q.    What airport did you fly into? |
| 18 | A.    On the way back? |
| 19 | Q.    Yes, sir. |
| 20 | A.    JFK. |
| 21 | Q.    Did anything happen upon your return to JFK? |
| 22 | A.    I remember we got stopped.  He was there (indicating.) |
| 23 | I remember they stopped us and did a series of questions and |
| 24 | asked us a bunch of questions and stuff, and then they let |
| 25 | us go after a while. |

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1   Q.    You said "he" was there.

2                Would you please identify the person you

3   were --

4   A.    The detective right there (indicating).  I remember

5   his face.  He was there.

6                ATTORNEY NEWBY:  May the record reflect that

7   the witness has identified Detective Charles Pak?

8                THE COURT:  So ordered.

9                Next question.

10  BY ATTORNEY NEWBY:

11  Q.    Over the course of your involvement in this scheme,

12  did you witness the defendant Henry Obilo participating in

13  any way?

14  A.    Yes.

15  Q.    What did you witness him do?

16  A.    I witnessed him place phone calls.

17  Q.    What types of phone calls?

18  A.    Phone calls to banks.

19  Q.    What was he doing on those phone calls?

20  A.    He was placing phone calls to banks and finding out

21  how much -- finding out who had what on accounts and equity

22  line of credits and so on.

23  Q.    Was he impersonating those other people?

24  A.    Yes.

25                ATTORNEY IWEANOGE:  Objection; leading.

1          THE COURT:  Overruled.

2          The answer was "Yes"?

3          THE WITNESS:  Yes.

4          THE COURT:  Next question.

5   BY ATTORNEY NEWBY:

6   Q.    Where did you see the defendant Henry Obilo making

7   these calls?

8   A.    Well, two particular times that I seen him.  The first

9   time was December prior to us traveling in 2008 (sic).  And

10  that was in Miami, Florida, at Tobechi's house in Miami.

11  Q.    You said there were two times.

12          What was the other time?

13  A.    The other time was after we came back from the trip in

14  April 2008, somewhere around there after that, that was in

15  Dallas, Texas at Ezenwa's apartment.

16  Q.    Just so the record is clear, you said the first time

17  was in December before your trip.

18          Are you referring to December 2007?

19  A.    2007.

20          ATTORNEY NEWBY:  At this point, I would like to

21  play what's been marked as Government Exhibit 20, Clip 1.

22          THE COURT:  All right.  You may proceed.

23          (Tape played to the jury.)

24  BY ATTORNEY NEWBY:

25  Q.    Do you recognize the male voice on that phone call?

1    **A.**    Yes, I do.

2    **Q.**    Whose voice do you recognize that as?

3    **A.**    Henry Obilo.

4    **Q.**    You don't recognize that as someone you know as Brian

5    Kelly?

6    **A.**    No.

7              ATTORNEY NEWBY:  I would like to play

8    Government Exhibit 21, Clip 1.

9              THE COURT:  All right.  You may do so.

10             (Tape played to the jury.)

11   BY ATTORNEY NEWBY:

12   **Q.**    Do you recognize the male voice on that phone call?

13   **A.**    Yes, I do.

14   **Q.**    Whose voice do you recognize?

15   **A.**    Henry Obilo.

16   **Q.**    You don't recognize that as someone you know as Louis

17   Fraser?

18   **A.**    No, I don't.

19             ATTORNEY NEWBY:  No further questions.

20             THE COURT:  Cross-examination.

21             ATTORNEY IWEANOGE:  Yes, Judge.

22                  CROSS-EXAMINATION

23   BY ATTORNEY IWEANOGE:

24   **Q.**    Good morning, sir.

25   **A.**    Good morning.

1   **Q.**   When you were stopped on your way back from Nigeria

2   for the secondary inspection at JFK, you identified

3   Detective Pak as one of the people there; correct?

4   **A.**   Yes.

5   **Q.**   At the time, Detective Pak asked you if you go by the

6   nickname Q; correct?

7   **A.**   Yes.

8   **Q.**   And you lied to him and told him that your nickname is

9   not Q; correct?

10   **A.**   I don't remember that.

11   **Q.**   Do you recall him asking you if you go by the nickname

12   Q?

13   **A.**   Probably.  I think I remember that, but I don't

14   remember what I told him after that.

15   **Q.**   Okay.

16        You do not recall telling him that your

17   nickname is not Q?

18   **A.**   I don't recall telling him that.

19   **Q.**   With respect to your travel to Nigeria, you said it

20   you, Ms. Matthews, Tobechi, and Mr. Obilo that went to

21   Nigeria; correct?

22   **A.**   Uhm-hmm.

23   **Q.**   You have to say "Yes" or "No" for the court reporter.

24   **A.**   Yes.

25   **Q.**   Other than Ms. Precious Matthews, you, Tobechi, and

1    Mr. Obilo originally hail from Nigeria; correct?

2    A.    Can you ask that question again.

3    Q.    You're a United States citizen; correct?

4    A.    Yes, I am.

5    Q.    Prior to becoming a United States citizen, you were

6    from Nigeria; correct?

7    A.    That's correct.

8    Q.    And Tobechi Onwuhara and Henry Obilo also originally

9    were from Nigeria; correct?

10   A.    That's correct.

11   Q.    So you went to visit your homeland?

12   A.    That's correct.

13   Q.    You didn't go to Nigeria to commit any fraud; correct?

14   A.    No.

15   Q.    And it was just a visit; correct?

16   A.    Yes.

17   Q.    And after visiting, on your way back, you were then

18   asked questions at the airport; correct?

19   A.    That's correct.

20   Q.    Mr. Obilo worked as a bodyguard for Mr. Tobechi

21   Onwuhara; correct?

22   A.    I don't recall.  I don't know anything about that.

23   Q.    Tobechi owned a record label by the name of S.W.A.T.

24   Entertainment; correct?

25   A.    That's correct.

1    **Q.**   Donald Okoro, known as D.O., was one of the people on

2    his record label; correct?

3    **A.**   That is correct.

4           ATTORNEY NEWBY:  Objection.  This is getting

5    way beyond the scope of direct.

6           THE COURT:  It is, Mr. Iweanoge.  It's beyond

7    the scope of direct.

8           THE COURT:  I sustain the objection.

9           ATTORNEY IWEANOGE:  Yes, judge.

10   BY ATTORNEY IWEANOGE:

11   **Q.**   In 2002, as you told the jury, you were previously

12   convicted of illegal use of credit cards; correct?

13   **A.**   Of 2003.

14   **Q.**   2003.

15          You were convicted of attempted bank fraud;

16   correct?

17   **A.**   Actually, it was access device fraud.

18   **Q.**   Okay.

19          In other words, using a device for credit card

20   processing of other people's money; correct?

21   **A.**   That's correct.

22   **Q.**   Okay.

23          And after you pled guilty -- you pled guilty to

24   that; correct?

25   **A.**   That's correct.

1    Q.    That was in Federal Court; correct?

2    A.    Yes.

3    Q.    You were put on probation at the time, correct, on

4    supervised release after you served your time?

5    A.    After I served my time?

6    Q.    Yes.

7    A.    Yes.

8    Q.    After the supervised release, you made a promise to

9    them -- or to the Court that you were going to be of general

10   good behavior after that; is that correct?

11   A.    That's correct.

12   Q.    You never did that?  You went back to continuing to do

13   bank fraud; correct?

14   A.    No.

15   Q.    You just pled guilty before Judge Ellis to bank fraud

16   in 2008; correct?

17   A.    In 2008, yes.

18   Q.    So five years after you promised a judge in Federal

19   Court in Seattle, Washington you were going to be on general

20   good behavior, you appeared before Judge Ellis in 2008 for

21   the same thing, bank fraud; correct?

22   A.    Yes.  That was after my probation.

23   Q.    Okay.

24             You finished your probation and it was okay to

25   go back to taking other people's money?

1    A.    I didn't say it was okay to do that.

2              THE COURT:  Avoid the comments, Mr. Iweanoge.

3              ATTORNEY IWEANOGE:  Yes, Judge.

4    BY ATTORNEY IWEANOGE:

5    Q.    When you pled guilty before T.S. Ellis, III, you

6    accepted responsibility for participating in a scheme where

7    HELOC accounts -- where money was withdrawn from HELOC

8    accounts; correct?

9    A.    Yes.

10   Q.    HELOC stands for home equity line of credit; correct?

11   A.    Yes.

12   Q.    What you would do with Tobechi Onwuhara and with

13   Ezenwa Onyedebelu was to transfer funds to accounts outside

14   of the United States; correct?

15   A.    Yes.

16   Q.    And the monies subsequently were sent back to the

17   United States; correct?

18   A.    Somehow it did, yes.

19             THE COURT:  On some occasions, were monies sent

20   not to Nigeria but to somewhere in the U.S.?

21             THE WITNESS:  I truly don't know how all that

22   went because Tobechi was taking charge of that.

23             THE COURT:  Was he the leader?

24             THE WITNESS:  He was the one handling that.

25             THE COURT:  Next question.

1    BY ATTORNEY IWEANOGE:

2    Q.    But you did get your percentages from the fraud that

3    you guys were participating in; correct?

4    A.    Yes.

5    Q.    How much did you receive from your activities?

6    A.    From my activities?

7    Q.    For what you did?

8    A.    Can you be more specific?

9    Q.    How were you paid for what you did for each fraud that

10   was committed?

11   A.    I remember I got $25,000 one time.

12   Q.    How did you receive that money?

13   A.    Precious put the money in my wife's account.

14   Q.    Okay.

15         And your wife would be Ms. Brandy Anderson?

16   A.    Yes.  And she would give me the money.

17   Q.    So Precious Matthews deposited the $25,000 in Brandy

18   Anderson, your wife's, account?

19   A.    Yes.

20   Q.    And it was for your benefit and the benefit of

21   Ms. Anderson; correct?

22   A.    If was for me.

23   Q.    Ms. Anderson was part of the scheme as well; correct?

24   A.    They was not part of it.  I told her to -- I wanted to

25   use her account to receive the money because at that time I

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    didn't have an account.

2    Q.    Okay.

3          She's your wife; correct?

4    A.    Yes.

5    Q.    And you're aware she pled guilty in this case;

6    correct?

7    A.    Yes.

8    Q.    But she's not a part of the scheme?

9    A.    She's not part of it.  She didn't call no banks.

10   Q.    As part of your guilty plea before Judge Ellis, you

11   agreed to cooperate with the United States in its

12   prosecution of other people; correct?

13   A.    Yes, as part of my deal.

14   Q.    And have you been sentenced at this time?

15   A.    Yes, I have been sentenced.

16   Q.    How much time did you receive?

17   A.    I received 54 months.

18   Q.    54 months.

19          And part of your plea agreement includes that

20   if you provide substantial assistance to the United States,

21   they may file a motion for a downward departure for you;

22   correct?

23   A.    I don't understand what you mean by "downward

24   departure."

25   Q.    Okay.

1           Did you review your plea agreement with your

2    lawyer before you signed it?

3    **A.**    Yes, I did.

4    **Q.**    Part of your plea agreement on Page 11 says --

5           ATTORNEY IWEANOGE:  Court's indulgence.

6           (Pause.)

7           ATTORNEY NEWBY:  Your Honor, maybe it would be

8    best for him to be able to see his plea agreement if he's

9    referring to it.

10           THE COURT:  You can make it an exhibit, if you

11    wish.

12           You're going to refer to page numbers,

13    Mr. Iweanoge?

14           ATTORNEY IWEANOGE:  Yes, Judge.

15           THE COURT:  All right.

16           ATTORNEY IWEANOGE:  Court's indulgence.

17           (Pause.)

18           Page 8.

19           THE COURT:  What is it that you -- - just ask

20    him a question.  Let's move it along.

21    BY ATTORNEY IWEANOGE:

22    **Q.**    Your plea agreement includes that the government,

23    based on your cooperation, may file a motion for your

24    sentence to be reduced?

25    **A.**    I remember that.

1  Q.   And it's your expectation that part of your

2  cooperation includes coming to court to testify on behalf of

3  the government; correct?

4  A.   I'm just following up with the agreement that I

5  signed.

6  Q.   Say it again.

7  A.   I signed an agreement, and I'm following up with it.

8  Q.   I didn't hear the last part of it.

9  A.   I signed an agreement in my case, and that's why I'm

10 here.  I'm following up with my agreement.

11 Q.   It's your expectation that by testifying and

12 cooperating with the government, that they will file a

13 motion for your sentence of 54 months to be reduced;

14 correct?

15 A.   I don't know.  I don't know what's going to happen

16 with that.  I just know that I signed a plea agreement, and

17 I'm just following along with my plea agreement.

18 Q.   Thank you for the answer that you gave me.

19        My question --

20        THE COURT:  I'll strike that comment.  You may

21 not comment on the evidence, Mr. Iweanoge.

22        ATTORNEY IWEANOGE:  Yes, Judge.

23 BY ATTORNEY IWEANOGE:

24 Q.   Is it your expectation that the government will file a

25 motion to have your sentence of 54 months reduced?

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

```
 1                    ATTORNEY NEWBY:  Objection; asked and answered
 2       and argumentative.
 3                    THE COURT:  I'll permit it.  Overruled.
 4                    You may answer once again.
 5                    Is that your expectation?
 6                    THE WITNESS:  It's my expectation.  I'm not
 7       certain that I'll get it.  I don't know what's going to
 8       happen after that.
 9       BY ATTORNEY IWEANOGE:
10       Q.    During your interview on the 29th of August of 2008
11       with Detective Nail, do you recall telling Detective Nail
12       that Mr. Obilo was only involved in doing debit and credit
13       cards?
14       A.    During 2009, you said?
15       Q.    Interview of 8/29/2008.
16                    ATTORNEY NEWBY:  Objection; beyond the scope.
17                    THE COURT:  Sustained.
18                    ATTORNEY IWEANOGE:  Court's indulgence.
19                    (Pause.)
20                    THE COURT:  You may recall Mr. Nnabue in your
21       case, if you wish, Mr. Iweanoge.
22                    ATTORNEY IWEANOGE:  Yes, Judge.
23                    THE COURT:  Next question.
24                    ATTORNEY IWEANOGE:  Yes, Judge.
25                    Court's indulgence.
```

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          (Pause.)

2     BY ATTORNEY IWEANOGE:

3     Q.    You said you observed Mr. Obilo on two occasions

4     making calls; is that correct?

5     A.    Yes.

6     Q.    And one was in Miami, Florida?

7     A.    Yes.

8     Q.    What month and what year did you witness that?

9     A.    If I'm not mistaken, I believe it was December 2007 or

10    January 2008, somewhere around there, in that window there.

11    Q.    Are you friends with Mr. Obilo?

12    A.    Yes.

13    Q.    Were you aware that Mr. Obilo was actually in Nigeria

14    from December to January of 2- -- from December of 2007 to

15    January of 2008?

16              ATTORNEY NEWBY:  Objection; beyond the scope.

17              THE WITNESS:  That's what I'm saying.

18              THE COURT:  I'll overrule it.

19              You may answer.

20              THE WITNESS:  That's what I said.  Somewhere

21    between December 2008 -- December 2007 and January 2008,

22    somewhere between there.  I remember him traveling, but I

23    remember him coming back as well.  So between that time --

24    it's been a long time.  I've been incarcerated, so I don't

25    remember vivid time of everything.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1     ATTORNEY IWEANOGE:  Court's indulgence.

2     (Pause.)

3     I believe I'm done.  Let me talk to my client

4 for a minute.

5     THE COURT:  All right.

6     (Pause.)

7     ATTORNEY IWEANOGE:  No further questions,

8 Judge.

9     THE COURT:  Redirect, Mr. Newby.

10     ATTORNEY NEWBY:  Briefly, your Honor.

11      REDIRECT EXAMINATION

12 BY ATTORNEY NEWBY:

13 **Q.** You testified on cross that you received funds by way

14 of your wife's bank account that was part of this scheme; is

15 that right?

16 **A.** Yes.

17 **Q.** Is that the only manner in which you received proceeds

18 from successful fraudulent wire transfers in this case, in

19 this scheme?

20 **A.** Me personally, you mean?

21 **Q.** Yes.

22 **A.** No.  Well, when I traveled to Nigeria, I received some

23 funds there, too, as well.

24 **Q.** Approximately how much did you receive in Nigeria?

25 **A.** $100,000.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    Q.    From whom did you receive those funds?

2    A.    It was through Toby.  I was paid directly by -- what's

3    his name? -- Tobe's uncle -- brother-in-law.  What's his

4    name?  Donald.

5    Q.    Donald?

6    A.    Yeah.

7    Q.    Do you also know him by the name of Daniel Ojenta

8    (phonetics)?

9    A.    Daniel, yeah, that's who I'm talking about.

10   Q.    Are you aware of whether he has been prosecuted?

11   A.    Do I know -- am I aware of that?

12   Q.    Yes.

13   A.    I don't know.

14              ATTORNEY NEWBY:  No further questions.

15              THE COURT:  You may step down.

16              Call your next witness.

17              (Witness excused.)

18              ATTORNEY EISINGER:  The prosecution calls John

19   Hayes.

20              THE COURT:  All right.  Mr. Wood.

21              (Witness sworn.)

22              THE COURT:  All right.  You may proceed.

23

24

25

1          JOHN HAYES, having been duly sworn, was

2     examined and testified as follows:

3                    DIRECT EXAMINATION

4     BY ATTORNEY EISINGER:

5     Q.    Can you please state your name and spell your last

6     name for the record.

7     A.    John Hayes, H-a-y-e-s.

8     Q.    How are you employed, Mr. Hayes?

9     A.    I work with the United States Senate Credit Union.

10    Q.    How long have you worked there?

11    A.    Five years.

12    Q.    What is your job?

13    A.    Executive vice-president and chief operations officer.

14    Q.    What are your duties there?

15    A.    With that I handle all of the operational side of

16    thing; lending, human resources, branches, call center,

17    back -- pretty much the back office operations.

18    Q.    How are calls coming into your customer service

19    routed?

20    A.    They all come in through the office at 2750 Eisenhower

21    Avenue, and then they're distributed to -- we have two call

22    centers:  One here in Alexandria, and one in Staunton,

23    Virginia.  And it's based upon the next available agent.

24    Q.    And you mentioned an address.

25              Is that also in Alexandria, the Eisenhower

1    Avenue?

2    A.    There's one in 2111 -- a branch at 2111 Eisenhower

3    Avenue.

4    Q.    Is that Eisenhower Avenue here in Alexandria?

5    A.    Yes, yes.

6    Q.    So all customer calls coming into the (202), (703),

7    and (800) numbers all come through Alexandria first?

8    A.    All come through Alexandria first and then they're

9    routed.

10   Q.    Where did the customer rep Marcy work in December of

11   2007?

12   A.    At the 2750 Eisenhower Avenue in Alexandria office.

13   Q.    Where is the United States Senate Federal Credit Union

14   headquarters?

15   A.    2750 Eisenhower Avenue, Alexandria.

16   Q.    If money was wired out of the credit union to a

17   foreign bank, what location would it begin in?

18   A.    It would begin in Alexandria.

19   Q.    Where are your computer systems?

20   A.    In Alexandria.

21   Q.    In December of 2007, what was the procedure if someone

22   called in to make a wire transfer?

23   A.    The member would call in, identify themselves, and

24   then there would be a form that would be filled out.  The

25   form would be faxed to our Alexandria office, and then our

1   accounting department in Alexandria would send it from

2   there.  It would go out through the Federal Reserve.

3   Q.   How would a caller identify themselves?

4   A.   Typically name, date of birth, mother's maiden name,

5   account number.  There's various information that might be

6   asked.

7   Q.   How about for wires that were larger than $5,000?

8   A.   There would be a call-back to the number that we have

9   on record to verify that the person actually -- to verify

10  the information and that they authorized it.

11  Q.   And is there any difference between domestic and

12  international wires?

13  A.   No.

14  Q.   With the help of the court security officer -- oh,

15  sorry.  Let me show you what's been marked as Grand Jury

16  Exhibit No. 6.

17          THE COURT:  Mark it what way?

18          ATTORNEY EISINGER:  Government's Exhibit

19  No. 6.

20          THE COURT:  Government Exhibit 6.

21          (Tape played to the jury.)

22  BY ATTORNEY EISINGER:

23  Q.   And did you recognize that clip?

24  A.   Yes.

25  Q.   And what was it?

1    **A.**    It was a call recording of a call-back from our call

2    center to the member to verify a wire transfer.

3    **Q.**    What member was this?

4    **A.**    Short; Robert Short or purported to be Robert Short.

5    **Q.**    Have you spoken to Robert Short?

6    **A.**    Yes, subsequently.

7    **Q.**    Did you recognize his voice on that call?

8    **A.**    No, that was not his voice.

9    **Q.**    And where did this call come from?

10            Sorry.  Strike that.

11            Where did that recording come from?

12   **A.**    From our call recording system that we have in

13   Alexandria.

14   **Q.**    And are all calls coming into or going out of the call

15   center recorded as part of your normal course of business?

16   **A.**    Yes.

17   **Q.**    Are they created at or near the time of the call?

18   **A.**    They're created at the time of the call.

19   **Q.**    And does the recording accurately reflect the

20   conversation it purports to record?

21   **A.**    Yes.

22            ATTORNEY EISINGER:  We would move to admit

23   Government Exhibit No. 6.

24            ATTORNEY IWEANOGE:  No objection, Judge.

25            THE COURT:  Admitted.

1   BY ATTORNEY EISINGER:

2   Q.   With the help of the court security officer, I would

3   like to show you what's been marked for identification as

4   Government's Exhibit No. 7.

5        Do you recognize this?

6   A.   Yes.

7   Q.   And what is this?

8   A.   It's the wire transfer request form that was filled

9   out during this call.

10  Q.   Who fills out that form?

11  A.   The call center agent.

12  Q.   And can you explain why and how wire transfer request

13  forms are created?

14  A.   They would be created when the member calls in and

15  requests to wire money to another institution, and the

16  member service agent would fill out a form similar -- well,

17  this form.

18  Q.   Is it created at or near the time of the call?

19  A.   Yes.

20  Q.   Does the form accurately reflect the information

21  provided by the caller?

22  A.   Yes, it does.

23  Q.   Are these forms completed in the regular course of

24  business?

25  A.   Yes.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1   Q.    What happens to the form after it's prepared by the

2   customer service rep?

3   A.    They're sent to our accounting department, and they

4   are then added from -- the accounting department puts in

5   into the Federal Reserve to transfer the money.

6   Q.    Does accounting retain a copy of this form?

7   A.    Yes.

8            ATTORNEY EISINGER:  The government would move

9   to admit Government Exhibit No. 7.

10           ATTORNEY IWEANOGE:  No objection, Judge.

11           THE COURT:  Admitted.

12   BY ATTORNEY EISINGER:

13   Q.    Have you listened to recordings of --

14           THE COURT:  All right.  You want to display it?

15   You're going to have to enlarge it.

16           You'll all of these exhibits in the jury room.

17   BY ATTORNEY EISINGER:

18   Q.    Have you listened --

19           THE COURT:  Just so we're clear, Exhibit 7 is

20   the form relating to the call we just heard?

21           THE WITNESS:  Yes, sir.

22           THE COURT:  Next question.

23   BY ATTORNEY EISINGER:

24   Q.    Have you listened to recordings of calls made on

25   December 7th, 2007 attempting to wire $280,000 out of

1   Robert Short's account?

2   A.   Yes.

3   Q.   Is the Swift Code on Government Exhibit No. 7 the one

4   provided by the person impersonating Robert Short?

5   A.   It is except for the last letter.  In the call,

6   Mr. Short -- the purported Mr. Short gives a Swift Code of

7   last initial of E, as in Edward, and the call center agent

8   wrote down D as in David.

9   Q.   What effect, if any, did that have on the wire

10  transfer?

11  A.   The wire transfer did not go through.  It was held by

12  Worrell Bank because it was the wrong Swift Code.

13  Q.   Did you lose any money -- did the credit union lose

14  any money as a result of this transaction?

15  A.   No.  Because of having the wrong Swift Code, the money

16  was delayed long enough that I was able to get ahold of

17  Worrell Bank before they transferred the money.

18  Q.   With the help of the court security officer, do you

19  recognize what has been marked for identification as

20  Government Exhibit No. 8?

21  A.   Yes.

22  Q.   And what is it?

23  A.   It's a listing of all of the times that Mr. Short's

24  account number, 15340, accessed our home banking system.

25  Q.   And can you explain how connection logs are created.

1    **A.**    Every time any member logs onto their account, there's

2    an audit log that's created and logs on where they logged on

3    from and what they did as an audit log.

4    **Q.**    And is it created at or near the time of the access?

5    **A.**    Yes.

6    **Q.**    Does the log accurately reflect the information it

7    purports to describe?

8    **A.**    Yes.

9    **Q.**    Are these logs maintained in the regular course of

10    business?

11    **A.**    Yes.

12          ATTORNEY EISINGER:  I would move to admit

13    Government Exhibit No. 8 into evidence.

14          ATTORNEY IWEANOGE:  No objection, Judge.

15          THE COURT:  Admitted.

16    BY ATTORNEY EISINGER:

17    **Q.**    And could you explain the entries from December 3rd to

18    December 6th.

19          THE COURT:  Enlarge that, please.

20          THE WITNESS:  Okay.

21          THE COURT:  Can you do a little better than

22    that?

23          All right.

24          THE WITNESS:  Starting on 12/3/2007 at

25    3:51:35 p.m., that's Mr. Short's account number, 15340.

1   He's coming in -- I'm not sure what the 2D number means.

2   The next number is the 172.  That's the IP address that he's

3   coming in from.

4           And the https://www.ussfcu.org/portallogauth,

5   that's where he's logging off to the system.  It's --

6   ussfcu.org is our Web page.  And then from there it's what

7   he does.

8           So on 12/4 at 10:14, he's doing something with

9   password.  12/4, 10:18, it's a logoff.  12/5 at 5:08,

10  there's something with password.  Those are all done with

11  172.163.149.

12  BY ATTORNEY EISINGER:

13  Q.   And based on your review of the recordings made on

14  December 7th, 2007 and activity on Mr. Short's account on

15  that day, can you explain the log entries on December 7th,

16  2007.

17  A.   12/7 at 10:55 a.m., his account number, he's coming in

18  from 75.192.189.135.  That's the IP address he's coming in

19  to -- coming in from, rather.  He's doing something with

20  password.

21          And then you can see a bunch of -- following

22  there, 175 -- same 175 numbers.  If you skip down a couple,

23  he's changing his password.

24  Q.   That's the third line that's shown on the screen to

25  your left?

1    A.    Yes.

2            And then the next line, the 12/7 at 11:08, same

3    address, he's looking at check images.  You can see it says

4    ussfcu.org/portaltransaction, history, check images, and

5    there's the check number.  It's actually cut off a little

6    bit on this copy and on that copy, too.  It tells you what

7    check number he's looking at.

8    Q.    Okay.

9    A.    And then the whole bunch of transactions are all

10   looking at check images all at the same log-in time, but

11   it's logging what he's doing at that point.

12           ATTORNEY EISINGER:  Court's indulgence, your

13   Honor.

14           (Pause.)

15   BY ATTORNEY EISINGER:

16   Q.    And can you describe what these transactions are?

17   A.    12/7 at 12:20, it is a one-time transfer transferring

18   money from one account to another account.  It doesn't tell

19   me specifically what is being done other than it's a

20   transfer.  I would have to look at the actual history of the

21   account to see what was transferred.

22   Q.    Do you happen to recall offhand what money was

23   transferred within Robert Short's account on that date?

24   A.    I believe it was money being transferred from one

25   account to another.  I don't recall the dollar amount.  I

1    know the wire transfer was 280,000, but I don't know if

2    that's what that is or -- I think he also moved money from

3    one account to another still within that account number.

4    Q.    Moving to December 9th and 10th, can you explain what

5    these are.

6    A.    This is back to the 172 number, coming in from

7    172.132.11.201.  It's password changes or looking at the

8    password.

9              ATTORNEY EISINGER:  No further questions, your

10   Honor.

11             THE COURT:  All right.  Cross-examination.

12             ATTORNEY IWEANOGE:  Yes.

13                   CROSS-EXAMINATION

14   BY ATTORNEY IWEANOGE:

15   Q.    Mr. Hayes, do you see the number 172.167.162.70?

16             Do you see that number?

17   A.    Yes.

18   Q.    Is that an IP address?

19   A.    Yes, it is.

20             ATTORNEY IWEANOGE:  If you can pull up the

21   transaction for 12/7.

22   BY ATTORNEY IWEANOGE:

23   Q.    Can you see that on the monitor?

24   A.    Can I see what, sir?

25   Q.    The IP address.

1    A.    Yes, sir.

2    Q.    The IP address for the transaction involved in -- the

3    $280,000 that was wired from Mr. Short's account, what's the

4    number?

5    A.    The 75.192.189.135.

6              ATTORNEY IWEANOGE:  No further questions, your

7    Honor.

8              THE COURT:  All right.  Any redirect?

9              ATTORNEY EISINGER:  No, your Honor.

10             THE COURT:  All right.

11             Thank you.  You may step down.

12             (Witness excused.)

13             THE COURT:  Call your next witness.

14             ATTORNEY NEWBY:  The government calls James

15   Witt.

16             ATTORNEY EISINGER:  Could we release the

17   witness, your Honor?

18             THE COURT:  Any objection, Mr. Iweanoge?

19             ATTORNEY IWEANOGE:  No, Judge.

20             THE COURT:  He's released.

21             There are three more witnesses after this,

22   Mr. Newby?

23             ATTORNEY NEWBY:  Yes; possibly just two.

24             THE COURT:  All right.

25             ATTORNEY NEWBY:  Probably just two.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  Come forward and take the oath,

2     please.

3          (Witness sworn.)

4          THE COURT:  You may proceed, Mr. Newby.

5          JAMES W. WITT, having been duly sworn, was

6     examined and testified as follows:

7                    DIRECT EXAMINATION

8     BY ATTORNEY NEWBY:

9     Q.    Good morning, sir.

10    A.    Good morning.

11    Q.    Please state your name and spell your last name for

12    the court reporter.

13    A.    James W. Witt, W-i-t-t.

14    Q.    Mr. Witt, where do you currently live?

15    A.    I live in Clifton, Virginia.

16    Q.    How long have you lived in Clifton?

17    A.    Eight years.

18    Q.    Are you currently employed?

19    A.    I am.

20    Q.    How are you employed?

21    A.    I'm employed as a contractor with the Department of

22    State.

23    Q.    How long have you worked as a contractor with the

24    State Department?

25    A.    Also about eight years.

1    Q.    And prior to that, where did you work?

2    A.    I worked for the Voice of America.

3    Q.    At any point, have you had financial accounts with the

4    State Department Federal Credit Union?

5    A.    I have.

6    Q.    With types of accounts did you have with the State

7    Department Federal Credit Union in 2007 and 2008?

8    A.    I had a savings account, checking account, home equity

9    line of credit, and some certificates of deposit.

10   Q.    Did you have those accounts in December of 2007?

11   A.    I did.

12   Q.    Can you recall what the last four digits of your State

13   Department home equity line of credit account was in that

14   time period?

15   A.    I believe it was 97.

16   Q.    Is that credit line still open?

17   A.    Yes, it is.

18   Q.    In December -- as of December 1st, 2007, what was the

19   total line of credit that you had on that HELOC?

20   A.    It was a total of -- a line of credit of 500,000.

21   Q.    And have you drawn that line of credit down at all?

22   A.    I have not.

23   Q.    Why did you have this $500,000 line of credit?

24   A.    It wasn't always that high, but my wife and I decided

25   to raise it to that level to assist possibly our son to

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    relocate to this area.  That's when the real estate prices

2    were very high, and we thought we might have to help him

3    out.  He wanted to relocate closer to us.

4    Q.    Is your line of credit on that account still $500,000?

5    A.    No.  I reduced it to 50,000.

6    Q.    With caused you to reduce it to 50,000?

7    A.    Because of the incidence of I.D. theft, I wanted to

8    reduce exposure from having something like this happen

9    again.

10   Q.    When did you learn of some attempted I.D. theft on

11   your account?

12   A.    It was in December of 2007.

13   Q.    How did you learn about it?

14   A.    I was -- I am in the habit of checking my account

15   online periodically.  I happened to notice that there was a

16   huge draw on the home equity line of credit.  That was my

17   first indication that something had happened.

18   Q.    You said "huge draw."

19              What size are we are talking about?

20   A.    Almost the full thing.  Almost 488,000 of the 500,000.

21   Q.    And what did you observe with respect to that draw on

22   your account?

23   A.    I observed that -- it appeared that that amount had

24   gone somewhere and I just observed that the balance was far

25   less.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    Q.   You observed that there was a debit on your account?

2    A.   Yes, a huge debit.

3    Q.   What was your reaction?

4    A.   Shock and dismay and rather frightened.

5    Q.   Did you authorize that debit?

6    A.   Did not.

7    Q.   Did you authorize anyone else to make that debit?

8    A.   I did not.

9    Q.   Did you personally make that debit?

10   A.   I did not.

11            ATTORNEY NEWBY:  At this point, the government

12   would like to play a portion of Exhibit 12, Clip 1.

13            (Tape played to the jury.)

14   BY ATTORNEY NEWBY:

15   Q.   Do you recognize the male voice on that phone call?

16   A.   I do not.

17   Q.   That's not your voice?

18   A.   That's not my voice.

19   Q.   At the time period of the beginning of December of

20   2007, was your password on your account with State

21   Department Federal Credit Union -- did it begin with the

22   letter K?

23   A.   Yes, it did.

24   Q.   There was reference in that phone call to an account

25   ending in 2330.

1          Did you have an account ending in 2330 with the

2     State Department Federal Credit Union?

3     A.   Yes, I did.

4     Q.   Were there any prefixes or suffixes that were attached

5     to that account?

6     A.   Yes.  Each portion of the account, whether it's

7     savings, checking, CD, or home equity line of credit, had a

8     different two-digit suffix.

9     Q.   Was "97" the suffix of your HELOC account?

10    A.   Yes.

11         ATTORNEY NEWBY:  I would ask the court security

12    officer to pass you what's been marked as Government's

13    Exhibit 13.

14         THE MARSHAL:  (Complied).

15    BY ATTORNEY NEWBY:

16    Q.   Do you recognize Government's Exhibit 13 as a document

17    you created?

18    A.   No, I did not create this.

19         ATTORNEY NEWBY:  At this point, we would ask to

20    publish Exhibit 13.  The next witness will tie it up.

21         ATTORNEY IWEANOGE:  No objection, Judge.

22         THE COURT:  All right.  You may do so.

23    BY ATTORNEY NEWBY:

24    Q.   Exhibit 13 shows some typed text.

25         Did you type that text?

```
1    A.    I did not.

2    Q.    There's a signature above your name, James W. Witt

3    toward the bottom of the typed text.

4              Is that your signature?

5    A.    It is.

6    Q.    Did you affix your signature to this document,

7    Government Exhibit 13?

8    A.    Did not.

9    Q.    Do you know anyone with an account in Central Hong

10   Kong?

11   A.    No, I do not.

12   Q.    After you observed this debit on your account of

13   approximately $488,000, what did you do?

14   A.    The first thing I tried to do was to call the bank --

15   the credit union, and one of the first things they asked me

16   is, what's my password.

17             So I gave them my password.

18             They said, "I'm sorry.  That's not it."

19             I said, "Well, that's impossible.  I've used

20   this password for a good number of years."

21             "Well, that's not it."

22             So then they were able to ask me other

23   questions about where I live, Social.  And with that

24   information they were able to tell me, yes, in fact, there

25   has been a debit on this.
```

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1                    And my next call was to the security officer at

2      the credit union, and then a meeting the following day.

3      Q.    Do you recognize the defendant sitting to my right --

4      two persons to my right?

5      A.    I do not.

6      Q.    Have you seen him before in your life?

7      A.    Just here in the courtroom.

8      Q.    Do you know the name Henry Obilo?

9      A.    No, I do not.

10     Q.    Do you know the name Tobechi Onwuhara?

11     A.    No, I do not.

12     Q.    Did you suffer any personal loss as a result of this

13     debit?

14     A.    Not financial.  The credit union was able to restore

15     the funds to my account, but there were a lot of other

16     things that happened, involving the credit bureaus and

17     trying to straighten things out.  So, not financially to me,

18     but in other areas I had some problems to deal with.

19                    ATTORNEY NEWBY:  No further questions for this

20     witness.

21                    THE COURT:  Cross-examination?

22                    ATTORNEY IWEANOGE:  None, Judge.

23                    THE COURT:  You may step down.

24                    May this witness be excused?

25                    ATTORNEY IWEANOGE:  Yes, Judge.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  You may be excused.

2          (Witness excused.)

3          THE COURT:  Call your next witness,

4    Mr. Eisinger.

5          ATTORNEY EISINGER:  The government calls Larry

6    Plassmeyer.

7          THE COURT:  Come forward and take the oath,

8    please, sir.

9          (Witness sworn.)

10          THE COURT:  All right, you may proceed.

11          LAWRENCE PLASSMEYER, having been duly sworn,

12    was examined and testified as follows:

13                    DIRECT EXAMINATION

14    BY ATTORNEY EISINGER:

15    Q.    Please state your name and spell your last name for

16    the record.

17    A.    Lawrence Plassmeyer, P-l-a-s-s-m-e-y-e-r.

18    Q.    And how are you employed?

19    A.    I'm employed with the State Department Federal Credit

20    Union.

21    Q.    How long have you been employed there?

22    A.    Fourteen and a half years.

23    Q.    What is your current job title?

24    A.    I'm a manager of loss prevention.

25    Q.    What are your duties?

1   A.    Security with the credit union and fraud

2   investigation.

3   Q.    How are calls coming in to customer service routed?

4   A.    They're routed through a 5000 number, and then it just

5   goes into the call -- the call queue for that -- for that

6   department.

7   Q.    And where is that located?

8   A.    1630 King Street in Alexandria.

9   Q.    Where is State Department Federal Credit Union's

10  headquarters?

11  A.    1630 King Street in Alexandria.

12  Q.    If money was wired out of the State Department Federal

13  Credit Union to a foreign bank, from what location would it

14  begin?

15  A.    It would have to be done through 1630 King Street in

16  Alexandria.

17  Q.    Where are your computer systems?

18  A.    In the same building at 1630 King Street in

19  Alexandria.

20  Q.    In December of 2007, what was the procedure if someone

21  wanted to call up and make a wire transfer?

22  A.    They would have to fax us in a request or they could

23  e-mail, but then we'll have to send them a form and have

24  them sign it requesting that the transfer be made.  And

25  that's for us to verify the signature with signatures we

1    have on file.

2    Q.    And what other kind of information would you need in

3    order to verify the person?

4    A.    We would need all the account information.  We would

5    be asking them questions about the account.  We would give

6    them a call back to verify that it was, in fact, from the

7    number that it was supposed to be coming from.

8    Q.    Was there any difference if it was a very large wire

9    transfer?

10   A.    No.  Same security measures are in place.

11   Q.    Is there any difference between a domestic or an

12   international wire?

13   A.    No.

14   Q.    With the help of the court security officer, I would

15   like to show with what's been marked for identification as

16   Government Exhibit No. 13.

17            Do you recognize what this is?

18   A.    Yes.  It's a fax that was sent in to us requesting a

19   wire transfer be made for Mr. Witt's account to a bank in

20   Hong Kong.

21   Q.    And is there a specific form that is required?

22   A.    Not -- well, for the fax request, no.  But we have

23   another form we have to fill out that the person has to sign

24   that is the official form for us, and that's the

25   verification of all the information provided and the

1    signature again.

2    Q.    And is this a true and accurate copy of the original

3    form received by State Department Federal Credit Union?

4    A.    Yes, it is.

5              ATTORNEY EISINGER:  We would move to admit

6    Government Exhibit No. 13 into evidence.

7              ATTORNEY IWEANOGE:  No objection, Judge.

8              THE COURT:  Admitted.

9    BY ATTORNEY EISINGER:

10   Q.    With the help of the court security officer...

11             Do you recognize what's been marked for

12   identification as Government Exhibit No. 14?

13   A.    Yes.  This is a monthly statement for December of '07

14   for Mr. James Witt.

15   Q.    Can you explain how account statements are created?

16   A.    These account statements are based on the actual

17   transactions being conducted on the account.

18   Q.    And are they created at or near the time of the actual

19   transactions?

20   A.    Yes, they are.

21   Q.    Does the account statement accurately reflect the

22   transactions on that account?

23   A.    Yes, it does.

24   Q.    Are these account statements maintained in the regular

25   course of business?

1    A.    Yes, they are.

2              ATTORNEY EISINGER:   The government moves to

3    admit Government Exhibit No. 14 into evidence.

4              ATTORNEY IWEANOGE:   No objection, Judge.

5              THE COURT:   All right.   It's admitted.

6              ATTORNEY EISINGER:   Can you publish that,

7    please.

8    BY ATTORNEY EISINGER:

9    Q.    Can you explain the transactions that are listed on

10   Government Exhibit No. 14.

11   A.    Well, it shows ATM withdrawals.   And then it shows a

12   transfer from a loan, which is Code No. 97.   So it's a home

13   equity line of credit.   It was transferred from the loan to

14   the savings account.   And then it looks -- directly after

15   that, there was a wire fee for $20 applied and a transfer to

16   JP Morgan Chase.

17   Q.    And on what date is that?

18   A.    That was done on 12/11/07.

19   Q.    And did that $486,000 wire actually go through?

20   A.    Yes, it did.

21   Q.    Did the State Department Federal Credit Union lose the

22   entire amount as a result?

23   A.    Yes, we did.

24   Q.    Are you federally insured?

25   A.    Yes, we are.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    Q.    What, if any, changes did you put into effect as a

2    result of this fraud?

3    A.    As a result of this fraud, now any large wire above a

4    certain dollar amount will automatically come to loss

5    prevention office prior to it leaving our building.

6    Q.    With the help of the court security officer, I would

7    like to show you what's been marked for identification as

8    Government's Exhibit No. 15.

9              THE MARSHAL:  (Complied.)

10   BY ATTORNEY EISINGER:

11   Q.    Do you recognize this?

12   A.    Yes.  This is the wire transfer form that we

13   officially do up to have the wire actually sent out.

14   Q.    For what account was this?

15   A.    It's for Account No. 83660-01, Joseph Witt.

16   Q.    And is this a true and accurate copy of the original

17   form received by the State Department Federal Credit Union?

18   A.    Yes, it is.

19             ATTORNEY EISINGER:  We would move to admit

20   Government's Exhibit No. 15 into evidence.

21             ATTORNEY IWEANOGE:  No objection, Judge.

22             THE COURT:  It's admitted.

23             Next question.

24   BY ATTORNEY EISINGER:

25   Q.    Did State Department Federal Credit Union lose any

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    money as a result of attempts after the Witt wire?

2    **A.**    No, we did not.

3              ATTORNEY EISINGER:  No further questions, your

4    Honor.

5              THE COURT:  Any cross-examination?

6              ATTORNEY IWEANOGE:  No, Judge.

7              THE COURT:  Thank you.

8              May this witness be excused?

9              ATTORNEY IWEANOGE:  Yes, Judge.

10             THE COURT:  All right.  You may be excused.

11   Thank you, sir.

12             (Witness excused.)

13             THE COURT:  Who's your next witness?

14             ATTORNEY EISINGER:  Our next witness is

15   Detective Pak.  It's likely to be very long.  It might be

16   appropriate to take a break at this time.

17             THE COURT:  Yes, I think this is a good time

18   for the morning recess.

19             Ladies and gentlemen, pass your books to the

20   right.  Mr. Wood, the court security officer, will collect

21   them and maintain their security during the break.  We'll

22   recess until 10:35, Mr. Wood.  10:35.

23             Remember to refrain from discussing the matter

24   with anyone or undertaking any investigation on your own.

25   You may follow Mr. Wood out.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          (Jury excused at 10:12 a.m.)

2          THE COURT:  I'm going to prepare a package of

3   instructions to use if it should be necessary to do so.  It

4   will encompass the standard opening and closing

5   instructions.

6          The government has submitted proposed

7   instructions, and this morning the defendant submitted

8   proposed instructions.

9          You've received copies of those, Mr. Eisinger?

10          ATTORNEY EISINGER:  Yes, we did, Your Honor.

11          THE COURT:  These instructions, I expect, will

12   be ready before noon.

13          Do you think your witness, Detective Pak --

14          Is it Park or Pak?

15          ATTORNEY EISINGER:  Pak, P-a-k.

16          THE COURT:  How long do you anticipate this

17   witness will take?

18          ATTORNEY EISINGER:  I believe that my portion

19   will take somewhere between -- maybe around 45 minutes,

20   maybe a little bit longer.

21          THE COURT:  Mr. Iweanoge, you're not required

22   to tell the Court at this time whether you have any

23   witnesses that you intend to offer.  If you are already

24   clear about it and you wish to do so, it may be useful for

25   planning purposes.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1     ATTORNEY IWEANOGE:  Judge, I may be calling

2   Detective Nail -- not Detective Nail -- Special Agent Nail,

3   Judge, for about five minutes.

4     THE COURT:  All right.  Is this the matter we

5   discussed yesterday?

6     ATTORNEY IWEANOGE:  Yes, Judge.

7     THE COURT:  Did you look on the -- did you find

8   in the transcript where Ms. Gipson said she saw him making

9   telephone calls?

10     ATTORNEY IWEANOGE:  Judge, we did not see it.

11   And for the record, this morning the government provided me

12   Exhibit Number 3.  And the individual that appears on the

13   photograph is Mr. Ezenwa Onyedebelu.

14     THE COURT:  So how is that relevant?

15     ATTORNEY IWEANOGE:  Judge, in my memory -- the

16   Court's memory controls, but my recollection is she talked

17   about what Mr. Ezenwa (sic) did.  However, before the grand

18   jury, she said that she doesn't know his name, but

19   recognizes him, but then did not see him physically doing

20   anything, which I submit, based on my recollection, that

21   that is inconsistent with what she said in open court.

22     THE COURT:  Let me be clear about this now.

23     What is it that you say that she said in the

24   grand jury?

25     ATTORNEY IWEANOGE:  She was shown a photograph

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1        of Mr. Ezenwa Onyedebelu for identification.

2                    She said, "I don't know his name, but I know

3        him."

4                    And then they asked what she had seen him

5        doing.

6                    And she said, "I have never -- I have not

7        physically seen him doing anything."

8                    THE COURT:  All right.  What is it that she

9        testified to in court?

10                    ATTORNEY IWEANOGE:  If my memory serves me

11       right, in one of her debriefings --

12                    THE COURT:  No.

13                    What did she testify to in court?

14                    ATTORNEY IWEANOGE:  In court, that he was

15       involved and I believe she saw him doing things as well as

16       part of the conspiracy.

17                    THE COURT:  I'm not sure I see any conflict.

18                    Mr. Newby, what's the government's position?

19                    ATTORNEY NEWBY:  The government's position, if

20       this is the purpose for calling Special Agent Nail, it seems

21       like a largely immaterial collateral issue.  I also don't

22       see the inconsistency.  She said in her grand jury

23       testimony -- she said on the stand --

24                    THE COURT:  All of this, it should be clear on

25       the record, is different from what was argued last night --

1          ATTORNEY NEWBY:  Correct.

2          THE COURT:  -- which was that it was this

3    defendant who was in the photograph, but we now know that's

4    not the case.

5          ATTORNEY NEWBY:  That's correct, your Honor.

6          ATTORNEY IWEANOGE:  Judge, just so -- I may

7    have led Mr. Newby in a different -- what I was raising --

8    the issue I was raising with respect to the inconsistency is

9    that I may call Ms. Gipson, not only Detective (sic) Nail.

10          Detective (sic) Nail that I raised was with

11    respect to inconsistencies in some of her testimony; and

12    then Ezenwa Onyedebelu as it relates to money that he said

13    was given to my client or paid to my client.

14          THE COURT:  Well, let's deal with one thing at

15    a time.

16          Last night you said that your recollection was

17    that Ms. Gipson had testified that she had seen this

18    defendant, Obilo, making calls, and you said that her grand

19    jury testimony contradicted that.  I said if that was the

20    case, I would let you show that.  The record should be quite

21    clear that that's not the case.

22          First of all, the record shows that she didn't

23    say she saw this defendant making calls in her direct

24    testimony.  And secondly, she didn't say in the grand jury

25    that it was this defendant making calls.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          It now appears that what she said in her grand

2     jury testimony is that she didn't know the person's name,

3     but she recognized him; is that right?

4               ATTORNEY IWEANOGE:  Yes, Judge.

5               THE COURT:  Now, how is that relevant to

6     anything that she might say if you call her?

7               ATTORNEY IWEANOGE:  Judge, she testified under

8     oath here in court that Mr. Ezenwa Onyedebelu -- that she

9     had seen Ezenwa Onyedebelu doing certain things as part

10    of -- as a member --

11              THE COURT:  All right.  Then you should have

12    cross-examined her on her grand jury testimony at that time.

13              ATTORNEY IWEANOGE:  The government didn't give

14    me the photograph that was part of the exhibit -- that was

15    part of the grand jury transcript.  I only got it this

16    morning, Judge.

17              THE COURT:  All right.  Go on.

18              So that's one reason you would call

19    Ms. Gipson.

20              ATTORNEY IWEANOGE:  Yes, Judge.

21              THE COURT:  Let me hear Mr. Newby's answer to

22    that.

23              ATTORNEY NEWBY:  Yes, your Honor.

24              The grand jury testimony -- if I can just read

25    exactly what the testimony was.

1            Question:  "Do you recognize the individual in

2      Grand Jury Exhibit No. 3?"

3            Answer:  "Yes, I do."

4            Question:  "Do you know his name?"

5            "I don't know his name."

6            "How have you seen this individual?"

7            "I've seen him with Toby several times."

8            "Did he make calls?"

9            "Well, I never physically -- I never heard him

10     making calls."

11           "Was he present when other individuals were

12     making calls?"

13           "Yes, he was."

14           And it goes on, "And was he present when people

15     were sitting around with laptops?"

16           "Yes, he was."

17           "Was he aware of what people were doing?"

18           "Yes, he was."

19           She couldn't recall his name at that instant.

20     When she testified at trial yesterday, she knew him as

21     Eze -- a guy as Eze.  She couldn't remember his last name.

22     She didn't know his full name.  So there's not really even

23     an inconsistency here.

24           In any event, she has been released.  The

25     defendant didn't object to it.  She's probably already back

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    in Texas.

2              THE COURT:  All right.  Other than calling

3    Ms. Gipson -- if she's not here, then it's maybe a moot

4    point, Mr. Iweanoge, but we'll see -- what else do you --

5    what else -- I think we've dealt with what came up last

6    night.

7              You've been furnished with Exhibit 3.  So --

8    and you don't have to tell me what you want to do in your

9    case-in-chief.  I merely asked you whether you intended to

10   present any evidence.  You volunteered that you do and that

11   you intend for call Detective Nail.

12             Will there be objections to that, Mr. Newby?

13             ATTORNEY NEWBY:  Yes, your Honor.  And I had a

14   case on this issue.  I believe the type of testimony

15   based on our --

16             THE COURT:  You and Mr. Iweanoge discussed

17   this?

18             ATTORNEY NEWBY:  We discussed -- I asked him

19   what topics he intends to cover as part of the Touhy

20   process.  He provided me with certain topics.  And those

21   were outlined last night, these three issues that are

22   essentially --

23             THE COURT:  No, I didn't ask him the

24   three issues last night.

25             ATTORNEY NEWBY:  Okay.  My recollection is

1    incorrect.

2            But the topics that we discussed were

3    impeaching the credibility of Ms. Gipson on who she

4    recalled -- whether she recalled seeing or mentioning

5    Mr. Obilo.  That was the primary topic.

6            Another one was whether Brandy Anderson and

7    Precious Matthews were good friends.  And then the third was

8    whether she had seen, I believe, an argument between

9    Mr. Obilo and Mr. Nnabue in Ezenwa's apartment.

10            Well, what the defense is trying to do is to

11    call an agent based on a 302, which is just a summary of an

12    interview -- it's not a verbatim transcript -- to attempt to

13    show inconsistencies in what she testified to.

14            The case that I have here is United States

15    versus Barillo.  That's a Fourth Circuit case, 286 F 3d,

16    749.  That's 2002.  It makes clear that under 613(b), for a

17    prior inconsistent statement to be introduced through

18    extrinsic evidence, it actually has to be a statement.

19            What Mr. Iweanoge has are 302s, which are

20    summaries that have never been adopted.  There's no

21    evidence.  He hasn't proffered any evidence that these have

22    been adopted as statements by Ms. Gipson.  Therefore, that's

23    improper under 613(b).  There's no basis for calling Agent

24    Nail.

25            THE COURT:  Mr. Iweanoge.

1          ATTORNEY IWEANOGE:  Judge, I completely

2     disagree with that proposition.  When an agent takes a note

3     and talks to a witness and an agent shows up and writes a

4     302 and disseminates it as a witness statement --

5          THE COURT:  He doesn't disseminate it.

6          ATTORNEY IWEANOGE:  It's provided in discovery

7     as a statement that was made by --

8          THE COURT:  No, it isn't provided as a

9     statement.  It's provided as a 302.  It isn't Jencks.  If it

10    were Jencks, it would be different.

11         There's a difference between a statement made

12    by a person who's interviewed where it's recorded -- or even

13    if it's not recorded, if it's summarized by the agent and

14    the person adopts it, then it becomes that person's

15    statement.

16         Otherwise, it is simply what it purports to be,

17    which is the agent's summary of what the agent recalls was

18    said.  But that doesn't make it the person's statement for

19    Jencks purposes, and I'll have to see whether it makes it a

20    statement for purposes of 613(b).

21         Have you read this case?

22         ATTORNEY IWEANOGE:  No, Judge, I have not read

23    the case.

24         THE COURT:  All right.  Then we'll proceed --

25    we'll have to deal with this -- because I want you to have

1    an opportunity to review it and to give me any authority you

2    may have, Mr. Iweanoge.  But, of course, I warned you about

3    it last night.

4              Yes, Mr. Newby.

5              ATTORNEY NEWBY:  If I can just crystallize this

6    issue a bit more.

7              The pin cite on this precise issue is on -- I

8    believe it's 757 through 759 at Section (b) of the analysis.

9    What the Fourth Circuit said there is essentially there has

10   to be a foundation that there was a statement that was

11   adopted.  Not only has a foundation not been laid, but the

12   foundation is that she never adopted these statements.

13             Mr. Iweanoge asked on cross whether she had

14   reviewed in discovery statements made by her in documents.

15   She said, "No.  I listened to phone calls.  I didn't review

16   anything else."

17             There's no evidence, there's no foundation that

18   she ever reviewed any of these 302s and adopted them as her

19   own statements.  Therefore, it's inadmissible under 613(b).

20             THE COURT:  I'll hear the parties further on

21   this after we finish the government's case-in-chief.  You'll

22   have an opportunity to argue it further.

23             And if you wish to call Ms. Gipson, you'll have

24   to see if she's here.  If she's not here, then the fact that

25   she's released and you did not subpoena her is the fact that

1    you'll have to live with.

2              ATTORNEY IWEANOGE:  Judge, let me raise another

3    issue so that --

4              THE COURT:  Yes.

5              ATTORNEY IWEANOGE:  The Government's Exhibit

6    No. 18 is a chart -- an analysis of calls.  Like the last

7    trial we had before your Honor, it has dates, which I

8    don't --

9              THE COURT:  18?  I'm sorry.

10             ATTORNEY IWEANOGE:  Government's Exhibit

11   No. 18.

12             THE COURT:  Let me find it.

13             ATTORNEY IWEANOGE:  Yes, Judge.

14             THE COURT:  Yes, I have it now.

15             ATTORNEY IWEANOGE:  It has dates, which I don't

16   have a problem with.  It has phone numbers, which I don't

17   have a problem with.  However, I will object to the names

18   that are attached to the phone numbers.

19             THE COURT:  All right.  And what's your basis

20   for that objection?

21             ATTORNEY IWEANOGE:  Judge, without

22   anticipating the government's evidence -- by anticipating

23   the government's evidence, Judge, it will be foundation.

24   And then the chart basically is testimonial because we are

25   assigning names to phone numbers that when you do the

1    analysis, as I argued before your Honor in the Portillo

2    case, these numbers do not even come back --

3              THE COURT:  Well, there wasn't any evidence in

4    the Portillo case that these numbers came back to them.

5              So if Detective Pak testifies that these

6    numbers are numbers that are registered to Onwuhara or

7    Obilo, then what's the problem?

8              ATTORNEY IWEANOGE:  The testimony is that it's

9    not registered to them.  That's why I'm raising it now.

10             THE COURT:  All right.  Mr. Eisinger.

11             ATTORNEY EISINGER:  We expect Detective Pak to

12   testify that the summary chart was created based on -- or

13   the names on those charts are based on who he was able to

14   identify as being the person making that phone call by voice

15   identification.  The phone numbers themselves are all

16   prepaid cell phones -- almost all prepaid cell phones.

17             THE COURT:  Who would have made the voice

18   identification?

19             ATTORNEY EISINGER:  The detective and other

20   witnesses who've already testified.

21             THE COURT:  So you're saying that when the name

22   appears, Obilo or Onwuhara, on this chart, that that's based

23   not on the registration of this number, but rather on the

24   detectives listening to these telephone calls and other

25   witnesses who've already testified listening to these

1    telephone calls and identifying them?

2            ATTORNEY EISINGER:  That's correct.

3            THE COURT:  Now, of course, that other

4    witnesses, I don't know whether each one of these calls was

5    identified, the voice -- is there testimony from other

6    witnesses other than Detective Pak identifying these

7    persons?

8            ATTORNEY EISINGER:  Not every single one of the

9    calls, but most of the calls have been identified by other

10   witnesses as well.

11           THE COURT:  Can you tell me which witnesses

12   identified each call?

13           ATTORNEY EISINGER:  Yes.

14           Paula Gipson identified Government Exhibit

15   No. 3 as Toby Onwuhara, Government Exhibit No. 6 as Tobechi

16   Onwuhara, Government Exhibit No. 12 as Tobechi Onwuhara,

17   Government Exhibit No. 16 as Tobechi Onwuhara, Government

18   Exhibit No. 17 as Tobechi Onwuhara.

19           THE COURT:  You said 6.  I don't see 6 on here

20   at all.

21           ATTORNEY EISINGER:  Yeah, that was a phone call

22   from --

23           THE COURT:  But it's not on the chart.  So she

24   identified those.

25           And on what basis would Detective Pak be able

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    to identify the voices?

2              ATTORNEY EISINGER:  He was present, as was

3    noted by Abel Nnabue, at JFK when Henry Obilo and Tobechi

4    Onwuhara were stopped.  He was present during both of their

5    interviews.

6              He's also listened to literally hundreds of

7    these phone calls and was able to identify their voices

8    based on having met them in person as well as listening to

9    phone calls.

10             THE COURT:  You've told me about Gipson having

11   everything 3, 12, 16, and 22 -- no.

12             ATTORNEY EISINGER:  17.

13             THE COURT:  3, 12, 16; is that right?

14             ATTORNEY EISINGER:  And 17, your Honor.

15             THE COURT:  And 17.

16             All right.  And what about 4 and 5?

17             ATTORNEY EISINGER:  She did not identify those,

18   too.

19             THE COURT:  All right.  And then what about the

20   rest?

21             ATTORNEY EISINGER:  Then Ezenwa Onyedebelu also

22   identified Government Exhibit No. 3 as Tobechi Onwuhara,

23   Government Exhibit No. 12 as Tobechi Onwuhara, Government

24   Exhibit No. As Henry Obilo, Government Exhibit 21 as Henry

25   Obilo, Government Exhibit 22 as Henry Obilo.

1          THE COURT:  How about 27?

2          ATTORNEY EISINGER:  No.

3          THE COURT:  So of these on here, you do have

4     testimony from witnesses identifying the persons on the

5     phone for all but, what, two of these or three?

6          ATTORNEY EISINGER:  I believe 4 and 5 were not

7     identified, and 27 was not identified.

8          THE COURT:  But the rest have been identified?

9          ATTORNEY EISINGER:  That's correct, your Honor.

10         22 was identified by Ezenwa Onyedebelu.

11         THE COURT:  I take it Mr. Nnabue is familiar

12    with all these and could identify these if you played them

13    for him?  You have that option.  But it seems to me that

14    Detective Pak has a fairly slender basis for identifying

15    voices.  We haven't heard it yet.

16         ATTORNEY EISINGER:  He will certainly testify

17    about that.

18         THE COURT:  All right.  Well, you can do it

19    both ways, if you wish, or do it that way.

20         If that's done, Mr. Iweanoge, what's the

21    objection?

22         Let's suppose that a witness has identified the

23    caller on GX3, 12/7/2007, that call, as Onwuhara.

24         Why is that now a problem?

25         ATTORNEY IWEANOGE:  Judge, because the names

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    are not registered to the telephone.

2              THE COURT:  All right.  But he's not -- that

3    can be brought out in the testimony.  What he's doing --

4    what the government is doing is saying that GX3, which is a

5    call, a specific call --

6              Isn't it, Mr. Eisinger?

7              ATTORNEY EISINGER:  That's correct, your Honor.

8              THE COURT:  That that specific call was

9    Mr. Onwuhara and then that was the number, and it went from

10   SpoofCard account so-and-so to U.S. Senate Federal Credit

11   Union.

12             What's the problem there with foundation,

13   Mr. Iweanoge, if that's the objection you've raised?

14             ATTORNEY IWEANOGE:  Judge -- in addition to the

15   foundation objection, Judge, the document itself becomes

16   testimonial.

17             If a witness has testified to it, I believe

18   that it should be only the phone numbers that are attached

19   to it and then where the calls went to.  And then adding

20   names to it is basically like a document itself basically

21   testifying in addition to the other documents that we have.

22   If you look at the phone records, it doesn't don't have all

23   these names.

24             THE COURT:  No, but we have the testimony of a

25   witness saying that's the person who made that call.  Let's

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    look at GX3.

2                    GX3 refers to a specific call; is that right?

3    Which of these many calls does it refer to, Mr. Eisinger?

4                    ATTORNEY EISINGER:  If you look at Government

5    Exhibit 3-1, it gives a transcript of the call at the top of

6    the list, most of the information that's on that chart.

7                    THE COURT:  All right.  Well, it would be

8    better, then, to say instead of GX3, GX3-1.

9                    ATTORNEY EISINGER:  Well, the call itself is 3,

10   your Honor.  And 3-1 is the transcript just showing what's

11   on that call.  We can admit the transcripts as well if that

12   would help, your Honor.

13                   THE COURT:  I thought 3 has a large number of

14   calls on there.

15                   ATTORNEY EISINGER:  That's Government

16   Exhibits 1 and 2.

17                   THE COURT:  Oh, 1.  I'm sorry.  Let me find 3.

18                   Exhibit 3 itself is the disk that has the calls

19   on it.

20                   ATTORNEY EISINGER:  That's correct.

21                   THE COURT:  And then 3-1 is the transcript.

22                   Those are both in evidence?

23                   ATTORNEY EISINGER:  The transcripts are not

24   currently in evidence.

25                   Well, actually, the calls aren't in evidence

```
 1    either, your Honor.  Those will all be brought in by

 2    Detective Pak because he can testify that the original disks

 3    that we got, which are Exhibits 1 and 2 --

 4              THE COURT:  When the jury heard the telephone

 5    calls, was it clear that it was Exhibit 3?.

 6              ATTORNEY EISINGER:  Yes, your Honor.

 7              THE COURT:  All right.  Mr. -- the reason that

 8    the Portillo matter is different is that there was no

 9    testimony in that case tying a specify call as there is here

10    to a voice.

11              ATTORNEY IWEANOGE:  Judge, I believe in that

12    case and including the Akinfe case, as well, your Honor --

13              THE COURT:  What case?

14              ATTORNEY IWEANOGE:  Akinfe.  We tried it before

15    your Honor in 2006.

16              ATTORNEY EISINGER:  It would have been June of

17    2006, your Honor.

18              THE COURT:  Well, I try a great many cases.  Go

19    ahead.

20              ATTORNEY IWEANOGE:  Judge, this same issue

21    arose.  There were witnesses again, I believe, in the

22    Portillo, which is the most recent.  The confidential

23    informant identified Gordo's voice and identified the other

24    voices and their phone numbers attached to it.

25              But then the problem that I raised with this
```

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    in the Akinfe matter as well is that when you attach a

2    name -- if the witnesses say that this is what it is, it's

3    one thing.  But then when you have a diagram or a chart

4    created by the government --

5              THE COURT:  Suppose this diagram said GX3 call

6    on such-and-such a date, 12/7/2007, identified by Gipson as

7    Onwuhara from (571) 426-1255 to the U.S. Senate Federal

8    Credit Union.

9              Would you have any objection, then?

10             ATTORNEY IWEANOGE:  No, Judge.  But then the

11   word -- it's like we're now adding additional -- in other

12   words, the witness has testified -- the jurors' recollection

13   controls.  But then when you bring in this one, Judge,

14   identified by so-and-so person, now we're adding additional

15   evidence on top of --

16             THE COURT:  But that's what a summary does.

17   It's to collect information that's based on admissible

18   evidence so the jury can see it.  And so under 1001 -- let's

19   look at 1001 again quickly, which is what you're offering it

20   under --

21             Is that right, Mr. Eisinger?

22             ATTORNEY EISINGER:  That's correct, your Honor.

23             THE COURT:   -- if we look at 1001, it makes it

24   fairly evident.

25             ATTORNEY EISINGER:  Actually, 1006.

1          THE COURT:  1006, you're correct.  It's 1006:

2     "The contents of voluminous writings, recordings, or

3     photographs which cannot conveniently be examined in court

4     may be presented in the form of a chart, summary, or

5     calculation."

6          A lot of phone records and these CDs, they can

7     be presented.  Of course, you can avoid all this,    Mr.

8     Eisinger.  Simply use the exhibit as demonstrative evidence

9     and ask him with respect to each.

10         And I'll tell the jury, "You won't have this in

11    the jury room, but you may use it for demonstrative

12    evidence."

13         You can put it up on the elmo, and he can go

14    down each one and say who identified the voice and he also

15    identified it.  You can do that.

16         ATTORNEY EISINGER:  And we expect to do that as

17    well, but we believe it would be helpful for the jury to be

18    able to look at a chart and then be able to play each one of

19    those so they can understand what's going on.

20         THE COURT:  Well, it would obviate his

21    objection entirely if it's just used as demonstrative

22    evidence in his testimony.  The jury can take whatever notes

23    they think are important.

24         Otherwise, it seems to me that your putting the

25    name next to the number suggests that the number is

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

 1   registered to him.  It isn't.  The reason the name is next

 2   to the number is that a witness identified his voice on that

 3   exhibit, which is a single call.

 4          And the same with some of the others, except

 5   for two or three which Detective Pak identified; unless you

 6   recall Nnabue to identify the others.  I'll let you think

 7   about how you wish to do it.

 8          It seems to me, Mr. Iweanoge, that this is

 9   different, to some extent, from the other two.  And it

10   doesn't matter because I'm looking at it in this way.  It

11   does seem to be a summary of otherwise voluminous records.

12          But I think, Mr. Iweanoge, that it may, even

13   with some changes that you've already conceded would

14   eliminate --

15          What's the red in here, Mr. Eisinger?

16          ATTORNEY EISINGER:  The two red numbers are

17   showing that the same phone number was used by two separate

18   individuals.

19          THE COURT:  Oh, I see.

20          Mr. Eisinger, you should consider whether you

21   wish to use this only as a demonstrative.

22          ATTORNEY EISINGER:  And that's what happened,

23   your Honor, in the Akinfe matter three years ago, and then

24   the jury asked for the chart back in the jury room.  It was

25   let back there eventually.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  We'll argue that perhaps.  We can

2     do that.  You see, this is shorter than that.  And if I tell

3     the jury in advance it's demonstrative evidence and they

4     won't have it in the jury room, they can take whatever notes

5     they think are important.

6          ATTORNEY EISINGER:  And that's fine, your

7     Honor.

8          THE COURT:  Let's proceed that way.

9          There can't be an objection, then, can there?

10          ATTORNEY IWEANOGE:  No, Judge.  I was going to

11     tell your something else.

12          THE COURT:  All right.

13          ATTORNEY IWEANOGE:  Judge, after full

14     discussion, so that the Court is aware of where we are in

15     terms of procedure and timing, after reviewing my trial

16     notes, the testimony -- the statement of Ms. Gipson and the

17     grand jury issue that I raised earlier and full discussions

18     with my client, Judge, we do not intend to recall Ms. Gipson

19     even assuming she's standing outside or not.  I do not

20     intend to recall Ms. Gipson, Judge.

21          THE COURT:  All right.  We'll need a brief

22     recess anyway for court personnel.  So Mr. Wood, if you'll

23     tell the jury we'll be another ten minutes.

24          THE MARSHAL:  Yes.

25          THE COURT:  And then we'll resume with

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    Detective Pak, and then we'll hear other matters.

2              ATTORNEY NEWBY:  Yes, your Honor.  To alleviate

3    the concerns that you raised about Detective Pak's

4    capability of identifying voices on these other exhibits, we

5    would like to recall Mr. Nnabue.

6              THE COURT:  All right.  You may do so.

7              Court stands in recess for ten minutes.

8              (Court recessed at 10:40 a.m.)

9              (Court called to order at 10:56 a.m.)

10             THE COURT:  All right.  Mr. Wood, you may bring

11   the jury in.

12             We'll take up Mr. Nnabue first.

13             ATTORNEY EISINGER:  Yes, your Honor.

14             (Jury impaneled at 10:56 a.m.)

15             THE COURT:  All right.  You may be seated.

16             I'm permitting the government to recall a

17   witness for a short period.

18             Mr. Newby.

19             ATTORNEY NEWBY:  Yes, your Honor.  The

20   government recalls Abel Nnabue.

21             (Witness previously sworn.)

22             THE COURT:  All right.  Mr. Nnabue, you'll

23   recall, sir, you're still under oath.

24             All right.  Mr. Newby.

25

1          ABEL NNABUE, previously duly sworn, was

2     examined and testified as follows:

3               FURTHER DIRECT EXAMINATION

4     BY ATTORNEY NEWBY:

5     Q.    Good morning, Mr. Nnabue.

6     A.    Good morning.

7               ATTORNEY NEWBY:  The government would like to

8     play Government's Exhibit 4, Clip 1.

9               (Tape played to the jury.)

10    BY ATTORNEY NEWBY:

11    Q.    Do you recognize the male voice on Government's

12    Exhibit 4?

13    A.    Can you play that again one more time.

14              THE COURT:  Play a longer clip.

15              (Tape played to the jury.)

16    BY ATTORNEY NEWBY:

17    Q.    Do you recognize the male voice in that phone call?

18    A.    Yes.

19    Q.    Whose voice is that?

20    A.    That is Tobechi Onwuhara.

21              ATTORNEY NEWBY:  The government would play

22    Government Exhibit 5.

23              (Tape played to the jury.)

24    BY ATTORNEY NEWBY:

25    Q.    Do you recognize the male voice on Government

1    Exhibit 5?

2    A.    Yes.

3    Q.    Whose voice do you recognize that as?

4    A.    Tobechi Onwuhara.

5              ATTORNEY NEWBY:  The government would play

6    Government Exhibit 27.

7              (Tape played to the jury.)

8    BY ATTORNEY NEWBY:

9    Q.    Do you recognize the male voice on Government

10   Exhibit 27?

11   A.    Yes, I do.

12   Q.    Whose voice do you recognize that as?

13   A.    Henry Obilo.

14   Q.    The defendant?

15   A.    Yes.

16             ATTORNEY NEWBY:  No further questions.

17             THE COURT:  Cross-examination.

18             ATTORNEY IWEANOGE:  Court's indulgence.

19             (Pause.)

20             ATTORNEY IWEANOGE:  No questions, Judge.

21             THE COURT:  You may step down.

22             (Witness excused.)

23             THE COURT:  Call your next witness.

24             ATTORNEY EISINGER:  The United States calls

25   Detective Charlie Pak.

1                (Witness sworn.)

2                THE COURT:  All right.  You may proceed.

3                CHARLIE PAK, having been duly sworn, was

4  examined and testified as follows:

5                  DIRECT EXAMINATION

6  BY ATTORNEY EISINGER:

7  **Q.**    Please state your name and spell your last name for

8  the record.

9  **A.**    My name is Charlie Pak, spelled P- -- as in Paul --

10  -a-k.

11  **Q.**    How are you employed?

12  **A.**    I'm a detective with Alexandria Police in Virginia.

13  **Q.**    And how long have you been employed by the Alexandria

14  Police Department?

15  **A.**    I have been employed by the Alexandria Police for the

16  last 19 years.

17  **Q.**    And how long have you been a detective?

18  **A.**    The last 13 years.

19  **Q.**    And what are your duties?

20  **A.**    As a detective, I conduct investigations on all

21  financial and also fraud-related crimes.

22  **Q.**    Are you the case agent for this case?

23  **A.**    Yes, I am.

24  **Q.**    Are you deputized by the United States Marshal

25  Service?

1    A.    Yes, I am.

2    Q.    How did you first get involved in this case?

3    A.    I conducted -- started conducting investigation on a

4    I.D. fraud and also bank fraud involving Mr. Short, who is

5    the resident of Alexandria, Virginia.  The offense took

6    place at a credit union called U.S. Senate Federal Credit

7    Union also located in Alexandria, Virginia.

8    Q.    And is Alexandria, Virginia located within the Eastern

9    District of Virginia?

10   A.    Yes, it is.

11   Q.    And how did you determine the conspirators were using

12   SpoofCard?

13   A.    Based on the training and also experience with prior

14   cases, I was aware of SpoofCard's existence.  Once I was

15   looking into the matter involving Mr. Short and also U.S.

16   Senate Federal Credit Union case, the facts were very clear

17   that the imposters were using some type of way to show an

18   account holder's phone number on the caller I.D. at the

19   financial institution.

20         So that was the one that drew my attention to

21   the possibility of using -- use by the suspects of

22   SpoofCard.

23   Q.    And were you aware of the fact that -- strike that.

24         Were you aware of something that the

25   conspirators did with home phone numbers of the account

1    holders?

2    A.   Once I learned that the calls made by the financial

3    institutions to the account holder for verification

4    purposes -- the calls were routed or intercepted by the

5    imposters, that also led me to believe that the calls were

6    forwarded to the imposters' cell phones or phones instead of

7    calls being made to the account holder's home.

8    Q.   And did you get lists of phones to which home phone

9    numbers were forwarded?

10   A.   Several phone numbers were identified which turned out

11   to be mostly the prepaid cell phones.  And the records were

12   obtained for those cell phones, and the records show that

13   numerous calls were made to financial institutions all over

14   the United States and also calls were made to the phone

15   carriers -- land line phone carriers and also to the

16   SpoofCard (800) numbers.

17   Q.   And how did you determine which SpoofCard account the

18   conspirators were using?

19   A.   SpoofCard company keeps track of account numbers and

20   accounts based on three numbers:  The numbers the callers

21   were calling, the numbers they were calling from, and also

22   the number they punch in to show up on the caller I.D. for

23   the receivers.

24        So when I searched for possible accounts that

25   were used by the imposters, I provided them with the number

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    of the financial institution that I was investigating for

2    this fraud and also the numbers of customers or account

3    holders, their contact numbers.  So based on the search from

4    those numbers, numerous SpoofCard accounts were identified.

5    Q.    I'm going to show you what's been marked as

6    Government's Exhibit No. 1-1.

7              Do you recognize what this is?

8    A.    Yes, I do.

9    Q.    And what is it?

10   A.    This is the printout of the SpoofCard account

11   403415776 that was provided to me by the SpoofCard company,

12   also doing business as E&M, Limited.

13             ATTORNEY EISINGER:  And the government would

14   move to admit Government Exhibit No. 1-1.

15             ATTORNEY IWEANOGE:  No objection, Judge.

16             THE COURT:  Admitted.

17             Next question.

18   BY ATTORNEY EISINGER:

19   Q.    I will have the court security officer show you what

20   has been marked as Government's Exhibit 2-1.

21             Do you recognize what this is?

22   A.    Yes, I do.

23   Q.    And what is it?

24   A.    This is the records I received from SpoofCard.com

25   company, also known as E&M, Limited, for the account

1    number -- SpoofCard account for 187222949.

2                    ATTORNEY EISINGER:  Government moves to admit

3    Government Exhibit 2-1.

4                    ATTORNEY IWEANOGE:  No objection, Judge.

5                    THE COURT:  Admitted.

6    BY ATTORNEY EISINGER:

7    Q.    Can you explain what the entries are on this report.

8    A.    The printout of these account call records starts with

9    the I.D. number to the left.  If you look at the top boxes,

10   it will show you I.D.  I.D. number is just an internal

11   control number.  So really it's for them to use.  So it

12   doesn't show anything at all.

13                   The number -- the second box, all the numbers

14   that show up underneath the box are the numbers that were

15   called by whoever is the user of the account.  Those are the

16   numbers mostly for financial institutions.

17                   No. 2 is what's called caller I.D.  No. 2 is

18   the number that callers were using.  If I was calling from

19   your home, your home number would show up.  If I was using a

20   cell phone, that would show up.  So it is SpoofCard's caller

21   I.D. checking system.  So that's a number that all the calls

22   were generated from.

23                   The next box is called Spoof caller I.D.  What

24   that is is the number the caller punched in to show up as --

25   in the receiver's or bank's caller I.D. screen.  That's what

1     they punch in.

2                  Then the next line is something called voice

3     change.  It was also discovered that SpoofCard provides

4     service for disguising your voice.  So you can elect to

5     either have a female or male voice.  Even if you're a male

6     caller, you can punch in the male caller's disguise.  It

7     would alter your voice so that the voice is changed to the

8     person who is receiving the call.  If you punch in the

9     option for female, I'm calling, but I will sound like a

10    female.

11                 And then the next one is the call start.

12    Obviously, that's a date and time when the call was

13    starting.

14                 And then obviously the next one is when the

15    call ends -- when the call was ended.

16                 The next item is internal cost of what the call

17    was for, because all the accounts were prepaid.  There is

18    internal finance, how much was the call.

19                 And then the next section, the last one, is

20    recording.  It will show that some of the calls were

21    recorded; it will show that some of the calls were not

22    recorded.  So the ones with a download means that there were

23    recordings that were recorded for each call.

24    Q.    Just to be clear, when you testified that you provided

25    bank phone numbers to SpoofCard in order to determine which

1     accounts were being used by the co-conspirators, that would

2     have shown up in the number column?

3     A.    That is correct.

4     Q.    Then the phone number from which the perpetrators were

5     calling would have shown up in the caller I.D. section?

6     A.    That's correct.

7     Q.    And then the SpoofCard caller I.D. would have been the

8     number -- would have been a home phone number for one of the

9     victims?

10    A.    It would be one of them.  Any number they wanted to

11    have bank a representative see as where the numbers are

12    coming from, yes.

13    Q.    What further information did you find out from

14    SpoofCard?

15    A.    I'm sorry?

16    Q.    Let me rephrase that question.

17                You mentioned the recordings.

18                Did you actually receive recordings from

19    SpoofCard?

20    A.    Yes.  SpoofCard, again, as a general practice of their

21    business, they routinely record all the calls.  So based on

22    a court order, I received CDs containing all the recordings

23    that were available.

24    Q.    And how did Tobechi Onwuhara come to your attention?

25    A.    In one of those accounts that was identified by

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    Exhibit 1 and 2 -- I believe it was Exhibit No. 1 -- there

2    were several calls to a pharmacy in Texas.  The caller was

3    posing as a doctor making a prescription order to a

4    pharmacy.

5              The caller provided a name of Tobechi Onwuhara

6    as the patient who was to receive medication.  And the date

7    of birth of that individual was provided and the address was

8    provided, and that was a name that we recognized later to be

9    one of the co-conspirators in this case.  So --

10   Q.    And do you recall what -- who the phone number came

11   back to that made that phone call?

12   A.    Based on the number, that was from Texas.  (214) 240,

13   I believe, 9841.  That is under the name of Tobechi

14   Onwuhara, also known as Toby.

15   Q.    And how did you verify that it was actually

16   Mr. Onwuhara?

17   A.    Based on the search through the Texas DMV, which is

18   the Division of Motor Vehicles -- everybody who has a

19   license has records.  Based on that search, Tobechi Onwuhara

20   indeed had a license through the State of Texas, and that we

21   were able to -- I was able to locate his photo and his

22   personal data, to include date of birth and Social Security

23   number.

24   Q.    Did you receive additional information from the United

25   States Senate Federal Credit Union?

1  **A.**   The United States Senate Federal Credit Union provided

2  me with documents pertaining to the incident that took place

3  in December of 2007.  The documents included bank statements

4  of Mr. Robert Short and also the online home banking log-in

5  log that lists all the IP addresses.  And the copy of the

6  wire transfer requests were given to me by the financial

7  institution.

8  **Q.**   And were you informed if an e-mail address was

9  provided during the Robert Short calls?

10  **A.**   During the call, the imposter of Mr. Robert Short

11  provided the call-taker at U.S. Senate Federal Credit Union

12  an e-mail address of allstateassociates@yahoo.com as the

13  e-mail address that he wanted to receive na IRS withdrawal

14  form.

15  **Q.**   And I'm going to have the court security officer show

16  you what's been marked for identification as Government

17  Exhibit No. 9.

18  **A.**   I recognize the document.

19  **Q.**   And what is it?

20  **A.**   This is a document that was provided by Yahoo

21  pertaining to the grand jury subpoena that I was provided.

22  This was the subpoena return for the account of the -- one

23  of the IP addresses and also -- correction.

24         This is the account information of the

25  allstateassociates@yahoo.com account.

1    Q.   And what did you do with the IP addresses that were

2    given to you as having accessed the online account of Robert

3    Short as well as the IP address that accessed the Allstate

4    Associates account?

5    A.   On this record here, the second and third page,

6    listings of IP addresses were obtained.  And also from the

7    IP address logged on Mr. Short's account at U.S. Senate

8    Federal Credit Union, I obtained information about those IP

9    addresses.  They were identified as being serviced by the

10   Verizon Wireless.

11              ATTORNEY EISINGER:  The government would move

12   to admit Government's Exhibit No. 9 into evidence.

13              ATTORNEY IWEANOGE:  No objection, Judge.

14              THE COURT:  Admitted.

15              ATTORNEY EISINGER:  With the help of the court

16   security officer, I would ask to show you Government's

17   Exhibit No. 10 -- marked for identification as Government's

18   Exhibit No. 10.

19              THE MARSHAL:  (Complied).

20   BY ATTORNEY EISINGER:

21   Q.   Do you recognize this?

22   A.   Yes, I do.  This is a document that I received from

23   Verizon Wireless also doing business as Cellco Partnership

24   of the account of Michael Zumback (phonetics).  That's just

25   the account holder's name.

1              The records contains the IP addresses that were

2   used by the account holder of this account and also page

3   listing a couple of payments that were made into the

4   account.

5   Q.    So this account was used to access both the Allstate

6   Associates account as well as Robert Short's online account?

7   A.    That's correct.  I do believe that the account number

8   is also associated with phone number (954) 892-7434.

9              ATTORNEY EISINGER:  Government moves to admit

10  Government Exhibit No. 10 into evidence.

11             ATTORNEY IWEANOGE:  No objection, Judge.

12             THE COURT:  Admitted.

13  BY ATTORNEY EISINGER:

14  Q.    And what did you do with that information?

15  A.    On that document, there were two payment recordings.

16  I asked Verizon Wireless to search and provide any security

17  footage from the kiosk machine at those stores where those

18  payments were made in an attempt to see if we can see anyone

19  making the deposit.

20             January 2nd was one of the dates that a couple

21  hundred dollars were deposited into the account.  When we

22  provided them with a grand jury subpoena for the footage,

23  Verizon Wireless was able to locate and provide me

24  with video footages -- several video footages of

25  three individuals making the deposit into that account with

1   the use of a kiosk machine.

2   Q.    I'm going to show you what's been marked -- already

3   been admitted as Government's Exhibit 11-1 on the monitor.

4            Do you recognize this still frame?

5   A.    This is a very -- sort of a blurry picture.  But there

6   are, again, video footages.  This is one snapshot from one

7   of the footages that I obtained from Verizon Wireless, and

8   these are the three individuals that I saw in the footages

9   making a cash deposit.

10  Q.    And how were you able to identify the three

11  individuals in this picture?

12  A.    The gentleman on the top right wearing dark clothing

13  with either grey, silver, or glittery writings, his face was

14  clear to me in the video footage.  That face matched the

15  Texas driver's license photo of Tobechi "Toby" Onwuhara.

16            THE COURT:  I take it when you view this on the

17  screen, it's clearer than this snapshot?

18            THE WITNESS:  Very clear.

19            THE COURT:  Next question.

20  BY ATTORNEY EISINGER:

21  Q.    Did you have a chance to meet Tobechi Onwuhara?

22  A.    Yes, I did.

23  Q.    And when was this?

24  A.    April of 2008.

25  Q.    And where?

1   A.   At JFK Airport.

2   Q.   And how did that meeting occur?

3   A.   Tobechi "Toby" Onwuhara was returning from Nigeria via

4   London, returning back to the U.S.  And when they arrived at

5   the airport, I had an opportunity to talk to Mr. Tobechi

6   "Toby" Onwuhara.

7   Q.   And how did you get to talk to him?

8   A.   Customs agents were assisting us with the interview,

9   but we obtained a search warrant for any electronic items

10  Tobechi "Toby" Onwuhara was carrying.  So while we were

11  executing the search warrant, we had a chance to talk to

12  Tobechi "Toby" Onwuhara.

13  Q.   And who was he traveling with at that time?

14  A.   His traveling companions were Henry Obilo, Precious

15  Matthews, Abel "Q" Nnabue.

16  Q.   And do you recognize Henry Obilo in the courtroom

17  today?

18  A.   Yes, I do.

19  Q.   Can you identify him by where he's sitting or what

20  he's wearing.

21  A.   The gentleman sitting in the grey suit with a blue

22  shirt sitting next to counsel wearing a yellow shirt and the

23  dark suit.

24          THE COURT:  The record will reflect that the

25  witness has identified the defendant.

1              Next question.

2    BY ATTORNEY EISINGER:

3    Q.    Was Precious Matthews involved in this scheme?

4    A.    Yes, she was.

5    Q.    Did she plead guilty?

6    A.    Yes, she did.

7    Q.    And has she been sentenced?

8    A.    Yes, she has been.

9    Q.    Did you recognize Tobechi Onwuhara when you saw him?

10   A.    Yes, I did.

11   Q.    How did you recognize him?

12   A.    By face based on the photo from security footage and

13   also photo and DMV photo from Texas.

14   Q.    Did you recognize Tobechi Onwuhara's voice when you

15   spoke to him?

16   A.    I recognized his voice immediately because I have

17   listened to hundreds of calls from SpoofCard accounts.  It's

18   like when you hear this voice a hundred time, you are very

19   familiar with the voice.  And as soon as they speak, you can

20   tell the tone of voice, the mannerism they speak.  So I

21   recognized his voice as soon as he started talking.

22   Q.    And were there any specific calls that you remember

23   having previously heard his voice?

24   A.    Because the case that I was -- I started investigating

25   was the case at U.S. Senate Federal Credit Union, I listened

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    to those calls numerous times to make sure that I had all

2    the facts together.  The imposter posing as Mr. Robert

3    Short's voice was the same voice as the voice of Tobechi

4    "Toby" Onwuhara.

5    Q.   And did you recognize his voice from the CDS

6    recordings?

7    A.   Yes, I did.

8    Q.   I'm going to play for you what's been marked for

9    identification as Government Exhibit No. 28.

10                (Tape played to the jury.)

11   BY ATTORNEY EISINGER:

12   Q.   Did you recognize the cell phone number that the

13   individual provided?

14   A.   Yes, I did.  When he -- when Tobechi "Toby" Onwuhara

15   told us what his cell phone was, that's the same cell phone

16   number that showed up on the SpoofCard records as a number

17   that was called for those calls to pharmacists ordering

18   prescriptions for Tobechi "Toby" Onwuhara.

19   Q.   And what was the recording that you just heard?

20   A.   This is the recordings of interview that took place at

21   JFK when we talked to him in April of 2008.

22   Q.   Who are the two voices on that recording?

23   A.   One voice was -- who was asking questions was the

24   Customs agent, and the other gentleman answering with the

25   cell phone number and spelling of his name was Tobechi

1    "Toby" Onwuhara.

2    Q.   Have you listened to the entire recording within the

3    last week and verified that it's a true and accurate

4    recording of a conversation that took place on that date?

5    A.   Yes, I did.

6    Q.   Have you been able to identify the CD -- with the help

7    of Mr. Wood, please show him what's marked as grand jury --

8    Government Exhibit No. 28.

9    A.   Yes.

10   Q.   And how were you able to identify that CD?

11   A.   After reviewing the transcription and also CD content,

12   I put my initial and date that I see on it.

13           ATTORNEY EISINGER:   Government moves to enter

14   Government Exhibit No. 28 into evidence.

15           ATTORNEY IWEANOGE:   No objection.

16           THE COURT:   Admitted.

17   BY ATTORNEY EISINGER:

18   Q.   You mentioned that Henry Obilo was traveling from

19   Nigeria with Tobechi Onwuhara; is that correct?

20   A.   That's correct.

21   Q.   Were you present during the interview of Henry Obilo?

22   A.   Yes, I was.

23   Q.   I'm going to play for you what's been marked for

24   identification as Government Exhibit No. 23.

25           THE COURT:   What number?

1          ATTORNEY EISINGER:  23, your Honor.

2          THE COURT:  All right.  Proceed.

3          (Tape played to the jury.)

4   BY ATTORNEY EISINGER:

5   Q.    And have you listened -- do you recognize Government

6   Exhibit No. 23?

7   A.    Yes, I do.

8   Q.    And what is it?

9   A.    That's the recording of the interview with Mr. Henry

10  Obilo at JFK Airport.

11  Q.    And have you listened to the entire recording within

12  the last week and verified it's a true and accurate

13  recording of the conversation that took place on that date?

14  A.    Yes.

15  Q.    With the help of the court security officer, I would

16  like to show you Government Exhibit No. 23.

17          THE MARSHAL:  (Complied).

18          THE WITNESS:  Yes, I did.  I put the initial

19  after the reviewing (indicating).

20          ATTORNEY EISINGER:  The government moves to

21  enter Government Exhibit No. 23 into evidence.

22          ATTORNEY IWEANOGE:  No objection, Judge.

23          THE COURT:  Admitted.

24  BY ATTORNEY EISINGER:

25  Q.    Did you recognize the phone number that the defendant

1    gave you on that date?

2    A.    Yes, I did.  That was one of the numbers that showed

3    up as the originating call on the SpoofCard records that is

4    Government Exhibit No. 2.  That was used to make a call.

5    Q.    And did the call actually go anywhere?

6    A.    The (214) number, which is a Texas number, reached a

7    voicemail, and there was no talking.

8    Q.    So you weren't able for identify the defendant's voice

9    on that call?

10   A.    Not at all.  I was able to identify that that cell

11   phone number was used to make a call through that SpoofCard

12   account.

13   Q.    Have you been present during any other occasion during

14   which the defendant spoke?

15   A.    Yes.

16   Q.    And when was that?

17   A.    That was last year when he was arrested in Miami.

18   Q.    And based on those encounters with the defendant, were

19   you able to identify the defendant's voice on any phone

20   calls made to financial institutions?

21   A.    Last arrest -- during the arrest, there was a

22   several-hour period that he was talking to us.  By then I

23   was able to recognize his voice along with an interview with

24   him at JFK that many of the caller in the government Exhibit

25   No. 2 was the voice of Mr. Henry Obilo.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1  Q.    What was the person you recognized as the defendant

2  doing during those calls?

3  A.    Calling banks posing either as account holder or as

4  employee of financial institution attempting to withdraw

5  money or transfer money or activate credit yards or debit

6  cards or request checks.

7  Q.    I'm going to play for you what's been marked as

8  Government Exhibit No. 3.

9            (Tape played to the jury.)

10  BY ATTORNEY EISINGER:

11  Q.    Do you recognize the person on that call identifying

12  himself as Robert Short?

13  A.    Yes, I do.

14  Q.    Who is that?

15  A.    That's the voice of Tobechi "Toby" Onwuhara.

16  Q.    Have you spoken to the real Mr. Short?

17  A.    I have spoken to Mr. Short for the last 15 months,

18  14 months on several occasions.

19  Q.    Was that his voice on that phone call?

20  A.    No, it is not.

21            ATTORNEY EISINGER:  I would like to move at

22  this time to enter Government's Exhibit No. 3 into evidence.

23            ATTORNEY IWEANOGE:  No objection, Judge.

24            THE COURT:  Admitted.

25

1   BY ATTORNEY EISINGER:

2   Q.    I would like to play for you what's been marked as

3   Government's Exhibit No. 4.

4                (Tape played to the jury.)

5   BY ATTORNEY EISINGER:

6   Q.    Did you recognize the male voice on that phone call?

7   A.    Yes.

8   Q.    And who was it?

9   A.    That's the voice of Tobechi "Toby" Onwuhara.

10  Q.    And that was not the voice of Robert Short?

11  A.    It is not.

12               ATTORNEY EISINGER:  Government moves to admit

13  Government's Exhibit No. 4.

14               ATTORNEY IWEANOGE:  No objection.

15               THE COURT:  Admitted.

16  BY ATTORNEY EISINGER:

17  Q.    I would like to play for you what's been marked as

18  Government's Exhibit No. 5.

19               (Tape played to the jury.)

20  BY ATTORNEY EISINGER:

21  Q.    Do you recognize the voice on that phone call

22  representing himself as Robert Short?

23  A.    Yes, I do.

24  Q.    Who is that?

25  A.    That is the voice of Tobechi "Toby" Onwuhara.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    Q.    That's not Robert Short?

2    A.    It is not, sir.

3              ATTORNEY EISINGER:   The government moves to

4    admit Government Exhibit No. 5.

5              ATTORNEY IWEANOGE:   No objection.

6              THE COURT:   Admitted.

7    BY ATTORNEY EISINGER:

8    Q.    I would like to play for you what's been marked as

9    Government Exhibit No. 6.

10             (Tape played to the jury.)

11   BY ATTORNEY EISINGER:

12   Q.    And do you recognize the voice who's calling himself

13   Robert in that call?

14   A.    Yes.   That's the voice of Tobechi "Toby" Onwuhara.

15   It's not Robert Short.

16   Q.    I would like to play for you what's been marked as

17   Government's Exhibit No. 12.

18             (Tape played to the jury.)

19   BY ATTORNEY EISINGER:

20   Q.    Do you recognize the male caller on that voice who is

21   claiming to be James Witt?

22   A.    Yes.   It is the voice of Tobechi "Toby" Onwuhara.

23   It's not Mr. James Witt as I have spoken to him on several

24   occasions.

25             ATTORNEY EISINGER:   The government moves to

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1      admit Government's Exhibit No. 12 into evidence.

2                  ATTORNEY IWEANOGE:  No objection, Judge.

3                  THE COURT:  Admitted.

4      BY ATTORNEY EISINGER:

5      Q.   I would like to play for you what's been marked as

6      Government's Exhibit No. 16.

7                  (Tape played to the jury.)

8      BY ATTORNEY EISINGER:

9      Q.   Do you recognize the voice -- the person -- the male

10     caller on that call?

11     A.   Yes.  It is the voice of Tobechi "Toby" Onwuhara.

12                 ATTORNEY EISINGER:  The government moves to

13     admit Government Exhibit 16.

14                 ATTORNEY IWEANOGE:  No objection, Judge.

15                 THE COURT:  Admitted.

16                 Next question.

17     BY ATTORNEY EISINGER:

18     Q.   I would like to play for you what's been marked as

19     Government's Exhibit No. 17.

20                 (Tape played to the jury.)

21     BY ATTORNEY EISINGER:

22     Q.   Do you recognize the caller on that call who claims to

23     be Patrick Dillon?

24     A.   Same answer.  I do recognize that voice as the voice

25     the Tobechi "Toby" Onwuhara.

1          ATTORNEY EISINGER:  The government moves to

2     admit Government Exhibit No. 17.

3          ATTORNEY IWEANOGE:  No objection, Judge.

4          THE COURT:  Admitted.

5     BY ATTORNEY EISINGER:

6     Q.   I would like to play for you what's been marked as

7     Government's Exhibit No. 20.

8          (Tape played to the jury.)

9     BY ATTORNEY EISINGER:

10    Q.   And do you recognize the caller on that call?

11    A.   Yes.  It's the voice of Henry Obilo.

12         ATTORNEY EISINGER:  Government moves to admit

13    Government Exhibit 20 into evidence.

14         ATTORNEY IWEANOGE:  No objection, Judge.

15         THE COURT:  Admitted.

16    BY ATTORNEY EISINGER:

17    Q.   I would like to play for you what's been marked as

18    Government's Exhibit No. 21.

19         (Tape played to the jury.)

20    BY ATTORNEY EISINGER:

21    Q.   And do you recognize the male caller on that call who

22    identified him as Louis Fraser?

23    A.   Yes.  It's the voice of Henry Obilo.

24         ATTORNEY EISINGER:  The government moves to

25    admit Government Exhibit 21.

1          ATTORNEY IWEANOGE:  No objection.

2          THE COURT:  Admitted.

3     BY ATTORNEY EISINGER:

4     Q.   I would like to play for you what's been marked as

5     Government Exhibit No. 22.

6               (Tape played to the jury.)

7     BY ATTORNEY EISINGER:

8     Q.   And did you recognize the caller on that call -- the

9     male caller on that call?

10    A.   Can you play that just a little more, please.

11              (Tape played to the jury.)

12    BY ATTORNEY EISINGER:

13    Q.   Do you recognize the voice now?

14    A.   Can you play it from the beginning one more time.

15    It's muffled.

16              (Tape played to the jury.)

17    BY ATTORNEY EISINGER:

18    Q.   And did you recognize the voice there?

19    A.   Yes.  That's the voice of Henry Obilo.

20         ATTORNEY EISINGER:  The government moves to

21    admit Government's Exhibit No. 22.

22         ATTORNEY IWEANOGE:  No objection, Judge.

23         THE COURT:  Admitted.

24    BY ATTORNEY EISINGER:

25    Q.   I would like to play for you what's been marked as

1   Government's Exhibit No. 27.

2                    (Tape played to the jury.)

3   BY ATTORNEY EISINGER:

4   Q.   And do you recognize the caller on that call claiming

5   to be Leonard Cappy (phonetics), an employee of Bank of

6   America?

7   A.   Yes.   That's the voice of Henry Obilo.

8             ATTORNEY EISINGER:   Government moves to admit

9   Government Exhibit No. 27.

10             ATTORNEY IWEANOGE:   No objection, Judge.

11             THE COURT:   Admitted.

12   BY ATTORNEY EISINGER:

13   Q.   And did you assist in preparing a chart summarizing

14   the calls into SpoofCard that have been admitted into

15   evidence today?

16   A.   Yes, I did.

17   Q.   With the help of the court security officer, I would

18   like to show you what's been marked as Government's Exhibit

19   No. 18.

20             Do you recognize this?

21   A.   Yes, I do.

22             ATTORNEY EISINGER:   Your Honor, we would ask

23   the witness be able to put this on a pedestal and show the

24   jury.

25             THE COURT:   Ladies and gentlemen, this is

1   demonstrative evidence.  It isn't an exhibit that will be

2   with you in the jury room.  The law permits a witness to

3   demonstrate through his testimony in a graphic way what he's

4   saying.  So he may do so.  He may bring it here.

5                    Mr. Iweanoge, you may step around.

6                    You may proceed.

7   BY ATTORNEY EISINGER:

8   Q.    What are the boxes on the left?

9   A.    The numbers on the left in green are two SpoofCard

10  accounts:  One ending in 5776, and the other one 2949.

11  Q.    How many SpoofCard accounts were you able to identify

12  that the co-conspirators were using?

13  A.    Numerous.  Six to ten.

14  Q.    And what are the arrows in the center?

15  A.    The arrows represent calls made from -- with the use

16  of this SpoofCard accounts to banks.

17  Q.    And what are the boxes on the right?

18  A.    The boxes on the right in blue are the financial

19  institutions the calls were made to.

20  Q.    And what does the pink box on the upper right denote?

21  A.    Pink or peach color represents the two financial

22  institutions:  One being U.S. Senate Federal Credit Union.

23  The second being State Department Federal Credit Union being

24  located in Alexandria, Virginia, which is also in the

25  Eastern District of Virginia.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1   Q.    And can you explain what the writing above the calls

2   denotes.

3   A.    The writings are the 00 starts with Government exhibit

4   number, then the date of the call and the caller who was

5   identified, and then also the number that was used to make

6   the phone call.

7   Q.    And how were those callers identified?

8   A.    I'm sorry?

9   Q.    How were those callers identified?

10   A.    By several methods.  One was I listened to the

11   recordings and recognized the voice of the callers.

12   Q.    And has the jury heard any other testimony regarding

13   the identity of those callers?

14   A.    Yes.

15            ATTORNEY IWEANOGE:  Objection to the form of

16   the question, Judge.

17            THE COURT:  No.  I'll permit it.  I'll permit

18   it.  Overruled.

19            THE WITNESS:  We had earlier throughout

20   yesterday --

21            THE COURT:  The answer is "Yes"; is that right?

22            THE WITNESS:  That is correct.

23            THE COURT:  All right.  Next question.

24   BY ATTORNEY EISINGER:

25   Q.    Can you explain the first three calls that are listed

1    at the top.

2    A.    Three calls were made with the use of a SpoofCard

3    403415776 to U.S. Senate Credit Union on December 7th of

4    2007, the same caller whom -- who was identified as Tobechi

5    "Toby" Onwuhara.

6    Q.    And to what account were those calls made?

7    A.    Pardon me?

8    Q.    To what bank account were those calls made?

9    A.    Calls were made to U.S. Senate Federal Credit Union

10   accessing Mr. Robert Short's account.

11   Q.    And how about the next call, Government's Exhibit

12   No. 12?

13   A.    This call was made with the same SpoofCard account to

14   State Department Federal Credit Union.  The caller was

15   Tobechi "Toby" Onwuhara.

16   Q.    And to what account was that call made?

17   A.    That was to Mr. James Witt.

18   Q.    And what is the significance of the following

19   two calls, Government Exhibits 16 and 22?

20   A.    These two calls -- the importance of these two calls

21   are that the first call, Government Exhibit 16, was made by

22   the caller identified as Tobechi "Toby" Onwuhara with the

23   use of this SpoofCard call to State Department Federal

24   Credit Union.  The next call is Government's Exhibit 22 made

25   with yet a different SpoofCard by the caller identified as

1    Henry Obilo to a Visa card accessing the account.

2                The importance of these two calls are that the

3    call was made from the same cell phone, same physical cell

4    phone.  So these two calls were again made by the same cell

5    phone number.

6    Q.   And what's relevant about the call beneath that that

7    does not have a Government exhibit number on it?

8    A.   9/24/07, the call was made from (347) 528-0497 with

9    the use of this SpoofCard account.  The importance of this

10   call is that that is the same cell phone number that Henry

11   Obilo provided at JFK Airport saying that he -- that was his

12   cell phone and that he had for couple years.

13   Q.   What's the significant of Government's Exhibit No. 17,

14   which is the next phone call?

15   A.   On this call, Exhibit 17, the caller was identified as

16   Tobechi "Toby" Onwuhara making a call to USAA Banking, but

17   this time he used the SpoofCard account ending in 2949.

18   Q.   Were there any other calls that you were able to

19   identify Tobechi Onwuhara making from that SpoofCard

20   account?

21   A.   Many more.  But for purpose of showing, we just picked

22   one.

23   Q.   And what's the significance of the next call,

24   Government Exhibit No. 20?

25   A.   Exhibit 20 is the call made with the use of this

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    SpoofCard ending in 2949 to Bank of America.  The caller was

2    identified as Henry Obilo accessing an account and posing as

3    a Bank of America employee name Brian Kelly.

4    Q.    And to whose account was that call made?

5    A.    That's to Mr. George Frazier.

6    Q.    With's the significance of Government Exhibit No. 21,

7    the next phone call?

8    A.    21 is the call made with this SpoofCard ending in 2949

9    to Bank of America.  The caller was identified as Mr. Henry

10   Obilo accessing Mr. Louis Fraser's account.

11   Q.    And do you know what the time difference was between

12   Government Exhibit No. 21 and 27?

13   A.    Three minutes apart, possibly.

14   Q.    What's the significance of Government Exhibit No. 27?

15   A.    The call that was made from Government Exhibit No. 27

16   was made about two to three minutes after 21.  At this time,

17   the call was made with the same SpoofCard ending in 2949 to

18   Bank of America.  At this time the caller was identified as

19   Henry Obilo but posing as a Bank of America employee

20   accessing Mr. Louis Fraser's account after being told that

21   he had to go to talk to an employee to access the account.

22              ATTORNEY EISINGER:  I believe that's all for

23   this chart, your Honor.

24              THE COURT:  All right.  You may resume the

25   stand.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          Mr. Wood, you may remove the demonstrative

2     exhibit.

3          All right.  You may proceed.

4     BY ATTORNEY EISINGER:

5     **Q.**   Your mentioned a Bank of America employee by the name

6     of Brian Kelly; is that correct?

7     **A.**   That's correct.

8     **Q.**   What did your investigation into Brian Kelly uncover?

9     **A.**   The Bank of America informed me that Brian Kelly --

10          ATTORNEY IWEANOGE:  Objection; hearsay.

11          THE COURT:  Yes.

12          You're not eliciting hearsay, are you,

13     Mr. Eisinger?

14          ATTORNEY EISINGER:  We would move Stipulation

15     No. 12 regarding Government Exhibit No. 30.

16          THE COURT:  All right.

17          Mr. Wood, hand me the stipulation.

18          Ladies and gentlemen, the government and the

19     defendant have stipulated that the records produced by Bank

20     of America on April 6th and filed as Government's Exhibit 30

21     are business records of the Bank of America that Bank of

22     America makes and keeps in the ordinary course of business,

23     and that the records marked as Exhibit 30 are admissible in

24     evidence without any additional authentication.

25          So do you offer now Exhibit 30?

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          ATTORNEY EISINGER:  Yes, your Honor.

2          THE COURT:  Any objection?  It's stipulated.

3          ATTORNEY IWEANOGE:  No, Judge.  It's a

4     stipulation.

5          THE COURT:  All right.  Admitted.

6          Next question.

7          ATTORNEY EISINGER:  I would like to publish

8     Government Exhibit No. 30.

9          THE COURT:  That obviates the necessity to ask

10    any questions about the person.

11         ATTORNEY EISINGER:  Yes, your Honor.

12    BY ATTORNEY EISINGER:

13    Q.   And what information was obtained from Bank of America

14    in reference to Brian Kelly?

15    A.   Information from the records provided from Bank of

16    America, date of birth and a Social Security number and full

17    name and home address of the employee Brian Kelly was

18    obtained.

19    Q.   And when did Mr. Kelly stop working at Bank of

20    America?

21    A.   In the beginning of April 2007.

22    Q.   And when was the call that was Government Exhibit

23    No. 20?

24    A.   September of 2007.

25    Q.   I would like to show you what's been marked for

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    identification as Government Exhibit No. 30 -- I'm sorry --

2    29.

3              And do you recognize this?

4    **A.**    Yes, I do.

5    **Q.**    And what is it?

6    **A.**    This is the certified copy of a death certificate from

7    the Florida Bureau of Vital Statistics showing that a Brian

8    John Kelly died on April 25th of 2007 that lists the same

9    date of birth and same Social Security number with the bank

10   records of that employee.

11             ATTORNEY EISINGER:   The government would move

12   to admit Government Exhibit No.  29 as a certified public

13   record.

14             ATTORNEY IWEANOGE:   No objection, Judge.

15             THE COURT:  Admitted.

16   BY ATTORNEY EISINGER:

17   **Q.**    Were you able to calculate approximately how much

18   money the co-conspirators attempted to steal?

19   **A.**    Approximately over $25 million.

20   **Q.**    And do you know approximately how much money was

21   actually lost?

22   **A.**    Approximately over $8 million.

23   **Q.**    And does this include losses and attempted losses from

24   all calls with SpoofCard?

25   **A.**    Not at all.  If any -- if any -- we processed what we

1    looked into, less than half of what we have.

2    Q.    Do you know approximately how many phone calls there

3    were through SpoofCard?

4    A.    Countless.  Just along those accounts were about

5    150 -- I'm sorry -- over a thousand calls.

6    Q.    What is the current status of Tobechi Onwuhara?

7    A.    Fugitive.

8    Q.    How many people have pled guilty to date in this case?

9    A.    Six.

10    Q.    And other than the three individuals who testified in

11    this case, who else had pled?

12    A.    Brandy Anderson, Precious Matthews, Daniel Ojenta.

13    Q.    Who is Brandy Anderson?

14    A.    Brandy Anderson is girlfriend/fiancee/wife of Abel "Q"

15    Nnabue.

16    Q.    Who is Precious Matthews?

17    A.    Precious Matthews is fiancee of Tobechi "Toby"

18    Onwuhara.

19    Q.    Who is Daniel Ojenta?

20    A.    Daniel Ojenta, he is the brother-in-law of Tobechi

21    "Toby" Onwuhara.

22             ATTORNEY EISINGER:  I would like to move

23    Government Exhibit 19 into evidence.  It's a list of the

24    phone calls that we've listened to.  It's just a disk that

25    the jury could play if they wanted to listen to the phone

1    calls.

2             ATTORNEY IWEANOGE:  No objection.

3             THE COURT:  All right.

4             ATTORNEY EISINGER:  We have no further

5    questions at this time for this witness.

6             THE COURT:  All right.  Cross-examination.

7             ATTORNEY IWEANOGE:  Thank you, Judge.

8             THE COURT:  What was the last exhibit you

9    offered?

10            ATTORNEY EISINGER:  19, your Honor.

11            THE COURT:  All right.  It's admitted.

12            Proceed.

13            ATTORNEY IWEANOGE:  Yes, Judge.

14                    CROSS-EXAMINATION

15   BY ATTORNEY IWEANOGE:

16   Q.   Good afternoon, Detective Pak.

17   A.   Good afternoon, sir.

18   Q.   You're a deputized United States marshal; correct?

19   A.   Yes.

20   Q.   You have been working this investigation for some

21   time; correct?

22   A.   Yes.

23   Q.   With respect to the individuals you said that pled

24   guilty --

25            ATTORNEY IWEANOGE:  Court's indulgence.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

```
 1                    (Pause.)
 2   BY ATTORNEY IWEANOGE:
 3   Q.    -- Precious Matthews is one of them; is that correct?
 4   A.    Yes.
 5   Q.    And Brandy Anderson, Abel Nnabue's wife, as well;
 6   correct?
 7                 THE COURT:  What are you asking, Mr. Iweanoge?
 8                 ATTORNEY IWEANOGE:  Whether Brandy Anderson
 9   pled guilty.
10                 THE COURT:  It's already asked and answered.
11                 ATTORNEY IWEANOGE:  Okay.
12   BY ATTORNEY IWEANOGE:
13   Q.    With respect to Ms. Gipson, she pled guilty pursuant
14   to a plea agreement in this case to cooperate with the
15   United States; correct?
16                 THE COURT:  If you know.
17                 THE WITNESS:  I don't know.  I think so.
18   BY ATTORNEY IWEANOGE:
19   Q.    As the lead investigator in this case, you were the
20   one that had to make certain decisions about what had to be
21   done and not done; correct?
22                 THE COURT:  How is that within the scope of his
23   direct testimony?
24                 ATTORNEY IWEANOGE:  I'll link it up.  But let
25   me go directly there, Judge.
```

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  Yes.

2          THE WITNESS:  Thank you.

3     BY ATTORNEY IWEANOGE:

4     Q.    In this particular case, Detective Pak, there was no

5     voice analyzation done by an expert witness; correct?

6     A.    That is correct.

7          THE COURT:  Do you know what he means by "voice

8     analyzation"?  I take it he means voice analysis.

9          THE WITNESS:  I took that the same as your

10    Honor.

11         THE COURT:  All right.  Well, what do you

12    understand "voice analysis" to mean?

13         THE WITNESS:  I'm thinking that he's asking

14    for, did we put that on what we see on TV, like on a

15    machine, and so on.  We didn't do that.

16         THE COURT:  Next question.

17    BY ATTORNEY IWEANOGE:

18    Q.    You stopped Mr. -- you interviewed Mr. Toby Onwuhara

19    at the -- or actually Tobechi Onwuhara at JFK Airport back

20    in April of 2008?

21    A.    Yes.

22    Q.    And at the time, he gave you a telephone number; is

23    that correct?

24    A.    Yes.

25    Q.    And that telephone number is (214) 240-9841; is that

1    correct?

2    **A.**    My memory says yes, but I can say for sure.

3    **Q.**    Is there something that would refresh your

4    recollection?

5    **A.**    Yes, if I saw the transcription.

6              THE COURT:  It's an exhibit, isn't it,

7    Mr. Eisinger?

8              ATTORNEY IWEANOGE:  No, Judge.

9              ATTORNEY EISINGER:  It hasn't been admitted as

10   an exhibit.

11             THE COURT:  You many show it to him if you want

12   to refresh his recollection.

13             ATTORNEY IWEANOGE:  I'll mark it as Defense 1

14   for identification.

15             THE COURT:  All right.  Show it to the witness.

16   We'll mark it later.

17             Does looking at this give you a present

18   recollection?

19             THE WITNESS:  Do you know what page this is on?

20             THE COURT:  Detective Pak, does looking at that

21   document give you a present recollection, as you sit here

22   today, as to the telephone number that Onwuhara gave you at

23   JFK when you interviewed him?

24             THE WITNESS:  That is correct, number (214)

25   240-9841.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

```
 1              THE COURT:  Next question.
 2              ATTORNEY IWEANOGE:  If you could pull up
 3   Exhibit No. 18, please.
 4              THE COURT:  Are you asking the defendant --
 5              ATTORNEY IWEANOGE:  No, Judge.  I'm asking the
 6   high-tech person from the U.S. Attorney's Office to pull up
 7   Exhibit 18.
 8              THE COURT:  What exhibit?
 9              ATTORNEY IWEANOGE:  Exhibit No. 18,
10   demonstrative.
11              THE COURT:  All right.  Go ahead.
12   BY ATTORNEY IWEANOGE:
13   Q.    Exhibit No. 18 that appears on the monitor, do you see
14   that?
15   A.    Yes, I do.
16   Q.    The number that you got from Toby Onwuhara at JFK on
17   April 18th, the (214) 240-9841 number, does it appear
18   anywhere on this --
19   A.    No.
20   Q.    With respect to the number that you identified for the
21   9/24/07 call, the (347) 528-0497, do you see that?
22   A.    Did you say 9/24/07?
23   Q.    No. (347) -- under 9/24 --
24   A.    Okay.  Got it.  Yes, uhm-hmm.
25   Q.    The telephone number is (347) 528-0497.
```

1              Would that be accurate?

2      A.    Yes.

3      Q.    Is that the number that Henry Obilo gave to you when

4      you stopped him or talked to him at JFK Airport back in

5      April of 2008?

6      A.    Yes.

7      Q.    The calls that appear on Exhibit Nos. 20, 21, and 27

8      as well as 22 that you attributed to Mr. Obilo, does it

9      appear to have the phone number that Mr. Obilo gave you as a

10     cell phone when you stopped him in April of 2008?

11     A.    No.

12     Q.    On that 9/24/2007 phone call, you said that there was

13     a phone call made, but then there was no message left on the

14     other side?

15     A.    Correct.

16     Q.    So we don't have the voice; is that correct?

17     A.    Yes.

18     Q.    In fact, as you sit there, you don't even know if it

19     was Mr. Obilo that used the phone to make that call;

20     correct?

21     A.    I do not know that.

22     Q.    With respect to the --

23            ATTORNEY IWEANOGE:  Court's indulgence.

24            (Pause.)

25

1   BY ATTORNEY IWEANOGE:

2   Q.    With respect to the Spoof -- with respect to the

3   Spoof, Spoof is a system that people can get into online;

4   correct?  You register online to --

5            THE COURT:  Your question is now compound.  If

6   you want to ask him what is Spoof, just ask him "What is

7   Spoof?"

8   BY ATTORNEY IWEANOGE:

9   Q.    What is Spoof, Detective Pak?

10  A.    Sir, they provides for purchasers to be able to

11  disguise or put any number on caller I.D. of recipients.

12  Q.    And you register for the service online?

13  A.    I'm sorry?

14  Q.    You register for the service online?

15            You subscribe to it online?

16  A.    I'm pretty sure they are able to.

17  Q.    With respect to this Spoof service and the account

18  numbers that you have identified in Government Exhibit

19  No. 18, the two account numbers, in whose names are those

20  account numbers listed?

21  A.    I do not remember.

22  Q.    The Spoof system allows you to place a phone call and

23  disguise the number you're calling from; correct?

24  A.    For the person receiving the phone call, yes.

25  Q.    Okay.

1              So, if I, John Iweanoge, calls Detective Pak

2      and I want Detective Pak's number to appear on his own phone

3      using Spoof, I can do that; correct?

4      **A.**    Yes.

5      **Q.**    And if I want, using the Spoof system to call

6      Detective Pak even though John Iweanoge is calling as a man

7      and I want to sound like a woman, I can do that as well;

8      correct?

9      **A.**    Yes.

10     **Q.**    And if a woman makes a call using the Spoof system and

11     wants to sound like a man, the woman can sound like a man as

12     well; correct?

13     **A.**    Yes.

14     **Q.**    And then using the Spoof system, anybody using the

15     Spoof system can place a call and have a number that they

16     want to appear on the other end appear; correct?

17     **A.**    Yes.

18     **Q.**    So, in other words --

19              MR. IWEANOGE:  Court's indulgence.

20              (Pause.)

21     BY ATTORNEY IWEANOGE:

22     **Q.**    The number that appears on Government Exhibit 18 --

23              THE COURT:  It hasn't been admitted into

24     evidence.  It's just demonstrative.

25

1    BY ATTORNEY IWEANOGE:

2    Q.    Demonstrative evidence that is 18 on the call, the

3    GX- --

4              ATTORNEY IWEANOGE:  May I have it pulled up.

5              THE COURT:  Given that we've gone through it,

6    Mr. Iweanoge, it may be useful to reconsider.

7              THE WITNESS:  I'm ready, sir.

8              THE COURT:  All right.  Go ahead.  You may put

9    it up.

10             All right.  Mr. Iweanoge, what's your question.

11   BY ATTORNEY IWEANOGE:

12   Q.    With respect to the number that appears as GX20 -- on

13   GX20, do you see that?

14   A.    I do see it.

15   Q.    That number, (404) 717-5884, that has the name Obilo

16   next to it, whose number is that?

17   A.    I do not know who that belongs to.  Most likely a

18   prepaid cell phone.

19   Q.    And you don't know --

20   A.    I do not know.

21   Q.    With respect to Government Exhibit No. 21, (214)

22   586-4554, who does that number belong to?

23   A.    I do not know.  I did not check.

24   Q.    Government Exhibit No. 27, (214) 586-4554, who does

25   that number belong to?

 1                    THE COURT:  It's the same number.

 2                    THE WITNESS:  Same number.

 3        BY ATTORNEY IWEANOGE:

 4        Q.   Government Exhibit No. 22, (214) 597-2254 with the

 5        name Obilo next to it, who does that number belong to?

 6        A.   I do not know.  I did not check.  Most likely a

 7        prepaid cell phone.

 8        Q.   With respect to the Spoof system and how it was -- if

 9        John Iweanoge using the Spoof system decides to call

10        Detective Pak, I, John Iweanoge, can sound like Henry Obilo

11        using this Spoof system; correct?

12        A.   I'm not going to say that.  Because you want to try

13        and talk like one?  It's up to you.  I don't think so.

14                    THE COURT:  You testified that a man can sound

15        like a woman or a woman can sound like a man.

16                    Do you know of any ability of this system to

17        make a person sound like some other person?

18                    THE WITNESS:  No, sir.

19                    THE COURT:  Next question.

20        BY ATTORNEY IWEANOGE:

21        Q.   Is it your testimony that using the Spoof system that

22        can make a man sound like a woman, that a man cannot sound

23        like another man?

24        A.   Yes.  Another man?  No, definitely not sound like him.

25        Q.   So, in other words, if somebody has an accent and they

1    call to talk, to take away the accent and be able to sound

2    like someone without an accent?

3    **A.**    Are you asking me?

4    **Q.**    Yes.

5    **A.**    No.

6    **Q.**    So if you have an accent and you call, the Spoof

7    system cannot give you a male voice without an accent?

8    **A.**    It does not provide that.  It only disguises.  But it

9    says everything that you say.  If I say "I know not," that's

10   how it's going to sound, but with a slightly distorted.

11   **Q.**    So there's a distortion of voice when a man makes a

12   call and wants to sound like a man?

13                THE COURT:  Repeat the question.

14   BY ATTORNEY IWEANOGE:

15   **Q.**    There is a distortion -- based on your testimony,

16   there is a distortion of the man's voice when the man makes

17   a call and is sounding like a man, a slight distortion, as

18   you say?

19   **A.**    Your question is very confusing.  All I can say is

20   that you can disguise.  It doesn't matter who the caller is.

21   You can make it a male or a female sound.  That's it.  It

22   doesn't change much except that it doesn't sound like you.

23   That's it.

24   **Q.**    It doesn't sound like you?

25   **A.**    That's the purpose of giving the disguise.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  You don't Have to disguise the

2    voice in using it, though, do you?

3          THE WITNESS:  That's correct, sir.  You have

4    the option.

5          THE COURT:  Did you find any disguised voices

6    when you listened to these and heard the people whom you've

7    identified as making these calls?

8          THE WITNESS:  Your Honor, those calls that were

9    played here in this courtroom were not disguised.  They were

10   true voice of those callers.  That was the reason why I was

11   able to, along with other witnesses, identify the voice.

12         THE COURT:  Next question.

13   BY ATTORNEY IWEANOGE:

14   Q.   Did you check the records with Spoof to find out if

15   the voices were changed, if there were voice changes?

16   A.    If I can refer back to the Exhibits 1 and 2, one of

17   the boxes indicates "disguise man or female."  Indications

18   were if they were disguised, it would say either "male" or

19   "female."  On those calls that we played, there were none of

20   those options picked.  So they were true voices of the

21   caller.

22   Q.   The number (954) 892-7434, who does that number belong

23   to?

24   A.   A person named Michael Suba (phonetics).

25   Q.   And the phone (954) 892-7434, would that be the same

1   number that Toby, Q, and Eze loaded $400 on January 2nd of

2   2008?

3   **A.**   That Is the same wireless account assigned to the

4   wireless Internet access card that they made a $200 deposit

5   into.

6   **Q.**   Okay.

7          The Allstate account or Allstate Associates

8   account with Yahoo, the IP address, what's -- whose name is

9   listed on the IP address?

10  **A.**   I do believe Joseph Strom.

11  **Q.**   With the IP address 75.192.189.135?

12  **A.**   Are you asking me if that's the IP address?

13  **Q.**   Yes.

14  **A.**   I need to refer back to the documents that I received.

15  **Q.**   Okay.

16          Do you have -- do you have the documents next

17  to you?

18  **A.**   Not with me.

19          THE COURT:  What exhibit is it?

20          ATTORNEY IWEANOGE:  Exhibit 9.

21          THE COURT:  Has this been admitted,

22  Mr. Eisinger?

23          ATTORNEY EISINGER:  Yes.

24          THE COURT:  All right.  Go on.

25          ATTORNEY IWEANOGE:  Let me make sure, your

1    Honor.

2    BY ATTORNEY IWEANOGE:

3    Q.    Does Exhibit 9 that you have in front of you have the

4    IP number?

5    A.    What's the Number you read off?

6    Q.    I read off 75.192.198.145.

7    A.    I do not see that number on this list.

8          Where did you get that number?

9    Q.    I'm going to have you -- I'm going to have you look

10   at --

11         ATTORNEY IWEANOGE:  Court's indulgence.

12         (Pause.)

13         THE WITNESS:  Did that come from U.S. Senate

14   records?

15         THE COURT:  Wait until he -- he may have

16   misstated the number.  Go on to another question.

17         Which is it, Mr. Iweanoge?

18         ATTORNEY IWEANOGE:  Let's look at Government

19   Exhibit No. 8, Senate Credit Union.  It's already in

20   evidence, your Honor.

21         THE COURT:  What's your question?

22   BY ATTORNEY IWEANOGE:

23   Q.    The IP address?

24         THE COURT:  What IP?

25         ATTORNEY IWEANOGE:  That was used for the --

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  What number are you asking about?

2          ATTORNEY IWEANOGE:  75.192.189.135.

3          THE WITNESS:  Yes, that's the IP address that I

4   read off of this record provided by the US Senate Federal

5   Credit Union as the log-in IP for the -- used by the

6   imposter, yes.

7   BY ATTORNEY IWEANOGE:

8   Q.    The transactions that are referenced in the document

9   used as a demonstrative summary, Exhibit No. 20, that has a

10   transaction going to Bank of America that are referenced --

11   Exhibit No. 22, a call made for Visa Card Services, that is

12   not located within the Eastern District of Virginia?

13   A.    Just one second, please.

14          THE COURT:  If you know.

15          THE WITNESS:  I have no idea where that went

16   to.  They have banking centers all over the United States.

17   We haven't checked it.

18   BY ATTORNEY IWEANOGE:

19   Q.    With respect to Government's Exhibit Nos. 20 --

20   looking at the demonstrative documents, Exhibits 20, 21, and

21   27, the Bank of America, you do not know if Bank of America

22   is located in the Eastern District of Virginia, do you?

23   A.    I do not know.

24          THE COURT:  How much further do you have?

25          ATTORNEY IWEANOGE:  Judge, about five minutes.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1        THE COURT:  All right.  Let's proceed, and then

2    we'll take the luncheon recess.

3        ATTORNEY IWEANOGE:  Yes, your Honor.

4    BY ATTORNEY IWEANOGE:

5    Q.   With respect to -- as the lead agent in this case, did

6    you do an analysis of funds that were wired from overseas

7    into the account of Precious Matthews?

8        ATTORNEY EISINGER:  This is beyond direct.

9        THE COURT:  What are you asking, Mr. Iweanoge?

10   Ask it again.

11       MR. IWEANOGE:  If he did an analysis of funds,

12   monies --

13       THE COURT:  Funds.

14       ATTORNEY IWEANOGE:  Funds --

15       THE COURT:  Yes.

16       ATTORNEY IWEANOGE:  -- that were wired into

17   Precious Matthews's account, as he testified pled guilty in

18   this case, as a summary as the lead agent in this case.

19       THE COURT:  Well, you're suggesting he may have

20   knowledge.  You're not telling me why you think it's within

21   the scope of direct.

22       I'll let him answer.

23       Did you do an analysis?

24       THE WITNESS:  It was done.  Not by me.

25

1    BY ATTORNEY IWEANOGE:

2    **Q.**    Who did that?

3    **A.**    Another agent.

4    **Q.**    As the lead agent in this case, in reviewing the

5    financial documents -- you reviewed the financial documents

6    in this case?

7    **A.**    I had an opportunity, yes.

8    **Q.**    Did you see any monies that were wired into Mr. Henry

9    Obilo's account?

10    **A.**    I did not find any.

11    **Q.**    Did you see any documentation of any monies that went

12    to Henry Obilo?

13    **A.**    I did not see any.

14                    ATTORNEY IWEANOGE:  Court's indulgence.

15                    (Pause.)

16                    THE COURT:  Do you have redirect, Mr. Eisinger?

17                    ATTORNEY EISINGER:  I don't think so, your

18    Honor.

19                    ATTORNEY IWEANOGE:  Court's indulgence.  Let me

20    just check with Mr. Obilo to see.

21                    (Pause.)

22                    THE COURT:  All right.  Do you have anything

23    further?

24                    ATTORNEY IWEANOGE:  Judge, one last question.

25                    THE COURT:  All right.

1    BY ATTORNEY IWEANOGE:

2    **Q.**    When you stopped Mr. Henry Obilo at JFK Airport, did

3    he have a laptop on him?

4    **A.**    On him?

5    **Q.**    Yes.

6    **A.**    No.

7              ATTORNEY IWEANOGE:  No further questions.

8              THE COURT:  Mr. Eisinger, any redirect?

9              ATTORNEY EISINGER:  No, your Honor.

10             THE COURT:  Thank you.  You may step down.

11             (Witness excused.)

12             ATTORNEY EISINGER:  We would like to enter

13   three stipulations.

14             THE COURT:  Hand those --

15             ATTORNEY EISINGER:  We have one last witness,

16   but we don't think he'll show up.  So we'll use the lunch

17   break to find him, perhaps.  We don't expect to have any

18   more witnesses.

19             THE COURT:  Hand me the stipulations,

20   Mr. Eisinger.

21             Three additional stipulations, ladies and

22   gentlemen.  Let me review those with you.  And as I told

23   you, all of these stipulations you will have with you in the

24   jury room.

25             The first, numbered No. 1, is that the

1    defendant and the government stipulate that the United

2    States Senate Federal Credit Union is a financial

3    institution organized and operating under the laws of the

4    United States located in Alexandria, Virginia within the

5    Eastern District of Virginia and that it's federally

6    insured.

7            Stipulation No. 2 similarly says that the

8    defendant and the government stipulate that the State

9    Department Federal Credit Union is a financial institution

10   organized and operating under the laws of the United States

11   located in Alexandria, Virginia within the Eastern District

12   of Virginia and that it, too, is federally insured.

13           And then Stipulation No. 3 is that the

14   defendant and the government stipulate that the Bank of

15   America is a financial institution organized and operating

16   under the laws of the United States and that it is federally

17   insured.

18           We'll take the luncheon recess at this time.

19           Ladies and gentlemen, pass your books to the

20   right.  We are, I think, close to being done with the

21   government's case.

22           I'm fairly certain in forecasting that I will

23   be able to have closing arguments and the Court's final

24   instructions after lunch and that you'll have the case to

25   deliberate on your verdict this afternoon.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    Remember during the lunch period not to discuss

2    this matter among yourselves or with anyone or undertake any

3    investigation on your own.

4    You may hand your books to Mr. Wood as you file

5    out.  We will reconvene at 1:30.  You may follow Mr. Wood

6    out.  If there's a delay in reconvening, Mr. Wood will tell

7    you.  As a matter of fact, you may have until 1:45.

8    (Jury excused at 12:29 p.m.)

9    THE COURT:  You may be seated.

10    All right.  Mr. Eisinger, does that complete

11    the government's case?

12    ATTORNEY EISINGER:  We had one last witness

13    whose wife has been ill.  We're not sure if we're going to

14    be able to get him here or not.  So we'll try over the lunch

15    break to see if he'll come.  If not, that will be it.

16    THE COURT:  Let me see the deputy clerk's list

17    of admitted exhibits to make sure that there's an agreement

18    between the parties that I have correctly listed the

19    admitted exhibits.

20    The admitted exhibits are as follows:

21    1, 1-1, 2, 2-1, 3, 4, 5, 6, 7, 8 through 11, 12

22    through -- 12, 13, 14, 15, 16, 17, 19, 20, 21, 22, 23, 24,

23    27, 28, 29, 30.

24    Did I omit any, Mr. Eisinger?

25    ATTORNEY EISINGER:  I had 11-1 admitted by

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1     stipulation with Ezenwa Onyedebelu.

2               THE COURT:  I recall that.  It's admitted,

3     11-1.

4               ATTORNEY IWEANOGE:  For the record, that's my

5     notation as well.

6               ATTORNEY EISINGER:  And I believe that

7     Government Exhibit 15 was not admitted.

8               THE COURT:  I have it as admitted.

9               Do you not want to offer it?

10              ATTORNEY EISINGER:  It's fine as admitted.  I

11    don't recall --

12              THE COURT:  I have it as admitted.

13              Mr. Iweanoge?

14              ATTORNEY IWEANOGE:  I have it as admitted

15    through Larry Plassmeyer.

16              THE COURT:  Yes, it's been admitted.

17              ATTORNEY EISINGER:  Yes, that's the list I

18    have.

19              THE COURT:  Does that complete the exhibits,

20    then?

21              ATTORNEY EISINGER:  Yes.

22              THE COURT:  We'll recess for lunch.

23              Now, Mr. Iweanoge, what can you forecast for us

24    for the defendant?

25              ATTORNEY IWEANOGE:  Judge, I have good news and

1    bad news.  The good news is after due consultation with my

2    trial notebook, my preparation of my documents, and my

3    client, we have decided that we do not intend to call

4    Special Agent Nail because there's nothing that he's going

5    for add to the case that has not already been added at this

6    point.

7                    THE COURT:  All right.  Have you made a

8    determine as to whether you'll offer any other witnesses?

9                    ATTORNEY IWEANOGE:  Judge, I have made that

10   determination after full consultation and discussion with my

11   client.  I explained all his rights to him as to whether to

12   testify or not to testify.  He has chosen not to testify.

13   And I believe the Court -- and the Court --

14                    THE COURT:  I'll voir dire --

15                    ATTORNEY IWEANOGE:  -- will voir dire him on

16   the record.

17                    THE COURT:  Mr. Obilo, come to the podium,

18   please, sir.

19                    Mr. Obilo, I want to ask you some questions to

20   ensure that you understand that you have the right to

21   testify, if you wish to.  You also have the right not to

22   testify.

23                    Now, if you decide not to testify, then the

24   Court will instruct the jury that the jury may draw no

25   inference from your silence.  Indeed, the Court will

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    instruct the jury that when the jury retires to deliberate

2    on its verdict, the jury cannot discuss the fact that you

3    have not testified.  But you do have the right to testify if

4    you wish to.

5              Do you wish to waive your right to testify and

6    insist on your right to remain silent?

7              THE DEFENDANT:  Yes, your Honor.

8              THE COURT:  Mr. Obilo, let me ask you just a

9    few other preliminary questions.

10             What is your full name?

11             THE DEFENDANT:  Henry Obilo.

12             THE COURT:  What is your age?

13             THE DEFENDANT:  I'm 29.

14             THE COURT:  All right.  And have you discussed

15   your right to testify or to remain silent with your counsel

16   Mr. Iweanoge?

17             THE DEFENDANT:  Yes, your Honor.

18             THE COURT:  Are you fully satisfied with the

19   advice and counsel he's provided to you in this case?

20             THE DEFENDANT:  Yes.

21             THE COURT:  All right.  You may be seated.

22             Mr. Eisinger, I think that voir dire is

23   adequate.  I don't think it's necessary to place him under

24   oath or to question him about medications or anything else.

25   Unless you think otherwise and can persuade me, I'm going to

1    find that his waiver of his right to testify and his desire

2    to invoke his right to remain silent is a knowing and a

3    voluntary choice.

4               ATTORNEY EISINGER:  Yes.  The government

5    agrees, your Honor.

6               THE COURT:  Anything further at this time,

7    Mr. Iweanoge?

8               ATTORNEY IWEANOGE:  The bad news.  During the

9    break, I realized I sent in my jury instructions.  Because

10   it was in the middle of the night, Judge, I completely

11   forgot to add the cooperator's instruction.  In other

12   words --

13              THE COURT:  I'll include that.

14              ATTORNEY IWEANOGE:  Okay.

15              THE COURT:  I will include that --

16              ATTORNEY IWEANOGE:  Yes, Judge.

17              THE COURT:  -- in the preliminary.  I will

18   prepare -- I think that's appropriate, Mr. Iweanoge.

19              ATTORNEY IWEANOGE:  Yes.

20              THE COURT:  I'll prepare a package of

21   instructions.  It should be ready probably by 1:15.  And

22   we'll reconvene no earlier than 1:45.

23              You're directed to review the package and

24   review it with each other.  In other words, counsel are to

25   confer to see if they have any agreed-upon changes.  And if

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    they have any objections, you need to explain to opposing

2    counsel what your objection is, and opposing counsel is also

3    directed to disclose the counter-argument so that I hear

4    argument that is focused and informed.

5                    And I have the ones you submitted, and I have

6    the government's submitted instructions.  So they'll be

7    ready at 1:15.  We'll plan to reconvene at 1:45, but it may

8    take a little longer to have the instructions conference.

9    And then we'll go to closing arguments and the Court's final

10   instructions.

11                   Mr. Eisinger.

12                   Unless the government's witness shows up.

13                   ATTORNEY EISINGER:  And Mr. Wood will have

14   those instructions?

15                   THE COURT:  No.  The courtroom will probably be

16   locked.  So knock -- at chambers, knock on my chambers door

17   at about 1:15.  We should have the package ready by then.

18   If not, someone will answer the door and tell you to come

19   back in ten minutes.

20                   ATTORNEY EISINGER:  Thank you, your Honor.

21                   THE COURT:  How long do you think you need for

22   your closing argument, Mr. Eisinger or Mr. Newby?

23                   ATTORNEY NEWBY:  I would like to reserve

24   30 minutes, and I'll save about seven of those minutes for

25   rebuttal.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          THE COURT:  How long do you need, Mr. Iweanoge?

2          ATTORNEY IWEANOGE:  About 30 minutes, Judge.

3          THE COURT:  The Court stands in recess.

4          (Court recessed at 12:37 p.m.)

5          (Court called to order at 1:52 p.m.)

6                  INSTRUCTIONS CONFERENCE

7          THE COURT:  All right.  Have counsel had enough

8    time to review the instructions, Mr. Newby?

9          ATTORNEY NEWBY:  Yes, the government has.

10         ATTORNEY IWEANOGE:  Yes, the defense has,

11   Judge.

12         THE COURT:  All right.  Mr. Iweanoge, if you're

13   curious about what happened in your cases, you'll have to

14   find that out for yourself.

15         ATTORNEY IWEANOGE:  I didn't hear you, Judge.

16         THE COURT:  If you're curious about what

17   happened in your other two cases before Judge Davis --

18         ATTORNEY IWEANOGE:  Yes, Judge.

19         THE COURT:  -- you'll have to find that out for

20   yourself.

21         ATTORNEY IWEANOGE:  Yes, Judge.

22         THE COURT:  Now, is Mr. Short here?

23         ATTORNEY NEWBY:  No, he's not able to make it.

24   So the government --

25         THE COURT:  All right.  So I'll give you an

1    opportunity before the jury to close the government's case.

2    Then I'll tell the jury that the defendant doesn't have any

3    obligation or burden to present evidence, but he may if he

4    wishes.  "Do you have any evidence -- or do you wish to

5    present any evidence?"

6              And Mr. Iweanoge at that time will say, "No.

7    The defense rests."

8              And then we'll proceed to closing argument.

9              Now let's look over the instructions.

10             Are there any -- I know that there's one --

11   there's one instruction that I did not include, and I'll

12   review that with you at the end.  Put the multiple

13   conspiracy instruction to one side.

14             Are there any agreed-upon changes or

15   corrections to the package of instructions that I've

16   provided to counsel, Mr. Newby or  Mr. Iweanoge, any

17   agreed-upon changes?

18             ATTORNEY NEWBY:  No, your Honor.  We have no

19   changes.

20             ATTORNEY IWEANOGE:  No changes.

21             THE COURT:  Do you have any objections?

22             ATTORNEY NEWBY:  The government has no

23   objections to the instructions provided by the Court?

24             THE COURT:  Mr. Iweanoge.

25             ATTORNEY IWEANOGE:  No objections leaving the

1     multiple conspiracy aside.

2              THE COURT:  All right.  I'll hear from you now

3     on that, Mr. Iweanoge.

4              ATTORNEY IWEANOGE:  Yes, Judge.

5              THE COURT:  I put in the venue instruction.

6              ATTORNEY IWEANOGE:  Yes, I saw that.

7              THE COURT:  It's modified somewhat.

8              ATTORNEY IWEANOGE:  Yes.

9              THE COURT:  All right.  Go ahead.

10             ATTORNEY IWEANOGE:  Judge, on the multiple

11    conspiracy, I believe it's a proper instruction to give in

12    this case.  The reason I say that, Judge, is that the

13    testimony -- I believe it was from Ezenwa -- was that my

14    client was doing something with credit cards or debit cards

15    with Bank of America and his business partner, Ben Charles

16    Obassui or Obassui (pronouncing), or something like that.

17             And then the chart, demonstrative chart that

18    the government used, Exhibit No. 18, seems to have some

19    calls allegedly made by my client to some institutions that

20    are not in the Eastern District of Virginia.

21             The defendant's theory of the case is that the

22    defendant is not a member of this conspiracy.  However, the

23    defendant, of course, is entitled to inconsistently argue

24    that even if there was to be a conspiracy found, that it's

25    more than one conspiracy or the overall conspiracy charged

1    in this particular case that he may have made calls, but

2    then there were conspiracies with Charles Obassui, and those

3    are separate from what Mr. Onwuhara or -- Toby Onwuhara was

4    doing.

5              Based on those reasons, Judge, I believe that

6    the instruction is appropriate.

7              THE COURT:  All right.  Mr. Newby.

8              ATTORNEY NEWBY:  It's the government's position

9    that the evidence adduced at trial does not support a

10   multiple conspiracy instruction.  There was a question, and

11   I believe it was only one question, that was asked of

12   Mr. Onyedebelu on cross whether he recalled making a

13   statement.  It was in the form of a leading question.  There

14   was not a determinative answer on that.  That was the only

15   way that this would come in.

16             Otherwise, there was no evidence adduced at

17   trial to show that there was -- potentially have been

18   multiple conspiracies.  These were questions that were asked

19   by Mr. Iweanoge.

20             THE COURT:  The matter is before the Court on

21   the objection by the defendant of the Court's having omitted

22   from its package of instructions an instruction relating to

23   multiple conspiracies.

24             The defendant submitted two instructions:  One

25   on venue which has been modified but will be given, the

1    other on multiple conspiracies that will not be given.

2                In United States against Nunez, 432 Fed. 3d

3    573, the Fourth Circuit established clearly the criteria for

4    a multiple conspiracy instruction stating -- it's actually

5    quoting from an earlier case, United States against Zwelicot

6    (phonetics) at 221 Federal 2d 542.  In that case, as quoted

7    in the Nunez case, "A multiple conspiracy instruction is not

8    required unless proof at trial demonstrates that appellants

9    were involved only in a separate conspiracy unrelated to the

10   overall conspiracy charged in the indictment.

11               "The focus" -- and then the opinion goes on no

12   longer quoting from Zwelicot.  "The focus of a conspiracy is

13   a single-mindedness to achieve a particular goal.

14   Generally, a single conspiracy exists where there's an

15   overall agreement or one business venture.  Whether there is

16   a single conspiracy or multiple conspiracy depends upon the

17   overlap of key actors, methods, and goals.  However, one may

18   be a member of a conspiracy without knowing its full scope

19   or all of its members and without taking part in the full

20   range of its activities or over the whole period of its

21   existence."

22               That's citing United States against Banks in

23   the Fourth Circuit.

24               "It's also not necessary," the opinion

25   continues, "for the conspiracy to have a discrete

1    identifiable organizational structure.  As this Nunez

2    opinion points out, often the single conspiracy is comprised

3    of a loosely knit association of members linked only by

4    their mutual interest in sustaining the overall enterprise

5    or catering to the ultimate demands" -- this happened to be

6    a drug case they're quoting from -- "of the drug market."

7            And in both the Nunez case and in this case, I

8    find that the evidence here warrants only a single

9    conspiracy and there isn't evidence that the defendant here

10   was involved only in a separate conspiracy unrelated to the

11   overall conspiracy charged in the indictment.

12           So the instruction will be denied.  And you

13   have your exception -- or your objection, Mr. Iweanoge.

14           Now, let me ask a couple of other questions.

15           The indictment in this case charges in

16   Paragraphs 7 through 16 various means and methods.

17           Is that right, Mr. Newby?

18           ATTORNEY NEWBY:  Yes, your Honor.

19           THE COURT:  Are familiar with that?

20           ATTORNEY NEWBY:  Yes.  I don't have it in front

21   of me at the moment.  I'm familiar with the indictment.

22           ATTORNEY IWEANOGE:  There you go.

23           ATTORNEY NEWBY:  Thank you.

24           THE COURT:  7 through 16, those are the means

25   and methods, is that right, that are charged?

1        ATTORNEY NEWBY:  That is correct, your Honor.

2        THE COURT:  Now, I included an instruction that

3   there may be many means and methods alleged, but they only

4   have to agree unanimously on one.

5        How are they going to do that without the

6   indictment?

7        ATTORNEY NEWBY:  Your Honor, it's the

8   government's position that the indictment should go back to

9   the jury.

10        THE COURT:  All right.  That's typical with

11   many cases.  I don't often do it.  It may be that this

12   instruction is not needed.  I don't know.

13        Mr. Iweanoge, do you want this instruction?

14        ATTORNEY IWEANOGE:  Yes, I do, Judge.

15        THE COURT:  Well, then it seems appropriate to

16   send the indictment back with it; is that right?  Without

17   the forfeiture part.  I'll come to forfeiture here in a

18   moment.

19        Any objection, Mr. Iweanoge, to sending the

20   indictment back without the forfeiture aspect?

21        ATTORNEY IWEANOGE:  No, Judge.

22        THE COURT:  All right.  Now, with respect --

23   what I want you to do -- or I'll get the deputy clerk to.

24   I'm going to white out the forfeiture notice on the face of

25   the indictment and then give the jury the indictment up

1    through Page 7 and not the forfeiture aspect.

2              ATTORNEY NEWBY:  Yes, the government agrees

3    that would be appropriate, your Honor.

4              THE COURT:  The jury gets Page 1 through 7 with

5    the forfeiture notice on the front whited out.

6              Now, Mr. Newby, what is the appropriate process

7    for disposing of the forfeiture assuming there is a verdict?

8              ATTORNEY NEWBY:  It's the government's position

9    that we would raise --

10             THE COURT:  That is, if there's a verdict of

11   not guilty, it's over; is that right?

12             ATTORNEY NEWBY:  Yes, your Honor.  There is a

13   separate civil forfeiture action regarding --

14             THE COURT:  That doesn't implicate this

15   particular forfeiture notice.

16             ATTORNEY NEWBY:  Correct.

17             THE COURT:  So assuming there's a verdict of

18   guilty, is there anything further that needs to be done with

19   respect to forfeiture with this jury?

20             ATTORNEY NEWBY:  Not with this jury, your

21   Honor.

22             THE COURT:  And what would happen, in your

23   view, with respect to forfeiture in the event there is a

24   verdict of guilty?

25             ATTORNEY NEWBY:  The government would attempt

1    to prove up the forfeiture allegations at sentencing.

2              THE COURT:  Mr. Iweanoge, is that also your

3    view of the proper disposition on forfeiture; that is, if

4    there is a verdict of not guilty, it's over?

5              ATTORNEY IWEANOGE:  Yes.

6              THE COURT:  That is, it's over -- as a criminal

7    matter as far as forfeiture is concerned in the indictment,

8    it's over?

9              ATTORNEY IWEANOGE:  Yes.

10             THE COURT:  If there's a verdict of guilty,

11   however, then Mr. Newby says the matter of forfeiture will

12   be resolved at sentencing before the Court.

13             ATTORNEY IWEANOGE:  Judge, my experience is

14   that the defendant has a choice either the jury deciding it

15   or the judge deciding it.

16             THE COURT:  All right.  So what we'll do, then,

17   Mr. Iweanoge is we'll wait to see what the verdict is.

18             ATTORNEY IWEANOGE:  Yes, Judge.

19             THE COURT:  At that point and time, I will ask

20   you whether you want the jury to consider this or you want

21   the Court to consider it.

22             ATTORNEY IWEANOGE:  Yes, Judge.

23             THE COURT:  At that time, I take it the

24   instruction to the jury would be that forfeiture is required

25   joint and severally of all conspiracy members of all profits

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    or proceeds of the conspiracy and all assets used to

2    facilitate the illegal venture; is that right?

3              ATTORNEY IWEANOGE:  Yes.

4              THE COURT:  All right.

5              ATTORNEY NEWBY:  Yes, your Honor.

6              THE COURT:  Then you would put on a witness to

7    identify each of these and to describe how they were either

8    profits or proceeds or used to facilitate?

9              ATTORNEY NEWBY:  Yes, your Honor.  And to be

10   clear at this point, the items listed in this forfeiture

11   notice are ones that we would seek to hold the defendants

12   jointly and severally liable.  These assets that were seized

13   were not seized from the defendant.  They were seized from

14   other members of the conspiracy.

15             THE COURT:  Yes, but he may still be jointly

16   and severally liable for it.

17             ATTORNEY NEWBY:  Yes, your Honor.

18             THE COURT:  So you would have to go through

19   each of these, describe them; where they were seized and how

20   the person from whom they were seized -- or whose property

21   it is as part of this conspiracy.

22             ATTORNEY NEWBY:  That's correct, your Honor.

23             THE COURT:  All right.  Yes, Mr. Iweanoge.

24             ATTORNEY IWEANOGE:  Judge, I note procedurally

25   speaking when the government rests and when your Honor is

1  going to ask me if I have to present any case and I'll say

2  that I will rest as well, before then I will just advise the

3  Court that -- you know, making my motion.

4             THE COURT:  Go ahead.  Your Rule 29 motion?

5             ATTORNEY IWEANOGE:  Yes, Judge.

6             THE COURT:  All right, sir.  I'll hear from

7  you.

8        PROCEEDINGS RE:  RULE 29 MOTION BY THE DEFENDANT

9             ATTORNEY IWEANOGE:  Judge, I'll move for

10  judgment of acquittal.  And I rest on the record -- I submit

11  on the record.

12                    RULING BY THE COURT

13             THE COURT:  All right.  The matter is before

14  the Court appropriately by counsel for defendant for a

15  motion for judgment of acquittal pursuant to Rule 29.

16             I believe that's what you intend, Mr. Iweanoge?

17             ATTORNEY IWEANOGE:  Yes, Judge.

18             THE COURT:  At this stage of the proceeding,

19  which is following the completion of the government's case,

20  the standard to be applied by the Court is to view the

21  evidence in the light most favorable to the government and

22  to consider whether viewing the evidence in that light and

23  taking the inferences favorably for the government, is there

24  evidence from which a jury can find each of the elements of

25  the offense charged beyond a reasonable doubt?  And in this

1   case, there plainly is.

2            There is ample evidence that there was a

3   conspiracy.  There is ample evidence that the object of this

4   conspiracy was to defraud banks; to use a scheme and

5   artifice to defraud these lending institutions of funds that

6   were in their care, custody, or control; that the way in

7   which they did it was to obtain identifying information of

8   home equity line of credit holders; to impersonate these

9   persons; and then to request wire transfers which in some

10  instances succeeded and in some instances did not succeed.

11           And there is evidence that the defendant was a

12  member of this conspiracy, that is, from co-conspirators,

13  and also other evidence, but chiefly from co-conspirators.

14           And the jury could believe all of that and find

15  that he knowingly, willfully, and unlawfully joined the

16  conspiracy and was a member of the conspiracy, proceeded to

17  engage in it.

18           He doesn't have to know -- it isn't required

19  that the government prove that he know the full scope of the

20  conspiracy or know all the members or take part in the full

21  range of the conspiracy's activity or be a member of the

22  conspiracy for the full period of its existence.

23           But the government does have to show beyond a

24  reasonable doubt that at some point during the life of the

25  conspiracy, he knowingly, intentionally, and unlawfully

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1     joined the conspiracy, and the evidence supports that.

2            So the motion -- it doesn't mean the jury has

3     to find that.  Mr. Iweanoge, you may convince the jury

4     otherwise or, better put, you may convince the jury that the

5     government hasn't proved all of that and -- but at this

6     point, there is evidence from which a jury could reach a

7     conclusion that each of the elements of the offense charged

8     has been proved beyond a reasonable doubt.

9            All right.  Is there anything else that we need

10    to deal with before we have the jury brought back in and

11    proceed with the closing arguments and final instructions?

12           ATTORNEY IWEANOGE:  Judge, other than one

13    minute to let me just run to the rest room.  I will run.  So

14    I'll do it in one minute, Judge.

15           THE COURT:  Just a moment.

16           All right, Mr. Newby.

17           ATTORNEY NEWBY:  The government would release

18    into the custody of the marshal, Abel Nnabue as a witness.

19           THE COURT:  Yes.  He doesn't need to remain.

20    So the marshals may now remove him.

21           THE COURT:  All right.  We'll take a brief

22    recess.

23           Mr. Iweanoge, you may use the men's room.

24           Mr. Wood, you may change the podium.

25           We won't take more than a two- or three-minute

1   recess, and then we'll resume and go directly to closing

2   arguments and the Court's final instructions.

3                  Court stands in recess.

4                  (Court recessed at 2:10 p.m.)

5                  (Court called to order at 2:14 p.m.)

6                  THE COURT:  Are we ready to proceed?

7                  ATTORNEY IWEANOGE:  Yes, Judge.

8                  THE COURT:  Let's bring the jury.

9                  (Jury impaneled at 2:14 p.m.)

10                 THE COURT:  All right.  You may be seated.

11                 All right.  Ladies and gentlemen, we're

12  prepared now to proceed with the trial.

13                 First, let me ask, Mr. Newby, does the

14  government wish to present any additional evidence?

15                 ATTORNEY NEWBY:  No, your Honor.  The

16  government rests.

17                 (Government rests)

18                 THE COURT:  All right.

19                 Now, the defendant is not required to present

20  any testimony or evidence.  He has no burden to prove his

21  innocence.  However, he has the opportunity to present

22  testimony or evidence if he wishes to.

23                 Mr. Iweanoge, does the defense wish to present

24  any testimony or evidence?

25                 ATTORNEY IWEANOGE:  No, Judge.  The defense

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    rests at this time.

2             THE COURT:  All right.  Now, we'll proceed,

3    ladies and gentlemen, with the closing arguments.  These

4    will be approximately 30 minutes in length.  Mr. Newby, on

5    behalf of the government, will make the closing argument.

6             And Mr. Newby, who will do the rebuttal?

7             ATTORNEY NEWBY:  I will, your Honor.

8             THE COURT:  You will, as well.

9             Now, the government has a rebuttal because the

10   government has the burden of proof.  So the government will

11   be the last to address you.

12            And Mr. Iweanoge, on behalf of the defendant,

13   will address you in between.

14            So it will be about 25, and then 30, minutes

15   and then five at the end, or seven or thereabouts.

16            (To Attorney Newby)  However you want to cut it

17   up.

18            (To jury)  Thereafter, the Court will give you

19   its closing instructions, and they will be about 30 minutes

20   in length.  So at the moment it will be about an hour and a

21   half that we will proceed, and then you will be permitted to

22   retire and deliberate on your verdict.

23            I should tell you, also, that, as I told you at

24   the outset, you and you alone are the judges of the facts in

25   this case.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          Now, the attorneys, in their summarizing and

2     interpreting the evidence for you in the course of their

3     closing arguments, will tell you what they think the

4     evidence was.

5          However, your recollection controls as to what

6     the testimony and the evidence was because you're the judges

7     of the facts of this case.

8          And the attorneys also have the privilege and

9     ability to tell you what they think the Rules of Law are

10    because I've reviewed some of that with them.  If any

11    difference appears to you between the law as I give it to

12    you and the law as they recite it, you are, of course, to be

13    governed by the law as I give it to you.

14         And similarly, if there's any difference

15    between the testimony and the evidence as you recall it and

16    the testimony and the evidence as the attorneys state it,

17    it's your recollection that will control.

18         All right.  You may proceed, Mr. Newby.

19         ATTORNEY NEWBY:  Thank you.

20         May it please the Court.

21         CLOSING ARGUMENT BY THE GOVERNMENT

22         ATTORNEY NEWBY:  Ladies and gentlemen of the

23    jury.

24         Over the past year or so, you've probably heard

25    commentators remark about and use the metaphor that

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    homeowners have gotten themselves into financial trouble by

2    using the equity in their homes as ATMs; that is, they would

3    withdraw money based on the equity in their houses and spend

4    it on unwise things and get themselves overextended.

5            The story you've just heard over the past

6    two days described how a group of people working together as

7    a team, sharing resources, sharing the same tools, used

8    equity in homes literally as a cash machine.  Only the homes

9    that they were using as their cash machine were not their

10   own.  They weren't borrowing against their own accounts.

11   They were stealing from other people.

12           That's what this case is really about.  It's a

13   group of individuals who got together to steal identities

14   and then use those stolen identities to steal enormous sums

15   of money.

16           It's the government's position that the

17   defendant Henry Obilo was an important member of that

18   conspiracy.

19           As you heard from several witnesses, a scheme

20   of this size's complexity, which involved stealing lots of

21   identities over the Internet, using paid services and the

22   like, disguising voices, disguising phone numbers, was more

23   than just one person could do.

24           It required a team effort.  It required shared

25   resources.  It required a division of labor.  It required

1    some inside knowledge, special skills, and how certain bank

2    procedures worked; things like MBK  code, CIA codes that

3    allowed banks like Bank of America to forward and rush

4    checks and debit cards to certain people.

5            Ladies and gentlemen, the evidence you have

6    heard has proven beyond any reasonable doubt that the

7    defendant was part of that group.  He used those special

8    skills, he used SpoofCard, he used the identities of other

9    people just like people like Paula Gipson, Ezenwa

10   Onyedebelu, Tobechi Onwuhara, and Q, Abel Nnabue, did.

11           You heard at the beginning of the trial, as the

12   judge will instruct you in a few moments, the government has

13   brought to you one criminal charge against the defendant:

14   And that is that he was a member of a conspiracy to commit

15   bank fraud.

16           After Mr. Iweanoge and I have finished talking,

17   the judge will describe exactly what the law means on

18   conspiracy.  And he'll tell you what the government had to

19   have shown in order for you to reach a verdict of guilty

20   beyond a reasonable doubt.

21           Let's review the evidence piece by piece that

22   the government believes shows beyond any reasonable doubt

23   that there was a conspiracy and that the defendant was a

24   member of that conspiracy.

25           The first issue you that you will have to

1    confront is whether a conspiracy existed.  The evidence that

2    we have presented at trial for the last two days has shown

3    the very essence of a conspiracy.  It was a partnership in

4    crime.

5           The government doesn't have to prove that there

6    was a solemn written agreement to commit a particular crime.

7    It just needs to show that there was an understanding

8    between more than one person as to what the object and

9    purpose of this confederation was.

10          You heard from Paula Gipson.  You heard from

11   Ezenwa Onyedebelu.  You heard from Abel Nnabue.  There was

12   no doubt on that the purpose of their confederation was.  It

13   was to steal a whole lot of money; hundreds and hundreds and

14   hundreds of thousands of dollars.  Sometimes it would be

15   wired domestically; sometimes it would be wired overseas.

16   But in the end, it would all come back to them.  They would

17   take their cut.  They'd move on.  They'd hit another victim.

18          Each of those individuals has pleaded guilty to

19   being a part of that conspiracy.  They have admitted it.

20   More than that, they identified the defendant Henry Obilo as

21   another one of their team, another member of this

22   conspiracy.

23          Now, how did this conspiracy work?  How did it

24   achieve its purpose?

25          The first thing they had to do was to steal the

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    identities of people with large home equity lines of credit.

2    And that's what they did.  They did it right here in the

3    Eastern District of Virginia and across the country.

4              Toby Onwuhara and others would develop

5    essentially a hit list, a list of targets; names, Social

6    Security numbers, dates of birth.  They'd use things like

7    tracers.info, List Source, Merlin Data, as you heard Paula

8    Gipson testify, to develop a profile on individuals.  They'd

9    target people with large HELOCs, houses worth often more

10   than a million dollars.  That's who they would focus in on.

11             Once they got that list, they would narrow it

12   down, get more information, build their target profile,

13   essentially identify a flaw in the credit report --

14   freecreditreport.com website that would allow them to get in

15   and get someone else's credit report.  Once they had access

16   to that information, they could see exactly where these

17   individuals' accounts were, what banks, what balances they

18   had, and that's when they would call the banks.

19             How would they do that?

20             You heard from three members of the conspiracy,

21   Paula Gipson, Ezenwa, and Abel Nnabue, that often the people

22   would use SpoofCard.  We've heard quite a bit of testimony

23   about SpoofCard and how it works.

24             It's essentially a service, an online service,

25   where you call in, dial a 1-800 number, you enter an account

1    number that's already been set up, you dial the number that

2    you want to call, and you dial the fake number that you want

3    to appear in the caller I.D. of the financial institution.

4    You heard Paula Gipson.  She told you exactly how it's done

5    because she did it.

6              Once that was done, the financial institution

7    would have no reason to believe that it was anyone other

8    than the account holder calling in because that's whose

9    number would show up on their caller I.D.  And, of course,

10   they already had the information, the personal information,

11   on this individuals.  They had their Socials.  They knew

12   their dates of birth.  Sometimes they even knew their

13   mother's maiden name.

14             How did they find out that?

15             Paula Gipson testified that sometimes they

16   would check ancestry.com, another website.  That would give

17   them that type of information to get into the account.

18             Once they're in the account, that's when they

19   would really get to work.  They would ask for a wire

20   transfer request form.  Sometimes it would be e-mailed to

21   them.  You heard it was e-mailed, in the Robert Short case,

22   to an e-mail address called allstateassociates@yahoo.com.

23   Abel Nnabue testified that was his e-mail address.  He used

24   that to communicate with Toby and others to share

25   information in furtherance of the scheme.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          Sometimes it would be faxed.  It would be faxed

2     to an e-fax number, as Paula Gipson testified and as Abel

3     Nnabue testified.  E-fax was just a service that lets you

4     receive faxes in a e-mail account.

5          Once the wire transfer form was received, they

6     would fill it out, fax it back to the bank, and the bank

7     would proceed with the wire transfer.  In fact, in the case

8     of James Witt, the account holder from the State Department

9     Federal Credit Union, there was no wire transfer form that

10    needed to be faxed.

11         Tobechi Onwuhara just typed up a form, accessed

12    a signature of James Witt, affixed that signature to the

13    form, faxed it off to the bank, bam, $488,000 gone just in

14    the blink of an eye.

15         But how did they get access to these

16    signatures, legitimate signatures?  You heard James Witt.

17    That was his signature.  How did they get that?  He didn't

18    put it there.

19         Well, we heard Abel Nnabue testify that they

20    would get access through paid services, paid mortgage

21    databases, fraudulently and obtain these signatures.  Then

22    you would use a program like Photoshop, and they would just

23    cut and paste it, print it out, and fax it off.  The bank

24    would have no reason to believe that that was anything other

25    than a legitimate request.

1    So what would happen next?  If the wire didn't

2    go through successfully, if it got hung up somewhere along

3    the way in the authentication process while talking to a

4    bank rep, hang up, move on, hit another account.  It wasn't

5    worth wasting time.

6    You heard Ezenwa Onyedebelu testify he heard

7    members of the conspiracy make hundreds and hundreds and

8    hundreds of calls over a several month period.  He himself

9    made many calls.

10   This was not just a group of friends with some

11   shared background who had gone to school together goofing

12   around playing phone pranks occasionally trying to steal

13   some money.  This was an organized effort.  This was an

14   assembly line.

15   Get the information, process the information on

16   victims, get the credit reports, farm that out to other

17   members of the conspiracy like Henry Obilo, the defendant.

18   Like Paula if it's a female account holder.  Like Ezenwa.

19   Like Abel Nnabue.  They do more of the work.  The wire goes

20   through.  If it goes through, then the money comes back into

21   the country, and Toby distributes the proceeds.

22   It's like working on commission if you're a

23   salesperson.  You make a sale, you get a piece of the cut.

24   You get a piece of the proceeds.  They make a fraudulent

25   wire, they get a cut of it.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          Now, you heard or lot of testimony about how

2     they would get those proceeds.  The defense has asked in

3     cross-examinations of several of the co-conspirators, "Did

4     you get wire transfers?"

5               "Did you get them from Precious Matthews?"

6               "Brandy Anderson?"

7          In some cases, yes, that's what the evidence

8     showed.  In other cases, they got it in cash.  Every single

9     one of those co-conspirators testified that they received

10    cash in hand from the leader of this conspiracy, Toby

11    Onwuhara.

12         Paula Gipson received cash, $15,000 to $18,000

13    from Toby.  Ezenwa Onyedebelu received cash.  Abel Nnabue

14    got money from his girlfriend or wife.  Brandy Anderson

15    wired it to her account.  But then he went to Nigeria and

16    got $100,000 in cash from another member of the conspiracy.

17         By the way, that was the same trip that Tobechi

18    Onwuhara was on with the defendant Henry Obilo in Nigeria.

19    Cash was the way that they distributed the proceeds of this

20    conspiracy.

21         Now, one of the other issues that you're going

22    to have to address is whether there was some conduct in

23    furtherance of this conspiracy that took place here in the

24    Eastern District of Virginia.  We've already had a

25    stipulation that the judge read into the record before the

1    lunch break -- there were three separate stipulations.

2              One was that the State Department Federal

3    Credit Union is a financial institution.  It's a credit

4    union.  It does business in the United States.  It's located

5    in Alexandria, Virginia in the Eastern District of Virginia.

6    It's federally insured.

7              Second, United States Senate Federal Credit

8    Union located here in Alexandria, federally insured.  It's

9    in the Eastern District of Virginia.

10             Bank of America, there was also a stipulation

11   that it was federally insured.  It's a bank licensed to do

12   business and does business in the United States.

13             So there really should be no dispute that

14   financial institutions were at issue here and that they were

15   financial institutions in if United States.  There was

16   testimony from John Hayes from United States Senate Federal

17   Credit Union.  He's the CFO.  He testified that all calls

18   routed in through the United States Senate Federal Credit

19   Union are routed through the Alexandria call center.

20             Online accesses to accounts like we saw

21   evidence of fraudulent accesses to Robert Short's account

22   come in through computers based here in Alexandria,

23   Virginia.

24             Similarly, the State Department Federal Credit

25   Union, you heard testimony from Larry Plassmeyer.  They're

1    located here in Alexandria, Virginia.  The victim James Witt

2    lived in Clifton, Virginia.

3         The third big issue that you're going to have

4    to decide -- the final issue that you're going to need to

5    decide is whether the defendant Henry Obilo intentionally

6    and willfully joined this conspiracy and was a member of it.

7         Again, it's the government's position that

8    there can be no reasonable doubt that he was a member of the

9    conspiracy, the very conspiracy that Abel Nnabue, Ezenwa

10   Onyedebelu, and Paula Gipson testified about and described

11   in detail and that they pled guilty to being members of.

12        So what's the testimony that proves that?

13        Paula Gipson, recall her testimony.  She was

14   the very first witness.  She testified that she saw the

15   defendant in Ezenwa Onyedebelu's apartment in the spring of

16   2008 and that he was holding credit reports of other people

17   and he was receiving a check book from another member of the

18   conspiracy she identified as Nokoro.  He was in an argument

19   with Abel Nnabue over getting some of the funds that were

20   supposed to have come through from a fraudulent wire

21   transfer that the defendant Abel Nnabue had worked on.

22        They were in the apartment of Ezenwa

23   Onyedebelu.  He was an admitted member of the conspiracy.

24   She was there with Tobechi Onwuhara.  He was there going

25   through credit reports in furtherance of this very same

1    seem.   That's one piece of evidence.

2            Two, you heard Ezenwa Onyedebelu.  He knew even

3    more about the defendant.  He testified that on several

4    occasions he took cash from Tobechi Onwuhara who everyone

5    that you've heard from, all the three members of the

6    conspiracy who testified in brief, was the leader of this

7    conspiracy.

8            He took cash from Toby Onwuhara at Tobe's

9    direction to give to the defendant Henry Obilo as his cut.

10   He took cash from Henry Obilo to give it to Tobechi Onwuhara

11   for participating in this conspiracy.  They were sharing the

12   proceeds.  They were members of the same conspiracy.

13           And more than that, Ezenwa Onyedebelu testified

14   that he personally witnessed the defendant making phone

15   calls to financial institutions acting as someone else,

16   either an account holder or an employee.  He witnessed that

17   on several occasions.

18           You also heard from Abel Nnabue, the

19   incarcerated person, who testified today.  He also testified

20   that he witnessed Henry Obilo, the defendant, making

21   fraudulent phone calls to financial institutions on at least

22   two occasions.

23           One was in Florida.  And where?  At Tobechi

24   Onwuhara's house in Florida, at the house of the leader of

25   this conspiracy.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          Second, he saw him making calls in Texas.

2          Three members of the conspiracy have all

3     testified under oath that the defendant was a member of this

4     conspiracy.  Two of them saw him make calls.  One of them

5     brought cash to him and took cash from him to give to the

6     leader of the conspiracy.

7          Then, of course, there were the recorded phone

8     calls that you listened to.  Those were captured on

9     SpoofCard.  We heard Government Exhibits 20, 21, and 22.

10    Ezenwa Onyedebelu testified that the voice on those calls

11    was the defendant Henry Obilo.

12         Ezenwa Onyedebelu testified that in Exhibit 20

13    where the caller identified himself as Brian Kelly, a bank

14    manager -- or financial manager at Bank of America who was

15    trying to do a $385,000 wire transfer for George Frazier,

16    that that was, in fact, the defendant's voice.

17         He also testified about Exhibit 21.  That was

18    the call, if you'll recall, in which the caller claimed he

19    was Louis Fraser.  He was trying to transfer $38,200.

20    Again, Ezenwa Onyedebelu testified that was Henry Obilo's

21    voice.

22         Abel Nnabue listened to the very same calls.

23    He knew the defendant.  He traveled to Nigeria with him.  He

24    spent time with him.  That was Henry Obilo's voice.  That

25    was Abel Nnabue's testimony.

1          You also heard from George Frazier and Louis

2     Fraser, the two account holders at Bank of America whose

3     accounts were targeted on Exhibits 20 and 21.  They

4     testified they didn't make those calls.  George testified

5     that he was not on a three-way call with Brian Kelly trying

6     to wire $385,000 out of his account.

7          In fact, when he landed back in Phoenix after a

8     trip to Florida and received frantic calls about whether to

9     authorize this $385,000 wire transfer, he knew that

10    something was up.  He called in and he canceled it.  He did

11    not authorize those transfers.

12         Louis Fraser similarly testified he did not

13    make that call trying to transfer $38,200.

14         More than that, you heard testimony from

15    Detective Pak.  He did some research into who Brian Kelly

16    is.  Brian Kelly was dead at the time these calls were made.

17    He had been dead for five months.  You saw the certification

18    from the State of Florida.  He died in April of 2007 after

19    leaving Bank of America's employ.  It couldn't have been

20    Brian Kelly who was making those calls.  It was the

21    defendant.  That's what the evidence has shown beyond a

22    reasonable doubt.

23         Now, there were tools that the defendant shared

24    as part of his membership in this scheme, tools that he

25    shared with other members of the conspiracy.  Detective Pak

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    laid it out in quite a bit of detail.  If you recall on

2    Government's Exhibit 18, that is actually a demonstrative

3    exhibit to demonstrate the testimony that you've heard and

4    the evidence that's been presented.  It will not go back to

5    the jury room with you.  But it does illustrate these

6    points.

7              Recall that Detective Pak identified Government

8    Exhibit 16 and Government Exhibit 22.  Government

9    Exhibit 16, that was a SpoofCard call that was identified as

10   having Tobechi Onwuhara's voice associated with it.  Paula

11   Gipson testified that that was Tobe's voice on that call.

12   It was a call to USAA Bank.  The phone number associated

13   with that call calling into SpoofCard in the SpoofCard

14   records was (214) 597-2254.  That's the phone number that

15   was used, the actual cell phone.

16             Government's Exhibit 22 was a SpoofCard call

17   that was recorded on account ending in 949.  That was a call

18   that was identified by Abel Nnabue and Ezenwa Onyedebelu as

19   having the defendant Henry Obilo's voice.  It was another

20   call relating to the attempted wire transfer from Louis

21   Fraser's account, except that time it was an individual

22   identifying himself as Leonard, another Bank of America

23   employee.

24             The SpoofCard records show that that phone call

25   was made from the same number that Tobechi Onwuhara had

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1   placed this phone call to USAA Bank.  Toby, Henry, they used

2   the same phones.  Part of the same conspiracy.  Both calling

3   banks, both trying for defraud banks and their account

4   holders.

5           THE COURT:  You have a little less than

6   ten minutes left.

7           ATTORNEY NEWBY:  Thank you, your Honor.

8           We have also seen evidence that the defendant

9   Henry Obilo used the same SpoofCard account -- shared

10  SpoofCard account as Tobechi Onwuhara.  That should come as

11  no surprise.  Paula Gipson testified that they shared

12  accounts.  She would get the account from Toby or someone

13  else, and they placed these calls.  She didn't know how the

14  accounts were paid for.  They were just set up.

15          Ezenwa Onyedebelu testified that members of the

16  group would use identities that they had stolen from other

17  people using Social Security numbers and their dates of

18  birth to buy these Green Dot cards, prepaid debit cards,

19  from places like Walgreens.  Then they would use those cards

20  to set up SpoofCard card accounts online.

21          So really it should come as no surprise that

22  these SpoofCard accounts are not registered in the names of

23  any of the defendants.  They're too smart for that.  They

24  were using stolen identities.  If they can use someone

25  else's identity, why would you use your own if you're

1    committing a crime?

2          Similarly, Paula Gipson testified that they

3    would use prepaid cell phones that were untraceable to make

4    these calls.  The evidence has shown that the defendant used

5    them and all the other members of the conspiracy who

6    testified today used them in furtherance of this conspiracy.

7          Ladies and gentlemen, it's the government's

8    position that the evidence that has been presented here at

9    trial today and yesterday or through the testimony of

10   witnesses and the documents you have seen, the phone calls

11   that you have heard, shows beyond any reasonable doubt the

12   defendant Henry Obilo was a member of this conspiracy to

13   commit bank fraud.

14         Accordingly, we would ask that when you return

15   to the jury room after being instructed by the judge, that

16   you reach a verdict of guilty.

17         Thank you.

18         THE COURT:  All right.

19         Mr. Iweanoge, you may proceed.

20         ATTORNEY IWEANOGE:  Thank you, Judge.

21         May it please the Court, counsel.

22         CLOSING ARGUMENT BY THE DEFENDANT

23         ATTORNEY IWEANOGE:  Ladies and gentlemen of the

24   jury, good afternoon to you.

25         On behalf of Mr. Obilo and the government,

1    again I would like to thank you for taking out the time from

2    your other duties to attend to the jury summons, to pay

3    close attention to this case from the beginning to the end,

4    and take notes as well.  And at some point this afternoon,

5    you're going to have a chance to go back into the jury room

6    to be able to deliberate on this case.

7                Ladies and gentlemen of the jury, men and women

8    occasionally stumble upon the truth, then they each pick

9    themselves up and hurry off as if nothing happened.  Not

10   this case.  Not this time.  Because Mr. Obilo has not been

11   proven guilty beyond a reasonable doubt.

12               I remember standing here when this case started

13   yesterday, and I told you to keep an open mind.  That when

14   the witnesses testify, pay attention to what the witnesses

15   will be saying.  You're going to see documents in evidence.

16               And at the end of the day, when it's all said

17   and done and you go back into the jury room to deliberate,

18   you will come to one conclusion:  That the government has

19   not proven each and every element of the offense beyond a

20   reasonable doubt.

21               Why I do say that, ladies and gentlemen of the

22   jury?

23               Because they have not.

24               Reasonable Doubt No. 1, ladies and gentlemen of

25   the jury.  I made you a promise when I stood here yesterday

1  that you're not going to hear anybody take that stand to say

2  that my client received a dime from this, quote/unquote,

3  "conspiracy," ladies and gentlemen that he was a member of.

4  Surprise, surprise.  Somebody showed up.  Ezenwa Onyedebelu.

5          Ezenwa Onyedebelu showed up.  Paula Gipson

6  showed up.

7          And after Onyedebelu, who else showed up?

8          Abel Nnabue.  Paula Gipson, I told you, will be

9  Paula Gipson.  Ezenwa Onyedebelu will be Eze.  Abel Nnabue

10  will be Q.  Paula Gipson pled guilty before the judge.  She

11  has not even been sentenced, as she told you.  She's

12  awaiting sentencing.  She has an agreement with the

13  government to cooperate.

14          Remember what your mother -- our mothers used

15  to tell us many years ago; that if you cannot believe the

16  messenger, you definitely cannot believe the message.

17          Ladies and gentlemen or the jury, for lack of a

18  better expression, this case has been built like AIG and

19  it's fallen like a pack of cards.  Because the only evidence

20  the government is showing you are people who pled guilty

21  before T.S. Ellis, III.

22          Some of them have been sentenced.  They are

23  working off the time they're doing.  One is expecting to go

24  in for 37 months.  The other is doing 54 months.  Paula

25  Gipson doesn't even know what her fate is.  And they're not

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    expecting something from the government in return for their

2    testimony.

3              Am I making it up or is it what the evidence

4    shows?  I submit to you that that's what the evidence shows.

5              Let's take Paula Gipson, the first witness that

6    the government called.

7              "Ms. Gipson, isn't it true that when you spoke

8    to the detectives and the special agents, Etienne and Lynd,"

9    L-y-n-d, "back on the 5th of August, that you never said

10   anything about Henry Obilo being a member of the

11   conspiracy?"

12             "Huh-uh.  No.  I didn't talk to them in August.

13   No, it was actually September at the U.S. Attorney's Office

14   with my attorney."

15             "Do you recall talking to them August the

16   15th?"

17             "Uhm, that date sounds right."

18             "Ma'am, do you not recall talking to them on

19   the 5th of August?"

20             "Yes, yes."

21             "Isn't it true that on the 5th of August 2008

22   you named members of this conspiracy and Henry Obilo was not

23   one of them?"

24             "Yes."

25             "Isn't it true that on the 15th of August,

1    ten days later, you spoke to Special Agent Nail and you were

2    asked to name the members of conspiracy -- isn't it true

3    that you did not name Henry Obilo?"

4                "Yes, that's true."

5                "In fact, Ms. Gipson" -- I went through the

6    names.  Tobechi Onwuhara; Abel Nnabue, Q; Ty; the one that

7    sells drugs in New York, her ex-boyfriend Chikezie.  And I

8    asked her about:

9                "Isn't it true that after all you said about

10   Chikezie, his case was dismissed, after you said he was

11   making all these calls."

12               Her answer -- your recollection controls,

13   ladies and gentlemen of the jury.

14               I said:

15               "You came into the grand jury.  You took an

16   oath."

17               It's not like you take an oath before the grand

18   jury that is different than the oath you take in the

19   courtroom when you come in to testify.

20               "You took an oath before the grand jury to

21   testify truthfully.  Isn't it true, ma'am, that in your

22   testimony under oath before the grand jury, you were asked

23   to name the members of this conspiracy, and that you did not

24   name Henry Obilo?"

25               And the answer is, "Yes, I did not."

1          I know you're saying to yourself, why would

2     she -- why would she do it in the courtroom?

3               THE COURT:  Stay at the podium, please.

4               ATTORNEY IWEANOGE:  Judge, there's something

5     standing there.

6               THE COURT:  Mr. Wood, put it in front of the

7     picture.

8               Go ahead, Mr. Iweanoge.

9               ATTORNEY IWEANOGE:  Thank you, Judge.

10               And you're saying to yourself, "Why would she

11     come into court since August of '08 not knowing anything

12     about Henry Obilo after six people have pled guilty,

13     according to the Detective Pak -- why would she show up now

14     and all of a sudden remember Henry Obilo?"

15               The judge is going to give you instructions.

16     You're going to use your life experiences.  You're allowed

17     to do that.

18               You start to ask yourselves, ladies and

19     gentlemen of the jury, does her memory get better with age

20     or does it get better with time or is there something else

21     at work here.  The judge is going to instruct you about the

22     credibility of a witness who has pled guilty, that you have

23     to weigh their credibility and their testimony with great

24     care and decide if you're going to believe it.

25               Because, ladies and gentlemen of the jury, she

1    expects the government and -- expects the government to file

2    a Rule 35 motion for her to get a reduction in her exposure.

3    This is a lady -- young lady that did something in relation

4    to bank fraud in the past.  She finished her time.  She

5    didn't move on to big and better things.  She went right

6    back to doing the exact same thing.

7            And then the government says you should believe

8    her after she never said anything about Henry Obilo, not

9    even to the grand jury, not under oath, that you should

10   believe her and convict Mr. Obilo.

11           Ladies and gentlemen of the jury, with respect

12   to Paula Gipson, you'll recall when I asked her, "Ma'am, did

13   you see a photograph -- were you shown a photograph?"

14           And she said, "Yes.  Yes.  I don't recall.

15   Maybe in January."

16           Ladies and gentlemen of the jury, ask

17   yourselves this question:  You're charged in this case.

18   You're cooperating with the government.  And from August

19   until you walk into this courtroom, the name Henry Obilo

20   never showed up.

21           No pun intended, but I would submit that the

22   only thing that Abraham Lincoln said with respect to

23   individuals like Paula Gipson -- no pun intended -- "It's

24   better to remain silent and be considered," dot, dot, dot,

25   "than to speak and remove all doubt."

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          Ezenwa Onyedebelu, he initially lied to the

2     government because he's in communication with the "head,"

3     quote/unquote, of this conspiracy, T or Toby, as Detective

4     Pak told you.

5          And with respect to Ezenwa Onyedebelu, he's in

6     communication with the leader of the group who's a fugitive

7     and doesn't even communicate it to the government.  Talk

8     about sleeping with the enemy.

9          And then all of a sudden he shows up after

10    telling the detectives investigating this case and the

11    agents that Mr. Obilo is involved with Charles Obassui, who

12    is his business partner with something else in Miami, he

13    shows up here and he says to you, "Yes, I actually saw him

14    there.  And he was making calls.  He was doing this and he

15    was doing that."

16          "Did you actually give him any money?"

17          "Yes.  I sometimes gave him cash; and sometimes

18    I paid money to his account."

19          "Where does he bank?"

20          "Washington Mutual."

21          "Did you pay money to his account?"

22          "Yes, I did."

23          "Did you bring that to the attention of the

24    government?"

25          Your memory controls as to what he said.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          But then we have the sworn law enforcement

2     officer, Detective Pak, who took the stand today, not even

3     24 hours ago, and the two last questions I asked him,

4     two, specifically:

5               "As the lead investigator in this case, in the

6     course of investigating this case, did you see any evidence

7     that Henry Obilo received a dime, any money?"

8               And you heard his answer.  "No."

9               "Did you see or hear or even have any

10     documentation to show that Mr. Henry Obilo received any

11     money anywhere in his bank account?"

12               You heard his answer.  "No."

13               "Where does Ezenwa Onyedebelu come up with this

14     information?"

15               "I gave him cash, and then I paid some into his

16     account."

17               Don't you suppose that if that was to be the

18     case, you would see -- part of the evidence, ladies and

19     gentlemen of the jury, Bank of America records.  Part of the

20     evidence, that certificate of Mr. Kelly.

21               Do you think that if there was an account at

22     Washington Mutual that money was paid into by Mr. Onyedebelu

23     for the benefit of Mr. Obilo that you would not see it in

24     this courtroom?

25               Agent (sic) Pak even told you about his own

1   number, the (347) number, that he saw when he was returning

2   from Nigeria.  You would think that that money would be

3   traceable to him.  That's who you put that number to, ladies

4   and gentlemen of the jury.

5          You cannot trust the messenger who's looking to

6   work off his 37 months.  He has not started yet.  He's in

7   the good graces of the government.  He's still at home

8   waiting to report.  And he's looking and expecting his

9   sentence to be reduced based on his cooperation.

10          Ladies and gentlemen of the jury, Q -- Abel

11   Nnabue aka testified today -- I apologize if I'm looking

12   down -- he testified today.

13          Remember what Paula Gipson told you yesterday:

14   "I saw Mr. Obilo having an exchange with Q,"  also the real

15   name is Abel Nnabue, "about some account that they did and

16   money that he did not receive."

17          You heard Mr. Nnabue testify today.  I heard

18   the government asking him specifically "How many times -- or

19   what did you see Mr. Obilo do?"

20          He said, "I saw him making two phone calls:

21   One in Miami, one in Dallas."  I'll get to that in a minute.

22          "Did you hear him say anything about having a

23   disagreement or an exchange with Mr. Obilo about money?"

24          Paula Gipson testified she received money.  She

25   said about 18,000.  You heard me ask Mr. Onyedebelu "There

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    was no transaction of 70,000 wired into your account?"

2                    "Yes."

3                    You heard -- the government asked Mr. Nnabue,

4    Q, "While in Nigeria, a hundred thousand was handed to you

5    from a transaction?"

6                    "Yes."

7                    And then in my cross-examination, I asked him

8    "You all went to visit your homeland?"

9                    "Yes."

10                    "You all are United States citizens?"

11                    "Yes."

12                    "While you were in Nigeria, you guys did not

13   conduct any fraudulent activity, did you?"

14                    "No."  He said they did not do anything illegal

15   in Nigeria.

16                    He received his hundred thousand in Nigeria.

17   Did you hear him say that he gave any part to Henry Obilo?

18                    Now, you get to his statement.  He says, "I saw

19   him make a call in Miami, yeah."

20                    Remember he said, "We didn't review the

21   discovery.  We just got charged.  Our lawyers got the

22   papers.  Then we came into court and pled guilty."

23                    As Bob Dole said when he was running for

24   election, "I may have been born at night, but it was

25   definitely not last night."

1          Ladies and gentlemen of the jury, your charged

2    with bank fraud.  You're facing 54 and 37 months, and then

3    you don't review the discovery and you and your lawyer show

4    up in court and you just plead guilty?

5          The problem with the government witnesses goes

6    back to what Bill Clinton said some years ago.  "When the

7    other side who are geologists find themselves in a hole,

8    they will continue to dig and be asking for bigger shovels.

9    But when pragmatists find themselves in a hole, they will

10   stop digging to look around to see what's wrong."

11         On one occasion, they did.  After all their

12   cooperators kept mentioning "Chikezie did this.  Chikezie

13   did that," yes, they charged him.  But on one occasion, at

14   least they looked around and said, "Hmm, wait a minute.

15   This doesn't sound about right.  We're going to dismiss the

16   case against him."

17         When you return your verdict of not guilty

18   because the government has chosen not to look for and say

19   Mr. Obilo is not part of this conspiracy, you're going to

20   return a verdict of not guilty and tell them that they have

21   chosen not to do it themselves.  Because pragmatists, ladies

22   and gentlemen of the jury, don't ask for bigger shovels.

23   They look around to see what's wrong.

24         This case has doubts written all over it from

25   the beginning to the end.  Look at all the witnesses that

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1  they presented to you.  They are probably going to stand up

2  in their rebuttal because they have all the burden and say,

3  "Uh-oh.  They're not our friends.  They're his friends."

4  But then remember who is sleeping with the enemy today?

5  They are.

6         Ladies and gentlemen of the jury, this case has

7  so many doubts written all over it.  You heard about the use

8  of SpoofCard.  You heard about changing voices.  The people

9  that came in to identify voices are the people who are

10  looking to work off time from what they are facing.

11         And then Detective Pak says, "These are the

12  voices -- I believe these are the voices."  He talked about

13  distortions that will happen with the SpoofCard.

14         You have to ask this to yourselves, ladies and

15  gentlemen of the jury, to clear all doubt:  Based on a

16  Polish proverb that says, "Doubt is the mother of

17  intelligence," to clear all doubt, why -- why were these

18  voices not analyzed so that we know exactly beyond a

19  reasonable doubt as opposed to listening to cooperators tell

20  us that this is who that person is?

21         They are looking to work off time.  They can

22  say and do anything just to get out of jail.  But this is

23  not Monopoly.  There's not a get-out-of-jail-free card,

24  ladies and gentlemen of the jury.  You have to return the

25  only verdict in this case, which is a not guilty verdict.

1          With the Spoof where you can disguise your

2     voice, why would anybody be calling with their real voice?

3     And they say, "Oh, that's Mr. Obilo."  It's a (347), and

4     it's supposed to be the number when he was returning from

5     the airport.  They missed the call and then the voice was

6     not him.  But then all the other numbers that are not his

7     numbers all of a sudden are making calls with his number.

8          If Mr. Witt, if Mr. Short and if Mr. Frazier

9     and Mr. Fraser were punked using this SpoofCard on their

10    accounts, what makes Mr. Obilo any different?

11         Ladies and gentlemen of the jury, in the

12    judge's instructions -- you're not going to have the

13    instructions in the jury room, ladies and gentlemen of the

14    jury.  So please pay attention when the judge gives you the

15    instructions.  One of the instructions the judge is going to

16    give you that is really important is about membership in a

17    conspiracy.

18         The judge's instruction is going to tell you

19    that merely being present, doing similar things, associating

20    with people who are doing illegal things, does not make you

21    a member of the conspiracy.  It's Henry, friends with bad

22    people.  He's not on trial for choosing his friends.  He's

23    on trial for bank fraud.

24         Henry's friends were some of the individuals

25    that you heard their names, yes.  But he's not on trial for

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    friendship.  He's on trial for bank fraud.  At the end of

2    the day, ladies and gentlemen of the jury, you have to

3    follow the money.

4              Who becomes a member of a conspiracy?

5              According to Detective Pak, $8 million, and

6    they end up with zero.  And the government says he's a

7    member of the conspiracy.  He received cash.

8              Like in the movie as Cuba Gooding says, "Show

9    me the money."  The lead investigator says, "I can't find

10   any money paid to him."  The judge's instruction is going to

11   tell you it's not about conjecture.  You have to have this

12   case grounded on the government proving each and every

13   element beyond a reasonable doubt.

14             When you're in the jury room deliberating on

15   this case, part of the judge's instruction will be that as

16   jurors, you're not partisans.  You're supposed to talk

17   amongst yourselves and discuss this case based on the

18   evidence you heard in the courtroom.  But you should not

19   agree just for the sole purpose of reaching a verdict or do

20   something that would do violence to your conscience.

21             In other words, Easter's approaching.

22   Tomorrow's Thursday.  You may have travel plans.  But then

23   in your mind you're saying to yourselves "He's probably

24   guilty, but they have not proven beyond a reasonable doubt.

25   God, I have travel plans for tomorrow.  I don't want to come

1    back here tomorrow.  Let's vote.  I'm going to pick up the

2    phone and call the judge and say, 'I changed my mind.'"

3            That only happens in the movies.  It's not real

4    life, ladies and gentlemen of the jury.  Once you decide

5    this case, the case is over.  If you're saying to yourself

6    after you've deliberated with all the members of the jury --

7    if you say to yourself "He's probably guilty," that means,

8    ladies and gentlemen of the jury, that you have to acquit

9    because "probably" is not beyond a reasonable doubt.

10           If you're sitting in the jury room and you're

11   deliberating with your fellow jurors and you say to

12   yourselves "Hmm, the government may have proven this by

13   clear and convincing evidence that he's guilty," that means,

14   ladies and gentlemen of the jury, that you have to acquit

15   because "clear and convincing" is not good enough.  It's

16   beyond a reasonable doubt.

17           Ask yourselves, ladies and gentlemen, this

18   question:  If you were in need of heart surgery, would you

19   leave yourself open for Abel Nnabue, Paula Gipson, and

20   Ezenwa Onyedebelu to operate on you?

21           If the answer to those questions are no, ladies

22   and gentlemen of the jury, the only fair verdict to return

23   in this case is a not guilty verdict because that's what the

24   evidence demands.

25           Ladies and gentlemen of the jury, my time is

1      about up.  This is the only opportunity that I'm going to

2      have to talk to you.  The government will have an

3      opportunity to talk to you again because the burden rests at

4      this table.

5              I will ask you, ladies and gentlemen of the

6      jury, as the judge's instruction will tell you, do not rush

7      to judgment.  Tomorrow is another day.  In other words,

8      ladies and gentlemen of the jury, the weekend is

9      approaching, but that should not control the day.

10             Because Abraham Lincoln said that we should

11     have faith that right makes right and that we dare in that

12     faith to do our duty as we understand it.

13             As you do your duty as you understand it,

14     knowing that right makes right, ladies and gentlemen of the

15     jury, and deliberate on this case, there are reasonable

16     doubts written all over it.

17             When Mr. Tyler -- Tyler Newby gets up to talk

18     to you, ladies and gentlemen of the jury, because I won't

19     have that opportunity, you cannot ask him questions, but you

20     can look at him as you're asking him questions.

21             Have him explain to you like you're two years

22     old why would Paula Gipson, who played such a big role in

23     this conspiracy on August the 5th, on August the 15th,

24     appear under oath before the grand jury, and did not name

25     Mr. Obilo as a member of this conspiracy?

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          She's facing sentence and then takes the stand

2     here and then all of a sudden counts him as a member of this

3     conspiracy.

4          When he stands up to talk to you again, look at

5     him and have him explain to you like you're two years old

6     why would Ezenwa Onyedebelu take the stand under oath and

7     tell us that "I gave him money, cash, and I paid some into

8     his account" when your only detective who followed this case

9     from beginning to the end says that there is no money trail

10    on any part of this conspiracy going to Mr. Henry Obilo?

11         When he stands up to talk to you, have him

12    explain to you by looking at him like you're two years

13    old --

14         THE COURT:  Your time is about up.

15         ATTORNEY IWEANOGE:  Yes, Judge.

16         -- why Abel Nnabue would take the stand and

17    tell us under oath that there was no fraud committed in

18    Nigeria.  Ask him if he's given a hundred thousand dollars

19    or sharing any part of the hundred thousand with Mr. Obilo.

20         But the government wants you to make that leap

21    of faith.  That Paula Gipson said that they had an argument.

22    How come Mr. Nnabue did not say anything about that.

23         He will not be able to answer all of those

24    questions, ladies and gentlemen of the jury.  And you can

25    only return one fair verdict in this case, which is not

1    guilty.  But do not submit your individual conscience or do

2    violence to it just for the purpose of reaching a verdict.

3           Finally, ladies and gentlemen of the jury, I

4    thank you for the time and opportunity you've given to this

5    case and by listening to not just myself, but as well as the

6    government and the witnesses in this case.

7           But I'll end on this note with the words of a

8    great philosopher, that when there are doubts written all

9    over a case such as this case, it's better to free the

10   guilty than punish the innocent.  Because Mr. Henry Obilo is

11   an innocent man and hasn't been proven guilty by the

12   government.

13          Thank you, Judge.

14          THE COURT:  All right.

15          Mr. Newby, you have  ten minutes left.

16          ATTORNEY NEWBY:  Thank you, your Honor.

17          REBUTTAL ARGUMENT BY THE GOVERNMENT

18          ATTORNEY NEWBY:  Fortunately, this is a case

19   where the evidence shines a powerful beam of truth through

20   some of the grey that the defense has tried for cast in his

21   closing argument.

22          First, let's recall back to Paula Gipson's

23   testimony yesterday morning.  You'll recall there was

24   questioning on cross-examination.  "Did you identify -- did

25   you mention by name Henry Obilo in your grand jury

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1   testimony?"

2           And truthfully, yes, she answered she did not.

3           There was a follow-up question by the Court.

4           "Were you asked about Henry Obilo?"

5           "No," she said.  She was not asked in the grand

6   jury about Henry Obilo.  She testified that she identified

7   members of the conspiracy that she was asked about.  There's

8   nothing more to that story.

9           She testified again that when she was first

10  asked about Henry Obilo in January and February -- or

11  February of this year by the government, she identified him.

12  She identified what his role was and how she saw him.  And

13  then she testified about that in court yesterday morning.

14  There is nothing more to that story.

15          Yes, she has been convicted.  She pled guilty.

16  She has an agreement to cooperate.  What does that mean?

17  She testified that means she has to tell the truth.  She has

18  to tell the truth.  She took an oath.  She testified her

19  agreement requires her to tell the truth.

20          Ezenwa Onyedebelu, he testified that he saw the

21  defendant making calls and that he gave the defendant cash

22  on multiple occasions and he took cash from the defendant to

23  give to the leader of this conspiracy.

24          Yes, he has been convicted.  Yes, he has been

25  sentenced.  He also has a plea agreement that requires him

1   to tell the truth.  Admittedly, he admitted on

2   cross-examination, as Mr. Iweanoge mentioned, that he had

3   not disclosed voluntarily that he had been communicating

4   with Tobechi Onwuhara prior to his guilty plea.

5          Mr. Iweanoge asked him "After you agreed to

6   plead guilty and enter your plea agreement, you came clean?"

7          And he said, "Yes, I came clean.  I told them

8   about my interactions with Tobechi Onwuhara."

9          He took the oath.  You can be the judge of

10   whether he was credible or not as a witness.  You heard him.

11   You looked into his eyes.  You saw his demeanor.  You're the

12   judge of whether he was credible.

13          There is more to it, though.

14          The stories of Paula Gipson, Ezenwa Onyedebelu,

15   Abel Nnabue, how they describe the scheme and how it worked

16   and who did what, the same story.  It's the same story.

17   They match up.

18          Sure, Paula Gibson didn't testify that she saw

19   the defendant making phone calls.  She saw him with credit

20   reports amongst other co-conspirators, and she testified

21   going through these credit reports of victims was part of

22   the conspiracy.

23          It's what they did.  It was one of the steps in

24   the assembly line.  You get the credit reports, you get the

25   information, you call the banks, you do the wire, and you

1      take the money.  She saw him with the credit reports.

2              Abel Nnabue saw him making phone calls.  That's

3      another step in the conspiracy.  He saw him making phone

4      calls at Tobechi Onwuhara's house in Miami and at Ezenwa's

5      residence in Dallas.

6              Ezenwa saw him making phone calls in Dallas on

7      multiple occasions at his apartment, at hotels near his

8      apartment over the course of several months.

9              They all fill in different pieces of the story,

10     but the underlying theme of how this conspiracy worked is

11     consistent from witness to witness to witness.  The same

12     story.

13             Now, Mr. Iweanoge made -- tried to make a

14     big deal about not having financial records going into

15     Mr. Obilo's account, the defendant's account.  And if you'll

16     recall -- your recollection controls -- Detective Pak was

17     asked that question.  "Do you have records -- did you pull

18     records on Mr. Obilo's accounts?"

19             And he testified, "No."  He didn't testify he

20     never heard anything about money going to Mr. Obilo from

21     other members of the conspiracy.

22             He was sitting right there just a few feet away

23     from you when Ezenwa Onyedebelu testified he gave him cash.

24     That's what the testimony was.

25             Moreover, it's not necessary that the

1    defendant (sic) traced funds into Mr. Obilo's account.

2    That's a red herring.  It's not a requirement of a

3    conspiracy.  You'll get the instructions in a few moments.

4    You'll realize that's not a requirement.  It's one step in

5    how this conspiracy worked, but it's not a requirement.

6    What's required is that he intentionally and willfully

7    became a member of this agreement, this conspiracy, this

8    scheme knowing what its purpose was.

9              Ladies and gentlemen, the evidence is clear

10   based on his conduct that he knew exactly what was going on

11   because he was performing all the steps.  There wasn't a lot

12   of mention about these phone calls in Mr. Iweanoge's

13   closing.

14             There's a pretty good reason for that.  Because

15   you had two co-conspirators who knew Mr. Obilo well, who

16   knew his voice, who spent a lot of time with him, identified

17   his voice conclusively.  That was his voice impersonating

18   account holders and impersonating a Bank of America former

19   employee who had been dead for five months.  Two people knew

20   him well.  That's his voice.

21             Detective Pak testified he was listening to

22   hundreds, hundreds of calls.  He testified he was familiar

23   with the voices.  He sat in the same room with the defendant

24   at JFK Airport during a Customs & Border Protection

25   interview.  He recognized his voice right away.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1              Now, Mr. Iweanoge has tried to make some noise

2    about voice alteration on SpoofCard, and Detective Pak

3    testified that is a feature that's available.  But he also

4    testified that he looked through the records of the

5    SpoofCard materials that were provided, and there was no

6    voice alteration used on the phone calls linked to

7    Mr. Obilo.

8              If we could see Exhibit No. 2-1, which you'll

9    have in the jury room, on the first page.

10             These are records that have been stipulated --

11   were admitted into evidence during Detective Pak's

12   testimony.  These are the records produced by SpoofCard.  If

13   you look over about in the middle of the chart at the very

14   top, it says, "voice change."  You'll see in that column --

15   this is the first page -- there's woman, none, none, none,

16   none, woman.

17             If you go to Page 13 of Exhibit 2-1, the bottom

18   two rows, if you look over in about the fourth column from

19   the right, there's a date.  Those are the dates of the

20   calls.  The bottom two -- or three rows start with calls on

21   9/26.  The bottom two are this (404) 717-5884 number.  Those

22   are the calls that were going into Bank of America that were

23   identified and linked to the defendant Henry Obilo.

24             If you go to the next page, the top six rows.

25   Top six rows, again, these are all the calls taking place on

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

9/26.  These are the calls that were linked to the defendant

Henry Obilo.  His voice was identified.  None, none, none,

none, none for voice alteration.  There was no voice

alteration.  There was no voice alteration.  That was the

defendant's voice.  He made those calls.

Two witnesses who know him well testified

that's his voice.  He's impersonating those people.

Detective Pak, he's listened to his voice.  He's listened to

hundreds of calls.  That's his voice.  No way around it.  He

was a member of the conspiracy.

Ladies and gentlemen, the government submits

that all of this evidence that you've heard can really lead

to only one conclusion:  The defendant, beyond a reasonable

doubt, was a member of this conspiracy.  He had credit

reports, made calls in the presence of other known

co-conspirators, received money.

We're not talking about heart surgeons or heart

surgery.  Paula Gipson had been convicted of bank fraud.

Nnabue, conspiracy to change a -- to counterfeit a financial

instrument.  Abel Nnabue had been convicted of access I.D.

fraud, essentially credit card fraud.

They were members of this conspiracy.  They

admitted it.  It's not about heart surgery.  It's a

conspiracy to commit bank fraud.  They already knew how to

do it.

1            When you go back to the jury room after you've

2    heard the instructions, we would ask you to return a verdict

3    of guilty.

4            Thank you.

5            JURY INSTRUCTIONS BY THE COURT

6            THE COURT:  Members of the jury --

7            All right.  Mr. Wood, would you assist the

8    deputy clerk with the tape recorder.

9            You will not have the Court's instructions in

10   writing because they're not in a form available for that,

11   but you will have -- or you may have a tape-recording of my

12   instructions that you may listen to or parts thereof if you

13   wish.  But you're not required to.

14           (Continuing) -- now that you've heard the

15   evidence and the arguments of counsel, it is my duty to give

16   you instructions as to the law applicable in this case.

17           All of the instructions of law given to you by

18   the Court, those given to you at the beginning of the case

19   and those given to you during the trial and these final

20   instructions, must guide and govern your deliberations.

21           Is it working now, Mr. Wood?

22           THE MARSHAL:  Yes, sir.

23           THE COURT:  It is your duty as jurors to follow

24   the law as stated by the Court and to apply the Rules of Law

25   so given to the facts as you find them from the evidence in

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    the case.

2              Now, as I told you earlier, counsel in the

3    course of their arguments and quite properly referred to

4    some of the governing rules of law in their arguments.  If,

5    however, any difference appears to you between the law as

6    stated by counsel and the law as stated by the Court,

7    you're, of course, to be governed by the law as provided to

8    you by the Court in these instructions.

9              Nothing I say in the course of these

10   instructions is to be taken as an indication that I have any

11   opinion about the facts of the case or what that opinion is.

12   It's my not function to determine the facts, but yours.

13             Now, you're not to single out one instruction

14   alone as stating the law, but you must consider the

15   instructions as a whole.  And neither are you to be

16   concerned about the wisdom of any rule of law stated by the

17   Court.  Regardless of any opinion you may have as to what

18   you think the law ought to be, it would be a violation of

19   your sworn duty as jurors if you ignore the law as I give it

20   to you and apply some other law.

21             It would also be a violation of your sworn duty

22   as jurors of the facts to base a verdict on anything but the

23   evidence in this case.  You've been chosen as jurors in this

24   trial in order to evaluate all the evidence received and to

25   decide each of the factual questions raised by the

1       allegations brought by the government in the indictment and

2       the plea of not guilty by the defendant.

3               In deciding the issues presented to you for

4       decision in this trial, you must not be persuaded by any

5       bias or prejudice or sympathy for or against any of the

6       parties in this case or by any public opinion.  You should

7       not be influenced by any person's race, color, religion,

8       national ancestry, or sex.

9               Justice through trial by jury must always

10      depend upon the willingness of each individual juror to seek

11      the truth as to the facts from the same evidence presented

12      to all jurors and to arrive at a verdict by applying the

13      same rules of law given to you by the Court.

14              Now, as I told you at the outset, the law

15      presumes a defendant to be innocent of a crime.  Thus, a

16      defendant, although accused, begins a trial with a clean

17      slate, no evidence against him.  And the law permits nothing

18      but legal evidence presented before the jury to be

19      considered in support of any charge against the accused.

20              So the presumption of innocence alone is

21      sufficient to acquit a defendant unless the jurors are

22      satisfied beyond a reasonable doubt of the defendant's guilt

23      after careful and impartial consideration of all the

24      evidence in the case.  It is not required that the

25      government prove guilt beyond all possible doubt.  The test

1    is one of reasonable doubt.

2              The jury will remember that a defendant is

3    never to be convicted on mere suspicion or conjecture, and

4    the burden is always on the prosecution to prove guilt

5    beyond a reasonable doubt.  The burden never shifts to a

6    defendant, for the law never imposes on a defendant in a

7    criminal case a burden or duty of calling any witnesses or

8    producing any evidence.

9              So if the jury, after careful and impartial

10   consideration of all the evidence in the case, has a

11   reasonable doubt that the defendant is guilty of the charge,

12   it must acquit.

13             Now, there is nothing particularly different in

14   the way that a juror should consider the evidence in a trial

15   from that in which any reasonable and careful person would

16   treat any very important question that must be decided by

17   examining facts, opinions, and evidence.  You're expected to

18   use your good sense in considering and evaluating the

19   evidence in the case and for only those purposes for which

20   it has been received and to give such evidence a reasonable

21   and fair construction in the light of your common experience

22   or of the natural tendencies and inclinations of human

23   beings.

24             If a defendant be proved guilty beyond a

25   reasonable doubt, say so.  If not proved beyond a reasonable

1   doubt, say so.  Keep constantly in mind that it would be a

2   violation of your sworn duty to base a verdict upon anything

3   other than the evidence received in the case and the Court's

4   instructions.

5           Remember as well that the law, as I've stated

6   just a moment ago, never imposes on a defendant in a

7   criminal case the burden or duty of calling any witnesses or

8   producing any evidence, because the burden of proving guilt

9   beyond a reasonable doubt is always with the government.

10          Now, as I told you at the outset, the evidence

11   in this case consists of the sworn testimony of the

12   witnesses regardless of who may have called them and all

13   exhibits received in evidence regardless of who may have

14   produced them and all facts which have been agreed to or

15   stipulated.  And you'll have the stipulations in the jury

16   room with you.

17          And as I told you, when the attorneys on both

18   sides stipulate or agree as to the existence of a fact, you

19   may accept the stipulation as evidence and regard that fact

20   as having been proved.  You're not required to do so,

21   however, since you're the sole judges of the facts.

22          Any proposed testimony or proposed exhibit to

23   which an objection was sustained by the Court and any

24   testimony or exhibit ordered stricken by the Court must be

25   entirely disregarded.  And as I told you also at the outset,

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    anything you may have seen or heard outside the courtroom is

2    not proper evidence and must be entirely disregarded.

3            And also questions, objections, statements, and

4    arguments of counsel are not evidence in the case.  You're

5    to base your verdict only on the evidence received in the

6    case.  In your consideration of the evidence received,

7    however, you're not limited to the bald statements of

8    witnesses or to the bald assertions in the exhibits.

9            In other words, you're not limited solely to

10   what you see and hear as witnesses testify or as the

11   exhibits are admitted.  You are permitted to draw from the

12   facts which you find have been proved such reasonable

13   inferences as you feel are justified in the light of your

14   experience and common sense.

15           Now, charts or summaries -- there was a chart

16   prepared by the government and shown to you during the trial

17   for the purpose of explaining facts that are allegedly

18   contained in books, records, and other documents which are

19   in evidence in the case.  Such facts or summaries are not

20   evidence in this case or proof of any fact.

21           If you find that these charts or summaries do

22   not correctly reflect the facts or figures shown by the

23   evidence in the case, the jury should disregard the charts

24   or summaries.  In other words, such charts or summaries are

25   used only as a matter of convenience for you.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          To the extent that you find that they are not,

2     in truth, summaries of facts or figures shown by the

3     evidence in the case, you can disregard them entirely.  As I

4     told you also at the outset, there are two types of evidence

5     from which you may find the facts of the case:  Direct

6     evidence and circumstantial evidence.

7          Direct evidence is the testimony of a person

8     who asserts or claims to have actual knowledge of a fact,

9     such as an eyewitness.

10          Circumstantial evidence is proof of a chain of

11     facts and circumstances indicating the existence of a fact.

12          The law makes no distinction between the weight

13     or value to be given to either direct or circumstantial

14     evidence, nor is a greater degree of certainty required of

15     circumstantial evidence than of direct evidence.  You should

16     weigh all the evidence in the case.

17          After weighing all the evidence, if you're not

18     convinced of the guilt of the defendant beyond a reasonable

19     doubt, you must find the defendant not guilty.

20          Inferences which you're permitted to draw are

21     simply deductions or conclusions which reason and common

22     sense lead the jury to draw from the evidence in the case.

23          Now, testimony and exhibits can be admitted

24     into evidence during the trial only if certain criteria or

25     standards are met.  It's the sworn duty of the attorney on

1   each side of the case to object.  When the other side offers

2   testimony or an exhibit which that attorney believes is not

3   properly admissible under the Rules of Law, only by raising

4   an objection can a lawyer request and obtain a ruling from

5   the Court on the admissibility of the evidence being offered

6   by the other side.

7          Now, you should not be influenced against an

8   attorney or his client because an attorney has made an

9   objection.  And do not attempt, moreover, to interpret my

10  rulings on the objection as somehow indicating how I think

11  you should decide this case.  I'm simply making a ruling on

12  a legal question.

13         By allowing the testimony or other evidence to

14  be introduced over the objection of an attorney, the Court

15  does not, unless expressly stated, indicate any opinion as

16  to the weight or effect of such evidence.  As stated before,

17  you as jurors are the sole judges of the credibility of all

18  the witnesses and the weight and effect of all the evidence.

19         On the other hand, where the Court sustains an

20  objection -- or where I have sustained an objection to a

21  question addressed, jurors must disregard the statement

22  entirely.  You may draw no inference from the wording of the

23  question or speculate as to what the witness would have said

24  had he or she been permitted to answer the question.

25         Now, during the course of the trial, I

1    occasionally asked questions of a witness.  Do not assume

2    that I hold any opinion as to the matters on which my

3    question may have related.  The Court may ask questions, and

4    I asked questions, to clarify matters, not to hurt one side

5    or the other.  Remember at all times that you as jurors are

6    the sole judges of the facts of the case.

7              As I've told you several times already, if

8    there's any difference between any reference as to matters

9    by the Court or by counsel to matters of testimony, if

10   there's any difference between that and your recollection,

11   then it's your recollection that controls during your

12   deliberations, not the statements of the Court or counsel.

13   You're the judges of the evidence in the case.

14             Now, you as jurors are the sole judges -- sole

15   and exclusive judges of the credibility of each of the

16   witnesses called to testify in this case, and only you

17   determine the importance or the weight that their testimony

18   deserves.

19             After making your assessment concerning the

20   credibility of a witness, you may decide to believe all that

21   witness' testimony, only a portion of it, or none of it.

22             In making your assessment, you should carefully

23   scrutinize all of the evidence or all of the testimony

24   given, the circumstances under which each witness has

25   testified, and every matter in evidence which tends to

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    show...a witness' intelligence, motive to falsify, state of

2    mind, appearance and manner while on the stand.

3              Consider the witness' ability to observe the

4    matters as to which he or she has testified and whether he

5    or she impresses you as having an accurate memory or

6    recollection of these matters.

7              Consider also any relation a witness may bear

8    to either side of the case, the manner in which each witness

9    might be affected by your verdict and the extent to which,

10   if at all, each witness is either supported or contradicted

11   by other evidence in the case.

12             Inconsistencies or discrepancies in the

13   testimony of a witness or between the testimony of different

14   witnesses may or may not cause you to disbelieve or

15   discredit such testimony.  Two or more persons witnessing an

16   incident or transaction may simply see or hear it

17   differently.  And innocent misrecollection, like failure of

18   recollection, is not an uncommon experience.

19             So in weighing the effect of a discrepancy,

20   always consider whether it pertains to a matter of

21   importance or to an insignificant detail.  And consider

22   whether the discrepancy results from innocent error or from

23   intentional falsehood.

24             After making your own judgment or assessment

25   concerning the believability of a witness, you may then

1    attach such importance or weight to that testimony, if any,

2    as you may feel it deserves.  You'll then be in a position

3    to decide whether the government has proven the charges

4    beyond a reasonable doubt.

5            The testimony of an alleged accomplice, someone

6    who said he or she participated with another person in the

7    commission of a crime, must be examined and weighed by the

8    jury with greater care than the testimony of a witness who

9    did not participate in the commission of a crime.  The fact

10   that an alleged accomplice has entered a plea of guilty to

11   the offense charged is not evidence of the guilt of any

12   other person, including the defendant.

13           The jury must determine whether the testimony

14   of the accomplice has been affected by self-interest or by

15   an agreement that he or she may have with the government or

16   by his or her own interest in the outcome of this case or by

17   prejudice against the defendant.

18           This is the same -- 16 is the same.

19           Any objection to eliminating it?

20           ATTORNEY NEWBY:  No objection from the

21   government, your Honor.

22           ATTORNEY IWEANOGE:  No objection, Judge.

23           THE COURT:  I'll go ahead and give it.

24           ATTORNEY IWEANOGE:  Yes.

25           THE COURT:  The testimony of a witness who is

1    testifying pursuant to a plea agreement under which he or

2    she has agreed to cooperate with the government in the hope

3    of obtaining a sentence reduction must be examined with

4    greater care than the testimony of someone who is appearing

5    in court without the need for such an agreement with the

6    government.

7         The jury must determine whether the testimony

8    of such a witness has been affected by self-interest or by

9    the agreement he or she has with the government or by his or

10   her own interest in the outcome of the case or by prejudice

11   against the defendant.

12        And the testimony of a witness may be

13   discredited or impeached by evidence showing that the

14   witness has been convicted of a felony; that is, a crime for

15   which a person may receive a prison sentence of more than a

16   year.

17        Prior conviction of a crime, that is, a felony,

18   is one of the circumstances that you may consider in

19   determining the credibility of a witness.  It is the sole

20   and exclusive right of the jury to determine the weight to

21   be given to any prior conviction as impeachment and the

22   weight to be given to the testimony of anyone who has

23   previously been convicted of a felony.

24        Now, the defendant in a criminal case has an

25   absolute right under our Constitution not to testify.  The

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1   fact that the defendant did not testify must not be

2   discussed or considered by the jury in any way when

3   deliberating and arriving at your verdict.  No inference of

4   any kind may be drawn from the fact that the defendant

5   decided to exercise his privilege under the Constitution and

6   did not testify.

7           And as I've told you before, the law never

8   imposes on a defendant in a criminal case the burden or duty

9   of calling any witnesses or producing any evidence.

10          Any need for 19?

11          ATTORNEY IWEANOGE:  No, Judge.

12          ATTORNEY NEWBY:  No, your Honor.

13          THE COURT:  Now, the indictment, which I will

14  have provided to you in the jury room, is but a formal

15  method used by the government to accuse a defendant.  The

16  indictment itself is not evidence of any kind against the

17  defendant.

18          The defendant is presumed to be innocent of the

19  crime charged.  Even though the indictment has been returned

20  against the defendant, the defendant began this trial with

21  absolutely no evidence against him.  The defendant has pled

22  not guilty and, therefore, denies he's guilty of the charge.

23          The defendant is not on trial for any acts or

24  conduct not specifically charged in the indictment, and you

25  are here to determine whether the government has proven the

1    guilt of the defendant for the crime charged in the

2    indictment beyond a reasonable doubt.  You're not called

3    upon to return a verdict as to the guilt or innocence of any

4    other person or persons.

5            So if the evidence in the case convinces you

6    beyond a reasonable doubt of the guilt of the defendant for

7    the crimes charged in the indictment, you should so find

8    even though you may believe that one or more other

9    unindicted persons are also guilty.  But if any reasonable

10   doubt remains in your mind after impartial consideration of

11   all the evidence in the case, it's your duty to find the

12   defendant not guilty.

13           And in the indictment, you will see the phrase

14   "on or about."  The indictment charges that the offenses

15   alleged were committed on or about a certain date.  Although

16   it's necessary for the government to prove beyond a

17   reasonable doubt that the offense was committed on a date

18   reasonably near the dates alleged in the indictment, it

19   isn't necessary for the government to prove that the

20   offenses were committed precisely on the dates alleged.

21           Now, the indictment charges that from at least

22   May 2007 and continuing until on or about August 1, 2008, in

23   the Eastern District of Virginia and elsewhere, Henry Obilo

24   willfully and knowingly combined, conspired, confederated,

25   and agreed with others to execute and attempt to execute a

1    scheme or artifice to defraud a financial institution and to

2    obtain monies, funds, and credit owned by and under the

3    custody and control of a financial institution by means of

4    materially false and fraudulent pretenses and

5    representations, in violation of Title 18, Section 1349.

6           Specifically, the indictment alleges that it

7    was an object of the conspiracy to cause financial

8    institutions to transfer funds from account holders'

9    accounts to accounts controlled by co-conspirators without

10    the authorization or approval of the account holders.  And

11    the indictment also charges that in furtherance of the

12    conspiracy and to affect the aims and objectives thereof, at

13    least one co-conspirator acted in furtherance of the

14    conspiracy in the Eastern District of Virginia and

15    elsewhere.

16           Now, Section 1349 of Title 18 provides, in

17    pertinent part, as follows:  Any person who attempts or

18    conspires to commit any offense under this chapter shall be

19    subject to the same penalties as those proscribed for the

20    offenses, the commission of which was the object of the

21    attempt or conspiracy.

22           And Section 1344, which is under the same

23    chapter as Section 1349, provides that whoever knowingly

24    executes or attempts to execute a scheme or artifice to

25    defraud a financial institution or to obtain any of the

1   monies, funds, credits, assets, securities, or other

2   property owned by or under the custody or control of a

3   financial institution by means of false or fraudulent

4   pretenses, representations, or promises shall be guilty of

5   an offense against the United States.

6          So in order to sustain its burden of proof for

7   the crime of conspiracy to commit bank fraud, in violation

8   of Title 18, Section 1349, the government must prove the

9   following essential elements beyond a reasonable doubt:

10         First, that the conspiracy, agreement, or

11  understanding, as described in the indictment, was formed or

12  reached or entered into by two or more persons.

13         Second, that at some time during the conspiracy

14  or life of conspiracy, agreement, or understanding the

15  defendant new the purpose of the agreement.

16         And then, with that knowledge, the defendant

17  deliberately joined the conspiracy, agreement, or

18  understanding.

19         Now, a criminal conspiracy is an agreement or a

20  mutual understanding knowingly made or knowingly entered

21  into by at least two people to violate the law by some joint

22  or common plan or course of action.  A conspiracy in a very

23  true sense is a partnership in crime.  A conspiracy or

24  agreement to violate the law, like any other kind of

25  agreement or understanding, need not be formal or written or

1     even expressed directly in every detail.

2              The government must prove that the defendant

3     and at least one other person knowingly and deliberately

4     arrived at an agreement or understanding that they and

5     perhaps others would violate some laws by means of a common

6     plan or course of action as alleged in the indictment.  It

7     is proof of this conscious understanding and deliberate

8     agreement by the alleged members that should be central to

9     your consideration of the charge of conspiracy.

10             To prove the existence of a conspiracy or an

11    illegal agreement, the government is not required to produce

12    a written contract between the parties or even produce

13    evidence of an express oral agreement spelling out all of

14    the details of the understanding.

15             To prove that a conspiracy existed, moreover,

16    the government is not required to show that all of the

17    people named in the indictment as members of the conspiracy

18    were, in fact, parties to the agreement or that all of the

19    members of the conspiracy were named and are charged or that

20    all of the people whom the evidence shows were actually

21    members of a conspiracy agreed to all of the means or

22    methods set out in the indictment.

23             Unless the government proves beyond a

24    reasonable doubt that a conspiracy, as just explained,

25    actually existed, you must acquit the defendant.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          Now, before the jury may find that the

2     defendant or any other person became a member of the

3     conspiracy as charged in the indictment, the evidence in the

4     case must show beyond a reasonable doubt that the defendant

5     knew the purpose or goal of the agreement or understanding

6     and deliberately entered into the agreement intending in

7     some way to accomplish its goal or purpose by this common

8     plan or joint action.

9          If the evidence establishes beyond a reasonable

10    doubt that the defendant knowingly and deliberately entered

11    into the agreement to commit bank fraud, as alleged in the

12    indictment, the fact that the defendant did not join the

13    agreement or understanding at its beginning or did not know

14    all the details of the agreement or did not participate in

15    each act of the agreement or did not play a major role in

16    accomplishing the unlawful goal is not important to your

17    decision regarding membership with the conspiracy.

18          Merely associating with others and discussing

19    common goals, mere similarity of conduct between or amongst

20    such person, and merely being present at the place where a

21    crime takes place or is discussed or even knowing about the

22    criminal conduct does not of itself make someone a member of

23    the conspiracy or a conspirator.

24          The Court further instructs the jury that if

25    you find the conspiracy charged in the indictment existed,

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    it's not essential that the government prove that it began

2    or ended on a specific date.  It is sufficient if you find

3    that the conspiracy was formed and existed for some time

4    within or around the period alleged in the indictment.

5            Now, evidence has been received in this case

6    that certain persons who were alleged to be co-conspirators

7    have done or said things during the existence or life of the

8    conspiracy in order to further or advance its goal.

9            Such acts and statements of these other

10   individuals may be considered by you in determining whether

11   or not the government has proven the charge in the

12   indictment against the defendant.

13           Since these acts may have been performed and

14   these statements may have been made outside the presence of

15   the defendant and even done without the defendant's

16   knowledge, these acts or statements should be examined with

17   particular care by you before considering them against the

18   defendant who did not participate in the particular act or

19   make a particular statement.

20           Now, the government is not required to prove

21   that the parties or members of the alleged agreement or

22   conspiracy were successful in achieving any or all of the

23   objects of the agreement of the conspiracy.

24           Now, the phrase "scheme" or "any scheme or

25   artifice for obtaining any money or property" means any

1    deliberate plan of action or course of conduct by which

2    someone intends to deceive or to cheat another or by which

3    someone intends to deprive another of something of value.

4         The term "false or fraudulent pretenses,

5    representations, or promises" means a statement or an

6    assertion which concerns a material fact or important fact

7    or a material or important aspect of the matter in question

8    and that was either known to be untrue at the time it was

9    made or used or that it was made or used with reckless

10   indifference as to whether it was, in fact, true or false

11   and made or used with the intent to defraud.

12        A material fact is a fact that would be of

13   importance to a reasonable person in making a decision about

14   a particular matter or transaction.

15        And the term "false or fraudulent pretenses or

16   representations or promises" includes actual direct false

17   statements as well as half-truths and includes the knowing

18   concealment of facts that are material or important to the

19   matter in question and that were made or used with the

20   intent to defraud.

21        To act with the intent to defraud means to act

22   knowingly and with the intention or the purpose to deceive

23   or cheat.  An attempt to defraud is accompanied ordinarily

24   by a desire or purpose to bring about some gain or benefit

25   to one's self or some other person by a desire or purpose to

1    cause some loss in some person.

2              The term "financial institution," as used in

3    these instructions, means a bank organized or operating

4    under the laws of the United States, a bank with deposits

5    insured by the Federal Deposit Insurance Corporation, or a

6    credit union with accounts insured by the National Credit

7    Union Insurance Fund.

8              Now, the term "willfully," as used in these

9    instructions to describe the alleged state of mind of the

10   defendant, means that he knowingly performed acts or failed

11   to act deliberately and intentionally as contrasted with

12   accidentally, carelessly, or unintentionally.

13             And "knowingly," as used in these instructions

14   to describe the alleged state of mind of the defendant,

15   means that he was conscious and aware of his actions or

16   omissions, realized what he was doing and what was happening

17   around him, and did not act because of ignorance, mistake,

18   or accident.

19             Now, intent and motive are different concepts

20   and should never be confused.  Motive is what prompts a

21   person to act or fail to act.  Intent refers only to the

22   state of mind with which the act is done or omitted.

23   Personal advancement and financial gain, for example, are

24   two well-recognized motives for human conduct.

25             These praiseworthy motives, however, may prompt

1    one person to voluntary acts of good while prompting another

2    person to voluntary acts of crime.  Good motive alone is

3    never a defense where the act done or omitted is a crime.

4              The motive of the defendant is, therefore,

5    immaterial except insofar as evidence of motive may aid in

6    the determination  of the state of mind or the intent of the

7    defendant.  And the intent of a person or the knowledge that

8    a person possesses at any given time may not ordinarily be

9    proved directly because there is no way of directly

10   scrutinizing the workings of the human mind.

11             In determining the issue of what a person knew

12   or what a person intended at a particular time, you may

13   consider any statements made or acts done by that person and

14   any or all other facts and circumstances received in

15   evidence that may aid you in your determination of that

16   person's knowledge or intent.

17             You may infer, but you're certainly not

18   required to infer, that a person intends the natural and

19   probable consequences of acts knowingly done or knowingly

20   omitted.  It's entirely up to you, however, to decide what

21   facts to find from the evidence received in the case.

22             Now, the indictment alleges a number of

23   separate means and methods.

24             I believe these are Paragraphs 7 through 16; is

25   that correct?

1          ATTORNEY IWEANOGE:  Yes, Judge.

2          MR. NEWBY:  Yes, your Honor.

3          THE COURT:  You'll have that.

4          The government is not required to prove all the

5   means or methods alleged in the indictment.  Each juror must

6   agree with each other juror, however, that the same means or

7   method was, in fact, engaged in or employed in committing

8   the crime charged in the indictment.

9          The jury need not unanimously agree on each

10  means and method, but in order to convict must unanimously

11  agree upon at least one means or method as one -- in fact,

12  it need not be engaged in by the defendant, but by a member

13  of the conspiracy.

14          Is that right?

15          ATTORNEY NEWBY:  Yes, your Honor.

16          THE COURT:  Mr. Iweanoge?

17          ATTORNEY IWEANOGE:  Judge, I believe by a

18  member.

19          THE COURT:  By a member of the conspiracy?

20          ATTORNEY IWEANOGE:  By a member of the

21  conspiracy, yes, Judge.

22          THE COURT:  Unless the government has proven

23  the same means or method to each of you beyond a reasonable

24  doubt, you must acquit the defendant of the crime charged in

25  the indictment.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          The indictment also charges that some act in

2     furtherance of the alleged conspiracy occurred in the

3     Eastern District of Virginia.  There is no requirement that

4     all aspects of the alleged conspiracy take place or took

5     place in the Eastern District of Virginia.

6          But for you to return a guilty verdict, you

7     must find that at least one co-conspirator committed at

8     least one act in furtherance of the conspiracy in the

9     Eastern District of Virginia.

10          Yet, unlike the elements of the offense that I

11     have just described, this fact only needs to be proved by a

12     preponderance of the evidence.  This means that the

13     government only has to convince you that it is more likely

14     than not that some act in furtherance of the conspiracy took

15     place in the Eastern District of Virginia.

16          Remember, however, that the government must

17     prove all of the other elements of the charged conspiracy

18     that I have previously described beyond a reasonable doubt.

19          Now, you must not base your verdict in any way

20     upon sympathy, bias, guesswork, or speculation.  Your

21     verdict must be based solely on the evidence and the Court's

22     instructions.

23          Now, your verdict must represent the considered

24     judgment of each juror.  That means that in order to return

25     a verdict, it is necessary that each juror agree thereto.

1    In other words, your verdict must be unanimous.  But it is

2    your duty as jurors to consult with one another in your

3    deliberations and to deliberate with a view to reaching an

4    agreement, if you can do so, without violence to your

5    individual judgment.  You must each decide the case for

6    yourself but do so only after an impartial consideration of

7    all the evidence in the case with your fellow jurors.

8              And in the course of your deliberations, do not

9    hesitate to reexamine your own views and to change your

10   opinion if convinced it is erroneous, but do not surrender

11   your honest conviction as to the weight or effect of the

12   evidence merely because of the opinion of your fellow jurors

13   or for the mere purpose of returning a verdict.

14             Remember at all times you're not partisans.

15   You're judges of the facts.  Your sole interest is to seek

16   the truth from the evidence in the case.  The punishment

17   provided by law for the offense charged in the indictment is

18   a matter exclusively within the province of the Court and

19   should never be considered by the jury in any way in

20   arriving at an impartial verdict as to the offense charged.

21             Now, when you retire to the jury room, you'll

22   select one of your number to act as your foreperson.  That

23   person will preside over your deliberations and will be your

24   spokesperson here in court.

25             A form of the verdict has been prepared for

1   your convenience.

2           Mr. Wood, would you show this form to counsel

3   quickly.

4           It's a one-page document.  At the top of the

5   document it has the style of the case, and then immediately

6   below that it has "We, the jury, find."  When I have it

7   back, I'll describe it further to you.  But it says, "We,

8   the jury, find," and there's a shorthand description of the

9   offense, which I believe will be conspiracy to commit bank

10  fraud.  "We, the jury, find the defendant Henry Obilo, with

11  respect to Count 1, conspiracy to commit bank fraud," and

12  then you have a place to check either "not guilty" or

13  "guilty," as you may find.  And then your foreperson will

14  sign it.

15          Now, you'll take this form to the jury room.

16  When you've reached your unanimous agreement as to your

17  verdict, you will have the foreperson fill it in, date it,

18  and sign it setting forth the verdict on which you

19  unanimously agreed, and then you'll return with your verdict

20  to the courtroom.

21          Now, it's proper to add that nothing -- and

22  it's a caution.  Nothing said in these instructions and

23  nothing in any form of the verdict prepared for your

24  convenience is meant to suggest or to convey in any way or

25  manner any intimation as to what verdict I think you should

1    find.  What the verdict shall be, as I told you at the

2    outset, is your sole and exclusive duty and responsibility.

3            Now, if it becomes necessary during your

4    deliberations to communicate with the Court, you may send a

5    note signed by the foreperson or by one or more jury member.

6    Put the date and sign it.

7            And no member of the jury should ever attempt

8    to communicate with the Court by any means other than by a

9    signed writing.  And the Court will never communicate with

10   any member of the jury on any subject touching the merits of

11   the case other than here in open court or in writing.

12           Of course, I may communicate with you on other

13   matters, such as how long you wish to deliberate and that

14   sort of thing without doing so in writing and here in open

15   court.

16           And you'll note from the oath about to be taken

17   by the court security officer, Mr. Wood, that he, too, as

18   well as other all persons, are forbidden to communicate in

19   any way or manner with any member of the jury on any subject

20   touching the merits of the case.

21           Bear in mind that you're never to reveal to any

22   person, not even to the Court, how the jury stands

23   numerically or otherwise on the issues presented before you

24   or the questions before you until after you've reached your

25   unanimous verdict.

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1                    All right.  You may administer the oath to

2      Mr. Wood.

3                    (Oath administered.)

4                    THE COURT:  All right.  Let me have counsel one

5      final time very quickly at the bench.

6                    (Sidebar conference held as follows:)

7                    THE COURT:  All right.  Let me inquire of

8      counsel for the government.

9                    Has the Court fully and fairly instructed the

10     jury in accordance with the instructions conference?

11                    ATTORNEY EISINGER:  Yes, your Honor.

12                    THE COURT:  Mr. Iweanoge?

13                    ATTORNEY IWEANOGE:  Yes, Judge.

14                    THE COURT:  Okay.  I'm going now to allow the

15     jury to retire and deliberate.  Remain nearby in case we

16     have a question.  I'm going to tell the jury they may

17     deliberate as long or as little as they like, and I will

18     inquire around 5:00 or 5:30 how late they wish to do so.  I

19     will do that through Mr. Wood without disturbing them.

20                    Let's proceed.

21                    ATTORNEY IWEANOGE:  Yes, Judge.

22                    (End of sidebar conference, open court as

23     follows:)

24                    THE COURT:  All right.  Ladies and gentlemen, I

25     told you at the outset that the moment of deliberations is a

1   precise one.  It's now at hand.

2           You will not hear the familiar litany of

3   refraining from discussing the matter among yourselves

4   because the course of time has arrived when you must do so,

5   but it's not quite here yet.

6           In a moment, I'll excuse you to go into the

7   jury room.  Mr. Wood will then collect all the exhibits and

8   the jury verdict form, the indictment, which you remember is

9   not evidence -- the indictment, the jury verdict form, the

10  tape recorder, and all the exhibits.

11          Once Mr. Wood has brought all of these into the

12  jury room and he has left with the door closing, then you

13  may begin your deliberations.  Until then, you may not

14  discuss the matter at all.

15          Now, you may deliberate as long or as little as

16  you would like.  I will accommodate your schedules in that

17  regard.  You may take breaks when you wish.  If any of you

18  need to use the facilities, you must cease your

19  deliberations.  You may not deliberate unless all 12 of you

20  are in the jury room and the door is closed.

21          All right.  You may follow Mr. Wood into the

22  jury room at this time.  You may keep your books.

23          (Jury excused to deliberate at 4:05 p.m.)

24          THE COURT:  All right.  I want counsel to come

25  to the clerk's table and see -- ensure that the exhibits are

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1   properly assembled.  And let's get things to the jury room

2   as quickly as possible.  And I'll have the deputy clerk

3   advise the Court in chambers as soon as that's done.

4           Mr. Wood, you can check with them about 5:00 to

5   see if they want to go later.

6           THE MARSHAL:  They want to leave at 5:00.

7           THE COURT:  Then we have it already.

8           Court stands in recess.

9           Let's get that material in as quickly as

10  possible.

11          (Court recessed at 4:02 p.m.)

12          (Court called to order at 4:17 p.m.)

13          THE COURT:  Did you find the exhibit?

14          ATTORNEY EISINGER:  I'm looking for it right

15  now, your Honor.  We're trying to determine if the call from

16  State Department Federal Credit Union was on the SpoofCard

17  disk or if it's somewhere else.

18          THE COURT:  This is a little later to be doing

19  that.

20          ATTORNEY EISINGER:  We believe it was on a

21  separate disk.  When we looked in the binder, it wasn't in

22  the binder.

23          THE COURT:  I know.  It's a little later.  You

24  all ought to have your exhibits ready to go.

25          Any objection, Mr. Iweanoge, to having the jury

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    begin its deliberations without that disk?

2            ATTORNEY IWEANOGE:  No, Judge.

3            THE COURT:  All right.  Let's take everything

4    in to the jury, and let's move quickly to get that disk.  If

5    you find it, then, Mr. Wood, what we will do is -- well,

6    it's already only 45 minutes.  They want to be released

7    sharply at 5:00.  But if we find it, we'll insert it in the

8    book.  Perhaps we should tell them that one disk is missing.

9            Is there any reason not to?

10           ATTORNEY EISINGER:  That's fine.

11           ATTORNEY IWEANOGE:  That's fine except we're

12   suspecting that it may be part of 19.

13           ATTORNEY EISINGER:  We'll find it.

14           ATTORNEY IWEANOGE:  Okay.

15           THE COURT:  All right.  We'll take it back to

16   them.  And at the end of the day, I'll tell them there's one

17   disk missing.  We won't tell them that now.  I'll tell them

18   that.

19           Let's get it back to them as quickly as

20   possible so they can commence their deliberations.

21           We have the tape recorder, the jury verdict

22   form, and the redacted indictment; is that right.

23           THE MARSHAL:  Yes, sir.

24           THE COURT:  All right.  Thank you.

25           Court stands in recess.

1          (Court recessed at 4:19 p.m.)

2          (Court called to order at 4:35 p.m.)

3          THE COURT:  All right.  We're back in session.

4          Mr. Obilo is not present.  Neither is

5  Mr. Eisinger.

6          The record should reflect that the parties have

7  found on Exhibit 19 all of the various tracks.  I think the

8  right way for this to happen is for -- for this to be

9  labeled as Exhibit 31, and then Mr. Wood will take this in

10  with the two disks.

11          The two disks are Exhibit 19?

12          ATTORNEY NEWBY:  Yes.

13          THE COURT:  CD 1 and CD 2?

14          ATTORNEY NEWBY:  That's correct.

15          THE COURT:  Are they marked CD 1 and CD 2?

16          ATTORNEY NEWBY:  Yes.

17          THE COURT:  Well, then, he can take this in.

18  This will be marked as Exhibit 31.  He can take this in with

19  that and hand it to them, and I'll explain it further at

20  5:00.

21          Court stands in recess.

22          Mr. Iweanoge, maybe you can tell your client

23  what occurred and he can waive.  I didn't really do anything

24  other than give instructions to the court security officer.

25          ATTORNEY IWEANOGE:  For the record, I will

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1    waive his presence for this part of the proceedings.

2                    (Court recessed at 4:40 p.m.)

3                    (Court called to order at 5:03 p.m.)

4                    THE COURT:  All right.  You may bring the jury

5    in.

6                    THE MARSHAL:  They said they need five more

7    minutes.

8                    THE COURT:  I will take a five-minute recess.

9    They have indicated they need five minutes.  Court stands in

10   recess.

11                   (Court recessed at 5:03 p.m.)

12                   (Court called to order at 5:15 p.m.)

13                   THE COURT:  The jury has advised Mr. Wood, the

14   court security officer, that they wish to go home and return

15   in the morning.

16                   Did you have a problem in the morning,

17   Mr. Iweanoge?

18                   ATTORNEY IWEANOGE:  Yes.  I will not be able to

19   come back here until about 10:30 in the morning.

20                   THE COURT:  Well, they will want to convene

21   earlier.  So I will do this.

22                   ATTORNEY IWEANOGE:  Yes, Judge.

23                   THE COURT:  If you will waive appearance and

24   the government will not be here --

25                   ATTORNEY IWEANOGE:  Yes, Judge.

1          THE COURT:  -- I will convene the jury without

2    counsel present or the parties.

3          Any objection to that?

4          ATTORNEY IWEANOGE:  No, Judge.

5          ATTORNEY EISINGER:  No objection, your Honor.

6          THE COURT:  And all I will do at that time will

7    be to convene the jury, call the roll, permit them to

8    deliberate.

9          Now, if we have a question before you're back

10   here at 10:30, you need to give us a telephone number where

11   you can be reached.

12         ATTORNEY IWEANOGE:  Yes, Judge.  I will give my

13   cell phone number to Madam Clerk.

14         THE COURT:  I'm making this accommodation,

15   Mr. Iweanoge, because it has something to do with your

16   child's medical need.

17         ATTORNEY IWEANOGE:  Yes, Judge.

18         THE COURT:  Well, that's important.  You need

19   to be there.  We're going to accommodate you.

20         ATTORNEY IWEANOGE:  Thank you, Judge.

21         THE COURT:  All right.  Bring the jury in.

22         ATTORNEY IWEANOGE:  For the record, we're

23   trying to move it.  But I haven't had any feedback from my

24   wife.

25         THE COURT:  Don't worry about it.  You just be

1   there.  You'll have to come back quickly if we need you.

2                    Bring the jury in.

3                    (Jury impaneled at 5:16 p.m.)

4                    THE COURT:  All right.  You may be seated.

5                    Ladies and gentlemen, Mr. Wood has advised me

6   that you wish to be released and return in the morning.

7   That's fine.  We'll do so.

8                    How early would you like to commence in the

9   morning?  Did you discuss that?

10                   A JUROR:  As early as possible.

11                   THE COURT:  Well, all right.  9:00 o'clock

12  would be appropriate; at 9:00 o'clock.

13                   Now, when I reconvene you in the morning, there

14  won't be lawyers or anyone else in the courtroom, but just

15  myself and you all and the court family.  We will take the

16  roll and permit you to continue to deliberate.  But we won't

17  reconvene all of the government, defense counsel, and the

18  defendant.

19                   Now, you also have seen Exhibit 31, I think.

20  That tells you where on the two disks that are Exhibit 19

21  are the various conversations if you want to use it.  You're

22  not required to use it.  It's there.  It's admitted into

23  evidence.

24                   All right.  Ladies and gentlemen, again, when

25  you get home this evening, remember to resist the temptation

1    to discuss the matter with anyone.  You will have that

2    temptation because people will ask you questions.  Don't

3    look up anything in books.  Don't talk about the case.  Put

4    it out of your mind.

5              I alone, together with Mr. Rodriguez and

6    Mr. Wood and Ms. O'Connell, will see you in the morning, but

7    no one else will.  They will all be away.  And we'll see you

8    in the morning at 9:00.  I will reconvene you and permit you

9    to retire and deliberate on your verdict.

10             Thank you for your work today.  You may follow

11   Mr. Wood out.  Give him your books.  He'll put them in the

12   room and lock the door.

13             (Jury excused at 5:19 p.m.)

14             THE COURT:  All right.  Anything further to be

15   accomplished today?

16             ATTORNEY IWEANOGE:  Judge, so that I put it on

17   the record, when Mr. Obilo came back, I advised him what

18   happened with respect to Exhibit 31.  And he okayed that I

19   waived his presence, just so that the record is clear.

20             THE COURT:  Again, tomorrow morning I will

21   convene the jury.  No Government lawyers will be here or

22   Government representatives will be here, and neither you nor

23   Mr. Obilo will be here.  I'll simply take the roll to ensure

24   everyone's presence and permit them to retire and continue

25   to deliberate.  If there's a questions or anything,

1     Ms. O'Connell needs your cells so we can reach you promptly.

2              ATTORNEY IWEANOGE:  Absolutely.  If my wife was

3     able to move it --

4              THE COURT:  If she hasn't, don't worry about

5     it.  That's important to get that done.

6              ATTORNEY IWEANOGE:  Yes, Judge.

7              THE COURT:  Anything further today for the

8     government?

9              ATTORNEY EISINGER:  No, your Honor.

10             THE COURT:  Court stands in recess until

11    tomorrow morning at 9:00.

12             (Court recessed at 5:20 p.m.)

13

14                                 ---

15

16

17

18

19

20

21

22

23

24

25

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

CERTIFICATE OF REPORTER

I, MICHAEL A. RODRIQUEZ, an Official Court Reporter for the United States District Court, in the Eastern District of Virginia, Alexandria Division, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had and evidence adduced upon the jury trial in the case of UNITED STATES OF AMERICA v. HENRY OBILO.

I further certify that I was authorized and did report by stenotype the proceedings and evidence in said jury trial, and that the foregoing pages, numbered 1 to 230, inclusive, constitute the official transcript of said proceedings, Volume 2, as taken from my machine shorthand notes.

IN WITNESS WHEREOF, I have hereto subscribed my name this _____ day of _____, 2010.

_____
Michael A. Rodriquez, RPR/CM/RMR
Official Court Reporter

MICHAEL A. RODRIQUEZ, RPR/CM/RMR